## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| NO SPILL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| SCEPTER CORPORATION, and | ) | **JURY TRIAL DEMANDED** |
| SCEPTER MANUFACTURING LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff No Spill Inc. ("No Spill"), for its Complaint against Defendants Scepter Corporation ("Scepter") and Scepter Manufacturing LLC ("Scepter Manufacturing"), alleges as follows:

### Parties

1.      No Spill is a corporation organized and existing under the laws of the State of Kansas with its principal place of business located at 9808 Pflumm Road, Lenexa, KS 66208.

2.      On information and belief, Scepter is a corporation organized and existing under the laws of Canada and has a principal place of business at 170 Midwest Road, Scarborough, ON, M1P 3A9, Canada.

**3.**      On information and belief, Scepter Manufacturing is a limited liability company organized and existing under the laws of the State of Delaware and has a principal place of business at 404 26th Avenue NW, Miami, Oklahoma  74354.

### Jurisdiction and Venue

4.      This is an action for patent infringement under 35 U.S.C. § 271 *et seq*., breach of contract, unfair competition under the Lanham Act, and unfair competition under the common

149420776.1

law of Kansas.  The Court has subject matter jurisdiction over Counts I and II for patent infringement under 28 U.S.C. §§ 1331 and 1338(a), over Counts III and IV for breach of contract under 28 U.S.C. §§ 1332 in that the parties are diverse and the amount in controversy exceeds $75,000, over Count V for unfair competition under the Lanham Act under 28 U.S.C. § 1338(b) and under 28 U.S.C. §§ 1332 in that the parties are diverse and the amount in controversy exceeds $75,000, and over Count VI for unfair competition under the common law of Kansas under 28 U.S.C. § 1367 and under 28 U.S.C. §§ 1332 in that the parties are diverse and the amount in controversy exceeds $75,000.

5.      The Court has personal jurisdiction over Scepter, an alien, because Scepter has transacted business and/or committed tortious acts and/or participated in, directed, controlled and actively aided and abetted the commission of tortious acts within the State of Kansas out of which this action arises.  Kan. Stat. Ann. § 60-308.

6.      In addition, the Court has personal jurisdiction over Scepter pursuant to F.R.C.P. 4(k)(2).

7.      The Court has personal jurisdiction over Scepter Manufacturing because Scepter Manufacturing has transacted business, entered into a contract, and committed tortious acts in this judicial district out of which this action arises.  Kan. Stat. Ann. § 60-308.

8.      In addition, the Court has personal jurisdiction over Scepter Manufacturing because Scepter Manufacturing consented to personal jurisdiction in this judicial district.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) & (c) and § 1400(b) in that a substantial part of the events giving rise to the claim occurred here, and both Scepter and Scepter Manufacturing are individually subject to personal jurisdiction here.

10.     Further, Scepter is a foreign corporation subject to venue here under F.R.C.P. 4(k)(2).

**Patents-In-Suit**

11.     On November 3, 2015, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,174,075 (the "'075 patent"), entitled "Explosion Inhibiting Portable Fuel Container and Method of Inhibiting Explosions," to Thomas M. Cray.  A true and accurate copy of the '075 patent is attached as Exhibit A.

12.     Plaintiff No Spill is the owner by assignment of the '075 patent, including all rights to sue for past, present and future infringement of the '075 patent.

13.     On July 24, 2018, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,029,132 (the "'132 patent"), entitled "Explosion Inhibiting Portable Fuel Container and Method of Inhibiting Explosions," to Thomas M. Cray.  A true and accurate copy of the '132 patent is attached as Exhibit B.

14.     Plaintiff No Spill is the owner by assignment of the '132 patent, including all rights to sue for past, present, and future infringement of the '132 patent.

