## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NO SPILL INC.,                  )
                                     )

            Plaintiff,                )
                                     )

v.                                   )     Case No. 18-cv-2681-JAR-KGG
                                     )

SCEPTER CORPORATION,        )
   n/k/a 1216037 ONTARIO, INC.,   )
                                     )

and                                      )
                                     )

SCEPTER CANADA, INC.,        )
and                                    )     **JURY TRIAL DEMANDED**
                                       )

SCEPTER MANUFACTURING LLC,   )
                                     )

            Defendants.           )

## <u>AMENDED COMPLAINT</u>

Plaintiff No Spill Inc. ("No Spill"), for its Amended Complaint against defendants Scepter Corporation, n/k/a 1216037 Ontario, Inc.; Scepter Canada, Inc.; and Scepter Manufacturing LLC alleges as follows:

### <u>Parties</u>

1.     No Spill is a corporation organized and existing under the laws of the State of Kansas with its principal place of business located at 9808 Pflumm Road, Lenexa, KS 66208.

2.     On information and belief, defendant Scepter Corporation is a corporation organized and existing under the laws of Canada and has a principal place of business at 170 Midwest Road, Scarborough, ON, M1P 3A9, Canada.

3.     On information and belief, defendant Scepter Corporation is now known as "1216037 Ontario, Inc." pursuant to a name change.

4.    On information and belief, defendant 1216037 Ontario, Inc. is a corporation organized and existing under the laws of Canada and has a principal place of business at 170 Midwest Road, Scarborough, ON, M1P 3A9, Canada. Scepter Corporation and 1216037 Ontario, Inc. are hereinafter referred to as "Scepter Corporation."

5.    On information and belief, defendant Scepter Canada, Inc. (hereinafter "Scepter Canada") is a corporation organized and existing under the laws of Canada and has a principal place of business at 170 Midwest Rd., Scarborough, ON, M1P 3A9, Canada.

6.    Defendant Scepter Manufacturing LLC ("Scepter Manufacturing") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 404 26th Avenue NW, Miami, Oklahoma  74354.

## Jurisdiction and Venue

7.    This is an action for inducing patent infringement under 35 U.S.C. § 271 *et seq*., breach of contract, unfair competition under the Lanham Act, and unfair competition under the common law of Kansas.

8.    The Court has subject matter jurisdiction over Counts I and II for inducing patent infringement under 28 U.S.C. §§ 1331 and 1338(a); over Counts III and IV for breach of contract under 28 U.S.C. § 1332 in that the parties are diverse and the amount in controversy exceeds $75,000; over Count V for unfair competition under the Lanham Act under 28 U.S.C. § 1338(b) and 28 U.S.C. § 1332 in that the parties are diverse and the amount in controversy exceeds $75,000; and over Count VI for unfair competition under the common law of Kansas pursuant to 28 U.S.C. § 1367 and  28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

9.      The Court has personal jurisdiction over the alien defendant Scepter Corporation because it has transacted business and/or committed tortious acts and/or participated in, directed, controlled and actively aided and abetted the commission of tortious acts within the State of Kansas out of which this action arises, including the sale of Infringing Fuel Containers here. Kan. Stat. Ann. § 60-308.

10.     The Court has personal jurisdiction over the alien defendant Scepter Canada because it has transacted business and/or committed tortious acts and/or participated in, directed, controlled and actively aided and abetted the commission of tortious acts within the State of Kansas out of which this action arises, including the sale of Infringing Fuel Containers here. Kan. Stat. Ann. § 60-308.

11.     In the alternative, the Court has personal jurisdiction over defendants Scepter Corporation and Scepter Canada pursuant to F.R.C.P. 4(k)(2).

12.     Plaintiff's action for inducing patent infringement under 35 U.S.C. § 271 *et seq.* arises under federal law.  On information and belief, defendants Scepter Corporation and Scepter Canada are not subject to jurisdiction in any state's courts of general jurisdiction.

13.     Exercising personal jurisdiction over defendants Scepter Corporation and Scepter Canada pursuant to F.R.C.P. 4(k)(2) satisfies due process because Scepter Canada and/or Scepter Corporation purposefully directed their activities inducing infringement of Plaintiff's patents to residents of this District.  Plaintiff's patent infringement claims thus arise out of and relate to defendants' activities in this District, including the sale of Infringing Fuel Containers here.  The Court's exercise of personal jurisdiction over defendants Scepter Corporation and Scepter Canada is thus reasonable and fair.

14.     The Court has personal jurisdiction over defendant Scepter Manufacturing because Scepter Manufacturing has transacted business, entered into a contract, and committed tortious acts in this judicial district out of which this action arises, including the sale of Infringing Fuel Containers here.  Kan. Stat. Ann. § 60-308.

15.     In addition, the Court has personal jurisdiction over defendant Scepter Manufacturing because Scepter Manufacturing has expressly consented to personal jurisdiction in this judicial district.

16.     A Supply Agreement entered into between plaintiff No Spill and defendant Scepter Manufacturing that is discussed in more detail in Counts III-IV below, contains the following provision concerning Governing Law: "Any legal action, suit or proceeding arising out of this Agreement and brought by either Party shall be governed by the laws of the State of Kansas and shall be treated in all respects as a Kansas contract, without regard to any laws of any jurisdiction related to choice or conflict of laws principles and each Party hereby irrevocably submits to the exclusive jurisdiction of the courts of Overland Park, Kansas." Supply Agreement ¶ 29.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), (c) and § 1400(b) in that a substantial part of the events giving rise to the claims occurred here, and defendants are individually subject to personal jurisdiction here.

18.     Further, defendants Scepter Canada and Scepter Corporation are foreign corporations subject to venue here pursuant to F.R.C.P. 4(k)(2).

**Patents-In-Suit**

19.     On November 3, 2015, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,174,075 (the "'075 patent"), entitled "Explosion Inhibiting

Portable Fuel Container and Method of Inhibiting Explosions," to Thomas M. Cray.  A true and accurate copy of the '075 patent is attached as Exhibit A.

20.     Plaintiff No Spill is the owner by assignment of the '075 patent, including all rights to sue for past, present and future infringement of the '075 patent.

21.     On July 24, 2018, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 10,029,132 (the "'132 patent"), entitled "Explosion Inhibiting Portable Fuel Container and Method of Inhibiting Explosions," to Thomas M. Cray.  A true and accurate copy of the '132 patent is attached as Exhibit B.

22.     Plaintiff No Spill is the owner by assignment of the '132 patent, including all rights to sue for past, present, and future infringement of the '132 patent.

