**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| NO SPILL INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 18-cv-2681 JAR/KGG |
| | ) |
| SCEPTER CORPORATION | ) |
| n/k/a 1216037 ONTARIO, INC., | ) |
| | ) |
| and | ) |
| | ) |
| SCEPTER CANADA, INC., | ) |
| | ) |
| and | ) |
| | ) |
| SCEPTER MANUFACTURING LLC, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF SCEPTER MANUFACTURING, LLC'S**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

**Page**

I.      NATURE OF THE MATTER BEFORE THE COURT ....................................................1

II.     CONCISE STATEMENT OF FACTS ...........................................................................1

III.    QUESTIONS PRESENTED...........................................................................................3

IV.     LEGAL PRINCIPLES ..................................................................................................4

V.      ARGUMENT .................................................................................................................5

       A.     No Spill's Conclusory Statements of Performance Are Insufficient to
            Establish Breach, Thus Its Contract Claims Should Be Dismissed ......................5

            1.     No Spill fails to plead adequate facts to establish all elements of
                  breach of production requirements to support Count III. ...........................5

            2.     No Spill fails to plead adequate facts to establish all elements of
                  breach of the purchase option to support Count IV. ...................................8

       B.     No Spill's Contract Claims Under Counts III and IV Should Be Dismissed
            Because They Seek Damages Precluded Under the Contract..............................10

       C.     No Spill Does Not and Cannot Adequately Plead Distinctiveness and Non-
            Functionality, Thus Its Trade Dress Claims Should Be Dismissed .....................11

            1.     The features of No Spill's alleged "trade dress."......................................12

            2.     No Spill's alleged gas can design is functional on its face and the
                   Amended Complaint contains no factual allegations demonstrating
                   otherwise. ...................................................................................................13

            3.     No Spill fails to adequately plead that its gas can design has
                   acquired distinctiveness. ............................................................................18

VI.     CONCLUSION.............................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................4, 16, 17, 18

*Barnett v. Oliver*,
    858 P.2d 1228 (Kan.  Ct.  App. 1993) ..................................................................10

*Bell Atl.  Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................................................................4

*Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*,
    265 F. Supp. 2d 1179 (D.  Kan. 2003) .................................................................5

*C5 Med.  Werks, LLC v. CeramTec GmbH*,
    249 F. Supp. 3d 1210 (D.  Colo. 2017), *appeal argued*,
    No. 17-1173 (10th Cir.  Sept. 24, 2018). ...............................................12, 17, 18

*Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*,
    No. CV 15-769 PSG, 2015 WL 12731929 (C.D. Cal.  May 8, 2015) ..............16, 17

*Dinkum Sys., Inc. v. Woodman Labs, Inc.*,
    No. 14-CV-00152-PAB-KMT, 2014 WL 4437310 (D.  Colo.  Sept. 8, 2014) ................14, 18

*Domo, Inc. v. Grow, Inc.*,
    No. 2:17-CV-812, 2018 WL 2172937 (D.  Utah May 10, 2018) ................................... *passim*

*Forney Indus., Inc. v. Daco of Mo., Inc.*,
    835 F.3d 1238 (10th Cir. 2016) ...............................................................12, 19, 22

*Gore v. Beren*,
    867 P.2d 330 (Kan. 1994) ....................................................................................10

*Hammerton, Inc. v. Heisterman*,
    No. 2:06-CV-00806 TS, 2008 WL 2004327 (D.  Utah May 9, 2008)....................18

*Inspired By Design, LLC v. Sammy's Sew Shop, LLC*,
    No. 16-CV-2290-DDC-KGG, 2016 WL 6093778 (D.  Kan.  Oct. 19, 2016) ............18, 20, 21

*Jenny Yoo Collection, Inc. v. Essense of Australia, Inc.*,
    No. 17-2666-JAR-GEB, 2019 WL 1515236 (D.  Kan.  Apr. 8, 2019)....................11

*Jenny Yoo Collection, Inc. v. Essense of Australia, Inc.*,
    No. 17-2666-JAR-GLR, 2018 WL 3744060 (D.  Kan.  Aug. 7, 2018) ............11, 14

*Mike Vaughn Custom Sports, Inc. v. Piku*,
    15 F. Supp. 3d 735 (E.D. Mich. 2014) ...................................................................14

*Ponds ex rel.  Poole v. Hertz Corp.*,
    158 P.3d 369 (Kan.  Ct.  App. 2007) .....................................................................10

*Predator Int'l, Inc. v. Gamo Outdoor USA*,
    669 F. Supp. 2d 1235 (D.  Colo. 2009) ................................................................21

*Ridge at Red Hawk, LLC v. Schneider*,
    493 F.3d 1174 (10th Cir. 2007) ..............................................................................5

*Sally Beauty Co. v. Beautyco, Inc.*,
    304 F.3d 964 (10th Cir. 2002) ..............................................................................19

*Savant Homes, Inc. v. Collins*,
    809 F.3d 1133 (10th Cir. 2016) .................................................................11, 19, 20

*Smith v. United States*,
    561 F.3d 1090 (10th Cir. 2009) ..............................................................................2

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ................................................................................................4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................2

*Thomas & Betts Corp. v. Panduit Corp.*,
    65 F.3d 654 (7th Cir. 1995) ..................................................................................21

*TrafFix Devices, Inc. v. Mktg.  Displays, Inc.*,
    532 U.S. 23 (2001) ........................................................................................ *passim*

*Virgin Scent, Inc. v. Bel Air Naturals Care Corp.*,
    No. CV 17-08284-AB, 2018 WL 5264145 (C.D. Cal.  Feb. 8, 2018) ....................14

*Wagnon v. Slawson Exploration Co.*,
    874 P.2d 659 (Kan. 1994) .....................................................................................10

*Wal-Mart Stores v. Samara Bros., Inc.*,
    529 U.S. 205 (2000) ..............................................................................................18

