IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NO SPILL, INC.,

      Plaintiff,

      v.

SCEPTER CORPORATION n/k/a 1216037
ONTARIO, INC., SCEPTER CANADA, INC.,
and SCEPTER MANUFACTURING, LLC,

      Defendants.

Case No. 18-2681-JAR-KGG

<u>Filed Under Seal</u>

<u>MEMORANDUM AND ORDER</u>

Plaintiff No Spill, Inc. brings this action alleging, *inter alia*, direct and indirect patent infringement claims relating to portable plastic fuel containers that are manufactured, marketed, and sold by one or more Defendants. Before the Court are Defendant Scepter Corporation n/k/a 1216037 Ontario, Inc.'s Motion to Dismiss the Second Amended Complaint for Lack of Personal Jurisdiction and Failure to State a Claim (Doc. 46), and Defendant Scepter Canada Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 49). At issue in these motions is the business relationship, if any, between the named Defendants, and whether Scepter Corporation n/k/a 1216037 Ontario, Inc. ("121 Ontario") and Scepter Canada, Inc., have the requisite minimum contacts upon which this Court may exercise personal jurisdiction. The motions are fully briefed and the Court is prepared to rule. For the reasons explained in detail below, Defendant 121 Ontario's motion to dismiss is granted and Scepter Canada's motion to dismiss is denied.

I.      **Standard**

Because this is a patent infringement suit, the Court must apply the law of the Federal

Circuit in deciding personal jurisdiction, rather than the law of the Tenth Circuit.[1]  Plaintiff may demonstrate personal jurisdiction over an out-of-state defendant if "the relevant state's long-arm statute permits the assertion of jurisdiction without violating federal due process."[2]  The Kansas long-arm statute is construed liberally so as to allow jurisdiction to the full extent permitted by due process, therefore the Court proceeds directly to the constitutional analysis.[3]

For the court's exercise of jurisdiction to comport with due process, the defendant must have "minimum contacts" with the State of Kansas, "such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'"[4]  "Minimum contacts" can be established in one of two ways, either generally or specifically for lawsuits based on the forum-related activities.[5]  General jurisdiction is not at issue in this case.  The specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation."[6]  To establish minimum contacts, the "defendant's suit-related conduct must create a substantial connection with the forum State."[7]  "Each defendant's contacts with the forum State must be assessed individually."[8]

The Federal Circuit applies the following test to determine whether a forum state has specific jurisdiction: (1) whether the defendant purposefully directed activities at residents of the

---

[1] *See Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1328 (Fed. Cir. 2008); *Nuance Commcn's, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1230 (Fed. Cir. 2010).

[2] *Nuance Commcn's, Inc.*, 626 F.3d at 1230.

[3] *Fed. Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994) (citing *Volt Delta Res., Inc. v. Devine*, 740 P.2d 1089, 1092 (Kan. 1987)).

[4] *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[5] *Id.* at 1078 (citations omitted).

[6] *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).

[7] *Id.*

[8] *Calder v. Jones*, 465 U.S. 783, 790 (1984).

forum; (2) whether the claim arises out of or relates to those activities; and (3) whether assertion of personal jurisdiction is reasonable and fair.[9]  No Spill bears the burden of demonstrating the first two elements of specific jurisdiction.[10]

If No Spill meets this burden, the burden shifts back to Defendants to demonstrate that personal jurisdiction is unreasonable.[11]  Because there has been no formal jurisdictional discovery or an evidentiary hearing,[12] No Spill must only make a prima facie showing of jurisdiction.[13]   Under this standard, all factual disputes must be resolved in favor of No Spill.[14] "[W]here the plaintiff's factual allegations 'are not directly controverted, [they] are taken as true for purposes of determining jurisdiction. . . .'"[15]

## II.    Jurisdictional Facts

The following facts are either established by the parties' documentary evidence,[16] or derived from the Second Amended Complaint ("SAC") if not directly controverted by Defendants' evidence.

In 2012, Scepter Holdings, Inc., not a party to this action, purchased the assets of Blitz U.S.A., a company that previously dominated the United States' market for portable fuel containers.  These assets included the plant, equipment, and real estate from an old Blitz factory

---

[9]*Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1332 (Fed. Cir. 2008); *Nuance Commc'n's, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010).

[10]*Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015).

[11]*Id.*

[12]The parties engaged in informal discovery before No Spill filed the instant motion.  *See* Doc. 57-1 ¶ 3.

[13]*Celgard, LLC*, 792 F.3d at 1378.

[14]*See, e.g.*, *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1347 (Fed. Cir. 2002).

[15]*Nuance Commc'n's, Inc.*, 626 F.3d at 1231 (quoting *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995)).

[16]This includes the exhibits attached to the SAC, Doc. 41, Exs. A–O, as well as the exhibits attached to the parties' briefs.  Docs. 46, 50, 54–56, 60–61, 65–66.

in Miami, Oklahoma.  Fuel containers made at the Miami, Oklahoma plant are sold under the "Scepter" trademark.

