**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **NO SPILL, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 18-2681-JAR-KGG** |
| **SCEPTER CANADA, INC. and SCEPTER MANUFACTURING, LLC,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiff No Spill, Inc. brings this action against Defendants Scepter Canada, Inc. and Scepter Manufacturing, LLC, alleging claims for patent infringement, breach of contract, and trade dress infringement under the Lanham Act and Kansas law. Before the Court is Scepter Manufacturing's Motion to Dismiss for Failure to State a Claim (Doc. 51), to which Defendant Scepter Canada, Inc. joins.[1] The motion is fully briefed and the Court is prepared to rule. As described more fully below, the Court grants in part and denies in part Defendant's motion to dismiss. The motion is granted as to the breach of contract claims alleged in Counts III and IV insofar as they seek consequential damages; the motion is otherwise denied.

## I.     Legal Standard

To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above the speculative level" and must include "enough facts to state a claim for relief that is plausible on its face."[2] "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action'

---

[1]Doc. 50 at 20 n.9.

[2]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

will not suffice; a plaintiff must offer specific factual allegations to support each claim."[3]  The court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[4]

The Supreme Court has explained the analysis as a two-step process.  For purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'"[5]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[6]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[7]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]

## II.    Factual Allegations

The following facts are alleged in the Second Amended Complaint ("SAC") and contained in the attachments thereto.[9]  The Court assumes the alleged facts to be true for purposes of deciding this motion.

---

[3]*Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[4]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

[5]*Id.* (citing *Twombly*, 550 U.S. at 555).

[6]*Id.* at 678–79.

[7]*Id.* at 679.

[8]*Id.* at 678.

[9]When deciding a Rule 12(b)(6) motion, the court may consider documents that are attached to the complaint as long as their authenticity is not in dispute.  *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1178 (10th Cir. 2012).  The Court therefore considers the exhibits attached to the SAC.  Defendant repeatedly argues in the reply brief that Plaintiff's response relies on matters outside the pleadings.  But Plaintiff's only citation to an outside source in the response brief is on page 29, to a picture that is purportedly from the Bryce Langford Declaration attached to the response.  Doc. 56 at 29; Doc. 56-1.  As an initial matter, the cited paragraph in the Langford

Plaintiff No Spill and Defendants Scepter Canada, Inc. and Scepter Manufacturing, LLC, manufacture, market, and sell portable plastic fuel containers to consumers in the United States. Plaintiff and Defendant Scepter Manufacturing have a contractual relationship dating back approximately six years.[10] In 2013, the same year Defendant began manufacturing products at its facility in Miami, Oklahoma, Defendant recognized it had excess capacity and idle machines that could be used to increase revenue if put to use. Defendant thus sought a business arrangement with Plaintiff in which Defendant would manufacture gasoline cans for Plaintiff. In order to convince Plaintiff of the viability and likely success of this arrangement, Defendant assured Plaintiff that even though it was a competitor, Plaintiff and its products would be Defendant's top priority at the Oklahoma facility. Although Defendant manufactured competing gasoline cans, it told Plaintiff that it aspired to be Plaintiff's "Vendor of the Year."[11]

### The Parties' Contractual Relationship

On September 6, 2013, Plaintiff and Defendant entered into a Supply Agreement.[12] Defendant agreed to custom mold, test, and package Plaintiff's five-gallon fuel container body and sell it to Plaintiff under the terms outlined in the agreement. The Supply Agreement included specific commitments from Defendant as to the amount of Plaintiff's products Defendant would have available at all times. Specifically, Defendant would "stock

---

Declaration does not contain the picture contained in the brief, although the picture does appear to be appended as Exhibit 9. But even if Plaintiff properly cited to an authenticated document on this point, the Court disregards this single reference to outside evidence in considering the instant motion because it was neither included in nor attached to the SAC.

[10]For purposes of deciding this motion only, the Court refers to Scepter Manufacturing as "Defendant" throughout this opinion.

[11]Doc. 41 ¶ 102.

[12]Doc. 62 (under seal).

approximately eight (8) to ten (10) truck-loads" of No Spill Product . . . .  This stock will be used to fill new purchase orders and then replenished as used (FIFO)."[13]

Regarding "Order Procedure," paragraph 5 of the Supply Agreement provides:

> Buyer shall issue purchase orders for Product based on full truck loads.  Each "Order" shall provide the type and quantity of Products required, the delivery destination and the delivery date. Supplier must accept or reject an Order within one (1) business day of receipt. No order will be deemed accepted unless Supplier confirms its acceptance. . . .[14]

Defendant agreed it "understands and acknowledges that time is of the essence with regard to the delivery of the Products under this Agreement."[15]  Plaintiff submitted regular, consistent purchase orders to Defendant by email, as Defendant requested.  If Defendant did not have the required truckloads of stock available, Plaintiff would be unable to complete its sales of gasoline cans to dealers and third parties.

