**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| NO SPILL INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 2:18-cv-2681-JAR-KGG |
| | ) |
| SCEPTER CANADA, INC., | ) |
| | ) |
| and | ) |
| | ) |
| SCEPTER MANUFACTURING LLC, | ) |
| | ) |
| Defendants. | ) |

## NO SPILL INC.'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

No Spill's Initial Infringement Contentions and accompanying Claim Charts clearly identify the structures in Defendants Scepter Canada, Inc. and Scepter Manufacturing, LLC's (collectively "Scepter") accused products that correspond to each limitation of the asserted claims of the Patents-In-Suit as required by Local Patent Rule 3.1.  Contrary to the assertions in Scepter's Memorandum in Support of its Motion to Compel (Dkt. 131, hereinafter "Memo."), the standard applicable to *initial* infringement contentions is providing "reasonable notice" of No Spill's infringement theories.  Initial infringement contentions need not identify and provide detailed evidentiary support that will ultimately be relied upon to prove No Spill's case.  Despite this, Scepter requested by letter on May 28, 2020 that No Spill provide additional information and evidentiary support regarding certain claim limitations of the asserted claims—the same limitations identified in Scepter's Memo.  Memo. at 6–8.

No Spill, after receiving assurances from Scepter that Scepter would not assert that providing this additional requested information constituted a waiver of No Spill's attorney-client privilege and work product protections associated with No Spill's Rule 11 prefiling investigation,

provided that additional information in an interrogatory response served on **June 25, 2020,** *i.e.,* over *two months* before Scepter filed its instant Motion to Compel seeking that very same information.  Tellingly, despite filing a lengthy brief with this Court replete with 22 exhibits, <u>Scepter failed to apprise the Court that it had already received the requested information via interrogatory response</u>, and further omitted much of the correspondence between counsel on this very subject.  This type of intentional omission and deception should not be countenanced.

Scepter already has the information it asks the Court to compel, and has more than reasonable notice of No Spill's infringement theories as a result.  Scepter's Motion relies on misstatements of the applicable standards, and evasions of the contents of No Spill's Initial Infringement Contentions and detailed discovery responses in an attempt to manufacture a discovery dispute where none exists.  Scepter's Motion and preceding letter campaign has been an inefficient use of the parties' time and, more importantly, the Court's resources. Consequently, Scepter's motion should be denied.

I.    **INTRODUCTION**

The Patents-In-Suit are generally directed to fuel containers having a perforated "fuel retention structure" or "flash suppressor" (referred to hereinafter as "Flash Suppressor").  Below are images of an embodiment of a Flash Suppressor disclosed and described in the Patents-In-Suit as well as the Flash Suppressors included in the No Spill and Scepter fuel containers at issue in this lawsuit:

CORE/3002339.0003/161844011.1



Example Flash Suppressor
Shown in '075 Patent



No Spill Original
Flash Suppressor[1]



Scepter
Flash Suppressor[2]

No Spill's patented Flash Suppressors are a life-saving invention which can prevent the gasoline can from exploding upon misuse around open flames. The parties have also referred to these Flash Suppressors as "FMDs" in the course of this lawsuit.

Consistent with the description in the Patents-in-Suit, the Flash Suppressor in the No Spill products is located at the opening of the fuel container and extends downwardly into the container as shown in the following images:



Example Fuel Container
in '075 Patent

Flash Suppressor
extending downwardly
into the fuel container

No Spill
Fuel Container

---

[1] No Spill introduced a new version of its Flash Suppressor a few months ago.

[2] Images of the Scepter Accused Instrumentalities included herein are taken from No Spill's Rule 3.1(c) claim charts accompanying Plaintiff's Initial Infringement Contentions. *See*, *e.g.*, Exhibit 4.

CORE/3002339.0003/161844011.1

The same is true of the Flash Suppressor in Scepter's Accused Instrumentalities as shown in the following screenshot of a Scepter advertising video:



Scepter Flash Suppressor extending downwardly into the fuel container

Scepter Fuel Container with Flash Suppressor

Close Up View of Flash Suppressor in Scepter Fuel Container

Accordingly, the liquid fuel must flow through the perforations in the No Spill and the Scepter Flash Suppressors when the fuel containers are filled and when the fuel is subsequently poured out of the container.  The Flash Suppressors retain a quantity of liquid fuel in the perforations when the fuel container is tipped or inverted to dispense the liquid fuel.[3]

This novel "fuel retention" feature is one of the aspects of the fuel containers claimed in the Patents-In-Suit that distinguishes them from prior art fuel containers.  The Flash Suppressors inhibit a flame from entering the body of the fuel container because, counterintuitively, the Flash Suppressors retain a sufficient amount of fuel to create an environment in which there is **_too much_** fuel to combust.  To quote the '075 patent:  "combustion may occur if the [fuel-air] mixture has slightly more fuel than a stoichiometric mix, but if the fuel-air mixture has **too much fuel (becoming too rich)**, **combustion cannot occur in this condition**."  Dkt. 1-1 at Col. 2, lines 44-48 (emphasis added).

---

[3] A video explaining how the Flash Suppressors at issue in this lawsuit generally operate can be found on No Spill's website at https://c2rtech.weebly.com/how-it-works.html (*see* video titled "The Science Behind C2R").

CORE/3002339.0003/161844011.1

No Spill's Second Amended Complaint (Dkt. 41 at ¶¶ 140–146), as well as No Spill's Rule 3.1(c) Initial Infringement Contention Claim Charts (Exhibits 4-7), specifically allege that the Scepter Flash Suppressor retains fuel in its perforations when fuel is poured from the container, and that the amount of fuel retained in the perforations is sufficient to provide a fuel-air mixture that is too rich for combustion.  Stated otherwise, No Spill has clearly and unequivocally identified the bases of its infringement theory as required by Local Patent Rule 3.1—the Scepter Flash Suppressor is the structure in the Accused Instrumentalities that satisfies the "fuel retention" and "too rich to support combustion" limitations of the asserted claims.[4]

Accordingly, and contrary to Scepter's representations in its Motion, there is can be no real confusion regarding the bases of No Spill's infringement allegations.  Indeed, and as explained in detail below in Section II(C), No Spill served an interrogatory response nearly ***two months before Scepter filed its Motion to Compel*** that explicitly disclosed the very information that Scepter's Motion claims it seeks—a fact that Scepter intentionally omitted from its Motion to Compel.

