# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| NO SPILL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-2681-JAR-KGG |
| | ) | |
| SCEPTER CANADA, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SCEPTER MANUFACTURING LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF GLEN STEVICK
## IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE PLAINTIFF NO SPILL INC.'S AMENDED INFRINGEMENT CONTENTIONS  AND RELATED DISCLOSURES FOR FAILING TO COMPLY WITH D. KAN. PAT. R. 3.5(b), AND DEFENDANTS' MOTION FOR ATTORNEYS' FEES

```
┌─────────────┐
│  EXHIBIT    │
│     1       │
└─────────────┘
```

1

## I.     INTRODUCTION

1.      My name is Glen Stevick. I am over the age of 18 years and am fully competent to make

this declaration, which I will refer to simply as my "declaration."  I make the following

statements based on personal knowledge and, if called to testify to them, could and would

do so.

2.      I understand that on June 18, 2015, Mr. Tom Cray submitted a declaration ("Cray

Declaration") to the US Patent Office ("USPTO") to overcome a rejection by the

Examiner of his application for a patent.  I understand that the Cray Declaration describes

certain tests Mr. Cray performed on two prior art flame mitigation devices ("FMDs") and

a No Spill FMD, and Mr. Cray represented to the USPTO that those tests demonstrated

that the No Spill FMD was distinguishable from the prior art FMDs.

3.      I understand that on May 19, 2020, Plaintiff No Spill, Inc. served infringement

contentions, which I will refer to as the "No Spill May 19 Infringement Contentions."

4.      I understand that on October 1, 2020, Plaintiff No Spill, Inc. served amended

infringement contentions, which I will refer to as the "No Spill October 1 Infringement

Contentions."

5.      I have been asked by Defendants Scepter Canada, Inc. and Scepter Manufacturing LLC

(collectively "Defendants") to review the Cray Declaration, the No Spill May 19

Infringement Contentions, and the No Spill October 1 Infringement Contentions and

compare them.  My opinions are expressed herein.

6.      My opinions herein are based on my review of the claims of U.S. Patent Nos. 9,174,075

(the "'075 patent") and 10,029,132 (the "'132 patent") (collectively, the "Asserted

Patents"), the specification of the Asserted Patents,[1] and their file histories, including the Cray Declaration; my research and analysis; documents and things referenced throughout the infringement contentions and in this declaration; my testing; and on my education, training, and experience for over 35 years in mechanical engineering and testing, particularly within the area of fuel container technology including flame mitigation devices ("FMDs").

7.      I reserve the right to offer additional opinions in response to arguments or opinions that may be provided on behalf of Plaintiff No Spill, Dr. Roby, or at any hearing related to Defendants' motion to the extent I am asked to testify.

8.      I am being compensated at my customary hourly rate of $550/hour and my compensation is in no way dependent on the outcome of this matter.

## II.    QUALIFICATIONS

9.      I have more than 35 years of experience as a mechanical engineer.

10.     I am a registered Professional Engineer in the states of California, Idaho, Florida, Louisiana, Nevada and Texas and a member of the American Society of Mechanical Engineers and American Society of Civil Engineers.  I am both a registered professional Mechanical and Civil Engineer.

11.     I received a Bachelor of Science degree in Mechanical Engineering from Michigan Technological University in 1980 and a Master of Science degree in Mechanical Engineering from the University of California, Berkeley in 1981.

---

[1] In this declaration I cite to various portions of the '075 patent specification.  But as the specification for the '075 patent and '132 patent is the same, the same disclosures support the same arguments with respect to the '132 patent.

12.    My career began with nearly a decade working for Chevron as a project engineer and engineering mechanics specialist, analyzing fixed, floating and tension leg offshore platforms in a variety of water flow and wave conditions, solving difficult pressure vessel and piping problems (*e.g.*, remelting a frozen sulfur pipeline without rupturing the pipe), designing Chevron's first nonmetallic underground gasoline storage tanks, and flame arresters for relief systems, etc.

13.    In 1989, I was one of the founders of Berkeley Engineering And Research, Inc. ("BEAR"). BEAR provides mechanical (including stability under various conditions), civil and electrical engineering services ranging from project analysis and consultation to accident investigations and expert analysis and testimony.

14.    I completed my Ph.D. in Mechanical Engineering from the University of California, Berkeley in 1993 majoring in material behavior and design, and minoring in structural analysis and dynamics and controls (electronic controls). Since 1989, I have worked as the director and principal of, and as a consulting engineer, for BEAR.