15.     The '075 patent contains two independent claims and nineteen dependent claims.

16.     Independent claim 1 of the '075 patent follows:

Claim 1. A fuel container comprising:

a hollow tank body defining a fuel-receiving chamber and a main container opening for permitting flow of a liquid fuel into and out of the fuel-receiving chamber;

a fuel dispensing assembly coupled to the tank body proximate the main container opening and configured to dispense the liquid fuel from the container; and

3

a fuel retention structure located proximate the main container opening and extending generally downwardly into the fuel-receiving chamber,

wherein the fuel retention structure comprises a plurality of perforations through which the liquid fuel must flow in order to dispense the liquid fuel from the container,

wherein the fuel retention structure is configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom,

wherein the retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion.

17.    The '132 patent contains one independent claim and seventeen dependent claims.

18.    Independent claim 1 of the '132 patent follows:

Claim 1. A fuel container comprising:

a hollow tank body defining a fuel-receiving chamber and a main container opening for permitting flow of a liquid fuel into and out of the fuel-receiving chamber;

a fuel dispensing assembly coupled to the tank body proximate the main container opening and configured to dispense the liquid fuel from the container; and

a flash suppressor located proximate the main container opening and extending at least 2 inches downwardly into the fuel-receiving chamber,

wherein the flash suppressor comprises a plurality of perforations through which the liquid fuel must flow in order to dispense the liquid fuel from the container,

wherein the flash suppressor is formed of synthetic resin material,

wherein the flash suppressor has an internal volume of at least 2 cubic inches,

wherein the flash suppressor is at least 10 percent open,

149420776.1

wherein the average open area of the perforations is at least 0.001 and not more than 0.05 square inches and wherein the flash suppressor is not more than 80 percent open; and wherein the total number of perforations is at least 100 and not more than 10,000 and wherein the average length of the perforations is at least 0.02 inches.

## Factual Background

19.    Portable fuel containers, such as gasoline cans, have traditionally been constructed of metal or synthetic resins with an opening and attached spout to permit stored fuel or gasoline to be dispensed for use.

20.    Improper use of traditional fuel containers near open sources of ignition can cause a combustion within the fuel container.

21.    When fuel, such as gasoline vapor, and air are present and their mixture is within a given combustible range, combustion will occur if the mixture is ignited.

22.    If the mixture of fuel and air is either too lean (*i.e.*, not enough fuel is present) or there is too much fuel present (*i.e.*, too rich) combustion cannot occur.

23.    Scepter Manufacturing manufactures and sells within the United States plastic gasoline containers that employ a flash suppressor positioned through the opening of the gasoline container ("Infringing Fuel Container").

24.    On information and belief, Scepter has directed and controlled, and continues to direct and control, Scepter Manufacturing to manufacture and sell within the United States plastic gasoline containers that employ a flash suppressor positioned through the opening of the gasoline container, *i.e.*, Infringing Fuel Containers.

25.    Although the Infringing Fuel Containers are made in different sizes with different capacities, they each use the same flash suppressor component.

5

26.    A representative example of an Infringing Fuel Container is shown in the pictures below (note: the white flash suppressor has been partially removed and extended from the gas can to show its location– in use it is pressed into the gas can and a nozzle (not shown) is threaded onto the can to dispense gasoline).

 

27.    The Infringing Fuel Containers include a label affixed thereto that bears the word "SCEPTER" in all capital letters.

28.    The bodies of the Infringing Fuel Containers include raised letters molded into two of the sides thereof and spell the word "SCEPTER" in all capital letters.

29.    The flash suppressor in the Infringing Fuel Containers (shown below) is constructed of resin and comprises a plurality of perforations through which the liquid fuel must flow in order to dispense the liquid fuel from the containers.

 

6

30. The flash suppressor in the Infringing Fuel Containers has an internal volume of at least 2 cubic inches, and is at least 10 percent open and not more than 80 percent open.

31. The flash suppressor in the Infringing Fuel Containers has perforations with an average open area of at least 0.001 square inches and not more than 0.05 square inches, has at least 100 perforations and not more than 10,000 perforations, and has perforations with an average length of at least 0.02 inches.