23.     The '075 patent contains two independent claims and nineteen dependent claims.

24.     Independent claim 1 of the '075 patent follows:

Claim 1. A fuel container comprising:

a hollow tank body defining a fuel-receiving chamber and a main container opening for permitting flow of a liquid fuel into and out of the fuel-receiving chamber;

a fuel dispensing assembly coupled to the tank body proximate the main container opening and configured to dispense the liquid fuel from the container; and

a fuel retention structure located proximate the main container opening and extending generally downwardly into the fuel-receiving chamber,

wherein the fuel retention structure comprises a plurality of perforations through which the liquid fuel must flow in order to dispense the liquid fuel from the container,

wherein the fuel retention structure is configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom,

wherein the retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion.

25.     The '132 patent contains one independent claim and seventeen dependent claims.

26.     Independent claim 1 of the '132 patent follows:

Claim 1. A fuel container comprising:

a hollow tank body defining a fuel-receiving chamber and a main container opening for permitting flow of a liquid fuel into and out of the fuel-receiving chamber;

a fuel dispensing assembly coupled to the tank body proximate the main container opening and configured to dispense the liquid fuel from the container; and

a flash suppressor located proximate the main container opening and extending at least 2 inches downwardly into the fuel-receiving chamber,

wherein the flash suppressor comprises a plurality of perforations through which the liquid fuel must flow in order to dispense the liquid fuel from the container,

wherein the flash suppressor is formed of synthetic resin material,

wherein the flash suppressor has an internal volume of at least 2 cubic inches,

wherein the flash suppressor is at least 10 percent open,

wherein the average open area of the perforations is at least 0.001 and not more than 0.05 square inches and wherein the flash suppressor is not more than 80 percent open; and wherein the total number of perforations is at least 100 and not more than 10,000 and wherein the average length of the perforations is at least 0.02 inches.

## Factual Background

27.     For decades beginning with its supply of portable fuel containers during World War II, a third party formerly known as Blitz U.S.A. ("Blitz") came to dominate the U.S. market for portable fuel containers.

28.     Misuse of the Blitz fuel cans, *e.g.*, pouring fuel directly from the Blitz cans onto an existing campfire or smoldering embers, led to fires and explosions causing serious injuries and even death to those nearby.  Multiple lawsuits were pending against Blitz when it filed for bankruptcy in 2011.

29.     In 2012, third party Scepter Holdings, Inc. purchased the assets of Blitz through the bankruptcy court.

30.     These assets included the plant, equipment and real estate from the old Blitz factory in Miami, Oklahoma.  *See* "Blow molder Scepter buys selected assets of fuel can maker Blitz USA," *Canadian Plastics* (Oct. 14, 2012),  https://www.canplastics.com/plastics-processes/blow-molder-scepter-buys-selected-assets-of-fuel-can-maker-blitz-usa/1001762632/, (last visited Apr. 17, 2019)  A true and accurate copy  of the article is attached as Exhibit C.

31.     Robert Torokvei, the President of Scepter Holdings, Inc. in 2012, was paraphrased as saying that Scepter Holdings, Inc. wanted a presence in the U.S. and looked forward to being part of the community in Miami.  But he advised that it would "take time to reorganize, build new molds using Scepter's current portable fuel container designs, hire and train staff, and introduce similar quality assurance procedures as those in operation at Scepter Corporation . . . ." *Id.*

32.     The article above references a press release, which is attached as Exhibit D. The press release states: "In the longer term, Scepter wants to build a viable export business from the

Miami location and to broaden the overall product line to take advantage of the plant's excess capacity and available technology. Torokvei is quoted as saying "We want a presence in the US" and the release says Torokvei "hopes that the Miami, Oklahoma plant will be reopened in the near future and will run as a separate US entity under the Scepter Manufacturing, LLC banner."

33.     Thereafter, and to this day, the fuel containers made at the plant in Miami, Oklahoma are sold under the "SCEPTER" trademark.

34.     On information and belief, through a series of transactions in 2014, third party Myers Industries, Inc. ("Myers"), an Ohio corporation, purchased Scepter's Canadian and US operations through two of its wholly-owned subsidiaries.

35.     On information and belief, in July 2014, Myers was the parent of two subsidiaries: Crown US Acquisition Company in Ohio, and CA Acquisition Inc. in Canada.

36.     On information and belief, Crown US Acquisition Company purchased all of the equity of Eco One Leasing, LLC and defendant Scepter Manufacturing in July 2014.

37.     On information and belief, Crown US Acquisition Company then changed its name to Scepter US Holding Company (hereinafter "Scepter US Holding Company") in July 2014.

38.     On information and belief, in July 2014, Eco One Leasing, LLC merged with Scepter Manufacturing. The merged entities thereafter retained the name Scepter Manufacturing, LLC.

39.     On information and belief, in July 2014, CA Acquisitions Inc., a Canadian company and subsidiary of Myers, purchased substantially all of the assets of Scepter Corporation and certain real property of SHI Properties, Inc.

40.     On information and belief, that same month, CA Acquisition Inc. changed its name to Scepter Canada, Inc.

41.     Following the July 2014 transactions, the Scepter entities' organizational structure— at least on paper— appeared as follows:

    a.   In the United States, Myers Industries, Inc. is listed is the parent of Scepter US Holding Company, which in turn is the parent of Defendant Scepter Manufacturing, LLC; and

    b.   In Canada, Myers Industries, Inc. is listed as the parent of Defendant Scepter Canada, Inc.

42.      The Scepter entities' stated legal organizational structure is thus illustrated below:



43.     On information and belief, in practice and reality, defendants Scepter Corporation and/or Scepter Canada direct and control defendant Scepter Manufacturing.

44.     On information and belief, defendants Scepter Corporation and/or Scepter Canada direct and control the molding business operations in Miami, Oklahoma.

45.     On information and belief, defendants Scepter Corporation and Scepter Canada only conduct business concerning portable fuel containers in the United States through defendant Scepter Manufacturing.

46.     On information and belief, defendant Scepter Manufacturing produces all of its portable fuel containers under a license from defendant Scepter Corporation.

47.     On information and belief, in reality and practice, defendants Scepter Corporation and/or Scepter Canada direct and control the US business of all Scepter entities, including defendant Scepter Manufacturing in Oklahoma, as illustrated below:



48.     On information and belief, Terry Elliott is currently and has been the President of defendants Scepter Corporation, Scepter Canada and Scepter Manufacturing.

49.     On information and belief, Mr. Elliott is responsible for, directs and controls the operations of those defendants.

50.     On information and belief, Mr. Elliott is responsible for, directs and controls the manufacture, marketing and sales of all of the portable fuel containers made by Scepter in Canada and in Miami, Oklahoma.

51.     Mr. Elliott identifies himself in social media as the President of "Scepter" with no distinction made between any of the various Scepter entities.  A true and correct copy of Terry Elliott's LinkedIn Page is attached as Exhibit E.