*Winning Ways, Inc. v. Holloway Sportswear, Inc.*,
    913 F. Supp. 1454 (D.  Kan. 1996) .............................................................19, 20, 21

## STATUTES

15 U.S.C. § 1125(a)(3) ..............................................................................................14

Iowa Code Ann. § 214A.15......................................................................................................17, 22

## RULES

Fed. R. Civ. P. 8(a)(2).............................................................................................................4

Fed. R. Civ. P. 12(b)(6)...........................................................................................................15

## REGULATIONS

29 C.F.R. § 1910.144.............................................................................................................17, 22

## I.   NATURE OF THE MATTER BEFORE THE COURT

Defendant Scepter Manufacturing, LLC ("Scepter Manufacturing") respectfully moves the Court to dismiss all claims in the Amended Complaint (Doc. 21) asserted against it.[1]

No Spill asserts only two types of claims (contract and trade dress) against Scepter Manufacturing.[2]  But No Spill does not and cannot adequately plead either.  As to the contract claims, No Spill fails to adequately plead at least two critical elements to establish a claim for breach—that No Spill performed its obligations under the parties' agreement and that it is entitled to damages.  As to the trade dress claims, No Spill similarly fails to adequately plead two required elements to establish a claim for trade dress infringement—that its alleged trade dress is distinctive and non-functional.  Although No Spill amended its Original Complaint in an attempt to allege additional facts to support its claims, No Spill's Amended Complaint remains deficient.  Accordingly, even assuming the facts asserted in the Amended Complaint are true and viewed in the light most favorable to No Spill, its claims against Scepter Manufacturing must be dismissed.

## II.   CONCISE STATEMENT OF FACTS

1.   The Amended Complaint includes six claims: two patent infringement claims asserted against 1216037 Ontario, Inc. and Scepter Canada, Inc. (Doc. 21 ¶¶ 133-50), two breach of contract claims asserted against Scepter Manufacturing (*id.* ¶¶ 151-239), and two trade dress

---

[1] The Amended Complaint adds Scepter Canada, Inc. and substitutes Scepter Corporation (which no longer exists) with 1216037 Ontario, Inc. as Defendants.  Based on the docket, Plaintiff No Spill, Inc. ("No Spill") has not yet served either new party.

[2] The central claims in this case are directed to another type of claim: patents.  Although No Spill asserts that "Scepter Manufacturing manufactures and sells within the United States" the products that allegedly infringe its patents (Doc. 21 ¶ 88), No Spill only asserts these patent claims against 1216037 Ontario, Inc. and Scepter Canada, Inc.

claims asserted against all Defendants (*id.* ¶¶ 240-56).  This motion to dismiss only relates to the claims asserted against Scepter Manufacturing.

2.  The Amended Complaint incorporates by reference a Supply Agreement entered between No Spill and Scepter Manufacturing on or about September 6, 2013.  *Id.* ¶ 157 ("No Spill and Scepter Manufacturing entered into the Supply Agreement which is incorporated herein by reference"); Supply Agreement (attached herein as Exhibit A).[3]

3.  This Supply Agreement provides specific procedures to which both parties must adhere in order to maintain inventory (*id.* ¶ 4), submit purchase orders (*id.* ¶ 5), and to address delays (*id.* ¶ 6(d)).  The Supply Agreement also provides specific terms that No Spill must meet in order to exercise the option to purchase the specific molding machine and ancillary equipment used in the production of the products upon termination of the parties' Agreement.  *Id.* ¶ 9.

4.  No Spill alleges in its Amended Complaint that Scepter Manufacturing breached the Supply Agreement in two ways: by failing to meet production requirements and by failing to honor the purchase option.

5.  For failure to meet production requirements, No Spill alleges no facts related to the performance of its obligations under the Supply Agreement to meet production requirements.  For failure to honor the purchase option, No Spill alleges no facts that establish that it met the terms required to exercise the purchase option.

6.  The Supply Agreement also recites a limitation of liability clause that precludes "INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE

---

[3] When evaluating a motion to dismiss, the court may consider "not only the complaint itself, but also attached exhibits, . . . and documents incorporated into the complaint by reference."  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

DAMAGES, INCLUDING WITHOUT LIMITATION, LOST PROFITS OR LOST REVENUES, IN CONNECTION WITH ITS PERFORMANCE OR FAILURE TO PERFORM IN CONNECTION WITH THE AGREEMENT." *Id.* ¶ 13.

7.  As to failure to meet production requirements, No Spill seeks damages for "lost orders, sales, revenues and profits."  Doc. 21 ¶ 217.  As to failure to honor the purchase option, No Spill seeks damages for "lost sales, revenue profits and market position."  *Id.* ¶ 239.

8.  No Spill also alleges in its Amended Complaint that Scepter Manufacturing infringes its trade dress under federal law and state law.

9.  No Spill alleges that the features of a gas can constitute its trade dress: red plastic with a nozzle made from black plastic (Doc. 21 ¶ 122), an open handle on top of the fuel storage container (*id.* ¶ 116), a nozzle next to the handle (*id.* ¶ 117), a tapered spout projecting horizontally (*id.* ¶ 118), and a cap tethered to the spout on the underside of the spout (*id.* ¶ 120).

10.  No Spill states that its alleged trade dress is "ornamental" but alleges no facts to demonstrate how its alleged trade dress is non-functional.

11.  No Spill states that it has advertised and sold its products but alleges no facts to demonstrate that its alleged trade dress has a distinctiveness that establishes in the minds of the public a secondary meaning that the source of the products is No Spill.

## III.  QUESTIONS PRESENTED

1.  Should the contract claims be dismissed when the Amended Complaint does not adequately plead that No Spill has met its obligations under that contract?

2.  Should the contract claims be dismissed when the Amended Complaint alleges damages for lost profits, lost revenue, and other consequential damages that the contract precludes?