Third-party Myers Industries, Inc. ("Myers"), an Ohio corporation, is a leading manufacturer of polymer products for material handling and a distributor of tire retread and repair products.  Through a series of transactions in 2014, Myers purchased Scepter entities through its subsidiaries.  First, Scepter Corporation, SHI Properties, Inc. ("SHI"), and CA Acquisition, Inc. ("CA") entered into an Asset Purchase Agreement with Myers on May 30, 2014.[17]  Under that Asset Purchase Agreement, SHI and Scepter Corporation were the "Sellers," CA (a subsidiary of Myers) was the "Buyer," and Myers was the "guarantor of certain obligations of Buyer."

Under the agreement, Scepter Corporation transferred substantially all its assets to CA.  Also under that agreement, "[w]ithin ten (10) Business Days following the Closing Date, Scepter shall file articles of amendment and take all other action necessary or as may be requested by Buyer to change its name to one not including the name 'Scepter.'  Scepter shall provide to Buyer evidence of such name change."[18]

On July 11, 2014, Scepter Corporation, which was incorporated under the laws of Ontario, Canada, changed its name to 1216037 Ontario, Inc.  Robert S. Torokvei signed the amendment as President of Scepter Corporation.  As part of that change, 121 Ontario provided consent for "the use of the name 'Scepter Canada Inc.' by CA Acquisition Inc. which is the successor to the business of the Corporation."[19]  CA changed its name to Scepter Canada, Inc.

---

[17]Doc. 54-1 at 1 (under seal).

[18]*Id.* § 6.15.

[19]Doc. 55-3, Ex. C.

and is a wholly-owned subsidiary of Myers. It is incorporated in and exists under the laws of Canada and maintains its principal place of business in Scarborough, Ontario.

The May 30, 2014 Asset Purchase Agreement also contemplated that Crown US Acquisition Company ("Crown") in Ohio would purchase all of the "issued and outstanding membership units of Eco One Holdings, Inc. and Scepter Manufacturing, LLC," under a separate Unit Purchase Agreement.[20] This merged entity assumed the name Scepter Manufacturing, LLC, a wholly-owned subsidiary of Scepter US Holding Co. It is organized under the laws of Delaware with its principal place of business in Miami, Oklahoma.

Thus presently, Scepter US Holding Co. and Scepter Canada are wholly-owned subsidiaries of Myers; Scepter Manufacturing is a subsidiary of Scepter US Holding Co.

Since the Myers acquisition in 2014, 121 Ontario has had no ongoing business operations, and is no longer affiliated with Myers, Scepter Canada, Scepter Manufacturing, or any other Myers' subsidiary. 121 Ontario does not share officers, directors, or employees with Myers, Scepter Canada, Scepter Manufacturing, or any other Myers' subsidiary. 121 Ontario possesses no rights to the "Scepter" brand, name, logo, or trademark, and has similarly not marketed or sold any products under the "Scepter" name, brand, logo, or trademark. 121 Ontario does not maintain an office in Kansas, does not employ personnel, officers, or directors in Kansas, does not market or sell products in Kansas, and has never shared an address with Myers, Scepter Canada, Scepter Manufacturing, or any other Myers' subsidiary. 121 Ontario has no affiliation or control over the websites "scepter.com" or "scepterusa.com."

Scepter Canada has never directly provided, designed, manufactured, advertised, promoted, offered, or sold portable fuel containers, or any other products or services to any entity

---

[20]Doc. 54-1 at 7.

based in Kansas.  It has no contracts or agreements with Kansas entities.  Scepter Canada does

not maintain a place of business, offices, facilities, equipment, or property in Kansas.  It has no

employees in Kansas, nor does it maintain corporate books or records in Kansas.  Scepter

Canada does not pay taxes in Kansas.

     The accused fuel containers bear the Scepter trademark and have two product labels

affixed thereto.  The labels include the designation "MADE IN USA" and provide the Scepter

website, www.scepter.com, and the location of Miami, OK 74354.  The "Contact Us" page for

this website identifies the owner as Scepter Canada and provides the Canadian address of 170

Midwest Road, Scarborough, Ontario.  This page also refers customers to the Canadian customer

service department and displays a picture of a Canadian office building with the Scepter logo on

the front.  The website for Scepter's "Consumer" division is www.scepterconsumer.com,

accessible from the scepter.com website, and includes pictures of the allegedly infringing fuel

containers.  "Scepter Canada, Inc." appears at the bottom of every page of the

scepterconsumerusa.com website, and the "Contact" link identifies Scepter Canada.  That

website also contains a "Store Locator" link that allows a user to search for specific products and

find retailers that sell those products around the world, including within Kansas.  The results

page provides links to some big-box retailers where the accused products are offered for sale.  In

contrast, the scepter.com website, which includes contact information for Scepter Manufacturing,

does not include a store-locator function.

     Scepter Canada's customers include Walmart, Home Depot, and Lowe's.  For these big-

box retailers, products are ordered from Scepter Manufacturing or Scepter Canada on an as-

needed basis and shipped to the retailer's distribution center.  These big-box retailers sell Scepter

products throughout Canada and the United States, including to consumers and retail stores in

Kansas.  Other non-big box customers place electronic purchase orders that are fulfilled by either Scepter Manufacturing or Scepter Canada, depending on whether the customer is Canadian or American.  The products are manufactured and stored at the respective Scepter Manufacturing or Scepter Canada facility until the customer picks up its order.