Paragraph 9 of the Supply Agreement states "[u]pon expiration of the Term or other termination of" the Supply Agreement, No Spill "shall have the option, but not the obligation, to purchase the molding machine and ancillary equipment used in the production of the Products" under terms set forth in Exhibit D to the Supply Agreement.[16]  Exhibit D to the Supply Agreement identifies a Bekum blow molding machine by serial number, with described ancillary equipment, with a specified "Initial Value."  Exhibit D states:

> At the end of the Term of this Agreement, Buyer shall have the option to purchase the above equipment at a value calculated by reducing the Initial Value by 5% for each full year that the

---

[13]Doc. 41 ¶ 189 (quoting Doc. 62 ¶ 4(a)).

[14]*Id.* ¶ 191 (quoting Doc. 62 ¶ 4(b)).

[15]*Id.* ¶ 192 (quoting Doc. 62 ¶ 6(d)).

[16]*Id.* ¶ 193 (quoting Doc. 62, Ex. D).

Agreement had been in effect; this reduction not to exceed 50% of the Initial Value.[17]

Paragraph 10(b) of the Supply Agreement states that Defendant "warrants and represents that . . . (iii) the Products are of merchantable quality and free from defects in material and workmanship," and "(iv) the Products conform in all respects" to the Supply Agreement and No Spill's specification.[18]

Paragraph 13 of the Supply Agreement contains a limitation of liability provision.[19]

On or about February 9, 2016, the parties entered into the First Amendment to Supply Agreement, the purpose of which was to increase the volume of Plaintiff's product that Scepter agreed to provide. The First Amendment increased Defendant's inventory obligation from ten to eleven truckloads. Thereafter the parties mutually agreed that in order to ensure it could be better equipped to fulfill Plaintiff's order volume, Defendant would increase the quantity of truckloads it was required to have on hand to fifteen. Plaintiff paid Defendant in advance to maintain the requisite number of truckloads.

For the first four years of the parties' contractual relationship, Plaintiff was a valued customer and revenue source for Defendant, and Defendant was a reliable and important supplier to Plaintiff. From 2013 to 2017, Plaintiff's business grew steadily and its market share increased, making it more of a competitor to Defendant. Plaintiff's gasoline cans began to displace Defendant's gasoline cans with key customer accounts.

This change caused Defendant to begin treating Plaintiff as a competitor, rather than as a customer and partner. Thereafter, Defendant began to frustrate and obstruct the supply of manufactured gasoline cans to Plaintiff as follows:

---

[17]*Id.* ¶ 195 (quoting Doc. 62, Ex. D).

[18]*Id.* ¶ 196 (quoting Doc. 62 ¶ 10(b)).

[19]Doc. 62 ¶ 13.

a.    failing to keep sufficient stock of No Spill products on hand so that Plaintiff's orders could not be fulfilled, and Plaintiff could not deliver the ordered products to its customers (some of whom Defendant was pursuing for sales of its own products);

b.    dramatically changing the amount of machine and employee time it devoted to production of No Spill products, resulting in lowered production volumes, so that Plaintiff would receive lower volumes of product to sell to its own customers; and

c.    discontinuing, modifying, or failing to properly execute quality control procedures as to No Spill products produced at Defendant's facility, so that Plaintiff would have fewer products of adequate quality to sell to its customers and so that Plaintiff's customers would potentially receive products of a lower quality.

At least one of the unmerchantable products was sent to a dealer, which returned the defective can to Plaintiff, causing injury to Plaintiff's goodwill and reputation with that dealer. And because Defendant was not maintaining at least eleven truckloads as required by the Supply Agreement, Plaintiff was unable to sell millions of dollars of product to dealers and other third parties, which damaged Plaintiff.

On August 22, 2017, Defendant provided notice of its intent to terminate the Supply Agreement effective May 23, 2018. On May 21, 2018, Plaintiff gave written notice it was exercising the purchase option outlined in the Supply Agreement ("Option Notice"). The Option Notice stated:

> Pursuant to our existing Supply Agreement contract, please consider this letter as notice that No Spill, Inc. is hereby exercising the Option to purchase the blow molding machine that is currently running gasoline cans for No Spill, Inc. The Contract specifically

spells out a Bekum blow molding machine, Model BM-705D, Serial Number 204705-5-053. This Option also extends to the support equipment identified in the Contract.[20]

The serial number identified in the Option Notice for the machine is the same serial number identified in Exhibit D of the Supply Agreement. In the Option Notice, Plaintiff also asked Defendant to state whether a different blow molding machine was being used to manufacture the products, provide information concerning the current machine being used, and to provide an opportunity to inspect such equipment. On May 31, 2018, Defendant refused Plaintiff's exercise of its option to purchase the blow molding machine.

Plaintiff alleges damages as a result of Defendant's breaches of contract that include a loss of production capacity, sales, revenue, and profits at times of high order demand and thereafter. Plaintiff took efforts to try to mitigate its loss of production capacity caused by Defendant's breaches, but was unable to completely mitigate the losses.