## II.   FACTUAL BACKGROUND

After sending multiple letters accusing Plaintiff and its counsel of violating Rule 11 by filing this lawsuit, Scepter has now moved the Court to compel No Spill to supplement its Initial Infringement Contentions with information that No Spill already provided to Scepter.  Notably, however, Scepter failed to provide the Court with a full record of No Spill's discovery responses or the exchange of letters between counsel.  What follows is a description of the full record regarding No Spill's infringement allegations.  Citations in this Opposition to exhibits by **number**

---

[4] The Asserted Claims include numerous limitations beyond the physical characteristics of the Flash Suppressor.  Scepter's Motion to Compel, however, does not allege any deficiencies regarding those other limitations.  Accordingly, this Opposition will address only those limitations identified by Scepter in its Motion to Compel.

CORE/3002339.0003/161844011.1

(*i.e.* Ex. 1) refer to those exhibits submitted by Scepter.  Citations to exhibits by **letter** (*i.e.* Ex. A) refer to those exhibits submitted by No Spill.

### A.      No Spill's Initial Infringement Contentions

No Spill timely served its Initial Infringement Contentions on May 19, 2020 pursuant to the Court's Scheduling Order and Local Patent Rule 3.1.  Ex. 3.  Those contentions clearly identified the Scepter products of which No Spill was aware that included a Scepter Flash Suppressor (the "Accused Instrumentalities").  *Id.* at 1-2.  No Spill also served sixty-four pages of claim charts pursuant to Rule 3.1(c) that identified where every element of the Asserted Claims was found in those Accused Instrumentalities.  *See* Exhs. 4-7. No Spill's claim charts were identified as A1, A2, B1, and B2 and addressed Scepter Accused Instrumentalities as follows:

| Claim Chart (Ex. #) | Asserted Patent | Accused Instrumentality |
|---|---|---|
| A1 (Ex. 4) | '075 Patent | SmartControl Fuel Containers |
| A2 (Ex. 5) | '075 Patent | AmeriCan Fuel Containers |
| B1 (Ex. 6) | '132 Patent | SmartControl Fuel Containers |
| B2 (Ex. 7) | '132 Patent | AmeriCan Fuel Containers |

It was No Spill's understanding at that time that the Flash Suppressor in each of the Accused Instrumentalities was the same.  No Spill thus explained that the contentions in each Claim Chart applied equally to all fuel containers sold by Scepter under the SmartControl and AmeriCan names, respectively.  Exs. 4- 7 at fn. 1.

Each of No Spill's claim charts unequivocally identified the perforated Flash Suppressor in the Scepter Accused Instrumentalities as the "fuel retention structure" and "flash suppressor" required by the Asserted Claims.  An example from Claim Chart A1 follows:



Ex. 4 at 5.  *See also* Ex. 5 at 3-4; Ex. 6 at 5; and Ex. 7 at 3.

No Spill further clearly explained its contention that the Scepter Flash Suppressor retained a sufficient amount of fuel to provide a fuel-air mixture proximate the container opening that is too rich for combustion:

| Claim Limitation | Scepter SmartControl Fuel Containers[1] |
|---|---|
| wherein the fuel retention structure is configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom, | The fuel retention structure in the SmartControl Fuel Containers is configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom. |
| wherein the retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion | The quantity of the liquid fuel retained by the fuel retention structure in the SmartControl Fuel Containers provides a fuel-air mixture that is too rich to support combustion. This is the very purpose of the fuel retention structure in the SmartControl Fuel Containers. |
| 2. The fuel container of claim 1, wherein the fuel retention structure comprises a flash suppressor. | The fuel retention structure of the SmartControl Fuel Containers is a flash suppressor (i.e., a structure that retains fuel to prevent the development of an explosive event).<br><br>*See* Claim 1, *supra*. |

Ex. 4 at 6.  *See also* Ex. 5 at 4; Ex. 6 at 13; Ex. 7 at 11.  No Spill's Initial Infringement Contentions and Claim Charts thus identified the structure in the Accused Instrumentalities that satisfied every

CORE/3002339.0003/161844011.1

element of each Asserted Claim and provided substantial detail regarding No Spill's infringement theories as required by Rule 3.1(c).[5]

### B.    Scepter's Baseless Rule 11 Allegations and Concurrent Refusal to Provide Details Regarding its Own Product

Despite the undeniable similarities between the No Spill Flash Suppressor and the Scepter Flash Suppressor, and the detailed Initial Infringement Contentions served by No Spill, Scepter's counsel alleged in a May 28, 2020 letter that they believed "[No Spill] has failed to perform a proper Fed. R. Civ. P. 11 investigation to allege infringement of the Asserted Patents."  Ex. 10 at 1.  This letter is part of what is apparently an ongoing litigation tactic by Scepter to continually threaten opposing counsel with baseless Rule 11 allegations.   The May 28 letter requested additional details regarding thirteen specific limitations of the Asserted Claims—the same limitations Scepter included in its Motion to Compel.  *Compare* Ex. 10 at 2-3 with Memo. at 14–16.

In response, No Spill explained on June 11, 2020 that its Claim Charts complied with the standard articulated in Local Patent Rule 3.1(c) because the Claim Charts clearly identified the Scepter Flash Arrestor in each of the Accused Instrumentalities as the structure that satisfied the "fuel retention" and "too rich to combust" limitations.  Ex. 11 at 2.  No Spill further confirmed that it had tested Scepter's Flash Suppressor and that a proper Rule 11 prefiling investigation had been completed.   *Id*. No Spill made clear, however, that it would not waive its attorney-client privilege or attorney work product protections pertaining to that prefiling investigation.  *Id*.

In a further attempt to resolve this purported dispute, however, No Spill said it would provide the additional information regarding the thirteen claim elements requested by Scepter if

---

[5] Local Patent Rule 3.1(c) requires disclosure of "[a] chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality."

CORE/3002339.0003/161844011.1

Scepter would (1) "commit that the [flash suppressors] contained in the sample *AmeriCan* and *SmartControl* gas cans are exemplary of the [flash suppressors] contained in every *AmeriCan* and *SmartControl* product"; and (2) "agree that no work-product is waived by providing the additional information [Scepter] requested." *Id*.

Rather than responding to issues (1) or (2), Scepter asserted that "No Spill fails to identify any evidence that the perforated structures in the accused products meet these [fuel retention and too rich to combust] limitations."[6] Ex. 12 at 1-2. Scepter's response, however, implicitly revealed that Scepter clearly understood the basis of No Spill's infringement assertions. To quote Scepter's June 16 response:

> Defendants have already clearly set forth their position that these perforated structures ***do not*** retain sufficient fuel to provide a fuel-air mixture ratio that is too rich to combust, and that these structures instead can mitigate a flame even when they are dry.