15.    I have taught mechanical engineering at U.C. Berkeley, serving as an instructor for the department's senior design course, "Mechanical Engineering Design," and have conducted various lectures on mechanical engineering topics.

16.    In about 2009, I joined the American Society of Testing Materials' ("ASTM's") F 15.10 Working Group, which included technical representatives from the fuel container industry, academics, and members of the public. Some of the participants over time include Scepter Canada, Inc., No Spill Inc., Justrite Manufacturing, and others. I participated in the F 15.10 Working Group for approximately 10 years with meetings or phone calls occurring every few months. As part of that group, I reviewed testing

performed by Worcester Polytechnic Institute ("WPI") on flame arresters in fuel containers and provided feedback and recommendations for further testing and analysis. Mr. Thomas Cray, the named inventor of the '075 and '132 patents, was also a part of this working group.

17.    I am the lead author of the two peer reviewed papers that first explained why gasoline vapors explode in fuel containers and cause serious injuries (the gasoline must be aged – light constituents evaporated by leaving the container nozzle open), one of which won the Best Paper of the Year by the ASTM Journal of Failure Analysis and Prevention.

18.    I have conducted more than 200 gasoline, diesel and alcohol container explosion tests at my laboratory (both with and without flame arresters) for legal cases, my ASTM committee work and to assist safety can and alcohol manufacturers in the assessment and design of flame arresters.

19.    I am an author of numerous mechanical engineering publications and reports listed in my curriculum vitae, as well as the co-inventor of five U.S. patents.

20.    Additional details of my background are set forth in my curriculum vitae, attached as Exhibit 2 to this declaration, which provides a more complete description of my educational background and work experience, and lists presentations, articles and other publications I have authored or to which I have contributed

**III.    SUMMARY OF MY OPINIONS**

21.    Below I provide a brief summary of my opinions regarding a comparison of the tests described in the Cray Declaration and the No Spill October 1 Infringement Contentions. The remainder of my declaration provides more detail as to my opinions.  The tests shown in the Cray Declaration differ materially from the tests shown in the No Spill

October 1 infringement Contentions in the following ways that could likely affect whether combustion is demonstrated:

- **Spark type and strength**.  The October 1 Infringement Contentions use an automotive spark plug whereas the Cray Declaration specifies no particular type of spark generator although it appears to be an ordinary gas lighter used for igniting home gas appliances (e.g., barbecue, etc.).  A later communication from No Spill's counsel identified the spark generator as a Camco 57561 Olympian GM 12X Multi Sparker.  Exhibit 10.  In contrast, the automotive spark plug used in the October 1 Infringement Contentions has no use with home appliances.  There is no information in the October 1 Infringement Contentions or videos about the spark energy of the spark plug, and indeed the energy could vary substantially depending on how it is powered.  This is a materially different test than any test in the Cray Declaration.

- **FMD orientation**.  The October 1 Infringement Contentions have the FMD placed horizontally on a metal mesh with the opening to the side.  The Cray Declaration has the FMD placed vertically with the opening downward.  The orientation of the FMD could likely have a significant impact on the amount of fuel in the interior of the FMD during testing.  This is a materially different test than any test in the Cray Declaration.

- **Fuel type and condition**.  The October 1 Infringement Contentions specify fresh gas from a local gasoline station, but provide no other details regarding the composition such as octane level, geographic location,

summer/winter blend or the percent hydrocarbons in the airspace in its storage container.  The Cray Declaration provides no specifics with respect to fuel type or condition at all.  Neither the October 1 Infringement Contentions nor the Cray Declaration provide the specifics needed for assessing the impact on combustion.  The type of fuel could likely have a significant impact on the combustibility of the FMD.  This is a materially different test than any test in the Cray Declaration.

- **Test set up and implementation**.  The October 1 Infringement Contentions have a video in which the container filled with fuel is left open below the FMD when the spark plug is activated.  The Cray Declaration, by contrast, does not include the open fuel container underneath the FMD during testing.  The open fuel container below the FMD in the video included with the October 1 Infringement Contentions could likely provide an environment above the upper flammability limit above the container including the FMD, which would contribute to the lack of combustion in the video. This is a materially different test than any test in the Cray Declaration.

- **Timing**.  The October 1 Infringement Contentions show a video in which the spark plug is activated for approximately 18 seconds before the video cuts out.  The Cray Declaration, by contrast, does not specify a time period for activating the spark generator at all.  The amount of time could likely have a significant impact on the combustibility because the longer the

time, the more fuel has evaporated, which affects combustibility. This is a materially different test than any test in the Cray Declaration.