32. The flash suppressor permits the flow of liquid fuel into the Infringing Fuel Container.

33. The flash suppressor permits the flow of liquid fuel there-through and out of the Infringing Fuel Container to dispense the fuel.

34. The flash suppressor retains a quantity of the liquid fuel in the Infringing Fuel Container when the Infringing Fuel Container is tipped or inverted to dispense the liquid fuel therefrom.

35. This retained quantity of fuel is sufficient to provide a fuel-air mixture proximate to the main opening in the Infringing Fuel Container that is too rich to support combustion.

36. Since at least as early as the year 1989, No Spill and its predecessors have continuously and substantially advertised, marketed and sold gas cans with a distinctive plastic nozzle assembly having a tapered spout ("No Spill Trade Dress") throughout the United States.

37. The configuration and visual design of the No Spill Trade Dress provides a distinctive and non-functional appearance that the consuming public has come to associate with the good will and high quality of No Spill's products.

149420776.1

38.     The configuration and visual design of the No Spill Trade Dress has created and continues to create a strong favorable impression in the minds of consumers as an indicator of the source of No Spill's products.

39.     Due to its distinctive appearance as well as its substantial and continuous use by No Spill, the No Spill Trade Dress has acquired secondary meaning whereby the consuming public associates No Spill's trade dress with the good will and high quality of No Spill and its products.

40.     After selling gas cans for decades, Scepter Manufacturing has recently begun to manufacture and sell a gas can and nozzle assembly having an appearance and trade dress ("Scepter's Infringing Trade Dress") confusingly similar to the No Spill Trade Dress.

41.     Representative examples of the No Spill Trade Dress (left) and Scepter's Infringing Trade Dress (right), which are being sold in Kansas, are shown in the photo below:



42.     The gas cans sold with the No Spill Trade Dress and Scepter's Infringing Trade Dress both have an open handle formed into the top of the fuel storage container of the gas cans.

8

43.     The gas cans sold with the No Spill Trade Dress and Scepter's Infringing Trade Dress both provide a nozzle assembly installed on the top of the gas can adjacent the open handle.

44.     The nozzle assembly with the No Spill Trade Dress and Scepter's Infringing Trade Dress both have a tapered spout projecting horizontally.

45.     The No Spill Trade Dress and Scepter's Infringing Trade Dress both connect the nozzle to the gas can using a rotatable collar having spaced, elongated grips around the periphery of the collar.

46.     The appearance of the elongated grips around the collar creates a favorable ornamental impression.

47.     The No Spill Trade Dress and Scepter's Infringing Trade Dress both have a decorative fin on the underside of the spout.

48.     The No Spill Trade Dress and Scepter's Infringing Trade Dress each have a cap for covering the end of the spout.  The cap is tethered to the spout with a flexible plastic strap secured at one end to the underside of the spout near the back of the decorative fin.

49.     The No Spill Trade Dress and Scepter's Infringing Trade Dress are commonly marketed and sold wherein the gas can is made from red plastic and the nozzle is made from black plastic.

50.     On information and belief, Scepter has participated in, directed and controlled, and continues to participate in, direct and control, Scepter Manufacturing to manufacture, advertise, market and sell within the United States plastic gas cans and nozzles that tortiously incorporate the No Spill Trade Dress in knowing violation of No Spill's trade dress and common law rights.

9

51.     The gas cans and nozzles that incorporate Scepter's Infringing Trade Dress include a label affixed thereto that bears the word "SCEPTER" in all capital letters.

52.     The bodies of the gas cans that are used with nozzles and incorporate Scepter's Infringing Trade Dress include raised letters molded into two of the sides of the cans spelling the word "SCEPTER" in all capital letters.

53.     Scepter and Scepter Manufacturing's marketing and sale of gas cans bearing Scepter's Infringing Trade Dress are likely to cause confusion, mistake and deception by and among consumers as to the source, origin, sponsorship and affiliation of Scepter and Scepter Manufacturing's gas cans.