52.     In 2016 when Mr. Elliott was named President of defendant Scepter Manufacturing (which is located in Oklahoma), the accompanying press announcement stated that the position was based in Scarborough, Ontario, Canada.  A true and accurate copy of the press announcement is attached as Exhibit F.

53.     The Infringing Fuel Containers sold in the United States bear the SCEPTER trademark and have two product labels affixed thereto.  As seen in the following photograph of the relevant portion of one of those product labels, it recites, among other things, "MADE IN USA" and also provides the Scepter website (www.scepter.com), the name ("SCEPTER") and the location (Miami, OK 74354):



The other label provides the Scepter website (www.scepter.com).  The "Contact Us" page for the

www.scepter.com website identifies the owner as defendant Scepter Canada Inc. and provides

the Canadian address:  170 Midwest Road, Scarborough, Ontario, Canada.  A true and accurate

copy of the "Contact Us" webpage is attached as Exhibit G.  This page also refers customers to

the Canadian customer service department available at:  customerserviced@scepter.ca and

displays a picture of the Canadian offices of defendant Scepter Canada Inc.:



This all further evidences the continuing direction and control of defendant Scepter Canada over the manufacture and sale by defendant Scepter Manufacturing of the Infringing Fuel Containers.

54.     In emails directing the Oklahoma operations of Scepter Manufacturing, Mr. Elliott's signature block states that he is the "President" and lists the address of the Canadian headquarters of the various Scepter entities, as shown below. A true and correct copy of the emails are attached as Exhibit H.



55.     Press reports have quoted Mr. Elliott and referred to him as being in charge of "Scepter" in both Miami, Oklahoma and in Canada.  A true and correct copy of the press report is attached as Exhibit I, and the cited material can be found at pages 5 & 6 of 7.

56.     On information and belief, Canadian defendants Scepter Corporation and/or Scepter Canada share other employees with defendant Scepter Manufacturing.

57.     On information and belief, members, employees and managers of defendant Scepter Manufacturing take direction from defendants Scepter Corporation and/or Scepter Canada.

58.     For example, the Supply Agreement executed between defendant Scepter Manufacturing and plaintiff No Spill mandates that any required notices be sent not only to

Scepter Manufacturing and No Spill, the parties thereto, but also to defendant Scepter Corporation in Canada (Supply Agreement at ¶ 16).

59.     As another example of defendants Scepter Corporation and/or Scepter Canada's direction and control of defendant Scepter Manufacturing, in September 2016, Mr. Elliott travelled to Kansas to visit No Spill's facility.

60.     Following that September 2016 visit to Kansas, in an email Mr. Elliott referred to No Spill as one of "our customers." A true and correct copy of the email is attached as Exhibit J.

61.     In that same email, Mr. Elliott negotiated contract issues between plaintiff No Spill and defendant Scepter Manufacturing.

62.     In August 2017, Mr. Elliott again participated in contract negotiations and business dealings between plaintiff No Spill on the behalf of defendant Scepter Manufacturing.

63.     Upon information and belief, Mr. Elliott's business dealings with plaintiff No Spill were made by him on behalf of defendants Scepter Corporation and/or Scepter Canada and Scepter Manufacturing, and occurred from defendants' Canadian headquarters.

64.     On September 1, 2017, Mr. Elliott sent to No Spill an email that contained a force majeure declaration (the "Declaration") (A true and correct copy of the email is attached as Exhibit K; a true and correct copy of the Declaration is attached as Exhibit L.

65.     The Declaration was directed to "our valued customers."

66.     The Declaration contains the following sending address:  170 Midwest Road, Scarborough, Ontario, Canada M1P 3A9. This is the address for defendants Scepter Corporation and Scepter Canada.

67.     The Scepter entities' online presence further negates any claimed distinctions between defendants' Canadian and US presence.

68.     For example, at the time of this filing, the website Scepterusa.com states that "Scepter USA began operations in March 2013 and manufactures its products under license from **Scepter Corporation**." *See Home*, Scepter USA, https://scepterusa.com/ (last visited April 17, 2019 (emphasis added)). A true and correct copy of the Scepterusa.com home page is attached as Exhibit M.

69.     On information and belief, the "Scepter USA" entity referenced above and on scepterusa.com is not an actual entity.

70.     The above Scepter website contains defendant Scepter Manufacturing's Oklahoma address in the header and footer of each webpage. *See id; see also* Exhibit M.

71.     At the time of this filing, that website's footer further states: "Copyright 2013-2019 **Scepter Corporation** – All Rights Reserved." *Id.* (emphasis added); *see also* Exhibit M.

72.     Although defendants continue to utilize the Scepter Corporation name, in a pleading filed with this Court, defendants represented that Scepter Corporation ceased to exist in 2014. *See* Doc. #12 at 1 ("Scepter Corporation . . . is a Canadian corporation that no longer exists."); at 3 ("Can the District of Kansas assert personal jurisdiction over Scepter Corporation, an Ontario corporation that no longer exists?").

73.     The various Scepter entities utilize the same logo indiscriminately. For example, at the time of this filing, the Scepterusa.com website includes the same logo utilized by the defendants.

74.     Beginning in about 2017, the various Scepter websites have used the general Scepter logo now utilized by the various Scepter entities as shown below.



75.     A website used by both defendant Scepter Manufacturing and defendant Scepter Canada– www.scepter.com (last visited Apr. 17, 2019)– states that the gasoline containers identified therein, including the Infringing Fuel Containers which are the subject of this suit, are made in the USA.  A true and correct copy of the webpage is attached as Exhibit N.

76.     On information and belief, the plant in Miami, Oklahoma, utilized by defendant Scepter Manufacturing is the only plant in the U.S. where any defendant makes the Infringing Fuel Containers which are the subject of this suit.

77.     The websites Scepter.com and ScepterUSA.com contain identical content on their "New Products" page which describe the Infringing Fuel Containers.

78.     On or about August 30, 2018, the California Air Resources Board issued Executive Order G-18-075 (the "California Order"). A true and correct copy of the California Order is attached as Exhibit O.

79.     The California Order states, among other things, that Scepter Manufacturing, LLC and Scepter Canada, Inc. "submitted an application for their portable fuel container system, equipped with a SmartControl (R1) 00271 spout . . . ." Exhibit O.

80.     The California Order makes no distinction between Scepter Manufacturing or Scepter Canada, nor does it make a distinction between Scepter Manufacturing's portable fuel containers or Scepter Canada's portable fuel containers.

81.     On information and belief, Defendants Scepter Corporation and/or Scepter Canada own and control the trademark "SCEPTER" for use on portable fuel containers.

82.     On information and belief, Defendants Scepter Corporation and/or Scepter Canada license defendant Scepter Manufacturing to mark its portable fuel containers with the "SCEPTER" trademark and/or to manufacture portable fuel containers, including the Infringing Fuel Containers, with molds designed by defendant Scepter Canada.