3.      Should the trade dress claims be dismissed when the Amended Complaint fails to adequately plead distinctiveness and non-functionality?

## IV.   LEGAL PRINCIPLES

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  This short and plain statement must be more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rather, the statement must give the defendant adequate notice of what the plaintiff's claim is and the grounds of that claim.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Iqbal*, 556 U.S. at 678.  To survive a motion to dismiss, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The determination of the sufficiency of a claim is a two-step process.  First, the court must determine if the allegations are factual and entitled to an assumption of truth or merely legal conclusions that are not entitled to an assumption of truth.  *Iqbal*, 556 U.S. at 679.  Second, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  Plausibility requires more than "a sheer possibility."  *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (citing *Twombly*, 550 U.S. at 557).  Under this standard, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering

4

factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

## V.    ARGUMENT

### A.    No Spill's Conclusory Statements of Performance Are Insufficient to Establish Breach, Thus Its Contract Claims Should Be Dismissed

To establish a claim for breach of contract under Kansas law, plaintiff must allege: "(1) the existence of a contract between the parties; (2) consideration; (3) *the plaintiff's performance or willingness to perform in compliance with the contract*; (4) defendant's breach of the contract; and (5) that plaintiff was damaged by the breach." *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003) (emphasis added).

Here, No Spill alleges that Scepter Manufacturing breaches two terms of the parties' Supply Agreement: the production requirements and the purchase option.  But the specific terms impose obligations not just on Scepter Manufacturing but also on No Spill in order to be in compliance with the Supply Agreement.  Although No Spill alleges that it "has performed its obligations under the Supply Agreement" (Doc. 21 ¶¶ 172, 215, 221), No Spill fails to allege facts to support that conclusory statement.  Thus, even assuming all facts in the Amended Complaint to be true, No Spill fails to establish a claim for breach of contract that goes beyond mere possibility.

### 1.    No Spill fails to plead adequate facts to establish all elements of breach of production requirements to support Count III.

No Spill alleges breach of contract for failure to meet production requirements by refusing to keep the required levels of truck load inventory on hand (Doc. 21 ¶¶ 188, 191, 209), refusing to supply order quantities submitted (*id.* ¶¶ 211-13), and refusing to manufacture No Spill's orders on weekends without additional charge (*id.* ¶¶ 207, 210).  But none of these claims is adequately pled because each lacks any facts to support at least one critical element to establish a claim for breach—that No Spill performed its obligations under the Agreement.  Rather, the only

allegation related to No Spill's performance of its obligations is a single conclusory statement that "Plaintiff No Spill has performed its obligations under the Supply Agreement." *Id.* ¶ 215. This statement is plainly inadequate, particularly in light of No Spill's clear obligations under the Supply Agreement.

With respect to inventory on hand, No Spill fails to allege any facts that it met its obligations under the Supply Agreement to provide the necessary 14-day lead time and required quarterly forecasts "to keep the required level of truck load inventory on hand necessary to respond to orders." Doc. 21 ¶ 188. As No Spill acknowledges, under the Supply Agreement, inventory would "be used to fill new purchase orders and then replenished as used (FIFO)." *Id.* ¶ 163 (citing Supply Agreement ¶ 4(a)). Thus, the Supply Agreement required No Spill provide "good faith forecasts to Supplier at the beginning of each calendar quarter for the Product" and that "all production will be made to purchase order based on a fourteen (14) day lead time." Supply Agreement ¶ 4. Although No Spill rattles off a list of inventory levels on certain dates, No Spill noticeably fails to allege that it had given Scepter Manufacturing any forecasts or the 14-day lead time, as required under the Supply Agreement, to replenish the inventory before each of these dates. Ultimately, No Spill alleges no facts to establish how it met its obligations under the Supply Agreement to allow Scepter Manufacturing to maintain the required inventory level.

With respect to the failure to supply order quantities submitted, No Spill fails to identify any order that it submitted to Scepter Manufacturing that was not fulfilled. The Supply Agreement provides a specific procedure for supply orders to be submitted and accepted:

> **Order Procedure.** Buyer shall issue purchase orders for Product based on full truck loads. Each "Order" shall provide the type and quantity of Products required, the delivery destination and the delivery date. Supplier must accept or reject an Order within one (1) business day of receipt. No order will be deemed accepted unless Supplier confirms its acceptance.

Supply Agreement ¶ 5.  Accordingly, under the Supply Agreement, No Spill was required to issue specific purchase orders.  But No Spill identifies none that were accepted but not fulfilled.  Rather, the only specific event that No Spill points to as an alleged breach is an August 22, 2017 communication in which Scepter Manufacturing "announced it would not ship any product to No Spill until Scepter Manufacturing replenished the inventory levels."  Doc. 21 ¶¶ 211-13.  Setting aside No Spill's own allegation that Scepter Manufacturing declared a Force Majeure at this time due to Hurricane Harvey (consistent with Paragraph 11 of the Supply Agreement) (Doc. 21 ¶ 64, Ex.  K), No Spill again fails to identify any specific orders that were submitted and accepted but not fulfilled due to this announcement.

Last, with respect to the refusal to manufacture orders on the weekends without charge, there is no such requirement under the Supply Agreement.  Despite this, No Spill attempts to read in such a requirement under Paragraph 6(d) providing specific procedures for "Delays."  But even assuming that this provision requires the manufacture of orders on the weekends without charge (and it does not), No Spill fails to recite any facts that it performed its obligations under the "Delays" provision of the Supply Agreement.  The provision recites in full:

> Delays.  Supplier understands and acknowledges that time is of the essence with regard to the delivery of the Products under this Agreement.  If Supplier causes the Products to be delivered after the delivery date set out in the relevant Order, then Supplier shall reimburse Buyer for any out of pocket costs reasonably incurred and paid by Buyer to a third party because of Supplier's failure to timely deliver the Products.  In addition, Buyer may reject the shipment and cancel the relevant Order.  However, if the late delivery of the Products is due to Buyer's instructions, changes or modifications to the Products (a "Buyer Caused Delay"), the Supplier will not be responsible for any such out of pocket costs.  Supplier will notify Buyer in writing at the time Buyer provides any instructions, changes or modifications as to whether such instructions, changes or modifications will result in a Buyer Caused Delay.  Whenever an actual or potential labor dispute is delaying or threatens to delay timely delivery of the Products, Supplier shall immediately notify Buyer of such dispute and furnish all relevant details.