According to an independent audit report by Clayton & McKervey, P.C., submitted as Exhibit D by Scepter Canada ("audit report"), Scepter Manufacturing "is responsible for manufacturing consumer gas containers to the American market, while Scepter-Canada is responsible for manufacturing and marketing a variety of Scepter products to the Canadian market."[21]  Scepter Canada's marketing and sales team is responsible for establishing relationships with big-box retailers such as Wal-Mart, including introducing new products and renegotiating contracts and agreements, attending Trade Shows in North America, and otherwise promoting Scepter products.  Moreover, one company may sell inventory to another "in times of increased demand."[22]

Scepter Canada has the following officers and directors: David Banyard (President, Chief Executive Officer, and Director), Terry Elliot (President and Director); Michael McLaughlin (Director), Kevin Brackman (Executive Vice President, Chief Financial Officer, and Secretary). Scepter Manufacturing has the following officers and directors: David Banyard (President and Director), Kevin Brackman (Vice President, Treasurer, and Secretary).  Elliot has never been an employee of either 121 Ontario or Scepter Manufacturing.  However, on social media, Elliot identifies himself as the President of "Scepter."

---

[21]Doc. 54 ¶ 14 & Ex. D (sealed).

[22]Doc. 54 ¶ 14.

Scepter Manufacturing pays an annual management fee to Scepter Canada for certain services including marketing and the negotiation of pricing and contracts with certain customers, such as No Spill. For example, Elliot, who has worked for Scepter Canada since April 2016, negotiated pricing and contracts for the No Spill account. In September 2016, Elliot traveled to Kansas to visit No Spill's facility there. Following this visit, Elliot referred to No Spill in an email as one of "our customers," and negotiated contract issues between No Spill and Scepter Manufacturing. In August 2017, Elliot again participated in contract negotiations and business dealings with No Spill on behalf of Scepter Manufacturing. On September 1, 2017, Elliot sent No Spill an email that contained a force majeure declaration directed to "our valued customers."[23] It contained a sending address of 170 Midwest Road, Scarborough, Ontario.

The 2013 Supply Agreement executed between Scepter Manufacturing and No Spill requires that any notices under the contract be sent to both Scepter Manufacturing and "Scepter Corporation, Attn: Christopher Luck," at the 170 Midwest Road address in Ontario. This agreement also contains a forum selection clause, requiring any lawsuit addressing it to be filed in Kansas.

In the SAC, Counts I and II allege patent infringement claims against Defendants Scepter Canada and Scepter Corporation only. Counts III and IV allege contract claims against Scepter Manufacturing only. Counts V and VI allege federal and state unfair competition claims against all Defendants based on their advertising, marketing, and selling in commerce gasoline cans and nozzles that incorporate Scepter's Trade Dress.

---

[23]Doc. 41, Ex. L.

### III. Discussion

#### A. 121 Ontario

121 Ontario argues it has no contacts with the State of Kansas that would support specific jurisdiction, pointing to its President's declaration that 121 Ontario has no ongoing business operations, no offices or employees in Kansas, and that it does not sell or market products or services in Kansas. 121 Ontario submits that it has no rights to the Scepter name, brand, logo, or trademark. No Spill insists that these facts are contested, citing its well-pled facts from the SAC that Scepter Corporation "transacted business and/or committed tortious acts and/or participated in, directed, controlled and actively aided and abetted the commission of tortious acts within the State of Kansas out of which this action arises."[24]

The Court agrees with 121 Ontario that No Spill's allegations are insufficient to overcome the documentary evidence on this issue. The Court does not assume as true facts alleged in the SAC that are directly controverted by 121 Ontario's evidence. Moreover, the facts alleged by No Spill as to Scepter Corporation's transaction of business, and its direction and control over the other Defendants are conclusory allegations rather than factual averments, which are not entitled to an assumption of truth. No Spill's conclusory assertion that Scepter Corporation transacts business in Kansas is directly controverted by an Asset Purchase Agreement demonstrating that Scepter Corporation sold its assets to a subsidiary of Myers, and that as part of that agreement it was required to relinquish the Scepter name. Defendant has submitted uncontroverted proof that Scepter Corporation complied with this provision and changed its name to 121 Ontario after transferring substantially all its assets to CA, Scepter Canada's predecessor. Since 2014, 121 Ontario has had no ongoing business operations, nor has

---

[24]Doc. 57 at 4.

it sold or marketed products or services in Kansas. Moreover, No Spill provides neither documentary evidence nor factual allegations that 121 Ontario has had any contact with the State of Kansas since it was created in 2014.

Instead, No Spill alleges that Scepter Corporation, notwithstanding its name change, continues to maintain a controlling relationship with the other Defendants. But No Spill's own allegations in the SAC controvert this conclusory assertion. According to ¶¶ 42 and 47, after the 2014 transfers, Myers' Scepter business line was comprised of only Scepter US Holding Company, Scepter Manufacturing, and Scepter Canada. Similarly, the complete Myers organizational chart included in Scepter Canada's Exhibit D includes neither Scepter Corporation nor 121 Ontario.[25] There are simply no underlying facts alleged to support No Spill's conclusory assertions that Scepter Corporation continued to exist after 2014 or that 121 Ontario has any relationship with the other Scepter Defendants, particularly in light of the 121 Ontario President's Declaration attesting that 121 Ontario has no relationship with those entities.[26] This is not an instance where there are conflicting affidavits requiring the Court to resolve the conflict in favor of the plaintiff. Instead, Defendant has directly controverted the conclusory assertions in the SAC that Scepter Corporation continues to exist and exerts control over the other Defendants.