### *Plaintiff's Trade Dress*

Since at least 1989, No Spill and its predecessors have continuously and substantially advertised, marketed and sold gasoline cans with a distinctive horizontal plastic nozzle assembly having a tapered spout. Also since that time, No Spill fuel containers bearing the No Spill Trade Dress have been sold nationwide through third-party retailers including Amazon, Walmart, Ace Hardware, Stihl dealers, True Value hardware dealers, Do it Best hardware dealers, John Deere dealers, Honda dealers, Briggs and Stratton dealers and Home Depot. During at least the past ten years, Plaintiff sold its fuel containers bearing the No Spill Trade Dress in all fifty states and multiple foreign countries. Sales by year for the past five years have increased substantially. In the course of advertising its products, No Spill prominently highlighted its distinctive nozzle

---

[20]Doc. 41 ¶ 244.

assembly in particular, and the No Spill Trade Dress in general. No Spill gasoline cans have a product label affixed to them with an outline of its container shape framing the word "No," as seen here:



Defendant manufactures and sells within the United States plastic gasoline containers that employ a flash suppressor positioned through the opening of the gasoline container. These fuel containers are sold in a few different sizes and, depending on the nozzle, as either the "SmartControl" gasoline can or as the "Ameri-Can" gasoline can. They include a label affixed thereto that bears the word "SCEPTER" in all capital letters. The bodies of the fuel containers include raised letters molded into two of the sides thereof and spell the word "SCEPTER" in all capital letters.

Plaintiff highlights the following features shared by Plaintiff's and Defendant's products: (1) an open handle formed into the top of the container; (2) a nozzle assembly installed on the top of the container adjacent to the open handle; (3) a tapered spout projecting horizontally; (4) a cap for covering the end of the spout tethered to the spout with a flexible plastic strap, secured at one end to the underside of the spout; and (5) the red container combined with a tapered, molded black spout having a tether connected to the underside. Plaintiff provides the following pictorial representation of the two containers, with Plaintiff's on the left and Defendant's on the right:



By way of comparison, Plaintiff submits a pictorial representation of a Scepter developmental fuel container; one that it claims does not utilize Plaintiff's trade dress:



Plaintiff also provides examples of several other fuel containers in the marketplace that are dissimilar to both the No Spill and Scepter fuel containers. These examples utilize either a different spout configuration (angled or vertical), different handle placement, or different container shapes.

The SAC alleges four claims against this Defendant: (1) Count III for breach of contract under Kansas law based on Defendant's failure to meet production requirements; (2) Count IV for breach of contract claim under Kansas law based on Defendant's refusal to allow Plaintiff to exercise its option to purchase the Bekum blow molding machine; (3) Count V for trade dress infringement under the Lanham Act; and (4) Count VI for unfair competition under Kansas law.

## III.    Discussion

### A.    Breach of Contract Claims (Counts III and IV)

In Count III, Plaintiff alleges Defendant breached the production requirements in the Supply Agreement by: (1) failing to meet quality control standards; (2) refusing to keep the required levels of truck load inventory on hand; (3) refusing to supply submitted order quantities; and (4) refusing to manufacture orders on weekends without additional charge. In Count IV, Plaintiff alleges that Defendant breached the Supply Agreement by refusing to honor its purchase option on the blow molding machine.

The parties agree that Kansas law governs the contract claims in this matter. Under Kansas law, a party establishes breach of contract by proving five elements: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the

defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[21] Defendant moves to dismiss both contract claims on the basis that Plaintiff did not plead adequate facts establishing its performance or willingness to perform in compliance with the Supply Agreement. Additionally, Defendant argues Plaintiff's damages claim for lost profits, loss of revenue, and lost sales is foreclosed by the Supply Agreement's limitation of liability provision. The Court addresses these arguments in turn.

### 1. Plaintiff's Performance

#### a. Count III—Production Requirements

Defendant argues that Plaintiff fails to allege facts to support its conclusory assertion that it performed its obligations under the Supply Agreement. Defendant identifies myriad contractual provisions that imposed certain requirements on Plaintiff, and takes the position that Plaintiff must specifically allege compliance with each one in order to state a plausible contract claim under Rule 12(b)(6).[22]

Plaintiff's SAC goes well beyond the conclusory assertion that it performed or was willing to perform under the contract. On the quality control issue, Plaintiff alleges that it provided Defendant with notice when it was delivered defective products—it "confronted [Defendant] with pictures of the defective cans."[23] The Court reasonably infers from this allegation that Plaintiff fulfilled its obligation to notify Defendant when it shipped defective or nonconforming inventory.

---

[21]*Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citing *Commercial Credit Corp. v. Harris*, 510 P.2d 1322, 1325 (Kan. 1973)).

[22]Doc. 52 (citing Doc. 62 ¶¶ 4, 5, 6(d), and 7(c)).

[23]Doc. 41 ¶ 224.