*Id*. at 2 (emphasis in original). Scepter further asserted, incorrectly, that No Spill had waived its privilege and work-product protections in its prefiling investigation *by merely filing its Complaint*. *Id*.

On June 18, No Spill again asked Scepter to respond to issues (1) and (2), above. Ex. B. No Spill further requested that Scepter send an exemplar of each different Flash Suppressor included in any of Scepter's Accused Instrumentalities if more than one had in fact been used. *Id*. No Spill said it would then test and measure the exemplar Flash Suppressor(s) and provide the results to Scepter. *Id*. No Spill made this commitment despite the fact that its expert reports were not due until some unknown date in the future. *See* Dkt. 98 at 2. Lastly, No Spill agreed to meet

---

[6] As explained below in Section III(A), this is not the applicable standard for Initial Infringement Contentions under Rule 3.1.

and confer regarding Scepter's demands on June 25 or June 26 if Scepter was unwilling to proceed under any of the procedures proposed by No Spill in the June 18 letter.  Ex. B at 2.

Scepter responded the next day, June 19, refusing to confirm the Flash Suppressor in their Accused Instrumentalities was the same.  Ex. 13 at 2.  Scepter did agree, however, that disclosure of the additional information requested in Scepter's May 28 letter by No Spill would not constitute a waiver of the attorney-client privilege or work product protections.  *Id*.  Scepter also promised to produce "sample" fuel containers.  *Id*. at 3.

### C.    No Spill Provided the Additional Detail Requested by Scepter

Having received confirmation on June 19 from Scepter that providing the additional information Scepter requested in the May 28 letter would not constitute a waiver of any attorney-client privilege or work product protections, No Spill provided that information in its June 25, 2020 response to Scepter's Interrogatory No. 15.  Ex. A at 2-5.  That interrogatory sought the factual bases for infringement allegations contained in No Spill's Second Amended Complaint, including the "fuel retention" and "too rich to combust" limitations.  *Id.* at 2.  *See also* Dkt. 41 at ¶¶ 141-146.  The chart below identifies the portions of No Spill's interrogatory response that provide the additional information sought by Scepter's May 28 letter (as well as the instant Motion to Compel)[7]:

---

[7] The only claim limitation not specifically addressed by No Spill's interrogatory response require that the liquid fuel be retained in the perforations of the Flash Suppressor by "intermolecular forces."  But there can be no legitimate dispute that the liquid fuel is retained in the perforations of the Scepter Flash Suppressor by such intermolecular forces.  As the '075 patent explains, "a quantity of the liquid fuel is retained in the perforations due to intermolecular forces. **The intermolecular forces include forces between molecules within the liquid fuel and forces between molecules of the liquid fuel and molecules of the fuel retention structure**." Col. 8, ll. 45-50 (emphasis added).  In other words, the liquid fuel adheres to the walls of the perforation and is thus retained in the open space of the perforation.  As there are no physical barriers (*e.g.* dams) or other structural elements included in the Scepter Flash

| No Spill Response to Interrogatory No. 15 Served on June 25, 2020 (Ex. A) (reproduced as highlighted in No Spill's August 7, 2020 letter to Scepter's Counsel) | Claim Elements for Which Scepter Asserts in its September 4, 2020 Motion That No Spill Has Not Disclosed a Basis for Asserting Infringement (Memo. at 14-16) |
|---|---|
| "The flash suppressor of the Accused Instrumentalities was submerged in gasoline and retained approximately 5 grams of liquid gasoline after being removed from the liquid gasoline." | Limitations directed to a "quantity of liquid fuel" being retained in the "fuel retention structure" or "flash suppressor" |
| "A spark test, as detailed in the affidavit submitted by inventor Tom Cray during prosecution of the '075 patent in which the flash suppressor of the Accused Instrumentalities was submerged in liquid gasoline and then subjected to a spark (*e.g.* ignition source) was conducted. … After submersion and removal, the flash suppressor was subjected to a spark (*e.g.* ignition source). No flame or other combustion occurred, confirming that the fuel-air mixture … was too rich to support combustion."<br><br>[This Cray Declaration "Spark Test" is **the same test Scepter identified** in its Memorandum in Support as evidencing the "retained quantity of liquid fuel" and "too rich to support combustion" limitations during prosecution of the '075 patent. *See* Memo at 13. Scepter, however, did not include the Cray declaration in the portions of the file history that Scepter submitted with its Motion. *See* Ex. 9.[8]] | Limitations directed to the quantity of fuel that is retained in the "fuel retention structure" or "flash suppressor" being sufficient to provide "a fuel air-mixture proximate to the main container opening that is too rich to support combustion" |
| "The perforations have an average open area of approximately 0.0014 square inches which is within the claimed range of at least 0.001 square inches and not more than 0.05 square inches. Accordingly, the average open area of the flash | "flash suppressor . . . wherein the average open area of the perforations is at least 0.001 and not more than 0.05 square inches" (claim 1 of the '132 Patent) |

Suppressors that would retain fuel in the perforations, the liquid fuel is necessarily retained by "intermolecular forces" (*e.g.* adhesion) in the perforations.

[8] Scepter erroneously labeled these excerpts of the file history of the '075 patent as an "Application Data Sheet 37 C.F.R 1.76" on its Exhibit Index. Dkt. 131-1.

CORE/3002339.0003/161844011.1

| No Spill Response to Interrogatory No. 15 Served on June 25, 2020 (Ex. A) (reproduced as highlighted in No Spill's August 7, 2020 letter to Scepter's Counsel) | Claim Elements for Which Scepter Asserts in its September 4, 2020 Motion That No Spill Has Not Disclosed a Basis for Asserting Infringement (Memo. at 14-16) |
|---|---|
| suppressor in the Accused Instrumentalities is well within the claimed range of at least 10 percent open and not more than 80 percent open." | "flash suppressor is at least 10 percent open" (claim 1 of the '132 patent)<br><br>"flash suppressor is not more than 80 percent open" (claim 1 of the '132 patent) |
| "The flash suppressor in the Accused Instrumentalities has approximately 4,044 perforations that permit the flow of liquid fuel into and out of the containers, which is well within the claimed rage of at least 100 perforations and not more than 10,000 perforations." | "flash suppressor . . . wherein the total number of perforations is at least 100 and not more than 10,000" (claim 1 of the '132 patent) |
| "The average length of the perforations of the flash suppressor is approximately 0.05 inches which is at least 0.02 inches." | "flash suppressor . . . wherein the average length of the perforations is at least 0.02 inches" (claim 1 of the '132 Patent) |

Scepter neither included as an exhibit, nor mentioned the existence of, No Spill's interrogatory response within its Motion to Compel.  *See* Memo, *generally*.