- **Shaking and impact test**.  The October 1 Infringement Contentions include a test in which the FMD is shaken and knocked against the side of a container.  The Cray declaration contains no such shaking test or anything even remotely similar. This is a materially different test than any test in the Cray Declaration.

## IV.    TIMELINE OF SOME RECENT EVENTS

22.    In this section I summarize the timeline of recent events that demonstrate why the specifics of the tests conducted by Mr. Cray in 2015 and described in Mr. Cray's declaration are related to this litigation.

23.    **June 18, 2015 – Declaration From Mr. Cray Submitted to the USPTO (Exhibit 3)**. During prosecution of the application that led to the '075 patent, Mr. Cray (the named inventor of the Asserted Patents) submitted a declaration to the USPTO examiner to overcome his rejection of his patent application.  The Cray Declaration is attached to this declaration as Exhibit 3.  I refer to the tests described in the Cray Declaration as the "Cray Tests." The Cray Declaration describes certain tests Mr. Cray performed on two prior art flame mitigation devices ("FMDs") and a No Spill FMD. Mr. Cray represented to the USPTO that those tests demonstrated that the No Spill FMD was distinguishable from the prior art FMDs.  The USPTO allowed the application to issue to patent after receiving the Cray Declaration that was relied upon extensively in the response to the office action.

24.    **December 11, 2018 – No Spill Filed This Lawsuit**.  Plaintiff No Spill, Inc. filed this lawsuit almost two years ago.

8

25.    **May 19, 2020 – Plaintiff No Spill Served Infringement Contentions (Exhibit 4)**.  I

understand that on May 19, 2020, Plaintiff No Spill served its infringement contentions.

I attached chart Exhibit A1 from those contentions as Exhibit 4.  For claim 1 of the '075

patent in Exhibit A1, the No Spill May 19 Infringement Contentions provided no support

and simply repeated the claim language, as shown below with the claim language on the

left and No Spill's contention on the right:

| Claim Limitation | Scepter SmartControl Fuel Containers[1] |
|---|---|
| wherein the fuel retention structure is configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom, | The fuel retention structure in the SmartControl Fuel Containers is configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom. |
| wherein the retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion | The quantity of the liquid fuel retained by the fuel retention structure in the SmartControl Fuel Containers provides a fuel-air mixture that is too rich to support combustion.  This is the very purpose of the fuel retention structure in the SmartControl Fuel Containers. |

26.    **June 25, 2020 – No Spill's Response to Interrogatory No. 15 (Exhibit 5)**.  I understand

that on June 25, 2020, No Spill served a  response to Scepter Canada's Interrogatory No.

15 that asked for the facts and circumstances supporting No Spill's decision to file suit

against Scepter Canada, including any analyses, testing, calculations, or other

investigation.  No Spill responded that a "***spark test, as detailed in the affidavit***

***submitted by inventor Tom Cray*** during prosecution of the application that issued as the

'075 patent and in which the flash suppressor of the Accused Instrumentalities was

submerged in liquid gasoline and then subjected to a spark (e.g., ignition source), was

conducted."  Exhibit 5 at 4 (emphasis added).  No Spill also made a similar

representation with respect to the No Spill flame mitigation device, stating "[a]s ***detailed***

***in the affidavit submitted by inventor Tom Cray*** during prosecution of the application

that issued as the '075 patent, which is incorporated herein by reference" the amount of

fuel retained "created a fuel-air mixture that is too rich to support combustion."  Exhibit 5

at 6.

27.     **September 22, 2020 – Joint Claim Construction Statement (Exhibit 6)**.  I understand

that on Sept. 22, 2020, the parties filed a Joint Claim Construction Statement (Doc. 139).