54.     Members of the consuming public will likely be confused into falsely believing that cans and nozzles incorporating Scepter's Infringing Trade Dress are sourced from, sponsored by, approved by, or affiliated with No Spill.  Members of the consuming public will also likely be confused into falsely believing that No Spill's gas cans and nozzles incorporating the No Spill Trade Dress are sourced from, sponsored by, approved by or affiliated with Scepter and Scepter Manufacturing.

55.     Such confusion, mistake and deception by Scepter and Scepter Manufacturing has irreparably injured and will continue to irreparably injure No Spill and the good will No Spill has developed through the substantial and continuous marketing and sale of gas cans and nozzles incorporating the No Spill Trade Dress.

## COUNT I

## Infringement of U.S. Patent No. 9,174,075 by Scepter

56.     No Spill alleges and incorporates by reference Paragraphs 1 through 55 above, as if fully set forth herein.

10

57.     Scepter has directly infringed at least claim 1 of the '075 patent under 35 U.S.C. § 271(a) by participating in, directing, controlling and actively aiding and abetting Scepter Manufacturing to make, use, import, offer to sell, and/or sell the Infringing Fuel Containers within the United States.

58.     Scepter's direct infringement is immediate and ongoing.

59.     Scepter has induced infringement of at least claim 1 of the '075 patent under 35 U.S.C. § 271(b) by participating in, directing, controlling and actively aiding and abetting Scepter Manufacturing to make, use, import, offer to sell, and/or sell the Infringing Fuel Containers within the United States knowing that such acts constitute infringement of the '075 patent.

60.     Scepter's infringement is immediate and ongoing.

61.     In committing these acts of infringement, Scepter acted despite an objectively high likelihood that its actions constituted infringement of at least one valid and enforceable claim of the '075 patent, and Scepter knew or should have known that its actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '075 patent.

62.     Scepter's infringement of the '075 patent has been knowing and willful.

63.     As a direct and proximate result of Scepter's acts of infringement, No Spill has suffered and continues to suffer damages and irreparable injury.

64.     No Spill has no adequate remedy at law for Scepter's acts of infringement and unless Scepter's acts of infringement are enjoined, No Spill will continue to be damaged and irreparably injured.

149420776.1

## COUNT II

### Infringement of U.S. Patent No. 10,029,132 by Scepter

65.     No Spill alleges and incorporates by reference Paragraphs 1 through 64 above, as if fully set forth herein.

66.     Scepter has directly infringed at least claim 1 of the '132 patent under 35 U.S.C. § 271(a) by participating in, directing, controlling and actively aiding and abetting Scepter Manufacturing to make, use, import, offer to sell, and/or sell the Infringing Fuel Containers within the United States.

67.     Scepter's direct infringement is immediate and ongoing.

68.     Scepter has induced infringement of at least claim 1 of the '132 patent under 35 U.S.C. § 271(b) by participating in, directing, controlling and actively aiding and abetting Scepter Manufacturing to make, use, import, offer to sell, and/or sell the Infringing Fuel Containers within the United States knowing that such acts constitute infringement of the '132 patent.

69.     Scepter's infringement is immediate and ongoing.

70.     In committing these acts of infringement, Scepter acted despite an objectively high likelihood that its actions constituted infringement of at least one valid and enforceable claim of the '132 patent, and Scepter knew or should have known that its actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '132 patent.

71.     Scepter's infringement of the '132 patent has been knowing and willful.

72.     As a direct and proximate result of Scepter's acts of infringement, No Spill has suffered and continues to suffer damages and irreparable injury.

149420776.1

73.    No Spill has no adequate remedy at law for Scepter's acts of infringement and unless Scepter's acts of infringement are enjoined, No Spill will continue to be damaged and irreparably injured.

## COUNT III

## Breach of Contract- Production Requirements- by Scepter Manufacturing

74.    No Spill alleges and incorporates by reference Paragraphs 1 through 73 above, as if fully set forth herein.

75.    Plaintiff No Spill and defendant Scepter Manufacturing discussed having Scepter Manufacturing manufacture gas cans for No Spill.