83.     Upon information and belief, that license includes quality control provisions whereby defendant Scepter Canada requires defendant Scepter Manufacturing to maintain a stated level of quality and/or use prescribed manufacturing processes in making portable fuel containers.

*The Scepter Entities' Infringement*

84.     Portable fuel containers, such as gasoline cans, have traditionally been constructed of metal or synthetic resins with an opening and attached spout to permit stored fuel or gasoline to be dispensed for use.

85.     Improper use of traditional fuel containers near open sources of ignition can cause combustion within the fuel container.

86.     When fuel, such as gasoline vapor, and air are present and their mixture is within a given combustible range, combustion will occur if the mixture is ignited.

87.     If the mixture of fuel and air is either too lean (*i.e.*, not enough fuel is present) or there is too much fuel present (*i.e.*, too rich) combustion cannot occur.

88.     Defendant Scepter Manufacturing manufactures and sells within the United States plastic gasoline containers that employ a flash suppressor positioned through the opening of the gasoline container ("Infringing Fuel Container").  Such Infringing Fuel Containers are sold by defendants Scepter Manufacturing and Scepter Canada in a few different sizes and, depending on the nozzle, as either the "SmartControl" gas can or as the "Ameri-Can" gas can.

89.     On information and belief, defendants Scepter Corporation and/or Scepter Canada have directed and controlled, and continue to direct and control, defendant Scepter Manufacturing to manufacture and sell within the United States plastic gasoline containers that employ a flash suppressor positioned through the opening of the gasoline container, *i.e.*, Infringing Fuel Containers.

90.     As a part of the common application for the California Order, defendants Scepter Manufacturing and Scepter Canada jointly submitted test data purporting to demonstrate that the Infringing Fuel Containers comply with the required performance standards, including ASTM standards.

91.     On August 30, 2018, the California Air Resources Board issued the California Order (Exhibit O) to defendants Scepter Manufacturing and Scepter Canada certifying that the Infringing Fuel Containers met the standards.

92.     Although the Infringing Fuel Containers are made in different sizes with different capacities and different available nozzle configurations, they each use the same flash suppressor component.

93.     A representative example of an Infringing Fuel Container is shown in the pictures below (note: the white flash suppressor has been partially removed and extended from the gas can to show its location – in use it is pressed into the gas can and a nozzle (not shown) is threaded onto the can to dispense gasoline).  Both the SmartControl style nozzle and the Ameri-Can style nozzle are sized to be secured by the external threads shown below:

 

94.     The Infringing Fuel Containers include a label affixed thereto that bears the word "SCEPTER" in all capital letters.

95.     The bodies of the Infringing Fuel Containers include raised letters molded into two of the sides thereof and spell the word "SCEPTER" in all capital letters.

96.     The flash suppressor in the Infringing Fuel Containers (shown below) is constructed of resin and comprises a plurality of perforations through which the liquid fuel must flow in order to dispense the liquid fuel from the containers.

 

97.     The flash suppressor in the Infringing Fuel Containers has an internal volume of at least 2 cubic inches, and is at least 10 percent open and not more than 80 percent open.

98.     The flash suppressor in the Infringing Fuel Containers has perforations with an average open area of at least 0.001 square inches and not more than 0.05 square inches, has at

least 100 perforations and not more than 10,000 perforations, and has perforations with an average length of at least 0.02 inches.

99.     The flash suppressor permits the flow of liquid fuel into the Infringing Fuel Container.

100.     The flash suppressor permits the flow of liquid fuel there-through and out of the Infringing Fuel Container to dispense the fuel.

101.     The flash suppressor retains a quantity of the liquid fuel in the Infringing Fuel Container when the Infringing Fuel Container is tipped or inverted to dispense the liquid fuel therefrom.

102.     This retained quantity of fuel is sufficient to provide a fuel-air mixture proximate to the main opening in the Infringing Fuel Container that is too rich to support combustion.

103.     Since at least as early as the year 1989, No Spill and its predecessors have continuously and substantially advertised, marketed and sold gas cans with a distinctive plastic nozzle assembly having a tapered spout ("No Spill Trade Dress") throughout the United States.

104.     No Spill and its predecessors have expended substantial amounts since 1989 advertising portable fuel containers bearing the No Spill Trade Dress.

105.     This extensive use and advertising has created a very favorable impression with No Spill customers indicating that the source of the fuel containers is plaintiff and that the fuel containers have a very high quality.

106.     During the past 10 years, No Spill has sold its fuel containers bearing the No Spill Trade Dress in all 50 states and multiple foreign countries.  Sales by year for the past five years have increased substantially.

107.    The configuration and visual design of the No Spill Trade Dress provides a distinctive and non-functional appearance that the consuming public has come to associate with the goodwill and high quality of No Spill's products.

108.    The configuration and visual design of the No Spill Trade Dress has created and continues to create a strong favorable impression in the minds of consumers as an indicator of the source of No Spill's products.

109.    In the course of advertising its products, No Spill has prominently highlighted its distinctive nozzle assembly in particular and the No Spill Trade Dress in general.

110.    Shown below is a photograph of the product label that is affixed to a No-Spill can with an outline of the No Spill Trade Dress highlighted behind the word "No."



111.    As early as 1989 No Spill fuel containers bearing the No Spill Trade Dress have been sold nationwide through third party retailers including Amazon, Walmart, Ace Hardware, Stihl dealers, True Value hardware dealers, Do it Best hardware dealers, John Deere dealers, Honda dealers, Briggs and Stratton dealers and Home Depot.

112.    No Spill fuel containers bearing the No Spill Trade Dress have occupied the top three best seller spots on Amazon for its Outdoor Power Gas Cans category as of April 17, 2019.

113.    Due to its distinctive appearance as well as its substantial and continuous use by No Spill, the No Spill Trade Dress has acquired secondary meaning whereby the consuming

public associates No Spill's trade dress with the goodwill and high quality of No Spill and its products.

114.    After selling gas cans for decades, Scepter Manufacturing has recently begun to manufacture and sell a gas can and nozzle assembly having an appearance and trade dress ("Defendants' Infringing Trade Dress") confusingly similar to the No Spill Trade Dress.

115.    Representative examples of the No Spill Trade Dress (left) and Defendants' Infringing Trade Dress (right), which are being sold in Kansas, are shown in the photo below:



116.    The gas cans sold with the No Spill Trade Dress and Defendants' Infringing Trade Dress both have an open handle formed into the top of the fuel storage container of the gas cans.  Although the handle performs a function, the ornamental design of the handle is not functional and is not necessary for a competitor to sell a competing fuel container.

117.    The gas cans sold with the No Spill Trade Dress and Defendants' Infringing Trade Dress both provide a nozzle assembly installed on the top of the gas can adjacent the open handle.