Supply Agreement ¶ 6(d).  Accordingly, the Supply Agreement specifically contemplates that two types of delays may occur: Supplier caused delays (i.e., delays caused by Scepter Manufacturing) or Buyer Caused Delays (i.e., delays caused by No Spill).  To the extent that No Spill alleges that Scepter Manufacturing refused to manufacture orders on the weekends, thereby causing delays, this provision provides No Spill with two options: No Spill could pay for any out of pocket expenses caused by the delay (which would then fall on Scepter Manufacturing to reimburse), or No Spill could reject the shipment and cancel the relevant order.  Again, No Spill fails to identify any facts specific to the performance of its own obligations under this provision, which would be required to establish a claim for breach.

Removing legal conclusions, the Amended Complaint does not sufficiently state factual allegations that establish that No Spill met its own obligation to meet production requirements under the parties' Supply Agreement.  Accordingly, No Spill does not state a claim for breach of contract on which relief is entitled.

### 2.     No Spill fails to plead adequate facts to establish all elements of breach of the purchase option to support Count IV.

No Spill also alleges breach of contract based on Scepter Manufacturing's alleged refusal to honor a purchase option within the contract.  Doc. 21 ¶¶ 218-39.  But No Spill does not and cannot allege facts sufficient to establish a breach of the Supply Agreement on this basis.  In particular, No Spill fails to allege that it requested to purchase the specific Bekum blow molding machine under the specified pricing terms set forth in Exhibit D to the Supply Agreement within the specified time period.

No Spill alleges in its Amended Complaint that the following terms of the Supply Agreement were breached by Scepter Manufacturing:

226.  Section 9 of the Supply Agreement states: "**Option to Purchase Molding Machine and Ancillary Equipment.**  Upon expiration of the Term or other termination of this

Agreement, Buyer shall have the option, but not the obligation, to purchase the molding machine and ancillary equipment used in the production of the Products under the terms set forth in Exhibit D of this Agreement" [emphasis in original].

227.   Exhibit D to the Supply Agreement identifies a Bekum blow molding machine by serial number, with described ancillary equipment, with a specified Initial Value.

228.   Exhibit D to the Supply Agreement states: "At the end of the Term of this Agreement, Buyer shall have the option to purchase the above equipment at a value calculated by reducing the Initial Value by 5% for each full year that the Agreement had been in effect; this reduction not to exceed 50% of the Initial Value."

Doc. 21 ¶¶ 226-28.  But these provisions establish that No Spill had certain obligations to perform in order to exercise the purchase option.  First, No Spill only had the option to purchase the specified equipment.  In particular, No Spill could only purchase the Bekum blow molding machine identified by Model BM-705D, Serial No. 204705-5-053.  Second, No Spill had to purchase this specific machine at a specified price.  No Spill could only purchase the identified Bekum blow molding machine at $388,800 (the initial value of $486,000 reduced by 5% for each full year the Supply Agreement had been in effect).  Third, No Spill could only exercise this option at the end of the Term of the Agreement, not after.  Indeed, the Supply Agreement provided that this purchase option would not survive termination of the Supply Agreement.  Supply Agreement ¶ 8(d).

No Spill fails to allege facts that establish that it met these obligations.  To the contrary, No Spill only specifically states that two days before the termination of the Agreement, it "asked defendant Scepter Manufacturing to state whether a different blow molding machine was being used to manufacture the Products, provide information concerning the current machine being used, and to provide an opportunity to inspect such equipment."  Doc. 21 ¶ 230.  No Spill does not allege that it specifically requested to purchase the Bekum blow molding machine identified by Model BM-705D, Serial No. 204705-5-053.  No Spill does not allege that it specifically requested to

purchase the identified Bekum blow molding machine for $388,800.  And No Spill does not allege that it specifically requested to purchase the identified Bekum blow molding machine for the specified pricing terms before the termination of the Supply Agreement.

Accordingly, No Spill fails to adequately plead a claim for breach, and therefore, its contract claims must be dismissed.

### B.   No Spill's Contract Claims Under Counts III and IV Should Be Dismissed Because They Seek Damages Precluded Under the Contract

The damages that No Spill seeks for its alleged contract claims under Counts III and IV are foreclosed.  To establish a claim for breach of contract, No Spill must establish that it is entitled to damages as a result of that breach.  Here, No Spill alleges damages only from lost profits, lost revenue, and other consequential damages.  But these damages are precluded under the plain language of the Supply Agreement.

The construction of a written contract is a question of law.  *Ponds ex rel. Poole v. Hertz Corp.*, 158 P.3d 369, 372 (Kan. Ct. App. 2007).  Generally, if the language in a written contract "is clear and can be carried out as written, there is no room for rules of construction."  *Gore v. Beren*, 867 P.2d 330, 337 (Kan. 1994) (quotation omitted). "In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms."  *Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 858 P.2d 1228, 1238 (Kan. Ct. App. 1993)).