Having no affirmative facts or evidence to support a relationship between 121 Ontario, Kansas, and the other Defendants, No Spill points to Defendants' inconsistent responses to its informal jurisdictional inquiries, and to online and signature block references to Scepter Corporation since 2014. The sum of No Spill's argument is that the public-facing information

---

[25]Doc. 54-2 at 9.

[26]To be clear, the Court does not reject these assertions on the basis that they are based on "information and belief." The Court instead finds that they are conclusory assertions as opposed to statements of fact.

about Scepter Corporation's status is inconsistent and confusing.  While this may be true, it is not Defendants' burden to demonstrate that they are improperly named Defendants; No Spill bears the burden of demonstrating personal jurisdiction.  Stray references by non-121 Ontario employees and entities to Scepter Corporation, which no longer exists, cannot be the basis of 121 Ontario's minimum contacts with the State of Kansas.

Moreover, the stray and allegedly inconsistent references to Scepter or Scepter Corporation cited by No Spill are in fact consistent with Defendants' explanation that Scepter Corporation was required to relinquish its name and forfeit the right to use the Scepter logo and trademark after 2014.  No Spill alleges no facts to support its conclusory assertion that these references were made by either Scepter Corporation or 121 Ontario.  And it makes sense that Myers would want only its Scepter line of businesses to be able to use the Scepter name and logo in its public-facing materials after the Asset Purchase Agreement was finalized.  These references support 121 Ontario's position that it no longer has any affiliation with the Myers entities, a condition incorporated into the 2014 Asset Purchase Agreement put forth by Defendants in support of their motions.  Moreover, none of these stray references to Scepter Corporation give rise to the substantive claims alleged by No Spill in this matter.

For all of these reasons, the Court grants 121 Ontario's motion to dismiss under Fed. R. Civ. P. 12(b)(2) because No Spill has failed to meet its burden of demonstrating it has the requisite minimum contacts with the State of Kansas.  The Court denies 121 Ontario's request that the Court dismiss with prejudice.  Tenth Circuit law is clear that when a district court dismisses upon finding a lack of personal jurisdiction the dismissal must be without prejudice.[27]

---

[27]*See, e.g.*, *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction, as it did here, the dismissal must be without prejudice.").

## B.     Scepter Canada

### 1.     Purposeful Direction

No Spill asserts that Scepter Canada purposefully directed its activities toward Kansas through its: (1) website activity; (2) distributor relationships and marketing efforts; and (3) direction and control of Scepter Manufacturing.  The Court addresses each in turn.

#### a.     Website Activity

No Spill alleges and submits evidence that the allegedly infringing products are featured on the consumer website attributed to Scepter Canada, that the consumer website includes contact information for Scepter Canada, and that the consumer website, but not the Scepter Manufacturing website, provides store-locator links for the allegedly infringing products which include stores in Kansas.  Scepter Canada replies that the website activity relied on by No Spill is insufficient to establish purposeful direction because Scepter Canada is not capable of taking orders from customers, even if it does direct consumers to Kansas retail stores.

Under Federal Circuit law, the existence of Scepter Canada's interactive website is insufficient to show minimum contacts.[28]  Moreover, "the inclusion of Kansas in its dropdown of all states on its website is not enough to subject [Scepter Canada] to jurisdiction in Kansas."[29]  That court has explained that where a website is available to consumers throughout the country, as Scepter Canada's website is, there must be a showing that the forum state's residents actually used the website to transact business.[30]  Here, there is no allegation by No Spill that any Kansas resident actually used Scepter's consumer website to transact business.  Thus, "[s]omething more is needed" to "connect the defendant's infringing acts of making, using, offering, or selling its

---

[28]*NexLearn, LLC v. Allen Interactions*, 859 F.3d 1371, 1378 (Fed. Cir. 2017).

[29]*Id.*

[30]*Id.*

12

product with the forum state."[31]  The Court considers below other evidence of substantial

connection offered by No Spill.

### b.     Distributor Relationships and Marketing Efforts

No Spill contends that Scepter Canada negotiates distribution agreements and contracts

for Scepter-branded products with big box stores in the United States such as Wal-Mart, Home

Depot, and Lowe's.  Scepter Canada's own audit report supports this allegation.  Although the

report states that in 2017, Myers made the strategic decision to segregate "Scepter-US" and

Scepter Canada's manufacturing model so that each subsidiary would "manufacture products

solely for customers domiciled in their country," this change focused on manufacturing only.[32]

> For Scepter, a key part of the business is the establishment of
> strong relationships with big-box retailers such as Wal-Mart,
> Home Depot, and Lowe's, which is the responsibility of the
> marketing and sales team at Scepter-Canada. This team meets with
> customers regularly to introduce new products and renegotiate
> contracts and agreements, as well as attending various trade shows
> in North America to further promote their products. While some
> employees of Scepter-US do occasionally assist in this process
> when necessary, the majority of marketing and customer relations
> work is the responsibility of Scepter-Canada employees.[33]

No Spill contends that Scepter Canada's conduct in building distributorship relationships

and promoting products for the Scepter line in the United States confers minimum contacts under

a "steam-of-commerce" theory of jurisdiction.  Additionally, No Spill points to Scepter Canada's

admission that it sells its products to Scepter Manufacturing "in times of increased demand."[34]

Scepter Canada argues that since 2017, Scepter has kept its business in Canada and the United

---

[31]*Id.* at 1379.