Defendant's argument that Plaintiff failed to allege performance related to inventory maintenance and purchase order fulfillment also falls short. Plaintiff alleges that it complied with the Supply Agreement's order procedure by "submit[ing] regular, consistent orders" and "provid[ing] [Defendant] with good-faith forecasts as requested."[24] Plaintiff also provides a list of dates from February 2017 through December 2017 that Defendant allegedly did not keep the required amount of inventory on hand. Plaintiff alleges this resulted in Defendant accepting Plaintiff's purchase orders, then failing to fulfill the orders. According to Plaintiff, there was an ongoing breach during this date range; the breach was not an isolated event.

As to weekend production, Plaintiff alleges that Defendant altered its course of performance and violated an understanding between the parties that Defendant would routinely and consistently produce No Spill products during weekend hours as needed to fulfill its supply obligations under the Supply Agreement. Defendant suggests that Plaintiff must allege that it exercised one of its options under the contract when an order is delayed—cover or rejection of the shipment. The Court finds that such specificity is not required at the pleading stage. Plaintiff alleges the parties had an understanding "that [Defendant] had certain hours during which machines were idle and it was willing to produce [Plaintiff's products] during those hours."[25] When Defendant stopped maintaining the requisite inventory levels, it also informed Plaintiff that it would not produce No Spill products during the weekend hours anymore unless Defendant was also producing its own products at the time; it also demanded an additional payment for any weekend production. Plaintiff alleges that the Supply Agreement does not provide for increased charges for weekend production, nor that there would be a production relationship between No

---

[24]*Id.* §§ 203, 209.

[25]Doc. 43 ¶ 235.

Spill and Scepter products. These allegations are sufficient to place Defendant on notice of Plaintiff's breach of contract claim.

In sum, the Court finds that the SAC contains nonconclusory allegations that Plaintiff performed or was willing to perform under the contract as to the production breaches alleged in Count III. At this stage, Plaintiff is not required to allege the granular detail urged by Defendant in its motion. Plaintiff's SAC goes well beyond a recitation of the elements and provides detailed factual allegations sufficient to provide Defendant notice of its claims under the governing standard. Plaintiff need not identify specific purchase orders that were not fulfilled, specifically allege that Plaintiff made quarterly forecasts, or specify that purchase orders were sent fourteen days before each breach in order to state a plausible contract claim. Based on the factual allegations in the SAC, the Court can reasonably infer Plaintiff performed or was willing to perform in compliance with the contract.

### b. Count IV—Mold Machine

In Count IV, Plaintiff alleges a separate breach of contract claim based on Defendant's refusal to sell the blow molding machine identified in Attachment D to the Supply Agreement, despite properly exercising its right to purchase under the terms of the contract. Defendant argues that Plaintiff failed to perform under the contract by failing to include the purchase price in its Option Notice. Defendant's argument fails for two reasons. First, the Supply Agreement set a specific price of $388,800 for the purchase option; therefore, the price was undisputed. Second, the Supply Agreement does not require Plaintiff to include the predetermined price in its Option Notice.

Defendant next asserts that Plaintiff "never made ***any offer*** to purchase" and "only asked what equipment was being used and for the opportunity to inspect such equipment."[26]  Defendant is incorrect.  Plaintiff specifically alleges that it provided Defendant its Option Notice before termination of the Supply Agreement, which the Court must accept as true for purposes of this motion.  That notice, which Plaintiff includes in the SAC, unequivocally states that Plaintiff is "hereby exercising the Option to purchase the blow molding machine."  The Court thus denies Defendant's motion to dismiss Count IV.

### 2. Damages

On Count III, Plaintiff seeks damages "including, but not limited to, direct damages in excess of $75,000 for expectation damages, lost profits, loss of revenues, and lost sales."[27]  Under Count IV, Plaintiff alleges it "sustained direct damages, including but not limited to a loss of production capacity, sales, revenue and profits at times of high order demand and thereafter."[28]  The Supply Agreement's limitation of liability provision unambiguously forecloses recovery of consequential damages:

> NOTWITHSTANDING SECTION 15 BELOW, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY CLAIM BASED ON . . . INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR LOST REVENUES, IN CONNECTION WITH ITS PERFORMANCE OR FAILURE TO PERFORM IN CONNECTION WITH THE AGREEMENT, REGARDLESS OF WHETHER THE OTHER PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.[29]

---

[26]Doc. 64 at 11 (emphasis in original).

[27]Doc. 41 ¶ 295.

[28]*Id.* ¶ 314.

[29]Doc. 62 ¶ 13.

Defendant contends this provision precludes Plaintiff's recovery of lost profits, revenues, or sales. Plaintiff responds that the provision bars recovery of consequential lost profits and lost revenues, but allows for recovery of lost contractual revenues. Plaintiff maintains that it is entitled to benefit-of-the-bargain damages under the Uniform Commercial Code ("UCC").