Equally telling is the fact that Scepter has not challenged *any* of the measurements provided in No Spill's interrogatory response.  This is because the dimensions of these objectively measurable features can be confirmed by examining technical drawings of the Scepter Flash Suppressor produced by Scepter on July 28, 2020 (two months after No Spill served its Initial Infringement Contentions).  *See*, *e.g.*, Ex. C (filed under seal).

**D.   Scepter Continued to Demand the Information Already Provided in Response to Interrogatory No. 15 – While at the Same Time Asserting That it Did Not Know Whether More than One Flash Suppressor Had Been Included in its Own Products**

On June 26, 2020, No Spill specifically confirmed by letter that the June 25 interrogatory response discussed above provided the information requested by Scepter's May 28 letter.  Ex. D.

No contradictory response was received from Scepter.  Moreover, Scepter omits providing this correspondence to the Court along with its current motion.

On July 1, 2020, Scepter provided sales information pertaining to the Accused Instrumentalities.[9]  Of note, Scepter identified six previously undisclosed fuel containers that included a Scepter Flash Suppressor sold under the mark EASY FLO.  *See* Ex. E at 2.  The parties also produced physical sample fuel containers having a Flash Suppressor on July 1, 2020.  Scepter produced eleven sample products, none of which bore the EASY FLO mark.  Ex. 18.  *See also* Ex. E at 2.  On July 13, Scepter produced an additional and also previously undisclosed SmartControl product sample.  Ex. 19.

On July 22, 2020, nearly a month after No Spill provided the additional information requested in Scepter's May 28 letter, Scepter sent another letter demanding that No Spill provide supplemental infringement contentions and claim charts two days hence.  Ex. 14.  Scepter further demanded that such supplemental claim charts include "images, testing results, data, and an identity of the individuals involved in **the spark test that No Spill contends supports its infringement contentions**."  *Id*. (emphasis added).  In other words, Scepter clearly understood from No Spill's Initial Infringement Contentions and response to Interrogatory No. 15 that a "spark test" would show whether the Scepter Flash Suppressor retained sufficient liquid fuel to provide an environment that was "too rich for combustion" proximate the fuel container opening.

No Spill's July 30, 2020 response communicated its surprise that Scepter had again demanded production of the very information that had already been provided by No Spill on June

[9] This sales information was designated "Attorney's Eyes Only" – a designation No Spill does not challenge at this time.  But due to this designation and the nature of the information included therein, No Spill is not submitting that sales information as an exhibit with this Opposition.

CORE/3002339.0003/161844011.1

25. Ex. E.  Indeed, it was No Spill's understanding that the dispute had been resolved by the June 25 disclosure as it addressed all thirteen points raised in Scepter May 28 letter.  *Id.* at 2.

No Spill's July 30 response also pointed out that further supplementation was not yet appropriate because Scepter had not provided a sample of the previously undisclosed EASY FLO fuel container.  *Id.*  Accordingly, No Spill said it would not be providing serial supplementations of its Claim Charts because Scepter had not yet produced an EASY FLO sample or confirmed whether the Scepter Flash Suppressor was the same in each Scepter commercial fuel container.  *Id.* at 2.  No Spill instead represented, <u>again</u>, that it would perform the measurements and testing Scepter requested and provide the results to Scepter if Scepter would simply confirm that the Flash Suppressor identified in No Spill's Claim Charts was in fact the same in all commercial Scepter products—including the EASY FLO products.  *Id.*  To quote No Spill's July 30 response:

> [W]e again ask that Scepter confirm that the FMD in each of the Scepter products having an FMD is the same as the FMD shown in the claim charts accompanying No Spill's Initial Infringement Contentions.  If Scepter will not do so, then we request that Scepter provide a representative FMD of the FMD used in the Scepter fuel containers. … we will promptly measure it and provide you with those measurements. …
>
> [ ] If Scepter uses more than one type of FMD, then please send us an exemplar of that second type of FMD and we will promptly measure and provide the results as well.

*Id.*

Scepter responded on August 4 by reiterating the same baseless assertions that No Spill had failed to conduct a proper Rule 11 investigation before filing suit. Ex. 16 at 3.  The August 4 letter also incorrectly asserted—despite No Spill's June 25 interrogatory response and No Spill's letters stating that the interrogatory response addressed all of the alleged shortcomings identified in Scepter's May 28 letter—that No Spill had "refused" to provide the additional information requested by Scepter.  *Id.* at 2-3.  Scepter selectively chose its words in doing so, however, by

asserting only that the Second Amended Complaint and No Spill's May 19, 2020 Initial Infringement Contentions failed to provide the requested additional information, *i.e.*, Scepter ignored the June 25 Interrogatory response. *See id.* 1-2. Scepter also repeated its (incorrect) assertion that nothing about No Spill's prefiling investigation was privileged or subject to work-product protection. *Id.* at 3.

Scepter then sent yet another attack on August 5. In that letter, Scepter falsely asserted that No Spill had "refused" to provide the additional information Scepter requested regarding No Spill's infringement positions. Ex. I at 2. Scepter maintained its refusal to confirm whether the Flash Suppressor was the same in all of its Accused Instrumentalities. Instead, Scepter brazenly asserted that it was "not possible" for Scepter to "understand what an exemplar FMD" would be, despite the fact that Scepter manufactures and sells the FMD *in its own commercial products*. *Id.* Scepter further stated, citing a single Scepter technical drawing submitted herewith as Exhibit C, that "**each type of can is a different size and shape and has different features and Defendants' FMD has had revisions over time**." Ex. I at 2 (emphasis added). Scepter claimed it was, instead, No Spill's burden to prove what an exemplar of Scepter's own FMD(s) was. *Id.* Scepter did, however, confirm that the EASY FLO can was "physically the same as the Ameri-Can." *Id.* at 3.

No Spill responded on August 7, again explaining that the requested information had already been provided in response to Interrogatory No. 15. Ex. F. Indeed, No Spill provided a *highlighted copy* of that response specifically emphasizing the measurements of the Scepter Flash Suppressor and the results of the "spark test" that had been performed. *Id.* at 1-2. Scepter omits this correspondence from its Memo. No Spill also requested, again, that Scepter confirm that only one Flash Suppressor had been used in the Scepter Accused Instrumentalities:

Given the lack of clarity in your responses, we ask again:

**Has Scepter included a different FMD in any of its American, Easy Flo, or SmartControl products than the one shown in Exhibits A1, A2, B1, and B2 to No Spill's Initial Infringement Contentions?**

*Id*. (emphasis in original).  No Spill also offered, again, to test any such "different FMD[s]" produced by Scepter and provide the results to Scepter.  *Id*. at 4-5.