In Exhibit A to that Joint Claim Construction Statement, Plaintiff No Spill proposed

constructions that relied on the test set forth in the Cray Declaration.  I attached No

Spill's Exhibit A (Doc. 139-1) to this declaration as Exhibit 6.  Below I provide a

summary of the parties' proposed constructions for certain claim terms.  Importantly,

Plaintiff No Spill relies on the Cray Tests as "***set forth in the '075 patent file history***" for

its proposed construction of the claim term "retained quantity of the liquid fuel is

sufficient to provide a fuel-air mixture … that is too rich for combustion."

| Claim Element | Patent Claims | Defendants' Construction, which I support | Plaintiff's construction, supported by Dr. Roby |
|---|---|---|---|

| "retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture … that is too rich for combustion" | '075 patent, claims 1, 12<br><br>'132 patent, claim 17 | indefinite | No construction required.<br><br>If the Court determines that a construction is necessary, the term should be given its plain and ordinary meaning:<br><br>"the quantity of liquid fuel retained by the fuel retention structure is sufficient to provide a fuel vapor-air mixture that is above the upper flammability limit (UFL) proximate to the main container opening"<br><br>The *test for this fuel-air mixture condition set forth in the '075 patent file history is to submerge the test fuel retention structure in gasoline, and then insert and activate a spark generator inside the open end of the fuel retention structure to determine whether the generated spark causes a combustion flame to occur within the retention structure*. |
| "retained quantity of the liquid fuel"<br>"quantity of the liquid fuel" | '075 patent, claims 1, 12<br><br>'132 patent, claims 16, 17, 18 | indefinite | No construction required.<br><br>If the Court determines that a construction is necessary, the terms should be given their plain and ordinary meaning:<br><br>"a measureable amount of liquid fuel" |

28.     **September 25, 2020 – My first declaration served in support of Defendants' claim construction positions (Exhibit 7)**.  On September 25, 2020, I provided a declaration with my opinion that certain claims of the Asserted Patents were indefinite.  I refer to this

declaration as "my September 25 declaration."  I attached my September 25 declaration

as Exhibit 7.  I addressed why the Cray Declaration was submitted to the USPTO and the

Cray Tests in paragraphs 26-35 of my declaration and explained how a POSA would not

understand the bounds of the claim terms with reasonable certainty if they were to follow

the Cray Tests in paragraphs 77-85 of my declaration.  I also explained in detail several

of the factors that affect whether combustion occurs in paragraphs 36-52, including fuel

type, geographic location, time of year, temperature, weathering of the fuel,

environmental conditions, timing, test set up, flame source or spark strength, and

interrelationships between these factors.

29.   **October 1, 2020 – Plaintiff No Spill Served Amended Infringement Contentions**

**(Exhibit 8)**.  I understand that on October 1, 2020, Plaintiff No Spill served amended

infringement contentions.  I attach amended contentions Exhibit A-1 as Exhibit 8.[2]  The

No Spill October 1 Infringement Contentions referred to videos ROBY0000006 and

ROBY0000007, as shown in the image below and in Exhibit 8.  I address the No Spill

October 1 Infringement Contentions in more detail in this declaration.

---

[2] I only provide the Exhibit A-1 from the No Spill October 1 Infringement Contentions for the
sake of simplicity, but the same arguments in this declaration apply equally to Exhibits A-2, B-1,
and B-2 of the No Spill October 1 Infringement Contentions.

| wherein the retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion | The quantity of the liquid fuel retained by the fuel retention structure in the SmartControl Fuel Containers provides a fuel-air mixture that is too rich to support combustion.  This is the very purpose of the fuel retention structure in the SmartControl Fuel Containers. |
|---|---|
| | CSE performed a "spark test" on the exemplar Scepter FMD.  A video of that "spark test" was produced as ROBY0000006.  The exemplar Scepter FMD was submerged in gasoline and placed on top of a metal screen. The gasoline used in this test was purchased at a local commercial gasoline station.  The gasoline was pumped into a Scepter Smart Control gasoline can and the nozzle was promptly replaced when filling was finished.  A standard automotive spark plug used as a "sparker" was then placed inside the interior space of the exemplar Scepter FMD.  Upon activation of the "sparker," no combustion occurred in the interior space of the exemplar Scepter FMD.  No combustion occurred because the exemplar Scepter FMD retained sufficient fuel in its perforations to create an environment inside the exemplar Scepter FMD that was "too rich to combust." |
| | In addition, CSE performed a second "spark test" on the Scepter FMD.  A video of this second "spark test" was produced as ROBY0000007.  The Scepter FMD was submerged in gasoline.  Upon removal from the gasoline, the Scepter FMD was impacted against the side of the container containing the liquid gasoline and shaken, dislodging much of the retained liquid gasoline from the perforations in the Scepter FMD.  The "sparker" was then inserted into the interior space of the Scepter FMD and activated.  As seen in the video, |