76.    At that time defendant Scepter Manufacturing had excess capacity, and was eager to obtain No Spill's business.

77.    Defendant Scepter Manufacturing represented that it had available blow molding machines which were idle and could be utilized for No Spill's production orders as needed.

78.    In order to induce No Spill to utilize defendant Scepter Manufacturing to manufacture gas cans for No Spill, defendant Scepter Manufacturing promised that No Spill would be its "Priority 1."

79.    Although defendant Scepter Manufacturing manufactured competing gas cans, it told No Spill it aspired to be No Spill's "Vendor of the Year."

80.    On or about September 6, 2013, No Spill and Scepter Manufacturing entered into the Supply Agreement which is incorporated herein by reference (but not attached pursuant to its Confidentiality provision).

81.    On or about February 9, 2016, the parties to the Supply Agreement entered into the First Amendment to Supply Agreement (hereinafter together the "Supply Agreement").

13

82.    The Supply Agreement constitutes a valid contract between the parties.

83.    The parties have exchanged mutual consideration to support such contract.

84.    Pursuant to this Supply Agreement defendant Scepter Manufacturing agreed to manufacture, inventory and supply No Spill branded fuel containers to plaintiff.

85.    The parties operated under and exchanged mutual consideration pursuant to the Supply Agreement for several years thereafter without substantial difficulty.

86.    Pursuant to the Supply Agreement, defendant Scepter Manufacturing agreed to: ". . . stock approximately eight (8) to ten (10) truck-loads of Product and all production will be made to purchase order based on a fourteen (14) day lead time. The initial purchase order of eight (8) to ten (10) truck loads will be warehoused by Supplier. This stock will be used to fill new purchase orders and then replenished as used (FIFO)" (*Id.* ¶ 4(a)).

87.    Within the First Amendment, the above provision was changed to increase defendant Scepter Manufacturing's inventory obligation as follows: "Supplier agrees to increase the current stock of 10 truck-loads of Product 20003 [5 gallon gasoline cans] to 11 truck-loads. Supplier agrees to stock 4 truck-loads of Product 20004 [5 gallon diesel cans]."

88.    Thereafter the parties agreed to increase the quantity of truck-loads Scepter Manufacturing was required to have on hand to 15.

89.    The First Amendment provides that: "This stock will be used to fill new purchase orders and then replenish as used (FIFO)" (*Id.* at ¶ 1).

90.    Defendant Scepter Manufacturing represented that production capacity could be ramped up to meet No Spill's orders, as needed, with 24 hours' notice.

91.    Regarding "Order Procedure," the Supply Agreement provides: "Buyer shall issue purchase orders for Product based on full truck loads.  Each "Order" shall provide the type and

quantity of Products required, the delivery destination and the delivery date. Supplier must accept or reject an Order within one (1) business day of receipt. No order will be deemed accepted unless Supplier confirms its acceptance. . . . "(*Id.* at ¶ 4(b)).

92.     For several years No Spill submitted periodic Orders which were accepted and filled by defendant Scepter Manufacturing without general difficulty.

93.     Plaintiff No Spill's manufacturing orders to defendant Scepter Manufacturing increased steadily.

94.     Plaintiff No Spill has performed its obligations under the Supply Agreement.

95.     Plaintiff No Spill and Defendant Scepter Manufacturing continued to market competing gas cans in the marketplace.

96.     Plaintiff No Spill has enjoyed increasing sales generally, and particularly after announcing the development and availability of gas cans containing its patented flash suppressor, described above.

97.     No Spill's gas cans have enjoyed increasing market acceptance and began to displace Scepter's gas cans with key customer accounts.

98.     Thereafter Defendant Scepter Manufacturing began to frustrate and obstruct the supply of manufactured gas cans to No Spill.