118.   The nozzle assembly with the No Spill Trade Dress and Defendants' Infringing Trade Dress both have a tapered spout projecting horizontally.  The ornamental design of the tapered spout is not functional nor needed for a competitor to compete.

119.   Likewise, the ornamental design which projects the spout horizontally is not required to dispense fuel.  Fuel containers have been sold for decades with flexible, rigid, and re-shapeable spouts (without any taper) that project straight up from the fuel container or project upwardly at an angle from the fuel container.

120.   The No Spill Trade Dress and Defendants' Infringing Trade Dress each have a cap for covering the end of the spout. The cap is tethered to the spout with a flexible plastic strap, secured at one end to the underside of the spout. There is no functional need to have a loose plastic strap connected to the underside of the spout for tethering a cap.

121.   The features of the No Spill Trade Dress are not needed for a competitor to compete for sales.

122.   The No Spill Trade Dress and Defendants' Infringing Trade Dress are commonly marketed and sold wherein the gas can is made from red plastic and the nozzle is made from black plastic.

123.   While red may be a common color for gas cans, a red gas can in combination with a molded black spout is not – especially a tapered, molded black spout having a tether connected to the underside for tethering a nozzle cap.

124.   Defendants do not need to copy the ornamental appearance of the No Spill Trade Dress in order to sell a competing gas can having a detachable spout.  Indeed, here follows a photograph showing defendants' one gallon gas can on the left with the non-infringing trade

23

dress of defendants' Ameri-Can configuration and the same one gallon gas can on the right with

the Infringing Trade Dress of the SmartControl configuration.



125.    The presence or absence of these above-described ornamental features does not

affect the cost of manufacture, the quality of the gas can, nor the use or purpose of the gas can.

126.    On information and belief, defendants Scepter Corporation and/or Scepter Canada

have participated in, directed and controlled, and continues to participate in, direct and control,

Scepter Manufacturing to manufacture, advertise, market and sell within the United States plastic

gas cans and nozzles that tortiously incorporate the No Spill Trade Dress in knowing violation of

No Spill's trade dress and common law rights.

127.    The gas cans and nozzles that incorporate Defendants' Infringing Trade Dress

include a label affixed thereto that bears the word "SCEPTER" in all capital letters.

128.    The bodies of the gas cans that are used with nozzles and incorporate Defendants'

Infringing Trade Dress include raised letters molded into two of the sides of the cans spelling the

word "SCEPTER" in all capital letters.

129.     Defendants' marketing and sale of gas cans bearing Defendants' Infringing Trade Dress are likely to cause confusion, mistake and deception by and among consumers as to the source, origin, sponsorship and affiliation of defendants' gas cans.

130.     Members of the consuming public will likely be confused into falsely believing that cans and nozzles incorporating Defendants' Infringing Trade Dress are sourced from, sponsored by, approved by, or affiliated with No Spill.

131.     Members of the consuming public will also likely be confused into falsely believing that No Spill's gas cans and nozzles incorporating the No Spill Trade Dress are sourced from, sponsored by, approved by or affiliated with defendants.

132.     Such confusion, mistake and deception have irreparably injured and will continue to irreparably injure No Spill and the goodwill No Spill has developed through the substantial and continuous marketing and sale of gas cans and nozzles incorporating the No Spill Trade Dress.

## COUNT I

### Infringement of U.S. Patent No. 9,174,075 by Scepter Canada and Scepter Corporation

133.     No Spill alleges and incorporates by reference Paragraphs 1 through 132 above, as if fully set forth herein.

134.     Defendants Scepter Corporation and/or Scepter Canada have directly infringed multiple claims of the '075 patent under 35 U.S.C. § 271(a) by participating in, directing, controlling and actively aiding and abetting Scepter Manufacturing to make, use, import, offer to sell, and/or sell the Infringing Fuel Containers within the United States.

135.     Defendant Scepter Corporation and/or defendant Scepter Canada's direct infringement is immediate and ongoing.

136.     Defendant Scepter Corporation and/or defendant Scepter Canada have induced infringement of multiple claims of the '075 patent under 35 U.S.C. § 271(b) by participating in, directing, controlling and actively aiding and abetting Scepter Manufacturing to make, use, import, offer to sell, and/or sell the Infringing Fuel Containers within the United States knowing that such acts constitute infringement of the '075 patent.

137.     Defendant Scepter Corporation and/or defendant Scepter Canada's inducement of infringement is immediate and ongoing.

138.     In committing these acts of direct and indirect infringement, defendants Scepter Corporation and/or Scepter Canada acted despite an objectively high likelihood that their respective actions constituted infringement of at least one valid and enforceable claim of the '075 patent, and these defendants knew or should have known that their respective actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '075 patent.

139.     Defendant Scepter Corporation and/or defendant Scepter Canada's infringement of the '075 patent has been knowing and willful.

140.     As a direct and proximate result of defendant Scepter Corporation and/or defendant Scepter Canada's acts of infringement, No Spill has suffered and continues to suffer damages and irreparable injury.

141.     No Spill has no adequate remedy at law for defendant Scepter Corporation and/or defendant Scepter Canada's acts of infringement and unless these defendants' acts of infringement are enjoined, No Spill will continue to be damaged and irreparably injured.

## COUNT II

## Infringement of U.S. Patent No. 10,029,132 by Scepter Canada and Scepter Corporation

142.     No Spill alleges and incorporates by reference Paragraphs 1 through 141 above, as if fully set forth herein.

143.     Defendants Scepter Corporation and/or Scepter Canada have directly infringed multiple claims of the '132 patent under 35 U.S.C. § 271(a) by participating in, directing, controlling and actively aiding and abetting Scepter Manufacturing to make, use, import, offer to sell, and/or sell the Infringing Fuel Containers within the United States.

144.     Defendant Scepter Corporation and/or defendant Scepter Canada's direct infringement is immediate and ongoing.

145.     Defendant Scepter Corporation and/or defendant Scepter Canada have induced infringement of multiple claims of the '132 patent under 35 U.S.C. § 271(b) by participating in, directing, controlling and actively aiding and abetting Scepter Manufacturing to make, use, import, offer to sell, and/or sell the Infringing Fuel Containers within the United States knowing that such acts constitute infringement of the '132 patent.

146.     Defendant Scepter Corporation and/or defendant Scepter Canada's inducement of infringement is immediate and ongoing.

147.     In committing these acts of direct and indirect infringement, defendants Scepter Corporation and/or Scepter Canada acted despite an objectively high likelihood that their respective actions constituted infringement of at least one valid and enforceable claim of the '132 patent, and these defendants knew or should have known that their respective actions constituted an unjustifiably high risk of infringement of at least one valid and enforceable claim of the '132 patent.

148.     Defendant Scepter Corporation and/or defendant Scepter Canada's infringement of the '132 patent has been knowing and willful.