Here, there is no ambiguity that the Supply Agreement precludes lost profits, lost revenue, and other consequential damages.  The Supply Agreement expressly states:

**LIMITATION OF LIABILITY.**  NOTWITHSTANDING **SECTION 15** BELOW, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY CLAIM BASED ON ANY THIRD PARTY CLAIM AGAINST THE OTHER PARTY OR FOR INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR

PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION, LOST PROFITS OR LOST REVENUES, IN CONNECTION WITH ITS PERFORMANCE OR FAILURE TO PERFORM IN CONNECTION WITH THE AGREEMENT, REGARDLESS OF WHETHER THE OTHER PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Supply Agreement ¶ 13.  In Count III, No Spill alleges that Scepter Manufacturing's "failure to satisfy No Spill's order requirements" resulted in "lost orders, sales, revenues and profits" but these damages plainly fall under the "lost profits or lost revenues" precluded under the Supply Agreement. Doc. 21 ¶ 217.  Similarly, in Count IV, No Spill alleges that "Scepter Manufacturing's refusal to honor the purchase option" resulted in "lost sales, revenue, profits and market position" but these damages also plainly fall under the consequential, lost profits, and lost revenues damages precluded under the Supply Agreement.  *Id.* ¶¶ 235, 239.

Because No Spill only alleges damages that are precluded under the Supply Agreement, No Spill does not state a claim for breach.

### C.   No Spill Does Not and Cannot Adequately Plead Distinctiveness and Non-Functionality, Thus Its Trade Dress Claims Should Be Dismissed

No Spill's Amended Complaint also purports to assert claims for trade dress infringement under both federal and state law.  To state either claim, however, No Spill must identify the specific features of its gas can that allegedly constitute protectable trade dress.  *See Jenny Yoo Collection, Inc. v. Essense of Australia, Inc.*, No. 17-2666-JAR-GEB, 2019 WL 1515236, at *4 (D.  Kan. Apr. 8, 2019).  No Spill must then plead facts plausibly demonstrating that, and how, those gas can features (1) are non-functional; and (2) have acquired distinctiveness, such that they identify No Spill as the source of the gas can.  *See, e.g.*, *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1147 (10th Cir. 2016) (analyzing elements of trade dress infringement under the Lanham Act); *Jenny Yoo Collection, Inc. v. Essense of Australia, Inc.*, No. 17-2666-JAR-GLR, 2018 WL 3744060, at *7-8 (D.  Kan.  Aug. 7, 2018) (considering trade dress claim under Kansas common

law).

No Spill does not and cannot meet this pleading standard, as the Amended Complaint fails to adequately plead that No Spill's gas can features are either non-functional or have acquired distinctiveness.  Rather, No Spill's asserted features all appear facially functional, as they merely allow a user to store, handle, and pour gasoline.  Likewise, No Spill's repetitive assertions that various elements of its trade dress are "distinctive" does not make them so.  Nor do No Spill's generalized sales and marketing efforts.  Indeed, overcoming the presumption of functionality "is no easy task" and establishing acquired distinctiveness is "often the greatest hurdle" for a trade dress plaintiff.  *See Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1244 (10th Cir. 2016); *C5 Med.  Werks, LLC v. CeramTec GmbH*, 249 F. Supp. 3d 1210, 1216 (D.  Colo. 2017), *appeal argued*, No. 17-1173 (10th Cir.  Sept. 24, 2018).  No Spill does not rise to the occasion here in either instance, by overcoming the presumption of functionality or establishing distinctiveness, and thus its claims should be dismissed.

### 1.    The features of No Spill's alleged "trade dress."

No Spill purports to have trade dress rights in "gas cans with a distinctive plastic nozzle assembly having a tapered spout," as pictured below.[4]  *See* Doc. 21 ¶ 103.  No Spill attempts to narrow the claim by identifying the following specific features of its alleged gas can design:

- a gas can made from red plastic with a nozzle made from black plastic (*id*. ¶ 122);
- an open handle formed into the top of the fuel storage container of the gas can (*id.* ¶ 116);
- a nozzle assembly installed on the top of the gas can adjacent to the open handle (*id*. ¶ 117);
- a tapered spout projecting horizontally (*id*. ¶ 118); and
- a cap for covering the end of the spout, tethered to the spout with a flexible plastic strap secured to the underside of the spout (*id*. ¶ 120).

---

[4] No Spill's can is on the left; Scepter's can is on the right.  Doc. 21 ¶ 115.



According to No Spill, these features are "not functional" and "are not needed for a competitor to compete for sales."  *Id.* ¶¶ 116, 118–25.

No Spill alleges that it has advertised and sold gas cans with these characteristics since 1989 through various third-party retailers nationwide, and that its cans were at some point best-sellers in the "Outdoor Power Gas Can" category on Amazon.  *Id.* ¶¶ 111-12.  It further alleges that "the product label that is affixed to a No-Spill can" shows "an outline of the No Spill Trade Dress highlighted behind the word 'No.'" *Id.* ¶ 110.

However, No Spill tellingly has dropped two elements of its purported trade dress: "a rotatable collar having spaced, elongated grips around the periphery of the collar. . . [which] creates a favorable ornamental impression" (Doc. 1 ¶¶ 45-46) and the "decorative fin on the underside of the spout" (*id.* ¶ 47)."  No Spill apparently concedes that these features are either functional or non-distinctive, which remains true of the remaining features it continues to claim.

 2. **No Spill's alleged gas can design is functional on its face and the Amended Complaint contains no factual allegations demonstrating otherwise.**

 "It is well established that 'trade dress protection may not be claimed for product features that are functional.'" *Domo, Inc. v. Grow, Inc.*, No. 2:17-CV-812, 2018 WL 2172937, at *5 (D. Utah May 10, 2018) (quoting *TrafFix Devices, Inc. v. Mktg.  Displays, Inc.*, 532 U.S. 23, 29

(2001)).  Trade dress is presumed functional.  Product "features are deemed functional until proved otherwise by the party seeking trade dress protection."  *TrafFix Devices*, 532 U.S. at 30; *see also* 15 U.S.C. § 1125(a)(3) (plaintiff asserting unregistered trade dress "has the burden of proving that the matter sought to be protected is not functional").  A feature is functional if: (1) it is "essential to the use or purpose of the article or if it affects the cost or quality of the article;" or (2) its "exclusive use. . . would put competitors at a significant non-reputation-related disadvantage." *Jenny Yoo*, 2018 WL 3744060, at *6.