[32]Doc. 54, Ex. D at 5 (under seal).

[33]*Id.*

[34]Doc. 54 ¶ 14.

States separate, citing its audit report; therefore, it does not insert its products into the United States' stream-of-commerce.

The "stream-of commerce" theory of personal jurisdiction "refers to the movement of goods from manufacturers through distributors to consumers."[35]  The Federal Circuit notes that the "precise requirements" of the stream-of-commerce basis for purposeful direction remain unsettled because in *Asahi Metal Industry Co. v. Superior Court of California*, the Supreme Court was evenly divided over whether "mere awareness of a nonresident defendant that its products would foreseeably reach the forum state in the stream of commerce constitutes minimum contacts with the forum."[36]  Justice O'Connor, joined by three other justices, wrote that "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State," and there must be some additional conduct by the defendant demonstrating "intent or purpose to serve the market in the forum State."[37]  Justice Brennan, joined by three justices, disagreed and wrote that "[a]s long as a participant in [the stream-of-commerce] process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise."[38]

The Court revisited stream of commerce in *J. McIntyre Machinery, Ltd. v. Nicastro*,[39] but again did not reach a majority decision.  Justice Kennedy wrote the plurality opinion, explaining that the "defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum."[40]  Although the facts showed that the

---

[35]*J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011).

[36]*Polar Electro Oy v. Suunto Oy*, 829 F.3d 1343, 1348 (Fed. Cir. 2016) (citing 480 U.S. 102 (1987)).

[37]480 U.S. at 112 (plurality).

[38]*Id.* at 117 (Brennan, J., concurring in part and concurring in the judgment).

[39]564 U.S. 873 (2011) (plurality).

[40]*Id.* at 882.

defendant targeted the United States' market, Justice Kennedy found that they did not show the defendant targeted the forum State's market.[41]  Justice Breyer, joined by Justice Alito, concurred, stating that "the outcome of this case is determined by our precedents," and that he "would not go further."[42]

The narrowest opinion in *McIntyre* is binding since there was no majority opinion.[43] Thus, Justice Breyer's opinion is binding, and the Federal Circuit's existing precedent remains in place.[44]  Since *Asahi*, the Federal Circuit has repeatedly declined to decide which *Asahi* test controls the stream-of-commerce inquiry because it has not been necessary to resolve the cases before it.[45]  For example, in *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, the court considered the plaintiff's uncontroverted factual allegations that the defendants had a commercial relationship with an intermediary that was "ongoing, and obviously intentional," and that at least fifty-two of the defendants' products were present in the forum state.[46]  The court found from these facts that "it can be presumed that the distribution channel formed by defendants and [the intermediary] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum State]."[47] The court thus found that even under Justice O'Connor's stricter test in *Asahi*, the defendants placed the allegedly infringing products in the stream of commerce, knowing "the likely

---

[41]*Id.* at 886.

[42]*Id.* at 887–90 (Breyer, J., concurring).

[43]*Marks v. United States*, 430 U.S. 188, 193 (1977); *Polar Electro Oy v. Suunto Oy*, 829 F.3d 1343, 1349–50 (Fed. Cir. 2016) .

[44]*Polar Electro Oy*, 829 F.3d at 1349–50.

[45]*See, e.g.*, *id.* at 1350; *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1382 (Fed. Cir. 2015); *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1566 (Fed. Cir. 1994).

[46]21 F.3d at 1564.

[47]*Id.*

destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there."[48]

In *Celgard, LLC v. SK Innovation Co.*, the court found that even under Justice Brennan's more liberal foreseeability standard, the plaintiff could not demonstrate purposeful direction because there was no evidence that the defendant was aware that its allegedly infringing products were marketed in the forum state, nor was there evidence that the products were actually found in the forum state.[49]

And in *Polar Electro Oy v. Suunto Oy*, the court found that the plaintiff could satisfy the more stringent tests set forth by Justice O'Connor in *Asahi* and Justice Kennedy in *McIntyre* where the defendant purposefully shipped allegedly infringing products to retailers in the forum state with an awareness that the products would be sold there.[50]  The court reached this conclusion based on record evidence that the defendant entered into a distribution agreement with a sister company to market and distribute its products in the United States, and the defendant "physically fulfilled the orders, packaged the products, and prepared the shipments in Finland."[51]  The court found that this active participation constituted purposeful availment.[52]

No Spill alleges in the SAC that Scepter Manufacturing's Miami, Oklahoma plant is "the only plant in the U.S. where any defendant makes the Infringing Fuel Containers which are the subject of this suit."[53]  Based solely on the facts alleged in the SAC, Scepter Canada's contract negotiation and marketing activities would not be sufficient to establish jurisdiction under a

---

[48]*Id.* at 1566.