The construction of a written contract is a question of law.[30] Generally, if the language in a written contract "is clear and can be carried out as written there is no room for rules of construction."[31] "In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms."[32] "The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow."[33] "Where a contract is complete and unambiguous on its face, the court must determine the intent of the parties from the four corners of the document, without regard to extrinsic or parol evidence."[34] The provisions of a written contract must be interpreted as a whole and in harmony, rather than in isolation.[35]

The Tenth Circuit addressed a similar limitation of liability provision in *Penncro Associates, Inc. v. Sprint Spectrum, L.P.*[36] In *Penncro*, the Tenth Circuit affirmed Judge Lungstrum's decision permitting recovery of lost profits as direct damages despite a limitation of

---

[30]*See, e.g.*, *Ponds ex rel. Poole v. Hertz Corp.*, 158 P.3d 369, 372 (Kan. Ct. App. 2007).

[31]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

[32]*Wagnon v. Slawson Expl. Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 858 P.2d 1228, 1238 (Kan. Ct. App. 1993)).

[33]*Kay–Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (quoting *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996)).

[34]*Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[35]*Decatur Cty. Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 574 (Kan. 1999) (citations omitted).

[36]*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151 (10th Cir. 2007).

liability provision that barred recovery of "'consequential damages,' specifying that they 'include, but are not limited to, lost profits, lost revenues and lost business opportunities.'"[37] The Tenth Circuit rejected the defendant's argument that any lost profits borne by the plaintiff are consequential damages foreclosed under the contract.[38] As the court explained, lost profits and lost revenues may be classified as either direct damages or consequential damages, depending on the factual situation:

> Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract. Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages. Thus, for example, if a services contract is breached and the plaintiff anticipated a profit under the contract, those profits would be recoverable as a component of direct, benefit of the bargain damages. If that same breach had the knock-on effect of causing the plaintiff to close its doors, precluding it from performing other work for which it had contracted and from which it expected to make a profit, those lost profits might be recovered as "consequential" to the breach.[39]

The court found that the provision at issue in *Penncro* barred recovery of consequential lost profits, but not direct lost profits. The parties entered into a contract which required the plaintiff (seller) to supply the defendant (buyer) "with a fixed amount of available labor capacity, and required [the defendant] to pay for that labor, whether utilized or not."[40] The buyer breached the contract by terminating it prematurely without cause.[41] After a bench trial, the district court awarded the seller lost profits it would have earned directly from the buyer by providing the

---

[37]*Id.* at 1155–56.

[38]*Id.* at 1156.

[39]*Id.* (footnotes omitted).

[40]*Penncro Assocs., Inc.*, 499 F.3d at 1152.

[41]*Id.*

contractually fixed amount of labor for the remainder of the contract term.[42]  The district court

held, and the Tenth Circuit affirmed, that lost profits under the parties' agreement were direct

damages that were not barred by the limitation of liability provision.[43]

Here, the Supply Agreement allowed Plaintiff (buyer) to purchase a variable amount of

goods from Defendant (seller) at a fixed price.  Plaintiff could not earn a profit directly from

Defendant under the terms of the contract.  Therefore, the only lost profits Plaintiff incurred were

resale profits under contracts with its third-party customers.  Indeed, the SAC alleges that

Defendant's failure to maintain inventory meant that "No Spill was unable to sell millions of

dollars of product to dealers and third parties, which damaged No Spill."[44]

Kansas courts hold that a buyer's lost resale profits after a supplier's breach are

consequential damages, even when the buyer cannot fulfill a pre-existing resale contract as a

direct result of the breach.[45]  The Kansas UCC also makes this classification as consequential

damages clear by defining a buyer's consequential damages from a seller's breach as "any loss

resulting from general or particular requirements and needs of which the seller at the time of

contracting had reason to know and which could not reasonably be prevented by cover or

otherwise."[46]  The UCC comment explains that, "[i]n the case of sale of wares to one in the

---

[42]*Id.* at 1162.

[43]*Id.* at 1152.  Construing *Penncro* in a subsequent case with a similar limitation of liability provision, Judge Lungstrum explained: "no reasonable argument can be made that lost profits are 'always' considered consequential damages under Kansas law."  *Signature Mktg., Inc. v. New Frontier Armory*, No. 15-7200-JWL, 2016 WL 5409996, at *8 (D. Kan. Sept. 28, 2016).

[44]Doc. 41 ¶ 233.

[45]*See Tongish v. Thomas*, 840 P.2d 471, 474 (Kan. 1992) (quoting *Panhandle Agri-Serv., Inc.*, 644 P.2d at 419–20); *Panhandle Agri-Serv., Inc. v. Becker*, 644 P.2d 413, 416, 419 (Kan. 1982) ("We find nothing which would justify the trial court in arriving at damages using loss of business profits which are consequential damages.").