With the August 21 telephone conference with the Court looming, Scepter finally confirmed via email on August 19 that there had, in fact, been only been one version of its FMD. To quote Scepter's counsel:

> [W]e have now determined that the design of Defendants' FMD has been the same across all products since their inclusion in commercially available products.

Ex. G.  *See also* Recording of August 21, 2020 Telephone Conference at [4:28] to [5:17] (Mr. Steinberg stating "there's a lot of, you know, turnover at Scepter. … it's not important to get into the details on how these FMDs were set up … but very difficult to find people with the right information and knowledge with regards to them.  But we were able to confirm that.  … And, before, we were not able to confirm that, so that took some time.").  Scepter's belated confirmation of this point also confirms that, despite its repeated protestations to the contrary, Scepter has had all of the requested measurements for all of the Accused Instrumentalities since receiving No Spill's June 25 interrogatory response.  Scepter then produced six exemplars of its Scepter Flash Suppressor on August 24, 2020.  Ex. H.[10]

In summary, No Spill has provided Scepter with abundant notice of the bases for its infringement contentions and provided the additional more specific details that Scepter requested. No Spill also offered, repeatedly, to provide even further information if Scepter would simply

---

[10] No Spill has now provided exemplars to a retained consultant to take the measurements and perform the testing identified in No Spill's prior correspondence discussed above.  No Spill will promptly provide those results when completed.

address the straightforward issue of whether there had been more than one version of the Flash Suppressor in the Scepter products.  Scepter's representation in its Memorandum that No Spill made no such representation until the August 13 meet-and-confer is false, as the extensive correspondence provided herewith (which Scepter omitted) reveals.  *See* Memo. at 5–6.

## III.   ARGUMENT

### A.   Scepter Has Been Put On Reasonable Notice of No Spill's Infringement Theories as Required by Local Patent Rule 3.1

Local Patent Rule 3.1 provides that "a party claiming patent infringement" must serve a "Disclosure of Asserted Claims and Infringement Contentions" that contains, *inter alia*, the following information:

(a)   Each claim of each patent in suit that is alleged infringed . . . ;

(b)   Separately for each asserted claim, each accused … "Accused Instrumentality" . . . ;

(c)   A chart identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality. . . . If two or more Accused Instrumentalities have the same relevant characteristics, they may be grouped together in one claim chart.

Scepter, citing similar local patent rules from the Northern District of California and the Eastern District of Texas, is essentially arguing that No Spill's *Initial* Infringement Contentions and Claim Charts under Rule 3.1(c) must set forth the specific evidence that No Spill will ultimately rely on to prove its case.  *See* Memo. at, *e.g.*, 1 (asserting initial infringement contentions must contain "factual support, evidence, and explanation, including any pre- and post-suit testing of the accused products.").  That is wrong.

To the contrary, "[i]nfringement contentions are not intended to act as a forum for argument about the substantive issues but rather serve the purpose of providing notice to the Defendants of infringement theories beyond the mere language of the patent claim."  *Innovation Scis., LLC v.*

*Amazon.com, Inc.*, 2020 WL 4201862, at *2 (E.D. Tex., July 22, 2020).  Indeed, "'contentions are not intended to require a party to set forth a *prima facie* case'—instead, they 'need only provide fair notice.' *Id.*; *see also Team Worldwide Corp. v. Academy, LTD*, 2020 WL 4601635, at *2 (E.D. Tex., Aug. 11, 2020) ("infringement contentions are 'not meant to provide a forum for litigation of the substantive issues; they are merely designed to streamline the discovery process.'").  It is thus not necessary for a plaintiff, such as No Spill, to provide detailed reverse engineering or testing information in initial contentions to put a party on notice of the plaintiff's infringement theory.

To quote the Eastern District of Texas in a case applying the local patent rules cited by Scepter in its Motion:

> The question of whether the disclosing party conducted 'reverse engineering or its equivalent' is not synonymous with whether it has complied with Patent [Rule] 3–1, which, as discussed, **requires only to set forth specific theories of infringement**. . . . [T]he Court is unwilling to pre-try the case at this procedural stage by conducting a highly detailed and rigorous analysis of the *preliminary* claim infringement contentions.

*STMicroelectronics, Inc. v. Motorola, Inc.*, 308 F. Supp. 2d 754, 755–756 (E.D. Tex. 2004) (italics in original, bold added for emphasis).

Similarly, the Northern District of California has also made clear that initial infringement contentions under Rule 3–1 do not "require the disclosure of specific evidence nor do they require a plaintiff to prove its infringement case." *Droplets, Inc. v. Amazon.com, Inc.*, 2013 WL 1563256 at *2 (N.D. Cal., Apr. 12, 2013) (citations omitted).  Instead, "the degree of specificity under Local Rule 3–1 must be sufficient to provide **reasonable notice to the defendant** why the plaintiff believes it has a 'reasonable chance of proving infringement.'" *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022, 1025 (N.D. Cal. 2010) (emphasis added).

       1.     **No Spill's Disclosures to Date Provide More than Reasonable Notice of No Spill's Infringement Theories.**

     No Spill's Initial Infringement Contentions and responses to Scepter's Interrogatory No. 15 clearly identify the Accused Instrumentalities,[11] the asserted claims, and the structures in the Accused Instrumentalities that correspond to each limitation of those asserted claims.  Pertinent to this motion, No Spill's Claim Charts clearly identify the perforated Scepter Flash Suppressor as the structure that satisfies the "fuel retention," "too rich to combust," and specific dimensional limitations of the Asserted Claims.  Ex. 3 at 1-2; Ex. 4 at 5-6; Ex. 5 at 3-4; Ex. 6 at 5-6; Ex. 7 at 3-4.  And No Spill's response to Interrogatory No. 15 provided Scepter with the all of the specific dimensional measurements for the Scepter Flash Suppressor that Scepter requested in its May 28 letter, and identified, at a macro-level, the testing that was performed (*i.e.*, the "spark test") to confirm that the Scepter Flash Suppressor retained sufficient fuel to create an environment too rich for combustion.  Ex. A at 2-5. This was more than sufficient to provide Scepter with notice of No Spill's infringement theories. *See Lambeth Magnetic Structures, LLC v. Seagate Tech. Holdings, Inc.*, 2018 WL 466045 (W.D. Pa., Jan. 18, 2018) (rejecting motion to compel production of additional information where infringement contentions and interrogatory responses disclosed prefiling tests at "macro-level" and provided notice of infringement theories).