30. __October 16, 2020 – My second declaration served in support of Defendants' claim construction positions (Exhibit 9)__.  On October 16, 2020, I provided a second declaration in support of Defendants' claim construction positions.  I explained and showed through my own testing that certain claims of the Asserted Patents are indefinite.  For example, in paragraphs 27-35 of by October 16 declaration, I describe how I attempted to re-create the Cray Tests (based on Cray Declaration) although I had to make a number of assumptions to fill in the gaps that were not provided by the Cray Declaration.  In my testing, I found that No Spill's FMDs combusted immediately.  The Cray Declaration purports to have found no combustion for the No Spill FMD while I found immediate combustion following the same test (after making assumptions that the Cray Declaration did not provide).  As I explained in Exhibit 9, the inconsistent results as to whether an FMD combusts or not is due to a wide variety of factors (such as fuel type, spark type and strength, weathering of the fuel, temperature, timing, test set up, etc.) and demonstrates that the claim terms are indefinite.  I attached my October 16 declaration as Exhibit 9.

V.     **COMPARISON OF THE CRAY DECLARATION TEST AND THE TEST IN NO SPILL'S OCTOBER 1 INFRINGEMENT CONTENTIONS**

31.    As I described above in the Timeline section, I understand that No Spill has represented in its responses to Scepter Canada's interrogatories,  in its claim construction submission to the Court on September 22, 2020, and in opposition to Scepter's motion to compel that the tests described in the Cray Declaration are relevant to understanding the scope and meaning of the patent claims, particularly those containing the term "retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture … that is too rich for combustion" and "flash suppressor."

32.    Below I compare the Cray Declaration Test and the No Spill October 1 Infringement Contentions (including Combustion Science & Engineering, Inc.'s (CSE's) so called "spark test" shown videos ROBY0000006 and ROBY0000007 referred to therein) and explain the ways they differ.

33.    **<u>Cray Test</u>**.  Mr. Cray's declaration describes a test that Mr. Cray represented distinguish prior art flame arresters and whether an FMD retains a quantity of liquid fuel sufficient to create a fuel-air mixture that is too rich to support combustion.  Ex. 3, Cray Decl. at DEF-000002098-2100.

34.    As I explained in my September 25 declaration, the outcome of the test described in Mr. Cray's declaration from the prosecution history of the application that led to the '075 patent is highly dependent on myriad factors that are not provided in Mr. Cray's Declaration.  *See, e.g.*, Ex. 7, Stevick September 25 Decl. ¶¶ 36 – 52, 75 – 85.  I explained previously that Mr. Cray's declaration did not specify the parameters that would be important for a POSA to know including  the type of gasoline, whether it was fresh or aged, the temperature, the energy of the spark generator, the number and duration

of sparks, or the timing between submersion and exposure to the spark, among other things. Ex. 7, Stevick September 25 Decl. ¶ 78.

35. I explained in my October 16 declaration how I attempted to re-create the different tests shown in Mr. Cray's declaration for a No Spill FMD with a round cross-section and a No Spill FMD with a cross section having two flat sides and I had to make several assumptions in order to do so. Ex. 9, paragraphs 27-28, 30, 32-35. The Cray Declaration did not provide information on the fuel type or composition, sparker type, or much about the test implementation, so I had to make assumptions for those parameters.  For example, I had to select a particular fuel type (fresh gas, 87 octane regular unleaded from local gasoline station), spark generator, temperature, and timing sequence even though none of those things were specified in the Cray Declaration.  Contrary to Mr. Cray's conclusions, I demonstrated that there was immediate combustion of the No Spill FMDs which demonstrates that the No Spill FMDs do not practice the patent claims and/or that the patent claims are indefinite.

36. **No Spill October 1 Infringement Contentions' CSE Test**.  Exhibit 8 shows "Supplemental Exhibit A-1" that No Spill served on October 1, 2020.

37. For the claim terms including the term "retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture … that is too rich to support combustion" (claims 1, 12) or "flash suppressor" (claim 2), No Spill provides a description of testing "performed by Combustion Science & Engineering, Inc. ("CSE"), under the direction of Richard J. Roby, P.E., PhD., on one of the exemplar Scepter FMDs[.]"  Exhibit 8 at 6; *see also id.* 7, 21, 22.