99.     Upon information and belief, Defendant Scepter Manufacturing acted in concert with Defendant Scepter to attempt to harm the supply of gas cans and thus plaintiff No Spill's increasing acceptance and sales within the marketplace.

100.     For example, defendant Scepter Manufacturing supplied gas cans to No Spill which were grossly defective and which would have failed even a cursory quality control

examination, including supplying gas cans which had holes in them, as depicted below:



101.    Pursuant to the Supply Agreement, defendant Scepter Manufacturing agreed to "maintain its facility in good working order and condition necessary to produce the quantities and qualities of the Products ordered under this agreement" (*Id*. at ¶ 3(a)).

102.    Defendant Scepter Manufacturing represented  it would use the same quality control standards and procedures for No Spill's production cans as defendant used on its own products.

103.    In breach of the Supply Agreement, defendant Scepter Manufacturing failed and refused to keep the required level of truck load inventory on hand necessary to respond to orders from plaintiff No Spill.

104.    In breach of the Supply Agreement, defendant Scepter Manufacturing failed and refused to supply the Order quantities submitted by plaintiff No Spill.

105.    After failing to provide No Spill with reasonably requested order quantities, defendant Scepter Manufacturing then announced it would not ship any product to No Spill until

16

Scepter Manufacturing replenished the inventory levels it was required to maintain in the first place.

106.     In breach of the Supply Agreement, Defendant Scepter Manufacturing then announced that it refused to manufacture No Spill's orders on weekends without additional charge.

107.     Within the Supply Agreement defendant Scepter Manufacturing agreed it ". . . understands and acknowledges that time is of the essence with regard to the delivery of the Products under this Agreement" (*Id.* at ¶ 6(d)).

108.     The Supply Agreement mandates that any required notices be sent not only to Scepter Manufacturing and No Spill, the parties thereto, but also to defendant Scepter Corporation in Canada (*Id.* at ¶ 16).

109.     The Supply Agreement contains the following provision concerning Governing Law: "Any legal action, suit or proceeding arising out of this Agreement and brought by either Party shall be governed by the laws of the State of Kansas and shall be treated in all respects as a Kansas contract, without regard to any laws of any jurisdiction related to choice or conflict of laws principles and each Party hereby irrevocably submits to the exclusive jurisdiction of the courts of Overland Park, Kansas" (*Id.* at ¶ 29).

110.     Plaintiff No Spill has performed its obligations under the Supply Agreement contract.

111.     Defendant Scepter Manufacturing has breached the terms of the Supply Agreement contract, as described above.

149420776.1

112.     As a result of defendant Scepter Manufacturing's breaches of the Supply Agreement and failure to satisfy No Spill's order requirements, plaintiff No Spill lost orders, sales, revenues and profits in excess of $75,000.

## COUNT IV

### Breach of Contract- Sale of Mold Machine- by Scepter Manufacturing

113.     No Spill alleges and incorporates by reference Paragraphs 1 through 112 above, as if fully set forth herein.

114.     The Supply Agreement constitutes a valid contract between the parties.

115.     The parties thereto have exchanged consideration pursuant to the Supply Agreement.

116.     Plaintiff No Spill has performed its obligations under the Supply Agreement contract.

117.     On August 22, 2017, Defendant Scepter Manufacturing provided notice of its intent to terminate the Supply Agreement effective as of May 23, 2018.

118.     Upon information and belief, this termination was made after consultation with and upon the direction of defendant Scepter and/or affiliated companies.

119.     Upon information and belief, this termination was made with the intent of frustrating plaintiff No Spill's ability to fill orders, and to attempt to harm No Spill in the marketplace.

120.     Upon information and belief, defendant Scepter Manufacturing continued to manufacture and/or ship Product to plaintiff No Spill until May 23, 2018.