149.     As a direct and proximate result of such acts of defendant Scepter Corporation and/or defendant Scepter Canada's acts of infringement, No Spill has suffered and continues to suffer damages and irreparable injury.

150.     No Spill has no adequate remedy at law for defendant Scepter Corporation and/or defendant Scepter Canada's acts of infringement and unless such these defendants' acts of infringement are enjoined, No Spill will continue to be damaged and irreparably injured.

## COUNT III

### Breach of Contract - Production Requirements - by Scepter Manufacturing

151.     No Spill alleges and incorporates by reference Paragraphs 1 through 150 above, as if fully set forth herein.

152.     Plaintiff No Spill and defendant Scepter Manufacturing discussed having Scepter Manufacturing manufacture gas cans for No Spill.

153.     At that time defendant Scepter Manufacturing had excess capacity, and was eager to obtain No Spill's business.

154.     Defendant Scepter Manufacturing represented that it had available blow molding machines which were idle and could be utilized for No Spill's production orders as needed.

155.     In order to induce No Spill to utilize defendant Scepter Manufacturing to manufacture gas cans for No Spill, defendant Scepter Manufacturing promised that No Spill would be its "Priority 1."

156.     Although defendant Scepter Manufacturing manufactured competing gas cans, it told No Spill it aspired to be No Spill's "Vendor of the Year."

157.     On or about September 6, 2013, No Spill and Scepter Manufacturing entered into the Supply Agreement which is incorporated herein by reference (but not attached pursuant to its Confidentiality provision).

158.     On or about February 9, 2016, the parties to the Supply Agreement entered into the First Amendment to Supply Agreement (hereinafter together the "Supply Agreement").

159.     The Supply Agreement constitutes a valid contract between the parties.

160.     The parties have exchanged mutual consideration to support such contract.

161.     Pursuant to this Supply Agreement defendant Scepter Manufacturing agreed to manufacture, inventory and supply No Spill branded fuel containers to plaintiff with molds designed, manufactured and supplied by No Spill.

162.     The parties operated under and exchanged mutual consideration pursuant to the Supply Agreement for several years thereafter without substantial difficulty.

163.     Pursuant to the Supply Agreement, defendant Scepter Manufacturing agreed to "stock approximately eight (8) to ten (10) truck-loads of Product and all production will be made to purchase order based on a fourteen (14) day lead time. The initial purchase order of eight (8) to ten (10) truck loads will be warehoused by Supplier. This stock will be used to fill new purchase orders and then replenished as used (FIFO)" *Id.* ¶ 4(a).

164.     A truckload of gas cans equals 2,197 five gallon cans.

165.     Within the First Amendment, the above provision was changed to increase defendant Scepter Manufacturing's inventory obligation as follows: "Supplier agrees to increase the current stock of 10 truck-loads of Product 20003 [5 gallon gasoline cans] to 11 truck-loads. Supplier agrees to stock 4 truck-loads of Product 20004 [5 gallon diesel cans]."

166.    Thereafter the parties agreed to increase the quantity of truck-loads Scepter Manufacturing was required to have on hand to 15.

167.    The First Amendment provides that: "This stock will be used to fill new purchase orders and then replenish as used (FIFO)" *Id.* at ¶ 1.

168.    Defendant Scepter Manufacturing represented that production capacity could be ramped up to meet No Spill's orders, as needed, with 24 hours' notice.

169.    Regarding "Order Procedure," the Supply Agreement provides: "Buyer shall issue purchase orders for Product based on full truck loads.  Each "Order" shall provide the type and quantity of Products required, the delivery destination and the delivery date. Supplier must accept or reject an Order within one (1) business day of receipt. No order will be deemed accepted unless Supplier confirms its acceptance. . . ." (*Id.* at ¶ 4(b)).

170.    For several years No Spill submitted weekly Orders which were accepted and filled by defendant Scepter Manufacturing without general difficulty.

171.    Plaintiff No Spill's manufacturing orders to defendant Scepter Manufacturing increased steadily.

172.    Plaintiff No Spill has performed its obligations under the Supply Agreement.

173.    Plaintiff No Spill and defendant Scepter Manufacturing continued to market competing gas cans in the marketplace.

174.    Plaintiff No Spill has enjoyed increasing sales generally, and particularly after announcing the development and availability of gas cans containing its patented flash suppressor, described above.

175.    No Spill's gas cans have enjoyed increasing market acceptance and began to displace Scepter's gas cans with key customer accounts.

176.    Thereafter defendant Scepter Manufacturing began to frustrate and obstruct the supply of manufactured gas cans to No Spill.

177.    On information and belief, defendant Scepter Manufacturing acted in concert with Defendant Scepter Corporation and/or Scepter Canada to attempt to harm the supply of gas cans and thus plaintiff No Spill's increasing acceptance and sales within the marketplace.

178.    For example, defendant Scepter Manufacturing supplied gas cans to No Spill which were grossly defective and dangerous, and which would have failed even a cursory quality control examination, including supplying gas cans which had holes in them, as depicted below:



179.    As the parties began to have disputes, Scepter Manufacturing failed to conduct control procedures as required by paragraph 3 of the Supply Agreement.

180.    One of the cans with holes was sent to a dealer, which returned the defective can to No Spill, which caused injury to No Spill's goodwill and reputation with that dealer.

181.    In addition to supplying gas with holes, defendant Scepter Manufacturing supplied smashed or crushed cans to No Spill.

182.    At one point in December 2017, each truckload contained an average of 30 smashed or crushed cans.

183.    Pursuant to the Supply Agreement, defendant Scepter Manufacturing agreed to "maintain its facility in good working order and condition necessary to produce the quantities and qualities of the Products ordered under this agreement" *Id*. at ¶ 3(a).

184.    Defendant Scepter Manufacturing represented  it would use the same quality control standards and procedures for No Spill's production cans as defendant used on its own products.

185.    The delivery of defective cans to plaintiff No Spill was not a one-time occurrence. Scepter Manufacturing delivered defective cans in numerous truckloads over a period of several months in late 2017 and early 2018.

186.    When confronted with pictures of the defective cans, defendant Scepter Manufacturing admitted that the cans were "not our level of excellence."

187.    Defendant Scepter Manufacturing's delivery of gas cans that did not meet the quality control standards contemplated in the Supply Agreement constitutes a breach of the Supply Agreement.

188.    In breach of the Supply Agreement, defendant Scepter Manufacturing failed and refused to keep the required level of truck load inventory on hand necessary to respond to orders from plaintiff No Spill.

189.    The First Amendment to the Supply Agreement required defendant Scepter Manufacturing to maintain at least 11 truckloads of gas cans. First Amendment ¶ 1.

190.    By the spring of 2017, consumer demand for No Spill's gas cans continued to steadily increase.

191.    At the same time, it became clear that defendant Scepter Manufacturing was not maintaining at least 11 truckloads of gas cans, which was a material breach of the First Amendment and the Supply Agreement.