These basic principles of trade dress law have been applied at the pleading stage to require "the plaintiff to allege, in more than a conclusory fashion, that the trade dress taken as a whole is non-functional."  *Domo*, 2018 WL 2172937, at *5; *see also Virgin Scent, Inc. v. Bel Air Naturals Care Corp.*, No. CV 17-08284-AB (RAOx), 2018 WL 5264145, at *4 (C.D. Cal.  Feb. 8, 2018) (requiring a trade dress plaintiff "allege *how* a trade dress is non-functional"); *Dinkum Sys., Inc. v. Woodman Labs, Inc.*, No. 14-CV-00152-PAB-KMT, 2014 WL 4437310, at *3 (D.  Colo.  Sept. 8, 2014) (dismissing claim where plaintiff "allege[d] no facts that describe[d] the nonfunctional details of the ActionPod products' 'look and feel'"); *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 746–47 (E.D. Mich. 2014) ("[t]he failure to plead non-functionality with factual particularity establishes merely the possibility and not the plausibility of [relief] and is therefore fatal to Plaintiff's trade dress claim.").

Here, No Spill fails to allege facts demonstrating *how* the alleged trade dress features of its gas can design are, individually or collectively, non-functional.  Rather, the Amended Complaint relies on conclusory allegations that the design is non-functional and on logically fallacious assertions that certain patently functional features are simply not so.  *See, e.g.*, Doc. 21 ¶¶ 107, 116, 118-21.  No Spill's efforts are insufficient to establish non-functionality at this juncture,

particularly given that it "possesses all the facts about its product" and should be able to adequately plead facts (not conclusions) about how these features are non-functional. *See, e.g.*, *Domo*, 2018 WL 2172937, at *5 ("simply making a conclusory statement that its 'features constitute a design choice not driven solely by function' is not sufficient to meet the *Iqbal* standard under Rule 12(b)(6)").

The absence of any factual, non-conclusory allegations addressing the functionality question is particularly glaring here as the identified trade dress is so blatantly functional on its face.  At base, No Spill's claimed features simply allow the user to do precisely what a gas can is supposed to do—store, handle, and pour gasoline.  Specifically, No Spill's identified features enable the user to pick up the gas can (Doc. 21 ¶ 116 ("open handle formed into the top of the fuel storage container")), open the gas can without misplacing the gas can's cap (*id.* ¶ 120 ("[t]he cap is tethered to the spout with a flexible plastic strap, secured at one end to the underside of the spout"), pour gas from the can (*id.* ¶¶ 117-18 ("a nozzle assembly installed on the top of the gas can adjacent [to] the open handle" with "a tapered spout projecting horizontally")), and close the gas can (*id.* ¶ 120 ("cap for covering the end of the spout")).

Indeed, No Spill's additional allegations *admit* the functional nature of its trade dress. No Spill alleges outright that its "handle performs a function," yet claims its so-called ornamental design "is not functional," without any explanation of what exactly is "ornamental" about it.  *Id.* ¶ 116; *see Domo*, 2018 WL 2172937, at *5 (rejecting plaintiff's "conclusory statement that its 'features constitute a design choice not driven solely by function'"); *see also TrafFix*, 532 U.S. at 33–34 ("the functionality of the spring design means that competitors need not explore whether other spring juxtapositions might be used").  No Spill does not explain how, exactly, this basic handle is "ornamental," because it clearly is not, as shown here:

15



It is functional.  No Spill knows this and cannot plausibly plead to the contrary.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 680, 682 (2009) (disregarding plaintiff's allegations of "invidious discrimination" because of the "more likely" and "obvious alternative explanation" that his arrest was likely due to the "lawful and justified. . . nondiscriminatory intent" of the government to "detain aliens who. . . had potential connections to. . . terrorist attacks").

Similarly, No Spill alleges "[t]here is no functional need to have a loose plastic strap connected to the underside of the spout *for tethering a cap*" (Doc. 21 ¶ 120 (emphasis added)).  No Spill itself (again) admits there is a clearly functional *purpose* for the strap: to tether the cap to the gas can so that it does not get lost.  *See Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, No. CV 15-769 PSG (SSx), 2015 WL 12731929, at *4 (C.D. Cal.  May 8, 2015) (holding "Plaintiff's conclusory statement of non-functionality fails to sufficiently allege the element, particularly because some features of the claimed trade dress do perform a utilitarian function in certain contexts (*i.e.*, buttons or adjustable overlapping flaps)").  This feature is (again) clearly functional (as shown below), and No Spill's conclusory allegations to the contrary only highlight the absurdity of its allegations and claims.



While No Spill may desire to disregard reality and common sense in asserting its claims, such fantastical allegations should be rejected. *See Iqbal*, 556 U.S. at 679, 681 ("Determining whether a complaint states a plausible claim for relief will. . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense" and "reject" conclusory allegations, which are "not entitled to be assumed true").