[49]792 F.3d at 1382.

[50]829 F.3d at 1350.

[51]*Id.* at 1351.

[52]*Id.*

[53]Doc. 41 ¶ 83.

stream-of-commerce theory.  None of the cases cited by No Spill apply the theory to a sister company that merely markets, but does not manufacture, the allegedly infringing product.[54]

But No Spill goes beyond the factual allegations and points to Scepter Canada's admission in the Marshall Declaration and Exhibit D that it not only performs marketing and contract negotiation activities for Scepter Manufacturing, but also sells its own products to Scepter Manufacturing for distribution in the United States "in times of increased demand."[55] Because Scepter Canada, on behalf of Scepter Manufacturing, has a strong relationship with big-box retailers that distribute the allegedly infringing products throughout the United States, No Spill argues that Scepter Canada's sales to Scepter Manufacturing were made with knowledge that "the products would enter the nationwide (U.S.) distribution network created by Scepter Canada through which the Infringing Fuel Containers are regularly sold into Kansas."[56]  The Court agrees.

It is uncontroverted that Scepter Canada sells its products to Scepter Manufacturing in times of increased demand.  While the record does not make clear how frequently this occurs, it does make clear that Scepter Canada has an established relationship with third-party distributors Home Depot, Lowe's, and Amazon that sell the accused products throughout the United States, including in Kansas.  It is thus plausible from the record that Scepter Canada regularly introduces

---

[54]*See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1563 (Fed. Cir. 1994) (considering manufacturer's sale of its ceiling fans to forum state customers through intermediaries); *Polar Electro Oy*, 829 F.3d at 1350–51 (considering defendant's own conduct in fulfilling orders, packaging, and shipping its products after entering into distribution agreement with sister company to market and distribute to forum state); *Orbit Irrigation Prods., Inc. v. Melnor, Inc.*, No. 16-cv-137, 2017 WL 1274043, at *1–2 (D. Utah Apr. 3, 2017) (considering manufacturer's sale of products through established relationships with nationwide distributors such as Amazon and Home Depot); *Susan McKnight, Inc. v. United Indus. Corp.*, 273 F. Supp. 3d 874, 884–86 (W.D. Tenn. 2017) (describing stream-of-commerce theory as applying when "an out-of-state actor . . . 'purposefully shipped' the allegedly infringing item into the forum state 'through an established distribution channel.'" (quoting *Beverly Hills Fan*, 21 F.3d at 1565)).

[55]Doc. 54 ¶ 14 (under seal).

[56]Doc. 60 at 16 (under seal).

its products into the stream of commerce through nationwide distributors with knowledge that such products will reach the United States market, including in Kansas.  Unlike in *Celgard*, Scepter Canada's marketing role gives rise to a reasonable inference that it was aware that the big box retailers with which it established distribution channels sold Scepter Manufacturing's products in the United States.  Several district courts have determined that such activity satisfies both of the *Asahi* tests.[57]  In addition to intentionally and regularly distributing its own and Scepter Manufacturing's products through established nationwide distribution channels, No Spill has demonstrated that Scepter Canada's consumer website directs United States' consumers to third-party retailer links, where they may purchase the accused products online and have them shipped to addresses throughout the United States, including Kansas.  Even though such transactions occur through a distributor, "'defendant received an economic benefit from the sales,' making any further analysis of defendant's website functions irrelevant in the context of the stream of commerce theory."[58]  Scepter Canada receives a fee from Scepter Manufacturing for its marketing and contract negotiation services, and Scepter Manufacturing pays Scepter Canada for the products it sells to it "in times of increased demand."

### c.    Direction and Control of Scepter Manufacturing

Finally, No Spill argues that Scepter Canada exerts such direction and control over Scepter Manufacturing that Scepter Manufacturing's contacts in Kansas may be imputed to

---

[57]*See Susan McKnight, Inc.*, 273 F. Supp. 3d at 885–86; *Orbit Irrigation Prods., Inc.*, 2017 WL 1274043, at *4 ("Even if 'something more' than a nationwide distribution channel were required under *McIntyre*, Melnor's website's direct links to Home Depot and Amazon's websites may constitute that something . . . ."); *Acushnet Co. v. Zimventures, LLC*, 155 F. Supp. 3d 97, 105–06 (D. Mass. 2015) ("This Court is persuaded by Acushnet's argument that Nexen 'established a nationwide channel of distribution in the United States, including Massachusetts' by making its allegedly infringing products available for sale on golfballs.com, an "authorized dealer" of Nexen products.").

[58]*Orbit Irrigation Prods., Inc.*, 2017 WL 1274043, at *4 (quoting *Parah, LLC v. G'Strat LLC*, No. 2:13-cv-756 DB, 2014 WL 545871, at *4 (D. Utah Feb. 10, 2014)).