[46]K.S.A. § 84-2-715(2)(a).

business of reselling them, resale is one of the requirements of which the seller has reason to know."[47]

Therefore, the Court finds that Plaintiff's alleged lost resale profits to third parties are consequential damages under both Kansas caselaw and the UCC. Plaintiff is thus barred from recovering such consequential lost profits under the Supply Agreement's limitation of liability provision. But Plaintiff also claims direct damages sustained as a result of the breaches in Counts III and IV, and argues that it may recover the market price of the value of the nondelivered products under the UCC.[48] Defendant replies that Plaintiff's generic prayer for direct damages is insufficient to provide it with notice of the damages alleged. The Court disagrees. The UCC controls the direct damages recoverable under the contract. Plaintiff's claim for direct damages, in conjunction with the Court's order disallowing consequential lost profits, lost revenue, and lost sales, is thus sufficient to place Defendant on notice of Plaintiff's prayer for relief on the contract claims. The Court thus grants Defendant's motion to dismiss Plaintiff's claim for consequential lost profits, consequential lost revenues, and consequential lost sales. The Court denies the motion to dismiss as to Plaintiff's claim for direct damages under the UCC.

### B.    Trade Dress Infringement Claim under the Lanham Act (Count V)

The Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of action for trade dress infringement.[49] "A product's trade dress 'is its overall image and appearance, and may include

---

[47]K.S.A. § 84-2-715(2)(a) cmt. 6.

[48]*See* K.S.A. § 84-2-713(1) ("the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 84-2-715), but less expenses saved in consequence of the seller's breach.").

[49]*Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques.'"[50]  "[A] trade dress may be a composite of several features in a certain arrangement or combination which produces an overall distinctive appearance."[51]  To prevail on a trade dress infringement claim, a plaintiff must show: "(1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional."[52]  Defendant argues that Plaintiff's factual allegations in the SAC are insufficient to support any of the three trade dress elements.  Plaintiff responds that it has sufficiently alleged facts to pass muster under Rule 12(b)(6), and suggests that Defendant's position incorrectly assumes a heightened standard applies to the Court's review of trade dress claims at the motion to dismiss stage.  Plaintiff further argues that Defendant's arguments improperly focus on the individual elements of its trade dress rather than the trade dress as a whole.  The Court addresses the parties' arguments as to each trade dress element in turn.

### 1.    Inherently Distinctive or Secondary Meaning

A trade dress must either be inherently distinctive or have secondary meaning.[53]  A mark is "inherently distinctive if its intrinsic nature serves to identify a particular source.  Such [marks] almost *automatically* tell a customer that they refer to a brand and immediately signal a brand or a product source."[54]  Alternatively, a trade dress acquires secondary meaning "when, 'in

---

[50]*Id.* (quoting *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002)).

[51]*Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir. 1988).

[52]*Gen. Motors Corp.*, 500 F.3d at 1227 (citing *Sally Beauty Co.*, 304 F.3d at 977); *see also* 15 U.S.C. § 1125(a)(3).

[53] *Gen. Motors Corp.*, 500 F.3d at 1227.

[54]*Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1244 (10th Cir. 2016) (quoting *Sally Beauty*, 304 F.3d at 977) (citations and internal quotation marks omitted) (emphasis in original).

the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"[55] A plaintiff asserting a trade dress claim may establish secondary meaning "through 'direct evidence, such as consumer surveys or testimony from consumers.'"[56] A plaintiff may also rely on circumstantial evidence, such as:

> (1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.[57]

Plaintiff alleges its trade dress has secondary meaning. At the motion to dismiss stage, Plaintiff is not required to present direct or circumstantial *evidence* of secondary meaning. Instead, Plaintiff alleges facts that, if proved, would constitute circumstantial evidence of secondary meaning. Specifically, Plaintiff alleges facts touching on the first three categories of circumstantial evidence—that it continuously and substantially advertised, marketed, and sold its gas cans throughout the United States since 1989, and that in doing so it prominently highlighted its trade dress. Plaintiff pleads that it has "expended substantial amounts since 1989 advertising portable fuel containers bearing the No Spill Trade Dress," and that it has prominently highlighted the No Spill Trade Dress in the course of advertising its products. For example, Plaintiff's SAC includes a picture of its product labels, which highlight the trade dress through its drawing of the No Spill container shape around the "No" in "No Spill."

---

[55]*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (quoting *Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)).

[56]*Forney Indus., Inc.*, 835 F.3d at 1253 (quoting *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004)).

[57]*Id.* (citing *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1148 (10th Cir. 2016)).

Defendant argues that Plaintiff's allegations as to the various secondary meaning factors are conclusory. Defendant is correct that an allegation of continuous marketing, without more, "does not suggest with any degree of plausibility that consumers learned to associate the products' visual elements exclusively with the [Plaintiff's] trade dress."[58] But here, Plaintiff alleges more than simply the duration of its advertising and marketing to support the secondary meaning element of its claim. It alleges a thirty-year marketing effort, and ties that marketing effort to the trade dress itself, with a specific example of its product label. Moreover, Plaintiff alleges that Defendant intentionally copied its trade dress during the parties' contractual relationship when Plaintiff was a customer of Defendant's. Intentional copying, when done to capitalize on a product's reputation, may support a finding of secondary meaning.[59] Plaintiff also alleges facts about its sales volume, including that Plaintiff's fuel containers are sold through large nationwide retailers.[60] The Court finds that these allegations, when taken together, are sufficient to plausibly support the secondary meaning element of Plaintiff's trade dress claim.