     To eliminate any potential doubt, the correspondence discussed above in Section II(D) clearly and explicitly informed Scepter that No Spill's response to Interrogatory No. 15 provided the additional information Scepter requested in its May 28 letter regarding the bases of No Spill's infringement allegations.  Ex. D.  In its current motion Scepter chose to submit only cherry-picked

---

[11] Given Scepter's representations that the EASY FLO products are, for all relevant purposes, identical to the Ameri-Can products, and Scepter's representation that the Flash Suppressor in all Scepter products is the same, No Spill's Claim Charts regarding the Ameri-Can products (Claim Charts A1 and B1) are equally applicable to the previously undisclosed EASY FLO products.

pieces of correspondence and omitted including or making any mention of No Spill's response to Interrogatory No. 15 in order to falsely represent to the Court that No Spill "refused to provide" the requested information.  *See* Memo. at 2 ("No Spill refused to do so"); 6 (No Spill "refused to provide that supposed analysis"); 17 ("No Spill continues to refuse to produce this information"). Scepter's motion to compel is misleading and meritless.

Scepter's assertions that No Spill's Claim Charts must "explain[] why the accused fuel cans meet this limitation with factual support" also miss the mark as they contradict the standards applicable to initial infringement contentions as explained above.  *See id.* at 5; *see also, id.* at 2 (". . . continued withholding of explanations and facts in its infringement contentions"), 6 (seeking "facts, evidence, and explanations").  Indeed, the Western District of North Carolina, applying local patent rules virtually identical to those of this Court,[12] rejected arguments highly similar to those advanced by Scepter here.  The defendant in *Shurtape* alleged  plaintiff's initial infringement contention claim charts were deficient because they : (1) "d[id] little more than parrot back" the claim language and "provide arrows to generic components of 3M's accused painters tape;" and (2) failed to provide a "detailed explanation as to why 3M's accused products allegedly have the 'absorbent' edge coating required by the claims."  *Shurtape*, 2011 WL 4750586 at *2.

In denying 3M's motion to compel, the court noted the differences in requisite scope between "initial infringement contentions" and disclosures in "later stages of litigation" such as expert reports.  *Id.*  The court emphasized the importance of that distinction:

---

[12] The Western District of North Carolina's Local Patent Rule 3.1(c) required disclosure of "[a] chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality . . . ," which the court noted "mirror[s] local patent rules adopted by other district courts around the country, including the Northern District of California and the Eastern District of Texas."  *Shurtape Tech., LLC v. 3M Co.*, 2011 WL 4750586, at *1 (W.D. N.C. Oct. 7, 2011).

> Infringement contentions 'need not disclose specific evidence nor do they require a plaintiff to prove its infringement case, whereas expert reports must include a complete statement of the expert's opinions, the basis and reasons for them, and any data or other information considered when forming them.' . . . Similarly, infringement contentions are not the correct stage to 'pre-try the case . . . by conducting a highly detailed and rigorous analysis of the *preliminary* claim infringement contentions.'

*Id*. (first citing *Fenner Invs., Ltd. v. Hewlett-Packard Co*., 2010 WL 786606, at *2 (E.D. Tex. Feb. 26, 2010)) (second citing *STMicroelectronics*, 308 F. Supp. 2d at 756).  Accordingly, the *Shurtape* court found that the claim chart at issue was sufficient as it "matches up the accused painter's tape and specifically lists each claim and explains where on 3M's painter's tape each element of the claim is found" and was thus "adequate to put 3M on notice and allow 3M to defend its product." *Id*. at 3.

No Spill's Claim Charts and response to Interrogatory No. 15 go well beyond the disclosures that were found to be sufficient in *Shurtape*.  Scepter has, at minimum, reasonable notice of the bases of No Spill's infringement theories.  Scepter's motion should be denied for this reason alone.[13]

## 2.  The Cases Relied Upon by Scepter Are Inapposite

Scepter premises its motion on cases that are not analogous to this case.  Memo. at 9-10. In *Tech. Props. Ltd*., for example, the plaintiff's claim charts failed to specify where each limitation was found in the accused instrumentality.  *Tech. Props. Ltd. v. Samsung Elec.*, 114 F.Supp.3d 842 (N.D. Cal. 2015).  In fact, the contentions in *Tech. Prop.* "improperly accuse[d] hundreds of instrumentalities of infringing, even though they were never made, sold, used, or imported in the

---

[13] Scepter also asserts that No Spill has not identified documents showing the operation of its own covered products.  Memo. at 16.  But, again, Scepter ignores No Spill's interrogatory response, this time Interrogatory No. 16.  Ex. A at 5-8.  In that response, No Spill provided detailed measurements, videos, and the like that thoroughly explain the operation of No Spill's products. *Id*.

United States or they were released after the expiration of the [Patents-In-Suit.]"  *Id*. at 851.  The

*Tech. Prop.* claim charts were also deficient because they listed "hundreds of products with no

explanation" of an infringement theory beyond assertions of "information and belief" and that "a

[person of ordinary skill in the art] could locate the element in the accused instrumentality."  *Id*. at

850–852.  Such contentions, unlike No Spill's disclosures, were plainly deficient.

Scepter's reliance on *Connectel, LLC*. is equally misplaced.  The *Connectel* plaintiff failed

to provide a claim chart for many of the over 100 accused instrumentalities accused of infringing

over 120 claims in four patents in suit.  *Connectel v. Cisco Systems*, 391 F. Supp. 2d 526 (E.D.

Tex. 2005).  Nor did the charts that were served refer to a single "structure, process, algorithm,

feature or function of any accused product." *Id*. at 528.  Those types of contentions were plainly

deficient and are starkly different from the information provided by No Spill here.

In *Bender v. Maxim*, another case relied on by Scepter, the infringement contentions

included claims charts for only 9 of the over 200 accused instrumentalities and, for those

instrumentalities that were included, failed to "identify the location, in each accused product, of

each element of each asserted claim."  *Bender v. Maxim Integrated Prods., Inc.*, 2010 WL

1135762, at *1–*3 (N.D. Cal. March 22, 2010).

Scepter also points to the Northern District of California's decision in *Townshend v.

Broadcom*, but the plaintiff's contentions in that case "made no effort to identify 'where each

element of each accused claim [was] found within' defendant['s] accused products."  *Townshend

Intellectual Prop., L.L.C. v. Broadcom Corp*., 2007 WL 1994158, at *1 (N.D. Cal. 2007).  In fact,

the plaintiff in *Townshend* "expressly declined to commit to the basic infringement theory" and

instead sought to wait until after the *Markman* proceedings in the case to do so.  *Id*. at *3.  Again,

the same simply cannot be said of No Spill's disclosures here which clearly:  (1) identify the

Accused Instrumentalities; (2) identify the structures in those instrumentalities that correspond to each claim limitation; and (3) advance a clear infringement theory.