38.    No Spill refers to two tests in the No Spill October 1 Infringement Contentions.  First,

CSE performed a so called "spark test" and provided a video as ROBY0000006.  Exhibit

8 at 6.  I call this test the "CSE Test."  No Spill describes the CSE Test as follows:

CSE performed a "spark test" on the exemplar Scepter FMD.  A video of that "spark
test" was produced as ROBY0000006.  The exemplar Scepter FMD was submerged
in gasoline and placed on top of a metal screen. The gasoline used in this test was
purchased at a local commercial gasoline station. The gasoline was pumped into a
Scepter Smart Control gasoline can and the nozzle was promptly replaced when
filling was finished. A standard automotive spark plug used as a "sparker" was then
placed inside the interior space of the exemplar Scepter FMD. Upon activation of
the "sparker," no combustion occurred in the interior space of the exemplar Scepter
FMD. No combustion occurred because the exemplar Scepter FMD retained
sufficient fuel in its perforations to create an environment inside the exemplar
Scepter FMD that was "too rich to combust."

Exhibit 8 at 6.

39.    Second, CSE performed a "spark test" where the Scepter FMD was shaken and knocked

on the side of the fuel container before being exposed to a spark plug.  Exhibit 8 at 6.  A

video of this test was provided as ROBY0000007.  *Id.*  I call this the

CSE Shaking Test."  No Spill describes the CSE Shaking Test as follows:

In addition, CSE performed a second "spark test" on the Scepter FMD. A video of
this second "spark test" was produced as ROBY0000007.  The Scepter FMD was
submerged in gasoline.  Upon removal from the gasoline, the Scepter FMD was
impacted against the side of the container containing the liquid gasoline and shaken,
dislodging much of the retained liquid gasoline from the perforations in the Scepter
FMD. The "sparker" was then inserted into the interior space of the Scepter FMD
and activated.  As seen in the video, combustion occurred almost immediately with
the activation of the "sparker."  Combustion occurred at this point because after the
retained gasoline in the Scepter FMD was shaken out of the device the fuel vapor-
air mixture dropped below the UFL and was thus in the combustive mixture range.
That is, after the liquid was shaken out of the Scepter FMD, it could no longer
maintain an environment inside the Scepter FMD that was "too rich to combust."

Exhibit 8 at 6.

40.    No Spill Oct. 1 Infringement Contentions Exhibit A-1 (Exhibit 8 for my declaration here)

contains no discussion at all of the effects of using a spark plug rather than a gas

appliance igniter, including the type or brand of spark plug used and its strength, the orientation of the FMDs, fuel type, test set up, weathering of the fuel, timing, etc. can impact the results of the CSE  Tests  or the Cray Tests.

41.     **Differences Between the Cray Test and The No Spill October 1 Infringement Contention CSE Tests are Material**.  The Cray Test and the No Spill October 1 Infringement Contention CSE tests differed substantially.  The fact that No Spill has put forward new tests in its October 1 Infringement Contentions that differ substantially from the Cray Tests further supports my opinions in my September 25 declaration and my October 16 declaration that the patent claim terms are indefinite because a person of ordinary skill in the art would not understand the patent claim scope with reasonable certainty.  That is because different results can be obtained if one  were to implement the Cray Test verses the CSE Tests or variations of any of these tests depending on the myriad of parameters present.

•       **Significant Difference #1: Spark Type And Strength**.  Mr. Cray did not provide any details of the "spark generator" used in the Cray Tests.  Ex. 3, Cray Decl. ¶ 9.  A recent email by No Spill's counsel specifies that "the spark generator used in the Cray Affidavit testing was a Camco 57561 Olympian GM 12X Multi Sparker – a standard gas appliance ignitor."  Ex. 10 (Email from M. Hartley dated Oct. 22, 2020).  The No Spill October 1 Infringement Contentions, by contrast, used a "standard automotive spark plug."  Exhibit 8 at 6.  The No Spill October 1 Infringement Contentions provide no explanation as to why they used an automotive spark plug rather than a gas appliance igniter or the energy applied to or produced by the automotive spark plug.

- As I explained in my September 25 declaration, the type and strength of the spark generator could affect the results of this test. Ex. 7, Stevick September 25 Decl. ¶ 49. Spark plugs have variable ignition energy based on their energy source or type of spark plug used, and can be made to be very weak or strong depending on the energy source. There is no way from the video to tell the ignition energy.

- The spark generator in the Cray Test appears to be used without any modification to the commercially available sparker.  By contrast, the spark plug in the October 1 Infringement Contentions has been set up differently than it would be used in an automotive setting.  It is attached to an extension cord and it is not clear what the power consumption may have been or the tests.