121.     Section 9 of the Supply Agreement states: "**Option to Purchase Molding Machine and Ancillary Equipment.**  Upon expiration of the Term or other termination of this

18

Agreement, Buyer shall have the option, but not the obligation, to purchase the molding machine

and ancillary equipment used in the production of the Products under the terms set forth in

**Exhibit D** of this Agreement" [emphasis in original].

122.    Exhibit D to the Supply Agreement identifies a Bekum blow molding machine by

serial number, with described ancillary equipment, with a specified Initial Value.

123.    Exhibit D to the Supply Agreement states: "At the end of the Term of this

Agreement, Buyer shall have the option to purchase the above equipment at a value calculated by

reducing the Initial Value by 5% for each full year that the Agreement had been in effect; this

reduction not to exceed 50% of the Initial Value."

124.    On May 21, 2018, plaintiff No Spill gave written notice it was exercising the

above purchase option.

125.    In this Notice, plaintiff No Spill asked defendant Scepter Manufacturing to state

whether a different blow molding machine was being used to manufacture the Products, provide

information concerning the current machine being used, and to provide an opportunity to inspect

such equipment.

126.    On May 31, 2018, defendant Scepter Manufacturing (through its counsel) refused

plaintiff No Spill's exercise of its option to purchase the machine.

127.    Defendant Scepter Manufacturing's refusal to sell the subject machine upon the

terms of the Supply Agreement constitutes a breach of the Supply Agreement.

128.    Upon information and belief, defendant Scepter Manufacturing's refusal to honor

the purchase option within the contract was made with the intent of frustrating plaintiff No

Spill's ability to meet its increasing orders.

129.    Upon information and belief, defendant Scepter Manufacturing's above breaches of the Supply Agreement were made in concert with affiliated companies including defendant Scepter.

130.    As a result of such breaches, plaintiff No Spill has sustained damages, including a loss of production capacity, sales, revenue and profits at times of high order demand and thereafter.

131.    Plaintiff No Spill took efforts to try to mitigate its loss of production capacity caused by defendant Scepter Manufacturing's breaches, but was unable to completely mitigate such losses.

132.    As a result of defendant Scepter Manufacturing's breaches, plaintiff No Spill has sustained damages from lost sales, revenue, profits and market position in excess of $75,000.

## COUNT V

### Unfair Competition Under the Lanham Act by both Defendants

133.    No Spill alleges and incorporates by reference Paragraphs 1 through 132 above, as if fully set forth herein.

134.    As a result of No Spill's continuous, exclusive and extensive promotion and sale of gas cans and nozzles incorporating the No Spill Trade Dress in commerce and the commercial success of these gas cans and nozzles, the unique No Spill Trade Dress has developed secondary meaning amongst the relevant consumers as an identifier of the source of No Spill's gas cans and nozzles.

135.    No Spill has established valid and enforceable trade dress rights in the No Spill Trade Dress.

20

136.   Scepter and Scepter Manufacturing have infringed No Spill's rights in the No Spill Trade Dress and have committed unfair competition under 15 U.S.C. § 1125(a) by advertising, marketing and selling in commerce gas cans and nozzles incorporating Scepter's Infringing Trade Dress that are likely to cause confusion, mistake or deception by and among consumers as to the source of the parties' respective gas cans.

137.   Scepter's and Scepter Manufacturing's unfair competition is immediate and ongoing.

138.   Scepter's and Scepter Manufacturing's unfair competition has been knowing and willful.

139.   As a direct and proximate result of Scepter's and Scepter Manufacturing's acts of unfair competition, No Spill has suffered and continues to suffer damages and irreparable injury.

140.   No Spill has no adequate remedy at law for Scepter's and Scepter Manufacturing's acts of unfair competition and, unless they are both enjoined, No Spill will continue to be damaged and irreparably injured.

141.   No Spill has a substantial likelihood of prevailing on the merits.

142.   The injury to No Spill outweighs any damage injunctive relief may cause defendants.

143.   The impact of issuing injunctive relief in No Spill's favor will not be adverse to the public interest.

## COUNT VI

### Unfair Competition Under the Common Law of Kansas by both Defendants

144.   No Spill alleges and incorporates by reference Paragraphs 1 through 143 above, as if fully set forth herein.

21

145.     No Spill has the exclusive right to advertise, market and sell gas cans and nozzles that incorporate the No Spill Trade Dress.