192.    Because the First Amendment to the Supply Agreement required defendant Scepter Manufacturing to maintain at least 11 truckloads of gas cans at all times, defendant Scepter Manufacturing was required to keep at least 24,167 gas cans stocked at all times (24,167 = 11 x 2,197).

193.    On February 27, 2017, defendant Scepter Manufacturing had only stocked 73 gas can, 24,094 short of what was required in the First Amendment.

194.    On April 6, 2017, defendant Scepter Manufacturing had only stocked 3,215 cans, 20,952 cans short of what was required in the First Amendment.

195.    On April 21, 2017, defendant Scepter Manufacturing had only stocked 2,366 cans, 21,801 cans short of what was required in the First Amendment.

196.    On May 8, 2017, defendant Scepter Manufacturing had only stocked 4,160 cans, 20,007 cans short of what was required in the First Amendment.

197.    On July 14, 2017, defendant Scepter Manufacturing had only stocked 5,980 cans, 18,187 cans short of what was required in the First Amendment.

198.    On July 31, 2017, defendant Scepter Manufacturing had only stocked 533 cans, 17,090 cans short of what was required in the First Amendment.

199.    On November 21, 2017, defendant Scepter Manufacturing had only stocked 17,090 cans, 7,077 cans short of what was required in the First Amendment.

200.    On December 12, 2017, defendant Scepter Manufacturing had only stocked 18,117 cans, 6,050 cans short of what was required in the First Amendment.

201.    Because defendant Scepter Manufacturing was not maintaining at least 11 truckloads as required by the Supply Agreement and the First Amendment, No Spill was unable to sell millions of dollars of product to dealers, which damaged No Spill.

202.    During this time when defendant Scepter Manufacturing was failing to maintain the required truckloads of gas cans, it also refused to produce gas cans for No Spill on the weekends.

203.    Within the Supply Agreement, defendant Scepter Manufacturing agreed it "understands and acknowledges that time is of the essence with regard to the delivery of the Products under this Agreement" *Id.* at ¶ 6(d).

204.    Nowhere in the Supply Agreement is production limited to Monday through Friday.

205.    Rather, the Supply Agreement contemplates "timely delivery" and "that time is of the essence. *Id.*

206.    Contrary to the terms of the Supply Agreement's time is of the essence clause, defendant Scepter Manufacturing informed No Spill that it would not produce cans for No Spill unless defendant Scepter Manufacturing was also producing its own cans on the weekends.

207.    By failing to produce gas cans for No Spill on weekends, defendant Scepter Manufacturing breached the Supply Agreement, including but not limited to paragraph 6(d) of the Supply Agreement.

208.    By the spring and summer of 2017, defendant Scepter Manufacturing was failing to comply with the inventory requirements of the Supply Agreement and First Amendment, and it was failing to timely produce No Spill products in a timely manner.

209.     The failure to comply with inventory requirements and failure to timely produce No Spill products is a breach of the Supply Agreement and the First Amendment.

210.     In breach of the Supply Agreement, defendant Scepter Manufacturing then announced that it refused to manufacture No Spill's orders on weekends without additional charge.

211.     After failing to provide No Spill with its reasonably requested order quantities, on August 22, 2017, Scepter Manufacturing, through Mr. Terry Elliott, who was president of defendant Scepter Canada, Inc., announced it would not ship any product to No Spill until Scepter Manufacturing replenished the inventory levels it was required to maintain in the first place.

212.     The August 22, 2017, communication to No Spill constitutes a breach of the Supply Agreement and the First Amendment.

213.     In breach of the Supply Agreement, defendant Scepter Manufacturing failed and refused to supply the Order quantities submitted by plaintiff No Spill.

214.     The Supply Agreement mandates that any required notices be sent not only to Scepter Manufacturing and No Spill, the parties thereto, but also to defendant Scepter Corporation in Canada *Id.* at ¶ 16.

215.     Plaintiff No Spill has performed its obligations under the Supply Agreement contract.

216.     Defendant Scepter Manufacturing has breached the terms of the Supply Agreement contract, as described above.

217.    As a result of defendant Scepter Manufacturing's breaches of the Supply Agreement and failure to satisfy No Spill's order requirements, plaintiff No Spill lost orders, sales, revenues and profits in excess of $75,000.

## COUNT IV

### Breach of Contract- Sale of Mold Machine- by Scepter Manufacturing

218.    No Spill alleges and incorporates by reference Paragraphs 1 through 217 above, as if fully set forth herein.

219.    The Supply Agreement constitutes a valid contract between the parties.

220.    The parties thereto have exchanged consideration pursuant to the Supply Agreement.

221.    Plaintiff No Spill has performed its obligations under the Supply Agreement contract.

222.    On August 22, 2017, defendant Scepter Manufacturing provided notice of its intent to terminate the Supply Agreement effective as of May 23, 2018.

223.    On information and belief, this termination was made after consultation with and upon the direction of defendants Scepter Corporation and Scepter Canada, and/or affiliated companies.

224.    On information and belief, this termination was made with the intent of frustrating plaintiff No Spill's ability to fill orders, and to attempt to harm No Spill in the marketplace.

225.    On information and belief, defendant Scepter Manufacturing continued to manufacture and/or ship Product to plaintiff No Spill until May 23, 2018.

226.    Section 9 of the Supply Agreement states: "**Option to Purchase Molding Machine and Ancillary Equipment.**  Upon expiration of the Term or other termination of this

Agreement, Buyer shall have the option, but not the obligation, to purchase the molding machine and ancillary equipment used in the production of the Products under the terms set forth in **Exhibit D** of this Agreement" [emphasis in original].

227.    Exhibit D to the Supply Agreement identifies a Bekum blow molding machine by serial number, with described ancillary equipment, with a specified Initial Value.

228.    Exhibit D to the Supply Agreement states: "At the end of the Term of this Agreement, Buyer shall have the option to purchase the above equipment at a value calculated by reducing the Initial Value by 5% for each full year that the Agreement had been in effect; this reduction not to exceed 50% of the Initial Value."

229.    On May 21, 2018, before the May 23, 2018 termination, plaintiff No Spill gave written notice it was exercising the above purchase option.

230.    In this Notice, plaintiff No Spill asked defendant Scepter Manufacturing to state whether a different blow molding machine was being used to manufacture the Products, provide information concerning the current machine being used, and to provide an opportunity to inspect such equipment.

231.    On information and belief, the Bekum blow molding machine referenced in Exhibit D to the Supply Agreement was in use and operational at defendant Scepter Manufacturing's facility as of May 21, 2018.

232.    On information and belief, the Bekum blow molding machine referenced in Exhibit D to the Supply Agreement was being used to produce No Spill gas cans and/or the infringing cans.