Further, No Spill's other perfunctory assertions of non-functionality should also be rejected as conclusory and contrary to common sense. *See Deckers Outdoor Corp.*, 2015 WL 12731929, at \*4. For example, No Spill posits that its tapered spout "is not functional." Doc. 21 ¶ 118. Yet there is a clear purpose for the tapering: the narrowed spout better controls the flow of gasoline from the can and allows the nozzle to fit into smaller openings. Similarly, No Spill contends that the horizontal angle of the tapered spout is "ornamental" and "not required to dispense fuel." *Id.* ¶ 119. But it too is clearly driven by function: to allow the user to pour gas from the can at a particular angle, *i.e.*, without having to tilt the can further upside down.[5]

Moreover, the red color of the can itself is indisputably functional, as gas cans are often legally required to be red to alert consumers to the dangerous and flammable contents. *See, e.g.*, 29 C.F.R. § 1910.144 ("Red shall be the basic color for the identification of. . . [s]afety cans or other portable containers of flammable liquids"); Iowa Code Ann. § 214A.15 ("A person shall not place gasoline. . . into any can, cask, barrel or other similar receptacle having a capacity in

---

[5] No Spill's reference to alternative product designs does not save its futile attempt to establish non-functionality, as case law makes clear that "'[t]he crucial determination is not the availability of alternative designs, but whether the design at issue is 'the reason the device works.'" *C5 Med. Werks*, 249 F. Supp. 3d at 1217. In the words of our Supreme Court, "[t]here is no need . . . to engage . . . in speculation about other design possibilities . . . which might serve the same purpose. . . . [T]he functionality of the . . . design means that competitors need not explore whether other . . . juxtapositions might be used." *TrafFix*, 532 U.S. at 33-34.

17

excess of one pint unless the same is painted bright red. . . ”); *see also* ASTM Standard F852[6] ("The PFCs [portable fuel containers] intended for gasoline shall be predominately red in color."). No Spill's combination of the (often mandated) color red with a black cap (*see* Doc. 21 ¶ 123) does not transform its evidently functional product design into a protectable trade dress.  *See C5 Med.  Werks*, 249 F. Supp. 3d at 1221 (finding the color pink to be functional where it was "the natural byproduct of the chromium that is used in the production of BIOLOX Delta"); *cf. Inspired By Design, LLC v. Sammy's Sew Shop, LLC*, No. 16-CV-2290-DDC-KGG, 2016 WL 6093778, at *7 (D.  Kan.  Oct. 19, 2016) ("Prohibiting a competitor from. . . packaging its products with black toile and black hang tags would hinder competition.").

Granting No Spill exclusive rights over such functional features individually or together would severely harm competition and be a misuse of trade dress law.  *TrafFix*, 532 U.S. at 29 (noting that "copying" of "functional" features is not "discouraged or disfavored by the law" because it "preserve[s] our competitive economy" and has "salutary effects" for consumers). No Spill's reliance on conclusory allegations of non-functionality in an attempt to protect its clearly functional design should be rejected.  *See Iqbal*, 556 U.S. at 681–82 (disregarding plaintiff's allegations due to "more likely" and "obvious alternative explanation[s]").  Because the "only details" in No Spill's complaint "describe elements that are undoubtedly functional," its claims must fail.  *See Dinkum Sys.*, 2014 WL 4437310, at *3 (dismissing claim).

### 3. No Spill fails to adequately plead that its gas can design has acquired distinctiveness.

---

[6] The American Society for Testing and Materials ("ASTM") is an international standards organizations that develops and publishes standards for certain industries, including portable gasoline container industry.

No Spill's trade dress claims should also be dismissed on the additional, independent basis that the Amended Complaint fails to plead facts that plausibly show that No Spill's gas can design has acquired distinctiveness (*i.e.*, secondary meaning in the minds of consumers).

The Supreme Court has established that "a product's design is distinctive, and therefore protectible [*sic*], only upon a showing of secondary meaning." *Wal-Mart Stores v. Samara Bros., Inc.*, 529 U.S. 205, 215 (2000); *see also Hammerton, Inc. v. Heisterman*, No. 2:06-CV-00806 TS, 2008 WL 2004327, at *6 (D. Utah May 9, 2008) (noting that "courts have exercised particular 'caution' when extending protection to product designs."). To establish secondary meaning, a plaintiff must show that "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." *Forney Indus.*, 835 F.3d at 1245. "Put differently, secondary meaning exists when 'in the consumer's mind the [trade dress] denotes a single thing coming from a single source.'" *Savant Homes*, 809 F.3d at 1148 (quoting *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 978 (10th Cir. 2002)).

To that end, "[s]econdary meaning may be shown by direct evidence, such as consumer surveys or testimony from consumers," as well as through circumstantial evidence, such as:

> (1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.

*Savant Homes*, 809 F.3d at 1148 (internal citations and quotation marks omitted); *Domo*, 2018 WL 2172937, at *3 ("the plaintiff should know and allege some essential facts [regarding secondary meaning] even without the benefit of discovery" to survive dismissal). Importantly, while "[t]he amount, scope, nature and duration of advertising" can be relevant to this inquiry, "'the critical question in considering the evidence is not the extent of the promotional efforts but

19

their effectiveness in creating an association' between the trade dress and [the] plaintiff." *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1470 (D. Kan. 1996); *see also Forney Indus.*, 835 F.3d at 1254 ("[A]dvertising alone is typically unhelpful to prove secondary meaning when it is not directed at highlighting the trade dress."); *Savant Homes*, 809 F.3d at 1149 ("Standing alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification.").

No Spill fails to adequately allege facts necessary to plausibly plead secondary meaning. No Spill simply labels certain features of its gas can as "distinctive" or "ornamental" when identifying its alleged trade dress. *See, e.g.*, Doc. 21 ¶ 103 ("a *distinctive* plastic nozzle assembly having a tapered spout" (emphasis added)), ¶ 118 ("[t]he *ornamental* design of the tapered spout" (emphases added)). Such conclusory pleading is plainly insufficient, as courts uniformly recognize. *See, e.g.*, *Domo*, 2018 WL 2172937, at *3 ("But Domo's conclusory use of the word 'distinctive,' absent any factual allegations, is insufficient to adequately allege inherent distinctiveness."); *Inspired By Design*, 2016 WL 6093778, at *5 ("[P]laintiff just offers the conclusory assertion that its trade dress is distinctive. . . . But the Tenth Circuit has rejected this approach, holding that 'merely reciting. . . elements [of an alleged trade dress] does not [establish] inherent distinctiveness.'") (quoting *Savant Homes*, 809 F.3d at 1149 (alterations in original)).