Scepter Canada under an agency theory.  No Spill may be able to establish specific jurisdiction based on an agency relationship with a third-party if "defendant exercises control over the activities of the third-party."[59]  "[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."[60]

No Spill argues that the following facts demonstrate that Scepter Canada directed and controlled Scepter Manufacturing's activities targeting Kansas: (1) Banyard and Brackman are officers for both Scepter Canada and Scepter Manufacturing and they participate in the direction and control of Scepter Manufacturing; (2) the Supply Agreement between No Spill and Scepter Manufacturing required that all notices from No Spill be sent to both Scepter Manufacturing and Scepter Canada; (3) Elliot, who only worked for Scepter Canada, directed Scepter Manufacturing's performance under the Supply Agreement with No Spill, including traveling to Scepter Manufacturing's facility in Oklahoma, traveling to No Spill's facility in Kansas in 2016, referring to No Spill as one of "our customers," and negotiating contract issues between Scepter Manufacturing and No Spill; (4) Elliot's notice to No Spill on August 22, 2017, that Scepter Manufacturing would not provide any product to No Spill under the supply agreement until inventory levels were replenished; (5) Elliot's email to No Spill containing a force majeure declaration that was directed to "our valued customers" and sent from Scepter Canada's mailing address; and (6) Scepter Canada's website activity discussed earlier in this opinion.  In addition to these well-pled facts, Scepter Canada's audit report provides that Scepter Manufacturing does not conduct its own marketing and contract negotiation.  Instead, Scepter Canada is responsible

---

[59]*Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1379 (Fed. Cir. 2015) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014)).

[60]*Daimler AG*, 571 U.S. at 135 n.13.  Scepter Canada argues that *Daimler* does not apply here because it only considered general jurisdiction.  But the cited-to passage in footnote 13 addresses specific jurisdiction, and distinguishes agency activities that may give rise to specific jurisdiction from those that give rise to general jurisdiction.  *Id.*

for those activities on behalf of Scepter Manufacturing in exchange for an annual management fee.

The Court agrees that these facts demonstrate that Scepter Canada purposefully directed its activities to the State of Kansas on behalf of Scepter Manufacturing.[61]  Notably, No Spill alleges that Scepter Canada performed all marketing and contract negotiation on behalf of Scepter Manufacturing with No Spill, a Kansas corporation with its principle place of business in Kansas.  As part of these efforts, Elliot, who works exclusively for Scepter Canada, traveled to Kansas in 2016, and sent several emails to No Spill in Kansas in furtherance of those marketing and contract activities.[62]  Although the Supply Agreement was between No Spill and Scepter Manufacturing, Scepter Canada negotiated the contract and set pricing on behalf of Scepter Manufacturing.  Scepter Canada also marketed the accused products.

Scepter Canada argues that the functions Elliot and others performed for Scepter Manufacturing are "administrative," which this Court previously found to be insufficient to show direction and control in *Sprint Communications, L.P. v. Cox Communications, Inc.*[63]  In that case, the Court considered authority governing the direction and control inquiry between a parent and subsidiary, and distinguished the facts of that case from cases finding minimum contacts due to collaboration between sister companies.[64]  Moreover, the local subsidiary in *Sprint* had its own

---

[61]No Spill also points to Scepter Canada and Scepter Manufacturing's jointly submitted certification application to the California Air Resources Board for "their" allegedly infringing fuel container, which included drawings and test data.  While these documents indicate some relationship between the two entities, the Court does not find these facts material to the stream-of-commerce analysis and need not rely on them in reaching its minimum contacts findings.

[62]*See Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1351 (Fed. Cir. 2002) (explaining that negotiating patent license agreements over the phone or by mail and traveling to the forum state to discuss the agreements sufficed to establish minimum contacts).

[63]896 F. Supp. 2d 1049 (D. Kan. 2012).

[64]*See id.* at 1058–59 & nn.31–33.

marketing and sales team that merely received some national advertising guidance from the defendant grandparent corporation.[65]  Here, the audit report makes clear that Scepter Canada performs all marketing and contract negotiation on behalf of Scepter Manufacturing.  Its team also attends trade shows throughout North America.  Elliot negotiated the contract between No Spill and Scepter Manufacturing, and traveled to Kansas to further that business relationship.  In contrast, this Court found after an evidentiary hearing in the *Sprint* case that "the majority of marketing is conducted at the local level [and not by the defendant]."[66]  There was also evidence in *Sprint* that the defendant received no revenue associated with the grandparent company's national advertising support.  In contrast, the evidence in this case shows that Scepter Manufacturing pays a fee to Scepter Canada for its marketing support.  In sum, the Court does not agree that the functions performed by Elliot and the rest of the Scepter Canada marketing team were insignificant or administrative and finds the facts of the *Sprint* case relied on by Scepter Canada distinguishable.  The allegations and evidence of Scepter Canada's direction and control of Scepter Manufacturing in this case, in addition to the facts supporting a stream-of-commerce theory of jurisdiction, are sufficient to demonstrate purposeful direction of activities to Kansas.

### 2.    Arises Out of or Relates To

"In the ordinary patent infringement suit, the claim asserted by the patentee plaintiff is that some act of making, using, offering to sell, selling, or importing products or services by the defendant constitutes an infringement of the presumptively valid patent named in suit."[67]

---

[65]*Id.* at 1059.

[66]*Id.*

[67]*Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1332 (Fed. Cir. 2008) (citing 35 U.S.C. § 271(a)).