## 2. Likelihood of Confusion

Next, Defendant alleges that No Spill does not adequately plead likelihood of confusion. Likelihood of confusion is a question of fact, requiring consideration of the following factors:

> (1) the degree of similarity between the products; (2) the intent of the alleged infringer in designing its product; (3) evidence of actual confusion; (4) similarity in how the products are marketed; (5) the

---

[58] *Domo, Inc. v. Grow, Inc.*, No. 17-cv-812, 2018 WL 2172937, at *4 (D. Utah May 10, 2018).

[59] *See Marker Int'l v. DeBruier*, 844 F.2d 763, 764 (10th Cir. 1988); *Craft Smith, LLC v. EC Design, LLC*, 388 F. Supp. 3d 1385, 1411 (D. Utah 2019) ("[c]opying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's." (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995)).

[60] Again, sales volume standing alone may not suffice to demonstrate secondary meaning, but Plaintiff alleges facts about its sales volume in addition to other circumstantial evidence of secondary meaning. *See Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1149 (10th Cir. 2016).

degree of care likely to be exercised by purchasers; and (6) the strength of the trade dress.[61]

Plaintiff has adequately pled facts touching on several of these factors.  It alleges that the marks bear substantial similarity to one another and provides side-by-side pictorial representations to demonstrate similarity.  Plaintiff alleges intentional copying and similarity in marketing.  It also alleges that its trade dress is strong.  Defendant points to several differences between its product and the No Spill trade dress, urging that the marks are not similar and therefore there can be no likelihood of confusion.  But the degree of similarity between the products is an issue of fact that is not amenable to resolution at this stage of the litigation.  Plaintiff has alleged many similarities between the two products, and compares those similar products to other products in the marketplace (including Defendant's earlier generation products) that do not have similar horizontal, tapered nozzles.  These allegations are sufficient to pass muster at the motion to dismiss stage.

### 3.    Functionality

Finally, Defendant insists that Plaintiff's trade dress claim must fail because the trade dress features alleged in the SAC are functional.  Whether a trade dress is functional is a question of fact,[62] and the party asserting trade dress infringement bears the burden of demonstrating that the trade dress is nonfunctional.[63]  As a general rule, a "'product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the

---

[61]*Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007) (citing *Sally Beauty Co. v. Beautyco., Inc.*, 304 F.3d 964, 979 (10th Cir. 2002)).

[62]*Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 520 (10th Cir. 1987).

[63]*See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (citing 15 U.S.C. § 1125(a)(3)).

cost or quality of the article.'"[64]  In certain limited circumstances, such as cases dealing with aesthetic functionality, the Court may proceed to consider whether there is a competitive necessity for the feature.[65]  But if a design is deemed functional under the main test announced in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, there is no need to consider the issue of competitive necessity for the feature.[66]

Defendant argues that Plaintiff's allegations of non-functionality are conclusory and that each of the five features identified in the SAC are functional.  Specifically, the open handle feature allows the user to pick up the gas can, the tethered cap allows the user to open the gas can without misplacing the cap, the nozzle assembly allows the user to pour gas from the can, and the cap itself allows the user to close the can.  Moreover, Defendant urges that the red color of the can is mandated by federal regulations.  Plaintiff responds that its factual allegations are nonconclusory and sufficient to survive a motion to dismiss because they aver that the specific shape and orientation of the features do not dictate how the fuel container works.  Further, Plaintiff points to alternative designs in the marketplace, including Defendant's developmental design.  Finally, Plaintiff argues that Defendant mistakenly focuses on the individual features of its trade dress rather than the combination of features.

---

[64]*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)); *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982).

[65]*TrafFix Devices, Inc.*, 532 U.S. at 33. Aesthetic features, such as color, "serve an aesthetic purpose wholly independent of any source identifying function."  *Moldex-Metric, Inc. v. McKeon Prods., Inc.*, 891 F.3d 878, 885 (9th Cir. 2018).

[66]*TrafFix Devices, Inc.*, 532 U.S. at 33–34 (distinguishing cases of utilitarian functionality with those of aesthetic functionality such as color, at issue in *Qualitex*, 514 U.S. at 165); *see Moldex-Metric, Inc.*, 891 F.3d at 883–86 (discussing analysis for utilitarian and aesthetic trade dress functionality); *Antioch Co. v. W. Trimming Corp.*, 347 F.3d 150, 156 (6th Cir. 2003) ("The traditional *Inwood* test for functionality is the main rule, and if a product is clearly functional under *Inwood*, a court need not apply the competitive-necessity test and its related inquiry concerning the availability of alternative designs.").