**B.      The Details of No Spill's Prefiling Investigation Are Protected From Disclosure by the Attorney-Client Privilege and Work Product Doctrine**

Within its motion Scepter also seeks disclosure of No Spill's prefiling investigation. No Spill has provided a privilege log and specifically identified those materials which include videos, spreadsheets, claim charts, and correspondence with litigation counsel. *See* Ex. 8.  Scepter is not entitled to that information because it is privileged.   Moreover, Scepter has no need for that privileged information because the nature of No Spill's infringement contentions has already been abundantly revealed to Scepter and No Spill is not relying on that privileged information to prove infringement.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."   *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.*  "The privilege serves the client's need for legal advice, but **it also serves the attorney's need to receive complete information in order to give the proper advice**."   *In re Qwest Commc'ns Intern., Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (emphasis added).

The work product doctrine prevents disclosure of information that was produced in activation of litigation or trial. *See* FED. R. CIV. P. 26(b)(3).  No Spill, as the party that is asserting the privilege, has the burden of establishing its application. *Sudenga Indus., Inc. v. Global Indus., Inc.*, 2020 WL 2513072, at *8 (D. Kan. May 15, 2020).  No Spill must therefore establish that: "(1) the materials sought to be protected are documents or tangible things; (2) they were prepared

in anticipation of litigation or for trial; and (3) they were prepared by or for a party or a representative of that party." *Id*.

"[T]he work product doctrine is a valid objection to a pre-suit investigation performed by agents of a party in anticipation of litigation." *TQP Dev., LLC v. 1-800-Flowers.com, Inc.*, 2013 WL 7853448, at *1 (E.D. Tex. July 22, 2013)). Indeed, and as explained in an American Bar Association article **authored by the same law firm representing Scepter in this case**, a "pre-suit investigation is necessarily an attorney's thoughts and impressions, the essence of attorney work product. Care must be taken to preserve the privileges protecting your work product, as well as the communications made to your client regarding your investigation." Ex. J, *Litigation*, Vol. 36, No. 1, (Fall 2009).

The Federal Judicial center has also explained that information regarding a party's prefiling investigation in a patent infringement lawsuit generally is not discoverable outside the context of a Rule 11 motion. To quote the Federal Judicial Center's Patent Case Management Judicial Guide:

4.6.1 Discovery Regarding Patentee's Prefiling Investigation

The accused infringer may challenge the basis for the patentee's having filed suit. Normally this would happen in the context of a Rule 11 motion. . . . The issue occasionally arises outside of the Rule 11 context, **where a dispute over infringement contentions, for example, leads a defendant to request discovery of the patentee's prefiling investigation**. __In the absence of a waiver, the best practice is to deny such discovery__. However, the patentee should be required early in the proceeding, either through traditional contention discovery or as a result of patent local rules, to describe its infringement position, __without revealing what it did to analyze the accused product before filing__.

Third Ed., Federal Judicial Center (2016) (emphasis added).

**1.     No Spill is Not Relying on its Prefiling Investigation Materials to Prove Infringement and Has Not Waived its Privilege in Those Materials**

As the Federal Judicial Center advises, Scepter's motion seeking production of materials created as part of No Spill's Rule 11 investigation should be denied. No Spill expressly stated,

and Scepter agreed, that No Spill was **not waiving** its protections for its prefiling investigation by providing the additional information responsive to Scepter's May 28 letter.  Ex. 13 at 2.  *See also* Ex. A at 2.  Nor is No Spill relying on those privileged and work-product prefiling investigation materials to prove infringement in this case.  *See* Ex. K.

Contrary to Scepter's assertions, No Spill is not seeking to protect otherwise non-privileged or non-work product materials from disclosure.  To wit, this is not a situation where pre-existing and non-privileged factual materials (*e.g.* publicly available documents) were provided to counsel and No Spill is now asserting those materials should not be produced.  Instead, the testing videos and information at issue here were specifically created by Mr. Cray, the inventor of the Patents-In-Suit and owner of No Spill, at the direction of counsel[14] for the purpose of determining whether Scepter infringed the Patent-In-Suit before the complaint was filed.  *See* Privilege Log entries. Scepter's argument that "facts are not privileged" is simply inapplicable here.  *See* Motion at 17-19.

A factually similar situation was addressed by the Western District of Pennsylvania in *Lambeth Magnetic Structures, LLC*, 2018 WL 466045.  In *Lambeth*, the accused infringer moved to compel documents regarding prefiling "reverse engineering tests of Defendant's products [performed] for the purpose of establishing Lambeth's patent infringement case."  *Id*. at *4. Notably, those reverse engineering tests were performed by a third party at the plaintiff's request. *Id*.  The accused infringer asserted that the plaintiff's reference to those tests in its initial

---

[14] Scepter complains that one of No Spill's privilege log entries does not specify the attorney that directed Mr. Cray to perform the prefiling tests.  Memo. at 19.  That specific test was performed the same day as the other tests and was also directed by the same counsel identified in the three surrounding privilege log entries (Messsrs. Dalgleish and Evans).  *See* Ex. 8 at 2.

infringement contentions and interrogatory responses (like No Spill's reference to them in its response to Interrogatory No. 15) waived any privilege and work product claims.  *Id*.

The *Lambeth* court rejected that argument because the "[p]laintiff has not yet relied on these materials as evidence to support its infringement claims."  *Id*.  Instead, the *Lambeth* test results were recited by the plaintiff in its infringement disclosures at a "macro-level" to provide the defendant with notice of the "specific nature of [p]laintiff's claims."  *Id*. at *5.  The court further explained its reasoning as follows:

> This Court agrees with the *Kimberly Clark* court that **the appropriate distinction to be drawn is whether the party asserting the privilege at the present stage of the patent litigation relies upon the test results as evidence to support infringement or merely cites test results to place an opposing party on notice**. . . . Finding a waiver of privilege as to any testing cited at this early stage of litigation would cut against both the purpose of the privilege (protecting client's ability to seek preparatory advice without fear) and the purpose of the local rule (providing defendants with early notice of specific claims).

*Id*. (emphasis added), (citing *Kimberly Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, 2010 WL 4537002 (M.D. Pa. Nov. 3, 2010)).  The details of Lambeth's prefiling testing and results were thus recognized as privileged material and were properly shielded from discovery until such time (if ever) that the plaintiff chose to rely on the tests to prove its case.  *Id*.