- Also, spark plugs do not disturb the air around them as much of other kinds of spark generators.  Some spark generators create a convective draft due to the heated gas at the location of the spark.  There is no way from the video to tell whether this is occurring or not.  Those differences could affect the results of the tests, and therefore, the CSE Test differs materially from the Cray Tests.

| Cray Test -  Camco 57561 Olympian GM 12X Multi Sparker | CSE Test – Video ROBY0000006 |
|---|---|
|  Image 6 |  |

- **Significant Difference #2 – FMD Orientation**.  Mr. Cray performed the Cray Tests with the FMD held ***vertically with the opening downward***.  Ex. 3, Cray Decl. at DEFS-000002106-20107.  By contrast, the No Spill October 1 Infringement Contentions include the CSE Test with the FMD held ***horizontally with the opening to the side***.  Ex. 8 at 6. As I explained in my September 25 declaration, the orientation of the FMD could likely affect the results of this test. Ex. 7, Stevick September 25 Decl. ¶ 50.  By sitting an FMD horizontally, one reduces the rate of evaporation of the fuel in the FMD making the space inside it slower to reach a combustible fuel vapor concentration. Gasoline vapor is heavier than air at room temperature, and so the vapor is flowing down through the pores of the FMD and, because the cross-section is so small, it makes the internal volume of the FMD have a higher concentration of vapor temporarily during the test. No Spill's expert Dr. Roby also placed the FMD horizontally on a metal mesh screen, which also obstructs some of the evaporation of the fuel in the FMD, which could likely affect the outcome of these tests and therefore the CSE Test differs materially from the Cray Test.

| Cray Test - Vertical orientation of the FMD | CSE Test – Video ROBY0000006 – Horizontal orientation of FMD on metal mesh screen |
|---|---|
|  |  |


Image 6



- **<u>Significant Difference #3 – Fuel Type And Condition</u>**.  Mr. Cray did not specify the type of fuel, or its age, in the Cray Declaration.  The No Spill October 1 Infringement Contentions provide only a little more guidance in that he obtained the liquid gasoline from a local commercial gasoline station.  Ex. 8, No Spill October 1 Infringement Contentions at 6.  Neither No Spill nor Mr. Cray explain whether it was a summer or winter blend or any other information about its chemical composition such as octane level, and additives, which could likely affect the results as I explained in my September 25 declaration.  Ex. 7, Stevick September 25 Decl. ¶ 44.   Therefore the CSE Test differs materially from the Cray Test.

| Cray Test - Fuel Type | CSE Test – Video ROBY0000006 – Fuel Type |
|---|---|

| Paragraph 9 of Ex. 3 Cray Declaration: | Ex. 8 October 1 Infringement Contentions: |
|---|---|
| 9. In addition to measuring the amount of fuel retained by each of the devices, combustion tests were conducted to determine whether such amounts of fuel retained by the devices were sufficient to create a fuel-air mixture too rich to support combustion. After the devices were submerged, a spark generator was inserted within the open end of each of the devices. The spark generator was then caused to generate an electrical spark within the space enclosed by each of the devices. As illustrated by Images 4-5 below, the generated spark caused a combustion flame to occur for each of the Justrite and Eagle arresters. Contrastingly, as illustrated in Image 6, the spark generator did not cause combustion in the No-Spill suppressor. | CSE performed a "spark test" on the exemplar Scepter FMD. A video of that "spark test" was produced as ROBY0000006. The exemplar Scepter FMD was submerged in gasoline and placed on top of a metal screen. The gasoline used in this test was purchased at a local commercial gasoline station. The gasoline was pumped into a Scepter Smart Control gasoline can and the nozzle was promptly replaced when filling was finished. A standard automotive spark plug used as a "sparker" was then placed inside the interior space of the exemplar Scepter FMD. Upon activation of the "sparker," no combustion occurred in the interior space of the exemplar Scepter FMD. No combustion occurred because the exemplar Scepter FMD retained sufficient fuel in its perforations to create an environment inside the exemplar Scepter FMD that was "too rich to combust." |

- **Significant Difference #4 – Test Setup And Implementation**.  In the Cray Test, as I indicated above, the FMD is placed vertically with the opening facing down.  The spark generator is inserted into the opening of the FMD from the bottom.  Ex. 3, Cray Declaration Image 6.  No fuel container is visible in the still images of the Cray Declaration, nor is the fuel container described in the narrative portion as being open near the FMD.  In the CSE Test shown in ROBY0000006, the FMD is dipped into the fuel container and then placed on a horizontal mesh.  The spark plug is brought into the opening of the FMD.  In the video, the lab technician leaves the open fuel container underneath the FMD being tested for the duration of the test.