146.     Gas cans and nozzles that use Scepter's Infringing Trade Dress are likely to cause confusion, mistake or deception by and among consumers as to the source, origin, sponsorship, approval and affiliation of the parties' respective products.

147.     Scepter's and Scepter Manufacturing's conduct as alleged herein constitutes unfair competition under the common law of the State of Kansas.

148.     As a direct and proximate result of Scepter's and Scepter Manufacturing's unlawful acts, No Spill has suffered and continues to suffer damages and irreparable injury.

149.     No Spill has no adequate remedy at law for Scepter's and Scepter Manufacturing's acts of unfair competition and, unless they are enjoined, No Spill will continue to be damaged and irreparably injured.

22

**Prayers for Relief**

WHEREFORE, plaintiff No Spill respectfully requests that the Court enter judgments and Orders against defendants Scepter and Scepter Manufacturing as follows:

A.     Finding that Scepter has directly and indirectly infringed one or more claims of the '075 patent and the '132 patent under 35 U.S.C. § 271(a) and (b);

B.     Permanently enjoining Scepter and its officers, agents, servants, employees, and representatives, and all others in active concert or participation with it, from further infringing the '075 and '132 patents and from further manufacture, use, importation, offer for sale, and sale of the Infringing Fuel Containers employing a flash suppressor;

C.     Awarding damages to No Spill to compensate No Spill under 35 U.S.C. § 284 for Scepter's infringement of the '075 and '132 patents;

D.     Finding that Scepter's infringement has been willful and trebling the damage award under 35 U.S.C. § 284;

E.     Finding this to be an exceptional case under 35 U.S.C. § 285 and awarding No Spill its reasonable attorney fees and expenses in this action;

F.     Awarding No Spill damages for defendant Scepter Manufacturing's breaches of the Supply Agreement;

G.     Awarding No Spill damages for defendant Scepter Manufacturing's and defendant Scepter's unfair competition under the Lanham Act and under the common law of Kansas;

H.     Permanently enjoining Scepter, Scepter Manufacturing and their respective officers, agents, servants, employees, and representatives, and all others in active concert or participation with them, from further acts of unfair competition and from further manufacturing,

149420776.1

advertising, marketing and/or selling any gas cans and nozzles that use Scepter's Infringing

Trade Dress;

     I.      Awarding No Spill pre-judgment and post-judgment interest;

     J.      Awarding No Spill its costs, attorneys fees and expenses in this action; and

     K.     Awarding such other and further relief as the Court deems just and proper.

## Jury Demand

Under Rule 38(b) of the Federal Rules of Civil Procedure and other applicable law,

plaintiff No Spill demands a trial by jury of all issues so triable to a jury.


Dated:  December 11, 2018          Respectfully submitted,

                          STINSON LEONARD STREET LLP


                          By:  */s/ Douglas R. Dalgleish*
                          Douglas R. Dalgleish, KS #22328
                          Bradley J. Yeretsky, KS  #21092
                          Bryce E. Langford, KS  #27548
                          Stinson Leonard Street
                          1201 Walnut Street, Suite 2900
                          Kansas City, MO 64106
                          Tel: (816) 842-8600
                          Fax: (816) 691-3495
                          doug.dalgleish@stinson.com
                          brad.yeretsky@stinson.com
                          bryce.langford@stinson.com

                          Robert M. Evans, Jr., Mo Bar #35613
                          (*Pro Hac Vice* forthcoming)
                          Stinson Leonard Street
                          7700 Forsyth Boulevard, Suite 1100
                          St. Louis, MO 63105
                          Tel: (314) 345-7004
                          Fax: (314) 345-7600
                          robert.evans@stinson.com

                          **Attorneys for Plaintiff No Spill Inc.**

24