233.     On May 31, 2018, after the May 23, 2018 termination, defendant Scepter Manufacturing (through its counsel) refused plaintiff No Spill's exercise of its option to purchase the machine.

234.     Defendant Scepter Manufacturing's refusal to sell the subject machine upon the terms of the Supply Agreement constitutes a breach of the Supply Agreement.

235.     Upon information and belief, defendant Scepter Manufacturing's refusal to honor the purchase option within the contract was made with the intent of frustrating plaintiff No Spill's ability to meet its increasing orders.

236.     On information and belief, defendant Scepter Manufacturing's above breaches of the Supply Agreement were made in concert with affiliated companies including defendant Scepter Corporation and/or defendant Scepter Canada.

237.     As a result of such breaches, plaintiff No Spill has sustained damages, including a loss of production capacity, sales, revenue and profits at times of high order demand and thereafter.

238.     Plaintiff No Spill took efforts to try to mitigate its loss of production capacity caused by defendant Scepter Manufacturing's breaches, but was unable to completely mitigate such losses.

239.     As a result of defendant Scepter Manufacturing's breaches, plaintiff No Spill has sustained damages from lost sales, revenue, profits and market position in excess of $75,000.

## COUNT V

## Unfair Competition Under the Lanham Act by All Defendants

240.     No Spill alleges and incorporates by reference Paragraphs 1 through 239 above, as if fully set forth herein.

241.     As a result of No Spill's continuous, exclusive and extensive promotion and sale of gas cans and nozzles incorporating the No Spill Trade Dress in commerce and the commercial success of these gas cans and nozzles, the unique No Spill Trade Dress has developed secondary meaning amongst the relevant consumers as an identifier of the source of No Spill's gas cans and nozzles.

242.     No Spill has established valid and enforceable trade dress rights in the No Spill Trade Dress.

243.     Defendants have infringed No Spill's rights in the No Spill Trade Dress and have committed unfair competition under 15 U.S.C. § 1125(a) by advertising, marketing and selling in commerce gas cans and nozzles incorporating Scepter's Infringing Trade Dress that are likely to cause confusion, mistake or deception by and among consumers as to the source of the parties' respective gas cans.

244.     Defendants' unfair competition is immediate and ongoing.

245.     Defendants' unfair competition has been knowing and willful.

246.     As a direct and proximate result of defendants' acts of unfair competition, No Spill has suffered and continues to suffer damages and irreparable injury.

247.     No Spill has no adequate remedy at law for defendants' acts of unfair competition and, unless they are both enjoined, No Spill will continue to be damaged and irreparably injured.

248.     No Spill has a substantial likelihood of prevailing on the merits.

249.     The injury to No Spill outweighs any damage injunctive relief may cause defendants.

250.     The impact of issuing injunctive relief in No Spill's favor will not be adverse to the public interest.

## COUNT VI

### Unfair Competition Under the Common Law of Kansas by All Defendants

251.     No Spill alleges and incorporates by reference Paragraphs 1 through 250 above, as if fully set forth herein.

252.     No Spill has the exclusive right to advertise, market and sell gas cans and nozzles that incorporate the No Spill Trade Dress.

253.     Gas cans and nozzles that use Defendants' Infringing Trade Dress are likely to cause confusion, mistake or deception by and among consumers as to the source, origin, sponsorship, approval and affiliation of the parties' respective products.

254.     Defendants' conduct as alleged herein constitutes unfair competition under the common law of the State of Kansas.

255.     As a direct and proximate result of defendants' unlawful acts, No Spill has suffered and continues to suffer damages and irreparable injury.

256.     No Spill has no adequate remedy at law for defendants' acts of unfair competition and, unless they are enjoined, No Spill will continue to be damaged and irreparably injured.

## Prayers for Relief

WHEREFORE, plaintiff No Spill respectfully requests that the Court enter judgments and Orders against defendants as follows:

A.      Finding that defendants Scepter Corporation and Scepter Canada have directly and indirectly infringed one or more claims of the '075 patent and the '132 patent under 35 U.S.C. § 271(a) and (b);

B.      Permanently enjoining defendants Scepter Corporation and Scepter Canada and their respective officers, agents, servants, employees, and representatives, and all others in active concert or participation with them, from further infringing the '075 and '132 patents and from further manufacture, use, importation, offer for sale, and sale of the Infringing Fuel Containers employing a flash suppressor;

C.      Awarding damages to No Spill to compensate No Spill under 35 U.S.C. § 284 for defendant Scepter Corporation's and defendant Scepter Canada's infringement of the '075 and '132 patents;

D.      Finding that defendant Scepter Corporation's and Scepter Canada's infringement have been willful and trebling the damage award under 35 U.S.C. § 284;

E.      Finding this to be an exceptional case under 35 U.S.C. § 285 and awarding No Spill its reasonable attorneys' fees and expenses in this action;

F.      Awarding No Spill damages for defendant Scepter Manufacturing's breaches of the Supply Agreement and First Amendment;

G.      Awarding No Spill damages for defendants' unfair competition under the Lanham Act and under the common law of Kansas;

H.     Permanently enjoining defendants and their respective officers, agents, servants, employees, and representatives, and all others in active concert or participation with them, from further acts of unfair competition and from further manufacturing, advertising, marketing and/or selling any gas cans and nozzles that use Defendants' Infringing Trade Dress;

I.     Awarding No Spill pre-judgment and post-judgment interest;

J.     Awarding No Spill its costs, attorneys' fees and expenses in this action; and

K.     Awarding such other and further relief as the Court deems just and proper.

## Jury Demand

Under Rule 38(b) of the Federal Rules of Civil Procedure and other applicable law, plaintiff No Spill demands a trial by jury of all issues so triable to a jury.

Dated:  April 17, 2019

Respectfully submitted,

STINSON LEONARD STREET LLP


By:  */s/ Douglas R. Dalgleish*
Douglas R. Dalgleish, KS #22328
Bradley J. Yeretsky, KS  #21092
Bryce E. Langford, KS  #27548
Stinson Leonard Street
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Tel: (816) 842-8600
Fax: (816) 691-3495
doug.dalgleish@stinson.com
brad.yeretsky@stinson.com
bryce.langford@stinson.com

and

Robert M. Evans, Jr., Mo Bar #35613
(*Pro Hac Vice* forthcoming)
Stinson Leonard Street
7700 Forsyth Boulevard, Suite 1100
St. Louis, MO 63105
Tel: (314) 345-7004
Fax: (314) 345-7600
robert.evans@stinson.com

**Attorneys for Plaintiff No Spill Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of April, 2019, I filed the foregoing through Court's CM/ECF system, which will send notice of the electronic filing to all counsel of record.

*/s/ Douglas R. Dalgleish*
Attorney for Plaintiff No Spill Inc.

151832350