Nor is it enough for No Spill to allege that it has "continuously and substantially advertised, marketed and sold [its] gas cans. . . [s]ince at least as early as. . . 1989." Doc. 21 ¶¶ 103-06. Although No Spill's amended complaint now includes allegations regarding its (unspecified) "substantial" advertising expenditures (*id.* ¶ 104), (unspecified) "substantial[]" "increase[]" in sales over the past five years (*id.* ¶ 106), and sales through various third-party retailers (*id.* ¶¶ 111-12), it fails to adequately tether those efforts to its claimed trade dress. *See Winning Ways*, 913 F.

Supp. at 1470 (explaining the "'critical question'" is the advertising's "'effectiveness in creating an association' between the trade dress and [the] plaintiff'"); *see also Domo*, 2018 WL 2172937, at *4 (rejecting plaintiff's allegations "that its product has been advertised, marketed and sold nationwide and throughout the world and has continuously featured a number of common design elements" as "generic"). Every business advertises and sells products, but that does not mean that every product advertised and sold qualifies for trade dress protection. *See Domo*, 2018 WL 2172937, at *4 (dismissing plaintiff's claims because, while "[c]ontinuous marketing is a prudent business practice, [] it hardly warrants an inference that a business achieved such recognition that in the consumer's mind its trade dress means a single thing coming from a single source").

Rather, to rely on advertising and sales as evidence of secondary meaning, a plaintiff must establish that those efforts "creat[ed] an association between the trade dress and [the] plaintiff." *Winning Ways*, 913 F. Supp. at 1470. In an attempt to tie its trade dress to its ordinary business practices, No Spill alleges in a conclusory fashion that its prior advertising has "prominently highlighted" its trade dress—with no explanation as to when or how—and that its product labels have included "an outline of the No Spill Trade Dress highlighted behind the word 'No.'" Doc. 21 ¶¶ 109-10.[7] Yet these generic and non-specific allegations still fall short of establishing that its trade dress has acquired secondary meaning. *See Winning Ways*, 913 F. Supp. at 1470; *Inspired By Design*, 2016 WL 6093778, at *6 (finding particular sales volume evidence "insufficient" where "plaintiff provide[d] no evidence tying its sales to its alleged trade dress"). Indeed, the relevant question is not whether the advertising and sales efforts have *emphasized* the trade dress, but whether those undertakings have been used to *distinguish* the trade dress as being tied to the

---

[7] Notably, the "outline" of the No Spill trade dress depicted in paragraph 110 of the amended complaint lacks several of No Spill's claimed trade dress features, *e.g.*, the coloring of the cap and the strap tethering the cap to the nozzle. *See* Doc. 21 ¶¶ 110, 120, 122-23.

plaintiff.  *See Predator Int'l, Inc. v. Gamo Outdoor USA*, 669 F. Supp. 2d 1235, 1248 (D.  Colo. 2009) ("'Advertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding.'" (parenthetically quoting *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995)).

Finally, No Spill's assertion of trade dress rights over the color red—when used in combination with a generic black cap—highlights its "misuse [and] overextension of trade dress" law to stifle competition and (consequently) harm consumers.  *TrafFix Devices*, 532 U.S. at 29; *see* Doc. 21 ¶¶ 122-23 ("the gas can is made from red plastic").  There is no plausible way that red could ever "identify the source of the product" (*i.e.*, No Spill) because such coloring is often legally required to be used on all gas cans and therefore cannot distinguish one manufacturer from another. *See Forney Indus.*, 835 F.3d at 1245; 29 C.F.R. § 1910.144 ("Red shall be the basic color for the identification of. . . [s]afety cans or other portable containers of flammable liquids"); Iowa Code Ann. § 214A.15 ("A person shall not place gasoline. . . into any can, cask, barrel or other similar receptacle having a capacity in excess of one pint unless the same is painted bright red. . . ."). Granting No Spill the exclusive right to produce a red gas can with a generic black cap would not only run counter to numerous state laws, but it would harm competition and potentially expose consumers to unnecessary dangers.

As No Spill cannot claim its product's trade dress is inherently distinctive and it alleges insufficient facts to support a plausible inference that its trade dress has acquired distinctiveness, its conclusory allegations of distinctiveness must be rejected and its claims should be dismissed.

## VI.    CONCLUSION

For the reasons above, Scepter Manufacturing, LLC respectfully requests the Court dismiss all claims asserted against it for failure to state of claim for breach of contract (Counts III and IV) and trade dress infringement (Counts V and VI).

Respectfully submitted,

FOULSTON SIEFKIN LLP


By: *s/ Holly A. Dyer*
    Jay F. Fowler, KS #10727
    jfowler@foulston.com
    T: 316.291.9541
    Holly A. Dyer, KS #16644
    hdyer@foulston.com
    T: 316.291.9773
    1551 N. Waterfront Parkway, Suite 100
    Wichita, KS 67206-4466
    F: 316.267.6345

    LATHAM & WATKINS LLP
    Robert Steinberg (*pro hac vice*)
    bob.steinberg@lw.com
    T: 424.653.5500
    10250 Constellation Blvd.
    Suite 1100
    Los Angeles, CA 90067

    Lisa K. Nguyen (*pro hac vice*)
    lisa.nguyen@lw.com
    T: 650.328.4600
    140 Scott Drive
    Menlo Park, CA 94025

    *Attorneys for Defendant*
    *Scepter Manufacturing, LLC*

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of May, 2019, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system that will send notice of electronic filing to counsel of record.

*s/ Holly A. Dyer*
Holly A. Dyer, KS #16644