Therefore, when specific jurisdiction is invoked, "the jurisdictional inquiry is relatively easily discerned from the nature and extent of the commercialization of the accused products or services by the defendant in the forum."[68]

The Court finds that the patent infringement claims arise out of or relate to Scepter Canada's contacts with Kansas. Plaintiff alleges that Defendants' patent infringement activities arose from Scepter Manufacturing's contractual relationship with No Spill, which was negotiated by Scepter Canada. That relationship allegedly provided Defendants with information that led to the making and marketing of allegedly infringing gas cans. Moreover, Scepter Canada's marketing activities, including its consumer website and establishment of nationwide distributor agreements on behalf of itself and Scepter Manufacturing, relate to Scepter Manufacturing's sale of the allegedly infringing products in Kansas.

### 3.    Reasonableness

Since No Spill has met its burden of demonstrating the first two elements of personal jurisdiction, the burden shifts to Scepter Canada "to present a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"[69] In "rare circumstances," a defendant may be able to demonstrate that despite the presence of minimum contacts arising out of or relating to the lawsuit, the exercise of jurisdiction would be unfair.[70] The Court looks to the following reasonableness factors:

> (1) the burden on the defendant, (2) the interests of the forum state,
> (3) the plaintiff's interest in obtaining relief, (4) the interstate
> judicial system's interest in obtaining the most efficient resolution

---

[68]*Id.* (citation omitted).

[69]*Elec. For Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1351–52 (Fed. Cir. 2003) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

[70]*Polar Electro Oy v. Suunto Oy*, 829 F.3d 1343, 1351 (Fed. Cir. 2016) .

of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.[71]

Under the patent venue statute, No Spill cannot maintain an action against Scepter Manufacturing in Kansas because it "resides in" Oklahoma.[72]  Thus, Scepter Canada argues that personal jurisdiction is unreasonable because No Spill's patent infringement claims are being used to evade the venue statute.  The Court disagrees.  While it may be true that No Spill cannot name Scepter Manufacturing on the patent infringement claims under the patent venue statute, the exercise of personal jurisdiction over Scepter Canada does not change that result—it does not allow a previously unavailable claim against Scepter Manufacturing.  No Spill can only maintain an action in Kansas for direct and indirect infringement against Scepter Canada.

Unlike the due process inquiry at issue on personal jurisdiction, rights conferred by federal venue statutes are waivable; they "give added protection to defendants beyond those that are provided by the statutory and constitutional prerequisites of personal jurisdiction."[73]  These protections remain intact.  While it may be true that No Spill could not sue Scepter Manufacturing for patent infringement in the District of Kansas, there is no challenge to the exercise of this Court's personal jurisdiction over Scepter Manufacturing on the other claims alleged against it for breach of contract and trade dress infringement.  No Spill must litigate its contract claims in this venue anyway given the presence of a forum selection clause in the Supply Agreement between No Spill and Scepter Manufacturing.[74]  For these reasons, and given the prima facie showing of minimum contacts demonstrated by No Spill, the Court cannot find

---

[71]*See, e.g.*, *id.* at 1352 (citations omitted).

[72]28 U.S.C. § 1400(b); *see TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1521 (2017).

[73]*Whiting v. Hogan*, 855 F. Supp. 2d 1266, 1282 (D.N.M. 2012) (quoting 14D C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3801 (2007)).

[74]Doc. 62 ¶ 29.

that allowing No Spill's suit to proceed in this venue renders the exercise of personal jurisdiction unreasonable.

Scepter Canada offers no other argument to support its claim that exercising personal jurisdiction is unreasonable.  As No Spill notes, subjecting Scepter Canada to litigation in Kansas, given its status as a Canadian company, is a relatively minimal burden.[75]  And this minimal burden is outweighed by No Spill's interest in litigating in Kansas where it is located. It is also outweighed by Kansas's interest in this dispute given that No Spill alleges injury within its borders, and given the contract between No Spill and Scepter Manufacturing, which Scepter Canada negotiated.   The efficient resolution of this dispute weighs in favor of Kansas since the related contract claims in this matter must be litigated here under the forum selection clause in the Supply Agreement.  There is no indication that the shared interest of the several states in furthering fundamental social policies renders the exercise of jurisdiction in Kansas unreasonable.  For all of these reasons, the Court finds that this is not one of the rare cases where the defendant has demonstrated a compelling case of unreasonableness.  Scepter Canada's motion to dismiss for lack of personal jurisdiction is therefore denied.[76]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Scepter Corporation n/k/a 1216037 Ontario, Inc.'s Motion to Dismiss the Second Amended Complaint for Lack of Personal Jurisdiction and Failure to State a Claim (Doc. 46) is **granted**, and Defendant Scepter Canada Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 49)

---

[75]*Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1356 (Fed. Cir. 2002) (citing *Aristech Chem. Int'l, Ltd. v. Acrylic Fabricators*, 138 F.3d 624, 629 (6th Cir. 1998)).

[76]Given the Court's finding that there are minimum contacts with the State of Kansas, it need not consider whether jurisdiction is proper under Fed. R. Civ. P. 4(k)(2), the federal long-arm statute.

is **denied**.  Defendant Scepter Corporation n/k/a 1216037 Ontario, Inc. is **dismissed without**

**prejudice**.

      **IT IS SO ORDERED.**

      Dated: November 15, 2019

                          S/ Julie A. Robinson
                          JULIE A. ROBINSON
                          CHIEF UNITED STATES DISTRICT JUDGE