Under *TrafFix*, the Court must first consider the traditional test of functionality set forth in *Inwood*—whether the fuel container's trade dress is "essential to the use or purpose of the article or if it affects the cost or quality of the article."[67]  In addressing this question, the Court is not required to consider whether alternative designs are available.[68]  This is because  "[e]ven if there are alternative designs available in the marketplace, they cannot turn a feature that is functional under the traditional engineering-driven definition into a nonfunctional feature which is the exclusive trade dress property of one seller."[69]  Nonetheless, there is persuasive authority since *TrafFix* that evidence about the availability of alternative designs may aid courts in determining whether a product feature affects quality, or is merely ornamental, when such a question of fact is presented.[70]

The Court agrees with Plaintiff that, at least at the pleading stage, this case presents a factual dispute about whether the trade dress's features are qualitative rather than merely ornamental.  For example, Plaintiff pleads that although its fuel container handle is functional, the design of the open handle is ornamental.  Similarly, Plaintiff pleads that the horizontal design of the fuel spout is not required to dispense fuel, and points to other designs in the marketplace that dispense fuel through a non-horizonal spout.  And importantly, Plaintiff pleads that the combination of its trade dress's many features is nonfunctional, even if certain features may be

---

[67]*TrafFix Devices, Inc.*, 532 U.S. at 32 (quoting *Qualitex Co*, 514 U.S. at 165).

[68]*Id.* at 33–34; *Antioch v. W. Trimming Corp.*, 347 F.3d 150, 156 (6th Cir. 2003).

[69]1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:75 (5th ed. supp. 2019).

[70]*Antioch*, 347 F.3d at 156 (citing *ValuEngineering, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002); 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:75 (4th ed. 2003)); *Moldex-Metric, Inc. v. McKeon Prods., Inc.*, 891 F.3d 878, 885 (9th Cir. 2018); *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 312–13 (4th Cir. 2014); *see also Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, No. 17-cv-454-GKF-JFJ, 2018 WL 284991, at *8 n.10 (N.D. Okla. Jan. 3, 2018) ("Although the breadth of the *TrafFix* decision has not been addressed by the Tenth Circuit, the court is not persuaded that the Tenth Circuit would interpret *TrafFix* as holding that alternative designs are always irrelevant to functionality in a trade dress inquiry." (citations omitted)).

individually functional. Defendant leans on a "common-sense" application of the functionality doctrine to discount Plaintiff's assertions of functionality, but that position requires the Court to resolve a factual dispute. Such an exercise is not permitted at the motion to dismiss stage, where the Court must assume as true the facts as alleged. Here, those facts go beyond conclusory assertions or a recitation of the elements. Rather, Plaintiff submits a robust SAC containing substantial factual allegations to provide Defendant notice of its trade dress claim.[71] It alleges facts about the non-functionality of each product feature in its trade dress, and pleads the existence of alternative designs—facts that may be relevant to determining functionality in this case. Moreover, even if the Court agrees with Defendant that the fuel container's cap or its red color are functional, it must consider the trade dress as a whole. "A combination of features may be nonfunctional and thus protectable, even though the combination includes functional features."[72] Plaintiff pleads that the combination of these features is arbitrary and ornamental. For all of these reasons, the Court finds that Plaintiff's SAC sufficiently pleads the non-functionality of its trade dress. Defendant's motion to dismiss is denied as to Count V.

### C. Unfair Competition under Kansas Common Law (Count VI)

The Kansas common law also recognizes a cause of action for the misuse of trademark or other intellectual property.[73] To prevail under this theory, a plaintiff must prove: (1) it owns a valid, protectable trade dress and (2) defendant's product is so similar to plaintiff's it is likely to

---

[71]*See, e.g., Video Gaming Techs., Inc.*, 2018 WL 284991, at * 8 (finding allegations that trade dress features are distinctive, arbitrary, and provide cues that the products are manufactured by the plaintiff, in addition to alternative designs, were sufficient to pass muster under Rule 12(b)(6)); *Domo, Inc. v. Grow, Inc.*, No. 17-cv-812, 2018 WL 2172937, at *4 (D. Utah May 10, 2018) (finding that "a description of the appearance of [the plaintiff's] product" does relieve the plaintiff of its burden to "allege any facts about the non-functionality of that appearance.").

[72]*Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1272 (10th Cir. 1988) (citations omitted).

[73]*Schofield Auto Plaza, LLC v. Carganza, Inc.*, 979 P.2d 144, 147 (Kan. Ct. App. 1999).

cause consumer confusion.[74]  For the reasons explained in the last section, Plaintiff has sufficiently pled that it owns a valid, protectable trade dress, and that Defendant's product is likely to cause consumer confusion.  As such, the motion to dismiss is denied on Count VI as well.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Scepter Manufacturing's Motion to Dismiss for Failure to State a Claim (Doc. 51), to which Defendant Scepter Canada, Inc. has joined, is **granted in part and denied in part**.  The motion is granted as to the breach of contract claims alleged in Counts III and IV insofar as they seek consequential damages; the motion is otherwise denied.

**IT IS SO ORDERED.**

Dated: December 16, 2019

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[74]*Id.* at 148.