Here, No Spill is not relying on its Rule 11 prefiling investigation to prove its case.  Instead, No Spill provided the additional information Scepter requested on May 28 in an attempt to qualm Scepter's purported concerns that No Spill's Claim Charts did not provide sufficient notice of No Spill's infringement theory.  No Spill did so while expressly preserving its privilege and work product protections—a condition to which Scepter agreed.  Ex. 13; Ex. A at 2.  Accordingly, No Spill should not be required to produce its privileged information or work product materials related to No Spill's Rule 11 prefiling investigation.

2.      **The Cases Scepter Relies on Are Again Inapposite**

Scepter relies on several cases for the unremarkable proposition that existing facts are not rendered privileged simply because they are communicated to counsel. For example, Scepter cites the discussion of "Document No. 56" in *Greenfield v. Newman Univ., Inc.*, but that document contained notes that were taken "earlier than "[defendant] has established any party anticipated litigation" and thus were not protected by the work-product doctrine. 2019 WL 6877727, at *2 (D. Kan. Dec. 17, 2019). The videos and related materials prepared as part of No Spill's prefiling investigation, which necessarily were prepared in anticipation of litigation, are protected.

The other case relied upon by Scepter, *Perez v. Alegria*, is wholly inapt. That case involved a subpoena to Mr. Alegria by the U.S. Department of Labor ("DOL"). Mr. Alegria was an attorney being called to testify as a fact witness regarding wages and hours of employees. *Perez v. Alegria*, 2015 WL 4744487, at *4 (D. Kan. June 24, 2015). Importantly, the DOL did "not seek to depose Mr. Alegria regarding the legal advice he has provided to his clients." *Id.* Accordingly, the court rejected "Mr. Alegria's blanket privilege objection as a basis for prohibiting his deposition." *Id*. *Perez* has no application here.

Scepter has failed to come forward with any basis to violate No Spill's attorney-client privilege or work product protections in its prefiling investigation. Accordingly, an *in camera* review of No Spill's privileged information is not warranted.

C.      **Scepter's Claim of Prejudice Lacks Any Merit**

As established in Section III(A) above, No Spill's May 19 infringement contentions and June 25 interrogatory response provided Scepter with more than reasonable notice of No Spill's infringement theories. No Spill's allegation that the Scepter Flash Suppressor (which Scepter only recently confirmed is present in every Accused Instrumentality despite having sold those products

for several years) is the structure that retains sufficient fuel to create a fuel-air mixture that is too rich for combustion proximate to the opening of Scepter's accused fuel containers is clear. To that end, there is no other perforated structure in the Accused Instrumentalities that could satisfy any of the dimensional or fuel retention claim elements in the Asserted Claims. Scepter has also known since at least as early as June 25 that a "spark test" was performed on the Scepter Flash Suppressor to test the "fuel retention" and "too rich to combust" claim limitations. Scepter's claims that it lacked notice of No Spill's infringement theories and has thus suffered prejudice ring hollow.

Scepter served its initial Invalidity Contentions on July 27, 2020, over a month after receiving No Spill's interrogatory response providing the requested Flash Suppressor dimensional measurements and explaining that a "spark test" performed following the Cray declaration protocol was performed to confirm the "retains fuel" and "too rich to combust" limitations were satisfied by the Accused Instrumentalities. Those contentions were approximately 95-pages long and were accompanied by hundreds of pages of claim charts purporting to map the Asserted Claims to the prior art.

Scepter, which intentionally omitted No Spill's interrogatory responses and the key correspondence from No Spill regarding No Spill's infringement contentions with Scepter's motion, now moves the Court to grant it more time to serve supplemental invalidity contentions. Ignoring the detailed infringement contentions and interrogatory responses served by No Spill in this matter does not provide a justification to make any such supplements.

## IV.     CONCLUSION

Scepter already has the information its Motion to Compel seeks. Scepter's Motion to Compel failed to provide the Court with a full record of the pertinent facts, including the No Spill Interrogatory Response that was served months before the present Motion was filed. Scepter

28

already knows that No Spill's Initial Infringement Contentions, Claim Charts, and Interrogatory Response provide Scepter with more than reasonable notice of No Spill's infringement theories. Scepter's current motion, and the barrage of accusations of Rule 11 violations it has levelled at No Spill throughout the pendency of this case, is apparently part of some Scepter litigation tactic. That tactic is unfounded, unnecessary and unproductive. Scepter's motion to compel is misleading and baseless and has resulted in a significant waste of time and Court resources.

The Federal Rules allow for the Court to award expenses and attorneys' fees when a discovery motion is denied. If the Court denies the discovery motion, "the court . . . must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorneys' fees." Fed. R. Civ. P. 37(a)(5)(B). No Spill respectfully moves that the Court deny the Motion in its entirety and award No Spill its reasonable attorney fees incurred in responding to Scepter's unfounded Motion.

Respectfully submitted,

STINSON LLP

By: */s/ Bryce E. Langford*
Douglas R. Dalgleish, KS #22328
Bradley J. Yeretsky, KS #21092
Zachary H. Hemenway, KS #23602
Bryce E. Langford, KS #27548
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Tel: (816) 842-8600
Fax: (816) 691-3495
doug.dalgleish@stinson.com
brad.yeretsky@stinson.com
zachary.hemenway.com
bryce.langford@stinson.com

Lewis Rice LLC
Robert M. Evans, Jr.
Michael J. Hartley
600 Washington Ave., Ste. 2500
St. Louis, MO 63101
Tel:  314-444-7600
revans@lewisrice.com
mhartley@lewisrice.com

***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby states that on this 18th of September, 2020, a true and correct copy of the foregoing was filed with the Court using the CM/ECF system, which sent notice of electronic filing to the following:

Foulston Siefkin LLP
Jay F. Fowler
1551 N. Waterfront Parkway, Suite 100
Wichita, KS 67206-4466
Tel: (316) 291-9541
jfowler@foulston.com

Holly A. Dyer
1551 N. Waterfront Parkway, Suite 100
Wichita, KS 67206-4466
Tel: (316) 291-9773
hdyer@foulston.com

Latham & Watkins LLP
Robert Steinberg
10250 Constellation Blvd.
Suite 1100
Los Angeles, CA 90067
Tel: (424) 653-5500
bob.steinberg@lw.com

Lisa K. Nguyen
140 Scott Drive
Menlo Park, CA 94025
Tel: (650) 328-4600
lisa.nguyen@lw.com

***Attorneys for Defendants***

*/s/ Bryce E. Langford*
**Attorney for Plaintiff**

CORE/3002339.0003/161844011.1