| Cray Test - Fuel Container Away From FMD During Testing | CSE Test – Video ROBY0000006 – Fuel Container Left Open Immediately Below FMD During Testing |
|---|---|

21



The open fuel container directly underneath the FMD being tested by CSE will affect the results of the CSE Test. An open fuel container with fresh gas would give off a fuel-air mixture that is above the upper flammability limit, which could prevent combustion from happening irrespective of any contribution by the FMD. The open fuel container itself could likely be the cause of the lack of combustion shown in the video. Alternatively if the gas within the fuel container was not fresh gas, for example if it was weathered, or of a composition that was in the flammability zone at room temperature, then leaving the fuel container open was a reckless thing to do. With fuels that are susceptible to combustion at room temperature, like weathered fuels, activating an ignition source right above such flammable liquids could lead to an explosion and immediate danger to the lab technician. Because the lab technician in the CSE Test video ROBY0000006 was not following those standard safety protocols and remained near to both the open container and the spark plug, the lab technician likely knew that the gasoline was fresh and contributed to an environment above the upper flammability limit above the open fuel container such that no explosion would occur, or was unknowingly taking a risk.

Because of that environment in which the open fuel container contributed to an environment above the upper flammability point, the CSE Test differed materially from the Cray Test which did not appear to be influenced by an open fuel container underneath or anywhere near the FMD.

- **Significant Difference #5 – Timing**. The Cray Declaration provides no information as to how long the spark generator was ignited in or near the opening of the FMD. A POSA reviewing the Cray Declaration would not know whether Mr. Cray exposed the FMD to the spark generator for a second or a longer timeframe such as a minute. By contrast, the No Spill October 1 Infringement Contentions provide a video ROBY0000006 that exposes the FMD to the spark plug for approximately 18 seconds before the video is cut off. I explained in my September 25 declaration how time affects whether an FMD will combust or not. Ex. 7, Stevick September 25 Decl. ¶ 48. Because the Cray Tests specify no particular time limits for exposing the spark generator to the FMD whereas the No Spill October 1 Infringement Contentions provide video for approximately 18 seconds, they differ in material ways that could affect whether combustion is found.

- **Significant Difference #6 – Shaking And Impact Test**. The No Spill October 1 Infringement Contentions include the CSE Shaking Test. In the CSE Shaking Test, the FMD was first dipped into the gasoline then shaken and knocked against the side of a container. Ex. 8, No Spill October 1 Infringement Contentions at 6-7. I explained in my September 25 declaration how test implementation itself, such as shaking, could lead to drastically different results. Ex. 7, Stevick September 25 Decl. ¶ 82. In the real world, FMDs are in environments that could be subject to vibrations (e.g., if a gas can is in a moving car or truck) and other changes in environmental temperatures and pressures,

which alone or together could cause quicker evaporation of the gasoline (analogous to shaking off some fuel from the FMD).  Additionally, shaking and knocking of the FMD to remove fuel is analogous to evaporation over time for an FMD that has been removed from a fuel container.  For an FMD that has been removed from a fuel can, any fuel in or on the FMD evaporates such that less and less fuel is in the region.  As that occurs, the system could move from above the UFL to inside the flammable region and eventually outside the LFL.  The evaporation rate depends on the type of fuel, the timing, and the temperature.  No shaking test exists at all in the Cray Declaration and thus this CSE Shaking Test is a completely new test and a material difference.

| Cray Test -  No Shaking Test | CSE Shaking Test – Video ROBY0000007 |
|---|---|
|  |  |

| [Intentionally left blank] |  |
| --- | --- |

42.     Because of all the above differences, in my opinion, the tests in the No Spill October 1

Infringement Contentions were not performed in accordance with the Cray Tests.  The

No Spill October 1 Infringement Contentions provide tests that vary in material ways

from the Cray Tests that would affect whether combustion is demonstrated or not.  The

new differences in the October 1 Infringement Contentions and their cited videos were

clearly not used or performed by the Cray Test even though the Cray Test itself was

vague.  For all the reasons provided above, , the new CSE Test procedures, which are

incorporated into the Oct. 1 Infringement Contentions, amount to an entirely new theory

of infringement since these new tests require different procedures than those used in the Cray Test.

I declare that the information contained in this declaration is true and accurate to the best of my knowledge.  If called upon to testify, I would do so consistent with the statements and opinions contained in this declaration.

Executed on October 27, 2020, at Berkeley, California.

Glen Stevick