**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| NO SPILL, LLC and TC CONSULTING, INC., | |
| Plaintiffs, | Case No. 2:18-cv-02681-HLT-KGG |
| v. | |
| SCEPTER CANADA INC., and SCEPTER MANUFACTURING, LLC, | |
| Defendants. | |
| | JURY TRIAL DEMANDED |
| SCEPTER CANADA INC. and SCEPTER MANUFACTURING, LLC, | |
| Counter-Plaintiffs, | |
| v. | |
| NO SPILL, LLC, TC CONSULTING INC., MIDWEST CAN COMPANY, LLC, GENNX360 CAPITAL PARTNERS, GENNX/MWC ACQUISITION, INC., and ARGAND PARTNERS, LP | |
| Counter-Defendants. | |

**COUNTER-DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM**

# **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 1

II.  ARGUMENTS AND AUTHORITIES.............................................................. 2

    A.  Scepter's Opposition Does Not Fix the Counterclaims' Lack of Article III or Antitrust Standing. ...................................................................................... 2

        1.  Scepter does not allege that it paid an "inflated" royalty. ...................................... 3

        2.  The cost of defending a non-sham infringement suit is not a cognizable injury. .. 4

        3.  Scepter has failed to allege a significant threat of antitrust injury necessary for injunctive relief. ............................................................................................... 7

    B.  Scepter's Reformulated "Overarching Anticompetitive Scheme" Still Fails to Allege a Cause of Action Under Section 1 of the Sherman Act. ...................................... 8

        1.  Scepter alleges nothing nefarious about the 2017 License Agreement................. 9

        2.  Scepter fails to acknowledge that the patent infringement suit is protected by the *Noerr-Pennington* doctrine. ................................................................................ 12

        3.  Scepter cannot change its failure to plead a Sherman Act Section 1 claim by folding in its Clayton Act Section 7 allegations. ................................................. 13

        4.  Scepter cannot bootstrap Counter-Defendants into a conspiracy based on unrelated events. ............................................................................................... 14

    C.  Scepter Has Not Alleged Any Viable Claim Under Section 2 of the Sherman Act. ........ 16

        1.  Scepter does not plausibly allege monopoly power............................................ 16

        2.  Scepter does not plausibly allege exclusionary conduct..................................... 20

        3.  Scepter has not plausibly alleged that No Spill attempted to monopolize, or that Counter-Defendants conspired to monopolize....................................................23

    D.  Scepter's Opposition Fails to Cure Its Lack of Standing To Bring a Section 7 Claim and the Insufficiency of its Conclusory Allegations...............................................24

III.  CONCLUSION............................................................................................. 26

I.      **INTRODUCTION**

To play with the old saying, two rights don't make a wrong—and three don't either.  The 2017 License Agreement, as alleged, sets a patent holder's price.  The infringement litigation against Scepter enforces a patent holder's rights.  And bringing under common ownership a provider of FMD technology (No Spill) and a licensee with no such technology of its own (Midwest Can) does nothing at all to competition among FMD technology providers—let alone lessen it.  To avoid the inevitable result, Scepter claims to have unearthed "an overarching scheme," hoping those magic words will transform lawful activities into an antitrust claim.  They don't.

Scepter's Counterclaims cannot satisfy the most basic requirements of antitrust law.  Because competitors like Scepter inevitably try to use the antitrust laws to abuse their competitors, antitrust law holds that claims by one competitor against another must plead exclusion from the relevant market.  Scepter alleges no facts suggesting it was excluded—prevented from competing effectively—as a result of Counter-Defendants' conduct.  In fact, assuming Scepter's other allegations are true, it is implausible that Counter-Defendants excluded Scepter from competing in the alleged market for PFCs with FMDs. Scepter admits that:  it is the biggest player in the market (Countercl., Dkt. 316 ¶ 35), it is a low cost manufacturer (*id.* ¶ 1), lower priced suppliers of FMDs are available (*id.* ¶ 51), and paying the royalty doesn't prevent a PFC manufacturer from competing in any way (*id.* ¶ 52).[1]

Without a plausible allegation of exclusion to support its claims, Scepter posits a different "injury":  a choice.  Scepter was forced to "choose," it claims, between defending a patent infringement lawsuit, paying a royalty, or not selling PFCs. But such a "choice" could not injure Scepter.  A patent holder's right to bring a patent infringement suit is protected by the First Amendment, with only limited exceptions Scepter concedes it has not pleaded.  Scepter also has never paid any royalties and, far from exiting the market, it alleges that it remains the market leader (*id.* ¶ 35).  In truth, Scepter omits several

---

[1] For the avoidance of doubt, there are many misstatements in Scepter's Counterclaims that Argand Partners, GenNx/MWC Acquisition, GenNx360 Capital Partners, No Spill, TC Consulting, and Midwest Can dispute, while recognizing that Scepter's allegations must be accepted as pleaded solely for the purpose of this Motion. Accordingly, this brief refers to but does not concede the truth of any of Scepter's allegations.

choices it had, but failed to take: to innovate, to compensate its former contract partner fairly for its technology, or to compete on the merits.

In one last attempt to resuscitate its claims, Scepter cites old cases that pre-date the *Noerr-Pennington* doctrine, inviting the Court to follow their supposed logic. But other courts recognized years ago that Scepter's authorities "represent[] hostility to patent rights inconsistent with a modern understanding of intellectual property and competition law." *Hynix Semiconductors Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1096 (N.D. Cal. 2007). This Court should likewise decline Scepter's invitation and grant Counter-Defendants' motion to dismiss.

## II.      ARGUMENTS AND AUTHORITIES

### A.      Scepter's Opposition Does Not Fix the Counterclaims' Lack of Article III or Antitrust Standing.

In their opening brief, Counter-Defendants demonstrated that Scepter alleged no injury. *See* Counter-Defs.' Mem., Dkt. 375 at 1–5. Scepter responds by labeling its claims an "overarching scheme," but that label does not and cannot substitute for alleging facts evincing harm. Although Scepter claims it was "forced" to choose between paying an inflated royalty and defending an infringement action, Scepter does not (and cannot) allege that it actually paid No Spill a royalty. At the same time, Scepter's allegations make clear it would not have been injured even if it had paid the royalty. Countercl., Dkt. 316 ¶ 52. And Scepter does not allege any theory under which a patent lawsuit can violate the antitrust laws—*i.e.*, Scepter does not allege that No Spill obtained the patents through fraud or that the litigation is a sham. Thus, Scepter's need to defend the patent infringement litigation is not "fairly traceable" to the alleged misconduct. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). Neither does it "flow[] from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see In re EpiPen Antitrust Litig.*, 336 F. Supp. 3d 1256, 1293 (D. Kan. 2018) (to establish antitrust standing, plaintiff must allege a "direct causal connection between [its] injury and a defendant's violation of the antitrust laws") (citing *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006)). Accordingly, Scepter has not alleged Article III or antitrust injury under its theory of the case.

Scepter asserts three main arguments in response.  First, Scepter invites the Court to adopt Judge Gale's prior analysis, which was predicated on Scepter alleging it paid a royalty to license No Spill's patents.  *See* Scepter's Memorandum in Opposition to Counter-Defendants' Motions to Dismiss, Dkt. 378 ("Opp.") at 1–2, 7–8, 20–21 (citing Dkt. 280 at 10–17).  Second, invoking cases that predate *Noerr-Pennington*, Scepter argues that its supposed "choice"—between paying a royalty and defending infringement litigation—establishes both Article III and antitrust standing.  *Id.* at 2–5.  And third, Scepter argues that it has standing to seek injunctive relief even if it has not yet suffered injury.  *Id.* at 6–7.  Scepter is wrong at every turn.

### 1.    Scepter does not allege that it paid an "inflated" royalty.

Scepter lacks an injury-in-fact because it does not allege that it paid royalties.  The opposition brief relies entirely on the futility finding in Judge Gale's Order Granting Leave to Amend to suggest that Scepter suffered an injury in fact.  Judge Gale's opinion, however, turns on the belief that Scepter paid No Spill something.  In granting Scepter's motion, Judge Gale distinguished the *Motorola* case cited by Counter-Defendants on the grounds that, unlike Apple, "Scepter has demonstrated an antitrust injury" by being "forced to 'pay at least as much as the artificially inflated royalty price.'"  Dkt. No. 280 at 11.  This, Judge Gale concluded, means Scepter alleged "the presence of an anticompetitive scheme by which Scepter was financially burdened."  *Id.* at 12.  In other words, the decision relied on Scepter alleging that it paid No Spill a royalty.

But Scepter makes no such allegation—nor could it.[2]  Instead, Scepter merely alleges that the Licensing Agreement "ensured that all other PFC competitors would be forced to pay at least as much as the artificially inflated royalty price."  Countercl., Dkt. 316 ¶ 33.  Scepter chose its words carefully— "would be forced to pay" is not the same as "paid"—because Scepter never paid a dime for No Spill's

---

[2] In any event, the Order Granting Leave does not have precedential effect.  *Contra* Opp. at 1–2, 7–8, 20–21.  In fact, the Order itself notes that it is "without prejudice to the presentation of these issues to the District Judge pursuant to Rule 12(b)(6)."  Dkt. 280, at 17.

technology.  As a result, Scepter stops short of alleging that it actually paid a royalty, much less one that was "artificially inflated."  *See id.* ¶¶ 5, 33, 54, 89, 98.

Even if Scepter were forced to pay a royalty rate, it would not have been harmed as a result.  The Counterclaims allege that Scepter remained the market leader in PFCs and that paying the royalty does not hinder competing effectively.  *Id.* ¶¶ 35, 52.  Neither Scepter's allegations nor its opposition suggest that Scepter could or would have been excluded from competing by paying a royalty.

> ## 2. The cost of defending a non-sham infringement suit is not a cognizable injury.

Following the *Noerr-Pennington* doctrine, Scepter's defense of the patent infringement suit is not a cognizable injury.  Unable to allege that it paid any royalty or that it would have been harmed if it had, Scepter claims it suffered injury when faced with a choice between paying a royalty, exiting the PFC market, or defending a patent infringement suit.  But this so-called "Hobson's choice" is inconsistent with Scepter's allegations and is materially incomplete.  Scepter neither paid a royalty nor exited the PFC market.  Thus, Scepter's only supposed injury is that it was "forced" to defend the patent litigation.  Because the litigation is protected by the *Noerr-Pennington* doctrine, Scepter's need to defend the patent infringement suit cannot, as a matter of law, satisfy the injury in fact or antitrust injury requirements for standing.

Under the *Noerr-Pennington* doctrine, the rule is simple:  "no antitrust injury occurs when a patent holder sues for infringement unless the patent was fraudulently procured or the infringement action was a sham."  *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 136 (E.D.N.Y. 2003) (citing *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000)).  Scepter does not (and cannot) allege fraudulent patent procurement, and the opposition concedes that "Scepter does not make sham litigation allegations."  Opp. at 5 n.10.

Having made this fatal admission, Scepter attempts to resuscitate its claims with two outdated and obsolete decisions—*Dairy Foods Inc. v. Dairy Maid Prods. Coop.*, 297 F.2d 805 (7th Cir. 1961), and *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952).  Scepter asserts that *Dairy Foods* and *Kobe* stand

for the notion that merely facing the "choice" of defending a lawsuit is injury.  Opp. at 3–5.  Whether that was true then or not, it no longer stands today.  Those cases were decided in 1961 and 1952, respectively—years before the Supreme Court extended *Noerr-Pennington* to immunize non-sham litigation from antitrust scrutiny.  *See Cal. Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 510–11 (1972).  Courts have long since recognized that these decisions are "contrary to more recent pronouncements by the Supreme Court concerning *Noerr* immunity," *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 429–30 (D. Del. 2006) (declining to follow *Kobe* because "the proposition that litigation with an objective basis may nevertheless be part of an overall scheme to monopolize is contrary to the Supreme Court's statement that such immunized conduct cannot form the basis for antitrust liability."), and that they are hostile to intellectual property rights and are "inconsistent with a modern understanding of intellectual property and competition law." *Hynix*, 527 F. Supp. 2d at 1096; *see also In re Humira (Adalimumab) Antitrust Lit.*, 465 F. Supp. 3d 811, 835 (N.D. Ill. 2020) (rejecting an application of *Dairy Foods* because "*Dairy Foods* was decided before *Cal. Motor*").

Courts also recognized that *Kobe* and *Dairy Foods* were only applicable to cases involving allegations that the patent-holders had improperly acquired or pooled patents before threatening litigation.  *See Dairy Foods*, 297 F.2d at 807–08 (noting allegations that two competitors conspired to monopolize commerce for instant milk "through the pooling of patents and patent applications . . . and using the patents in the pool in a manner" that harmed "smaller producers of instant milk and instant milk products"); *Kobe*, 198 F.2d at 419–23 (noting allegations that defendants created a "complete monopoly of the business relating to hydraulic pumps for oil wells" by creating patent pool and acquiring rights to future patents).  *See also Air Liquide Am. Corp. v. MG Nitrogen Servs.*, 1999 WL 35809350, at *2 (D.N.M. July 9, 1999) (describing *Kobe* as "alleging misuse of patents—many of which had expired, making them an invalid basis for an infringement action—to publicly and inaccurately suggest legal domination of a market" and characterizing it as "the use of unjustified infringement actions to enforce invalid or inapplicable patents"); *Bendix Corp. v. Balax, Inc.*, 471 F.2d 149, 159 n.21 (7th Cir. 1972) (characterizing *Dairy Foods* as precedent in the patent pool context because "[t]he nexus between patent misuse and possible antitrust

violations is a close and obvious one in patent pool situations."). Scepter does not and cannot allege anything analogous here, so even if they were good law, *Kobe* and *Dairy Foods* still wouldn't save Scepter's Counterclaims.

Neither does *Microsoft Mobile*, cited by Scepter for the notion that litigation costs "constitute antitrust injury" if the litigation is "part of an overall anticompetitive scheme." Opp. at 5 n.10. That case involved allegations that the patent-holder defrauded a standard-setting organization by falsely promising to license its standard-essential patents on fair, reasonable, and nondiscriminatory terms. *Microsoft Mobile Inc. v. Interdigital, Inc.*, 2016 WL 1464545, at *1 (D. Del. Apr. 13, 2016). Because the subsequent infringement suit was necessary to effectuate the fraudulent scheme, the court held that *Noerr-Pennington* did not shield the patent-holder's litigation from antitrust scrutiny. *Id.* at *3–4. ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████ Scepter fails to allege any facts suggesting the patent infringement case itself furthers an anticompetitive scheme. Nor could it—as enforcement of intellectual property rights against infringers is presumptively valid.[3]

Scepter's attempt to rebrand non-sham patent infringement litigation as a component of an "overarching scheme" does not erase the lawsuit's immunity under the *Noerr-Pennington* doctrine. *Abbott Labs.*, 432 F. Supp. 2d at 430 ("Plaintiffs may not use [*Noerr-Pennington* immunized] litigation conduct to support a claim of an overall scheme to monopolize if they cannot prove that the litigation was a

---

[3] Even if Scepter alleged that the litigation itself violated the antitrust laws, its costs of defense would not constitute antitrust injury because Scepter fails to allege any connection between its defense costs and harm to competition in the relevant market. *See, e.g.*, *Otsuka Pharm. Co. v. Torrent Pharms. Ltd.*, 187 F. Supp. 3d 483, 487 (D.N.J. 2016) (dismissing antitrust counterclaim for lack of antitrust injury where counter-plaintiff failed to allege that costs of litigation "harmed the competitive landscape" or prevented counter-plaintiff from entering market); *Chip-Mender, Inc. v. The Sherwin Williams Co.*, 2006 WL 13058, at *5 (N.D. Cal. Jan. 3, 2006) (holding that cost of "defending against a patent infringement suit is not an injury to 'competition' . . . but is rather a purely individual economic injury to [counter-plaintiff] that has no effect on competition in the relevant market"); *Brotech Corp. v. White Eagle Int'l Techs. Grp.*, 2004 WL 1427136, at *7 (E.D. Pa. June 21, 2004) (dismissing antitrust counterclaim for lack of antitrust injury where counter-plaintiff did not allege that defense costs "had any effect on competition, on the price, quantity or quality of [its] products, or prevented [it] from pursuing its entry into the [relevant market]").

sham."). For all its rhetoric about an anticompetitive "scheme," Scepter cannot avoid the basic facts: It chose not to pay a royalty; it continued to sell infringing PFCs without a license; and it cannot point to any well-pled harm apart from being sued.

Faced with similar circumstances, the court rejected antitrust counterclaims in *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wisc. 2012). There, Apple refused to license Motorola's "patents essential to cellular standards," claiming the royalty rate was too high; Motorola sued for infringement; and Apple filed antitrust counterclaims. *Id.* at 1071. The court granted summary judgment for Motorola, explaining that:

> [I]t is undisputed that Apple refused to pay the 2.25% royalty rate that Motorola demanded and continued to manufacture and market its products despite Motorola's demands. Apple has produced no evidence or argument suggesting that Motorola's licensing demand caused Apple to change its product, delay the release of the iPhone, suffer from increased costs or lose any customers or market. Instead, *the only injury Apple suffered . . . was the attorney fees and costs that it has incurred responding to the patent litigation initiated by Motorola. . . .* Thus, Apple's antitrust claim is premised on Motorola's attempt to enforce its patents. Because Motorola's enforcement of its patents is privileged conduct protected by the First Amendment, the *Noerr-Pennington* doctrine applies.

*Id.* at 1076 (emphasis added). Therefore, the court held, Apple "presented no evidence that it suffered any antitrust injury as a result of Motorola's license demand." *Id.* While a summary judgment holding, *Apple* makes clear that without a pleading of a royalty payment or exclusion from the market, there can be no claim of injury.

### 3. Scepter has failed to allege a significant threat of antitrust injury necessary for injunctive relief.

Scepter's attempt to allege a "significant threat" of antitrust injury necessary to seek injunctive relief under Clayton Act Section 16 fares no better than its attempt to allege current injury. Counter-Defs.' Mem., Dkt. 375 at 5. As Counter-Defendants noted in their opening brief, to establish standing under Section 16, an antitrust plaintiff must demonstrate a significant threat of injury from "an impending violation of the antitrust laws" or from "a contemporary violation likely to continue or recur." *Id.* (quoting *B-S Steel of Kan. v. Tex. Indus., Inc.*, 439 F.3d 653, 667 (10th Cir. 2006)). Scepter does not dispute this requirement. Instead, Scepter argues it meets the standard because: (1) the alleged conspiracy

"disadvantages competitors including Scepter, by increasing their costs and excluding them from the PFC market"; (2) competitors "face being sued by Counter-Defendants or paying a supracompetitive royalty to license the patents-in-suit"; and (3) "if Counter-Defendants succeed in driving Scepter out of the PFC market, they will undisputedly control nearly 100% of the U.S. PFC market, which will result in increased prices for consumers."  Opp. at 6.

For the same reasons that it fails to allege an existing antitrust injury, Scepter cannot allege a significant threat of any of its three claims actually occurring or causing Scepter injury.  Per its own allegations, it is implausible that Scepter faces the threat of higher costs or being driven out of the PFC market.  *See infra* Section B.1.  Scepter has not paid royalties and has no intention of doing so, it is the low cost manufacturer, and others continue to compete in the market after having paid royalties.  *See* Counter-Defs.' Mem., Dkt. 375 at 5; *see infra* Section B.1.  Furthermore, Scepter has already been sued for infringement, and it will either win (and pay no royalty) or lose (and face a remedy to be determined by the Court).  *Id*.  Simply put, Scepter has not put forth any reasons as to why it faces a threat of being harmed in the future in light of its other allegations.  As such, there is no irreparable injury for the Court to enjoin.

**B.      Scepter's Reformulated "Overarching Anticompetitive Scheme" Still Fails to Allege a Cause of Action Under Section 1 of the Sherman Act.**

As with the issue of injury, Scepter resorts to the same relabeling exercise to rehabilitate its Section 1 conspiracy claims.  It invokes the phrase, "overarching scheme," but only points to allegations that: (1) a 2017 License Agreement was executed, which (a) set a royalty rate Scepter feels was "supracompetitive," (b) included a "most-favored-nations clause" with a competitor comprising only 25% of the market, and (c) provided for enforcement of the licensed patent rights; (2) patent infringement litigation was brought against Scepter; and (3) "various mergers and acquisitions" occurred.  Opp. at 8–10, 13–14.  None of the individual pieces of this "overarching scheme" independently support a Sherman Act Section 1 claim, and Scepter has no explanation for why combining them together can make up for the critical piece that is *still* missing, namely factual allegations of harm to competition in the alleged market for PFCs with FMDs.  *3Shape Trios A/S v. Align Tech., Inc.*, 2019 WL 4686614, at *2 (D. Del. Sept. 26, 2019) (finding

that, simply listing the "alleged actions and characteriz[ing] them as a course of anticompetitive conduct, without explaining why this specific course of conduct was anticompetitive under antitrust law" fails to state a claim, "especially when . . . no individual component of this course of conduct was anticompetitive") (cleaned up); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (rejecting Plaintiff's attempts to "alchemize [independent insufficient claims] into a new form of antitrust liability. . . . Two wrong claims do not make one that is right.").[4]

### 1.    Scepter alleges nothing nefarious about the 2017 License Agreement.

No matter which label Scepter uses, the Counterclaims' allegations regarding the 2017 License Agreement reveal nothing more than the valid exercise of patent rights. *Contra* Opp. at 9–13. First, there is simply no such thing as a "supracompetitive" royalty rate for a valid patent. Licensing agreements are an exercise of patent rights and have presumptive immunity from the antitrust laws. *See In re Indep. Serv. Orgs.*, 203 F.3d at 1326–28. No Spill, as a lawful patent owner, has the right "to exact royalties as high as [it] can negotiate with the leverage of that monopoly." *Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964). Scepter offers no authority contradicting this. *See* Opp. 9–13, 24–26.

Instead, Scepter makes the blanket assertion that No Spill and Midwest Can "set an artificially inflated royalty price for No Spill's FMD technology, effectively increasing rivals' costs and ultimately excluding them from the market so they could charge supracompetitive FMD prices." Opp. at 9. None of Scepter's factual allegations actually support this claim. There is exactly one fact alleged regarding rivals' costs—that Scepter can sell PFCs with FMDs at "price points that are lower - often significantly lower" than competitors." Countercl., Dkt. 316 ¶ 1. This admission renders Scepter's theory economically implausible because of all the PFC manufacturers, Scepter's competitive position would be *least* likely to be negatively affected by paying the royalty. There are exactly zero facts alleged describing exclusion from the market, but there are facts alleging the opposite: paying the royalty didn't hurt a competitor's ability to

---

[4] Scepter once more cites the Order Granting Leave as support for its "anticompetitive agreement" allegations. Opp. at 8. However, as discussed above, this Order lacks precedential effect over a Motion to Dismiss and is nonbinding on the Court. *See supra* Section A.1 & n.2.

compete effectively because consumers were happy to pay for PFCs with the technology. *Id.* ¶ 52. Scepter alleged it never paid any royalties and has experienced no exclusion, *i.e.*, it continued to be the market leader in PFCs. *Id.* ¶ 35; *see NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007) (finding plaintiff's allegations that it was excluded implausible because it was the market leader). Assuming Scepter's allegations are true, Scepter could follow Midwest Can's alleged approach and pass on royalty costs to consumers. This would be particularly effective for Scepter because it claims it has "invested in building and developing [its] own manufacturing capabilities" and is the low-cost manufacturer in the market. Countercl., Dkt. 316 ¶ 1. Taking Scepter's pleaded facts together, therefore, shows no plausible allegation that the 2017 License Agreement harmed competition.

Second, Scepter's factual allegations demonstrate that the 2017 License Agreement's Most Favored Nation (MFN) clause could *never* establish a price floor at the agreement's royalty rate. All of Scepter's conclusory assertions that the MFN clause could cause harm are therefore implausible. *See* Opp. 9–13. An MFN can only have an anticompetitive effect if between parties with high market share. Allegations that an MFN had a market impact are not just legally required, Counter-Defs.' Mem., Dkt. 375 at 9–12, but economically logical. Scepter is almost twice as big as Midwest Can. Countercl., Dkt. 316 ¶ 35. Thus, agreeing to a lower royalty for Scepter than for Midwest Can would earn No Spill royalties on three times as many units, making more profit overall—even though it would have earned less in royalties from Midwest Can's sales as a result of the MFN requiring No Spill to lower the rate for Midwest Can.[5] Scepter's reliance on the mere presence of an MFN clause in the 2017 License Agreement thus ignores its own allegations that make it impossible for the MFN clause to have had an adverse effect on competition.



Scepter's opposition fails to acknowledge that it must plead facts showing an anticompetitive effect for an MFN clause to plausibly support a Sherman Act violation.[6]  Scepter cites to *Delta Dental* to support its position that merely alleging the presence of an MFN is sufficient, but there the District of Rhode Island explains that the defendant, Delta Dental, had "significant market power" and that "[a]rmed with this power, Delta applie[d] its MFN clause selectively to block alternative reduced-fee plans from the dental insurance market."  *United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172, 180 (D.R.I. 1996).[7]  Scepter alleges the opposite situation:  an MFN with a smaller player and no alleged attempts by Counter-Defendants to block competition.  *See* Countercl., Dkt. 316 ¶¶ 35, 48–57.  Similarly, other cases cited by Scepter also involved defendants who were the dominant player in the market.  *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323–24 (2d Cir. 2010) ("First, defendants control over 80% of Digital Music sold to end purchasers in the United States."); *United States v. Blue Cross Blue Shield of Michigan*, 809 F. Supp. 2d 665, 674 (E.D. Mich. 2011) ("Blue Cross admits that it is the dominant health insurer in Michigan. Estimations of market share is sufficient to infer market power.").[8]  Put simply, taking Scepter's allegations as true, the MFN has no competitive effect.

---

[6] *See, e.g.*, *In re: Pool Prods. Distrib. Mkt. Antitrust Litig.*, 2016 WL 3567059, at *3 (E.D. La. July 1, 2016) (noting that multiple circuits "have found most favored nations clauses to be lawful"); *Blue Cross & Blue Shield of Wis v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (stating that MFNs "are standard devices by which buyers try to bargain for low prices" and only problematic when "misused to anticompetitive ends in some cases"); *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1111–13 (1st Cir. 1989) (concluding that the MFN policy did not "as a matter of law" violate the Sherman Act, but that it could if it were "predatory" or "below . . . cost"); *Blue Cross & Blue Shield of Ohio v. Bingaman*, 1996 WL 677094, at *4–5 (N.D. Ohio June 24, 1996) (reviewing multiple courts and concluding that "the use of MFN clauses could be illegal in certain circumstances" like predatory pricing or price fixing); *City of Pontiac v. Blue Cross & Blue Shield of Mich.*, 2012 WL 1079895, at *7 (E.D. Mich. Mar. 30, 2012) ("In order to survive a motion to dismiss under the rule of reason test, the complaint must plausibly allege that the MFN–Plus clauses produced adverse anticompetitive effects within relevant product and geographic markets.").

[7] Indeed, *Delta Dental* stands for exactly the opposite of what Scepter suggests:  While dicta, the same Court noted that an MFN clause structured like the one in this case would not be exclusionary as a matter of law.  *See* 943 F. Supp. at 189 ("a policy of insisting on a supplier's lowest price—assuming that the price is not 'predatory' or below the supplier's incremental cost—tends to further competition on the merits and, as a matter of law, is not exclusionary.").

[8] The other authorities cited by Scepter are either appellate cases involving unique factual circumstances or do not involve an MFN clause related to pricing at all.  *See United States v. Apple, Inc.*, 791 F.3d 290, 320 (2d Cir. 2015) (the Second Circuit reviewing lower court's final judgment acknowledged that "MFNs, though surely proper in many contexts, can be 'misused to anticompetitive ends in some cases.'"); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 610 (N.D. Cal. 2020) (involving MFE clause which would grant earlier drug entry under the Hatch-Waxman Act).

Third, Scepter points to a provision of the 2017 License Agreement that allegedly requires No Spill to "'take action to enforce [NSIP's] Patents against any material and likely infringement by any third party' that *Midwest Can* 'reasonably believes could have an adverse impact on the value of the FMD' and/or the portable fuel containers.'"  Opp. at 13 (quoting Countercl., Dkt. 316 ¶ 53) (emphasis in original).  It argues that this "provided 'functional exclusivity' to Midwest Can by allowing MWC to force NSIP to sue anyone who manufactured a PFC with an FMD."  *Id*. at 13 (quoting Countercl., Dkt. 316 ¶ 53).  However, the clause Scepter presumably refers to does not prohibit the licensing of No Spill's intellectual property to third parties.[9]  The agreement simply provides an assurance to Midwest Can that No Spill will enforce its patent rights against free riders.  Critically, Scepter cannot point to any clause in the 2017 License Agreement that prohibits No Spill from licensing its patent to other parties, nor to any effect on competition.

### 2.    Scepter fails to acknowledge that the patent infringement suit is protected by the *Noerr-Pennington* doctrine.

Just as with the standing analysis, the *Noerr-Pennington* doctrine demonstrates that Scepter cannot state an antitrust claim based upon its defense of the patent infringement suit.  Scepter's opposition claims that "an overarching anticompetitive scheme" can include "litigation enforcement" and violate Section 1.  Opp. at 13–14.  Specifically, Scepter alleges that, as a part of the "plan . . . to artificially inflate the price of No Spill's intellectual property," Counter-Defendants used patent infringement litigation to enforce the allegedly inflated prices.  Opp. at 2–3.  However, as noted in Section A.2, *supra*, Scepter's attempt to bypass the *Noerr-Pennington* doctrine relies on outdated and inapplicable case law and flies in the face of modern Supreme Court precedent.  "[A] patent owner who brings suit to enforce the statutory right to exclude others



[9]

from making, using, or selling the claimed invention is exempt from the antitrust laws, even though such a suit may have an anticompetitive effect," unless either the sham litigation or willful fraud exceptions are included in the pleading. *In re Indep. Serv. Orgs.*, 203 F.3d at 1326. Because Scepter admits that it does not make such an allegation, Scepter cannot justify including patent infringement litigation in its alleged anticompetitive scheme. *See, e.g.*, *Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1057 (D. Colo. 2017) (granting *Noerr-Pennington* immunity on Section 1 conspiracy claims based on "defense and enforcement of their patents"); *Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1233–34 (11th Cir. 2005) (upholding district court's dismissal of Section 1 and 2 claims based on patent infringement litigation, which could not be sham based on patentholder's success defending against validity challenges).

### 3.   Scepter cannot change its failure to plead a Sherman Act Section 1 claim by folding in its Clayton Act Section 7 allegations.

Scepter cannot bolster its failed Sherman Act Section 1 claim by shoehorning its Clayton Act Section 7 claim into the "overarching anticompetitive scheme." The opposition claims its Section 1 theory of harm includes "various mergers and acquisitions, the purpose of which was to 'formalize[] the control that Midwest Can already had over NSIP's FMD intellectual property as a result of the [2017 License Agreement].'" Opp. at 14 (quoting Countercl. ¶ 58) (alterations in original). However, Scepter alleges no facts suggesting how the separate acquisitions of No Spill and Midwest Can in 2020 harmed competition in the alleged market for PFCs with FMDs. First, it is implausible that the acquisitions had any effect on the terms of the 2017 License Agreement, which went into effect three years earlier, or the patent infringement suit, which was brought two years earlier, as Scepter seems to suggest. Second, Midwest Can does not supply FMD technology, so the acquisitions could not have led to any change in competition affecting royalty rates for that technology. Third, Scepter does not and cannot allege that the acquisitions prevented any competitor, including Scepter, from competing or entering the alleged market for PFCs with FMDs.

    **4.**      **Scepter cannot bootstrap Counter-Defendants into a conspiracy based on unrelated events.**

The Counterclaims allege no conduct by Argand Partners or GenNx/MWC that suggest they joined or had any intent to further the alleged conspiracy.  Scepter admits that Argand Partners and GenNx/MWC could not have participated in any conspiracy until 2020 because they had no affiliation with No Spill or Midwest Can prior to that.  Opp. at 18.  Therefore, Argand Partners and GenNx/MWC did not have any involvement in the critical components of the alleged anticompetitive scheme.  Specifically, Argand Partners and GenNx/MWC did not participate in the negotiation and signing of the 2017 License Agreement or in the decision to bring the patent infringement action against Scepter in 2018.  *See* Counter-Defs.' Mem., Dkt. 375 at 6–7.  Furthermore, Scepter alleges no facts that suggest Argand Partners or GenNx/MWC had knowledge of any ulterior motives of No Spill or Midwest Can with regard to No Spill's patents.  *See* Countercl., Dkt. 316 ¶¶ 60–63 (alleging solely that Argand Partners was "attracted to Midwest Can's leading market position within the portable fuel container market.").

Recognizing those Counter-Defendants' had no involvement with its Section 1 claims, Scepter attempts to hook Argand Partners and GenNx/MWC into the alleged conspiracy by mischaracterizing the Litigation Management Agreement.  Contrary to Scepter's claims in its opposition, the Litigation Management Agreement was entered into on December 24, 2020 between No Spill, TC Consulting Inc., and Thomas M. Cray to assign responsibility for enforcing No Spill's patents against Scepter principally to Thomas M. Cray and TC Consulting, Inc.  To illustrate how far removed Argand Partners and GenNx/MWC are from the Litigation Management Agreement and the patent infringement suit in general:

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.  If anything, this agreement reveals Argand Partners and GenNx/MWC's intentional distance from a patent enforcement action brought years prior to their affiliation with No Spill and Midwest Can.

Nevertheless Scepter attempts to amend its pleadings in its opposition brief by suggesting that the patent infringement lawsuit is ████████████████████████████ Opp. at

18. Scepter's Counterclaims do not allege this, Countercl., Dkt. 316 ¶ 63, and its opposition incorrectly relies on statements made in Counter-Defendants' brief in support of a motion to seal the Counterclaims. Dkt. No. 333-1. Scepter cites to the statement that the Litigation Management Agreement encompasses "the Counterclaim Defendants' forward-looking business strategy to enforce intellectual property rights," which in fact refers to the agreement that one Counter-Defendant, TC Consulting, would manage the litigation for one other Counter-Defendant, No Spill.[10] Opp. at 18. Scepter's opposition references another statement by Counter-Defendants to claim that the patent infringement suit is being managed ███████████████████████████████████ Opp. at 18–19. This is neither true nor alleged. Instead, the Counterclaims allege the Litigation Management Agreement "empower[s] Mr. Cray and [TC Consulting] to manage the litigation for the benefit of [only] No Spill." Countercl., Dkt. 316 ¶ 63. As to the other Counter-Defendants, Scepter alleges only that the agreement ████████████████████ ████████████████████████ *Id.*

Scepter clings to the acquisitions of No Spill and Midwest Can as somehow establishing Argand Partners' and GenNx/MWC's knowledge of the alleged conspiracy and intent to further it. But it is unclear how Argand Partners or GenNx/MWC furthered the alleged conspiracy to harm competition when Scepter has not alleged how these acquisitions affected competition or prices in the FMD technology space. *See infra* Section D. Scepter cites to Argand Partners' statement about being "attracted to Midwest Can's leading market position within the portable fuel container market," which is consistent with its rational economic interest in making a profitable investment. *See Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179–80 (10th Cir. 2019) ("An inference of conspiracy is impermissible if the defendants 'had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations.'") (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986)); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) ("Factual allegations that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy'

---

[10] In the very same brief, Counter-Defendants explicitly state that the Litigation Management Agreement is "among No Spill, LLC, TC Consulting, Inc., and Thomas M. Cray." Dkt. No. 333-1 at 11.

are insufficient" to support a conspiracy at the Motion to Dismiss stage) (quoting *Bell Atl. Co. v. Twombly*, 550 U.S. 544, 554 (2007)).

Scepter concedes that "[a] party can be held liable under Section 1 *so long as* they 'joined the conspiracy and played some role in it.'"  Opp. at 18 (citing *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 340 (S.D.N.Y. 2021)) (emphasis added).  Scepter's Counterclaims allege no other conduct by Argand Partners or GenNx/MWC that suggests they joined or had any intent to further the alleged conspiracy.

**C.**     **Scepter Has Not Alleged Any Viable Claim Under Section 2 of the Sherman Act.**

In opposing Counter-Defendants' motion, Scepter argues that No Spill is a "monopolist" merely because it allegedly *claims* its patents cover all FMDs, even though Scepter fails to allege that No Spill has a dominant share of the relevant market.  Scepter also argues that No Spill engaged in exclusionary conduct by threatening to enforce its patents.  Both theories are untenable.  By Scepter's telling, merely having a patent makes one a monopolist, and merely enforcing that patent opens the door to liability under the Sherman Act.  This view cannot be squared with decades of case law.[11]

**1.**     **Scepter does not plausibly allege monopoly power.**

As Counter-Defendants explained in their opening brief, the Counterclaims fail to show monopoly power through "direct" or "indirect" evidence in a properly alleged antitrust market.  Direct evidence is "evidence of supracompetitive prices and restricted output."  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  Indirect evidence is evidence showing the defendant had a "predominant share of the market," *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966), and that new competitors "would face significant barriers to entry," *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.* ("*Lenox MacLaren I*"), 762 F.3d 1114, 1123 (10th Cir. 2014); *see also* Counter-Defs.' Mem., Dkt. 375 at 13.  In its opposition, Scepter asserts it has plausibly alleged monopoly power under both methods.  *See* Opp. at 21–24.  It has

---

[11] Scepter again cites the Order Granting Leave in support of its Section 2 claims.  Opp. at 21.  However, as discussed above, this Order lacks precedential effect over a Motion to Dismiss and is nonbinding on the Court.  *See supra* Section A.1 & n.2.

not.

Beginning with direct evidence, Scepter's opposition confirms that, apart from conclusions and legalese, it cannot allege any *facts* showing that No Spill has actually exercised monopoly power in the relevant market.  Scepter points to allegations that No Spill: (1) has asserted "any company that wishes to manufacture [PFCs with FMDs] must license [its] intellectual property"; and (2) is "able to price FMD royalty licensing fees well above competitive levels."  Opp. at 21–22 (quoting Countercl., Dkt. 316 ¶ 75).  Both arguments are red herrings.  The question is not whether No Spill has patents covering a PFC with an FMD, or even whether those patents command a high license fee.  To allege monopoly power through direct evidence, Scepter must allege facts showing that No Spill actually exerted monopoly power in the relevant market by increasing the price of its own PFCs above competitive levels.  *See, e.g.*, *Blix. Inc. v. Apple, Inc.*, 2020 WL 7027494, at *6 (D. Del. Nov. 30, 2020) (rejecting claim for direct evidence of monopoly power where Plaintiff "[did] not plead any facts" to support claims for supracompetitive prices and similarly concluding that "allegations that [Defendant] has the *power* to restrict output are not equivalent to allegations that [Defendant] has *actually restricted* output"); *see also Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (holding direct evidence of monopoly power was "unavailable or inconclusive" when the proof offered was "at best ambiguous").  Scepter makes no such allegations.

Likewise, Scepter proffers no plausible "indirect" evidence of monopoly power.  Scepter alleges no facts regarding market shares in the market for PFCs with FMDs.  *See, e.g.*, *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *11–12 (E.D. Pa. Sept. 28, 2012) (dismissing Section 2 claims for failing to allege market share); Counter-Defs.' Mem., Dkt. 375 at 13–14.  Perhaps recognizing this flaw in its pleadings, Scepter now asserts "market share percentages for sales of PFC[s] generally should be sufficiently similar to market shares for PFCs with FMDs."  Opp. at 23.  Even accepting this assertion, Scepter's Counterclaims fail.  Scepter alleges No Spill had just a 10% share of the "general PFC market," and, when combined with Midwest Can's 25% share of the PFC market, would have just a 35% share.  *See* Countercl., Dkt. 316 ¶ 35.  In their opening brief, Counter-Defendants offered myriad Tenth Circuit

17

authorities holding that such a market share does not constitute monopoly power.  *See* Counter-Defs.'
Mem., Dkt. 375 at 14 & n.14.

Ignoring these authorities, Scepter argues some courts have "recognize[d] that parties with less than
50% market share can still possess monopoly power."  Opp. at 23 & n.25.  This too is a red herring.  The
question is not whether a firm can have monopoly power even if it has less than 50% share; the question is
whether a complainer can plausibly allege monopoly power *relying on the indirect method* without alleging
that the defendant has a dominant share of the relevant market.  As Counter-Defendants noted in their
opening brief, the answer to that question is "no."  Counter-Defs.' Mem., Dkt. 375 at 13–14 & n.14.  That
lower market shares may not doom a claim that is supported by "direct" evidence has no bearing on whether
a claim solely supported by "indirect" evidence has been properly alleged.

The cases Scepter relies on have consistently determined that market shares under 50% cannot
support a monopoly power claim unless other evidence has been presented.  In *Hayden Publishing Co. v.
Cox Broadcasting Corp.*, 730 F.2d 64 (2d Cir. 1984), for example, the Second Circuit noted in a footnote
that "a party may have monopoly power in a particular market, even though its market share is less than
50%."  *Id.* at 69 n.7.  This was dictum, but more importantly, neither *Hayden* nor the cases it cited for that
proposition found that market shares below 50% are *sufficient* to establish monopoly power when there is
no other evidence to support a finding of monopoly power.[12]

The same is true for *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656 (7th Cir.
1987).  There, the Seventh Circuit observed "the lowest possible market share legally sufficient to sustain
a finding of monopolization is between 17% and 25%," but did not cite any case holding such a market

---

[12] The Second Circuit in *Hayden* relied on *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122
(2d Cir. 1981).  That case noted prior decisions that "cast doubt on whether monopoly power can be possessed by a
company enjoying less than a 50% market share."  *Id.* at 127 (citing *United States v. U.S. Steel Corp.*, 251 U.S. 417
(1920)).  The Second Circuit in *Broadway Delivery Corp.* found it is appropriate to conclude a defendant lacks
monopoly power as a matter of law where "defendant's share is less than 50%, or even somewhat above that figure,
and the record contains no significant evidence concerning the market structure to show that the defendant's share of
that market gives it monopoly power."  *Id.* at 129.  The other case cited by Scepter, *Envirosource, Inc. v. Horsehead
Res. Dev. Co.*, 1996 WL 363091, at *12 (S.D.N.Y. July 1, 1996), also relies entirely on *Hayden* and *Broadway
Delivery Corp.*

share did, in fact, show monopoly power.  822 F.2d at 667.  Instead, the court cited a decision stating that a 17%–25% market share is "legally insufficient to uphold a finding of monopolization, at least absent other compelling evidence that the defendant has monopoly power."  *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984).[13]  The Tenth Circuit in *Cohlmia v. St. John Medical Center* has also directly criticized this observation from *Valley Liquors*.  The court explained *Valley Liquors*' 17%–25% metric is "hardly . . . commonly accepted[]," and such a market share "is woefully short under any metric from which to infer market power."  693 F.3d 1269, 1282–83 (10th Cir. 2012); *see also Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (concluding as a matter of law that a 35%–40% market share is "insufficient circumstantial evidence"); *Marshfield Clinic*, 65 F.3d at 1411 (stating a 50% market share "is below any accepted benchmark for inferring monopoly power"); *In re Pool Prods. Distrib. Antitrust Litig.*, 940 F. Supp. 2d 367, 382–84 (E.D. La. 2013) (summarizing multiple circuits to conclude that "courts almost never find monopoly power when market share is less than about 50 percent" and rejecting a monopolization claim with a market share of 33%).

Scepter additionally contends that, "where there are 'entry barriers'" to a market, an entity "can still be a monopolist" despite having a less than 50% market share.  Opp. at 23–24.  Here, Scepter is confusing a necessary condition with a sufficient condition.  To show monopoly power indirectly, a plaintiff must allege *both* high market shares and barriers to entry; it is not enough to allege one or the other.  *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435 (3d Cir. 2016) ("To support a claim of monopoly power through indirect evidence, [plaintiff] must show that (1) [d]efendants had market power in the relevant market ***and*** (2) that there were barriers to entry into the market." ) (emphasis added).  This is because, absent meaningful entry barriers, even a firm with high market share could not maintain high prices or exclude competitors.  *See, e.g., Matsushita*, 475 U.S. at 591 n. 15 ("[W]ithout barriers to entry it

---

[13] *See also Dimmit Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 529, 533–34 (5th Cir. 1982) (reversing monopolization verdict because defendant had a 17%–25% market share and plaintiff "cannot cite . . . any case in which monopolization was found . . . despite undisputed proof of market shares significantly below 50 percent"); *Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1348, 1368 (5th Cir. 1976) (concluding a 20% market share is insufficient as a matter of law).

would presumably be impossible to maintain supracompetitive prices for an extended time."). This is likely why Scepter does not cite any case finding a monopoly power solely because the defendant had a patent.[14]

Because Scepter has not alleged plausibly that No Spill has monopoly power, its monopolization counterclaim should be dismissed. *See* Counter-Defs.' Mem., Dkt. 375 at 12–15.

### 2.   Scepter does not plausibly allege exclusionary conduct.

Regardless of whether Scepter has plausibly alleged that No Spill has monopoly power, Scepter cannot overcome the core problem with its monopolization counterclaim: it has not alleged exclusionary conduct. Exclusionary conduct is distinct from "vigorous competition," and must "harm the competitive *process* and thereby harm consumers." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (emphasis in original); Counter-Defs.' Mem., Dkt. 375 at 16. Harm to competitors is insufficient. *See id.* As explained in Counter-Defendants' opening brief, Scepter's Counterclaims are devoid of any allegations of exclusionary conduct. *See* Counter-Defs.' Mem., Dkt. 375 at 16–18.

In opposition, Scepter asserts this Court should not "analyze the alleged anticompetitive acts one by one," but should consider the alleged "overall scheme to monopolize." Opp. at 24–25. In support, Scepter cites *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509 (10th Cir. 1984), and *In re EpiPen Marketing, Sales Practices & Antitrust Litigation*, 2017 WL 6524839 (D. Kan. Dec. 21, 2017). These cases do not help Scepter's cause. In both cases, the alleged "schemes" consisted of various forms of independent exclusionary conduct. *EpiPen*, 2017 WL 6524839, at *15 ("This alleged scheme

---

[14] Scepter fails to allege any facts analogous to the direct and indirect evidence credited by the cases it cites. Opp. at 22–24. In *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.* the Tenth Circuit affirmed a jury finding of monopoly power on a wide cross-section of direct evidence of "power over price and competition" including a market share of 47% to 62%, the fact that Blue Cross was "chartered under special enabling legislation," the defendant's ability to maintain market dominance despite rate increases of nearly 24% annually, and the defendant's leveraging its early market entry, tax advantages, and position as only intermediary for a major source of hospital revenue. 899 F.2d 951, 969 (10th Cir. 1990). Scepter has not alleged a comparable market share, annual rate increases, or historical advantages for No Spill. On the contrary, Scepter alleges *it* is both the largest and low cost manufacturer of PFCs. Countercl., Dkt. 316 ¶¶ 1, 35. Similarly, Scepter's allegation that No Spill and Midwest Can combined have 25-35% market share falls far short of: (a) the 62% to 98% market share, combined with "significant barriers to entry," that created a jury question regarding monopoly power in *Lenox MacLaren I*, 762 F.3d at 1125–26; (b) the 78.5% to 90% market share presented in expert testimony in *IGT v. Alliance Gaming Corp.*, 2008 WL 7071468, at *12 (D. Nev. Oct. 21, 2008); and (c) the *100% market share* in *Intell. Ventures I LLC v. Cap. One Fin. Corp.* 99 F. Supp. 3d 610, 625 (D. Md. 2015).

included unlawful exclusive dealing and deceptive marketing—alleged anticompetitive conduct that the court already has concluded sufficiently states a plausible claim under the Sherman Act § 2"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610–11 (1985) (holding "that the evidence supports an inference that Ski Co. was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival.").[15] Here, Scepter's claim does not turn on whether separate acts of exclusionary conduct are viewed in isolation or together—the problem is that Scepter alleges no exclusionary conduct whatsoever. *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *13 (D. Mass. Sep. 16, 2015) ("[Plaintiffs] argue that an overarching scheme can be an antitrust violation even if parts of the scheme individually are not themselves unlawful.  However when 'alleged instances of misconduct are not independently anti-competitive they are not cumulatively anticompetitive either.'") (quoting *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012)) (cleaned up); *see also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (stating that while a court should consider the "overall combined effect" of monopolistic conduct, "if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing").

Indeed, Scepter offers just three acts of purportedly exclusionary conduct: (1) "set[ting] a supracompetitive royalty rate"; (2) "threat[ening] to use litigation to monopolize the market"; and (3) "engag[ing] in a series of mergers and acquisitions to further consolidate . . . control over the market."  Opp. 25–26.  None of this alleged conduct is exclusionary.

First, Scepter fails to allege *how* the purported "supracompetitive" licensing fee charged to Midwest Can has impacted any competitor's costs or prevented anyone from developing or marketing a competing technology.  *See Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 2013 WL 6682981, at *6 (E.D. Va. Dec.

---

[15] The Supreme Court recognizes *Aspen Skiing* as a limited exception to the general rule that there is no duty to deal with competitors.  *See Verizon Comms. v. L. Offs. of Curtis V. Trinko*, 540 U.S. 398, 409 (2004) (stating "*Aspen Skiing* is at or near the outer boundary of § 2 liability"); *see also Novell, Inc.v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (describing *Aspen Skiing* as a "limited exception to the general rule of firm independence" and highlighting that "the Supreme Court has refused to extend liability to various other refusal to deal scenarios") (cleaned up).

18, 2013) (dismissing monopolization claim where no allegations "explain[ed] why [the] alleged 'supracompetitive prices' reflect unlawful monopoly power within the context of [Counter-Defendant's] right to license its patents"); *see also* Counter-Defs.' Mem., Dkt. 375 at 17 (showing that Scepter fails to explain how the licensing fee affects any other competitor from developing or marketing a competing technology and fails to even point to any specific competitor unable to enter the alleged PFCs with FMDs market). Indeed, Scepter's allegation that Midwest Can paid the licensing fee and just "pass[ed] those high costs along to its customers" suggests that others could do the same, showing clearly the royalty rate was not exclusionary. Countercl., Dkt. 316 ¶ 52; Counter-Defs.' Mem., Dkt. 375 at 17.

Second, Scepter's argument that "threat[ening] to use litigation" to enforce a patent constitutes exclusionary conduct ignores the *Noerr-Pennington* doctrine. *See* Counter-Defs.' Mem., Dkt. 375 at 17–18; *supra* at A.2. But modern case law is clear: a patent holder "has the right to . . . enforce its patent, . . . includ[ing] threatening alleged infringers with suit." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999); *see also Indus. Models, Inc. v. SNF, Inc.*, 716 F. App'x 949, 956 (Fed. Cir. 2017) (applying *Noerr-Pennington* to a "cease-and-desist letter" and "communications asking [a company] to cease-and-desist [the] sale of allegedly infringing products"); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997) (concluding patent-holder did not misuse patent by sending "infringement notices" "threaten[ing] suit and injunctions"); *Baxa Corp. v. McGaw, Inc.*, 996 F. Supp. 1044, 1048 (D. Colo. 1997) ("[W]here a patent is valid, the patentee has the right to give notice to infringers . . . and to threaten litigation for infringement without violating the antitrust laws."). Moreover, Scepter does not allege any facts identifying these purported "threats," their contents, the "potential competitors" to whom they were made, or their supposed impact on competition. *See* Countercl., Dkt. 316 ¶ 89. Thus, even if the *Noerr-Pennington* doctrine does not bar Scepter's theory (which it does), Scepter still fails to allege that No Spill's threats of litigation were exclusionary.

Third, Scepter fails to allege any manner in which No Spill and Midwest Can's supposed "merger" is exclusionary. Scepter alleges no facts suggesting the alleged combination excluded any entity from participating in the relevant market. Taking Scepter's allegations as true, all Scepter contends is that a

merger between Midwest Can (with a 25% market share) and No Spill (with a 10% market share) gave them a combined market share closer to, but still less than, Scepter's 40%–50% market share.  *See* Countercl., Dkt. 316 ¶ 35.  Scepter does not allege that No Spill and Midwest Can actually used this combined share to reduce or eliminate competition on the merits in the alleged market for PFCs with FMDs.  *See generally id.*  Moreover, to the extent Scepter contends the merger was intended "to further consolidate . . . control over the market," Opp. at 26, "conclusory allegations of motive are not facts entitled to the assumption of truth." *TKO Energy Servs., LLC v. M-I L.L.C.*, 2013 WL 789458, at *7 (N.D. Okla. Mar. 4, 2013).[16]

Scepter's opposition offers virtually nothing to address its failure to allege exclusionary conduct, and its monopolization counterclaim should be dismissed.

> **3.     Scepter has not plausibly alleged that No Spill attempted to monopolize, or that Counter-Defendants conspired to monopolize.**

Scepter does not deny that if it's monopolization counterclaim fails, its "attempt" and "conspiracy" counterclaims also fail.  Counter-Defs.' Mem., Dkt. 375 at 18–20; Opp. at 26.  Scepter's Counterclaims include no plausible allegations that No Spill engaged in exclusionary conduct, harmed competition, or held a market share even close to the bare minimum required for a Section 2 claim.  Indeed, Scepter's "attempt" and "conspiracy" counterclaims are little more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also* Countercl., Dkt. 316 ¶¶ 92–100.  In opposition, Scepter offers two brief arguments.

Scepter first asserts it has pleaded "specific intent" sufficiently.  *See* Opp. at 26–27; *see also Lenox MacLaren Surgical Corp. v. Medtronic, Inc.* ("*Lenox MacLaren II*"), 847 F.3d 1221, 1231 (10th Cir. 2017).  But Scepter's "specific intent" argument is wholly dependent on the Court "inferr[ing]" that intent "from [Counter-Defendants'] monopoly power or course of anticompetitive conduct."  Opp. at 27.  As discussed, Scepter has failed to plead either monopoly power or anticompetitive conduct.  *See also* Counter-

---

[16] And as explained in Counter-Defendants' opening brief, *see* Counter-Defs.' Mem., Dkt. 375 at 18, 22–23, and *infra* Section D, Scepter pleads no facts showing any "mergers and acquisitions" in the PFC market created a monopoly.

Defs.' Mem., Dkt. 375 at 19.

Scepter then asserts Counter-Defendants intended to monopolize because they "fil[ed] infringement lawsuits" and "consolidated No Spill and Midwest Can's control over the market." Opp. at 27.  Once again, the *Noerr-Pennington* doctrine bars No Spill's patent-infringement lawsuit from providing the basis for an antitrust claim.  And the mere desire to increase market share does not show a specific intent to monopolize. *See Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982) (explaining a defendant "want[ing] to increase its market share . . . is the normal desire of competitors; it does not reveal intent to monopolize") (citing *U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610 (1977)).  Moreover, the Counterclaims do not allege that No Spill's (and Midwest Can's) conduct impacted Scepter's 40% to 50% market share. *See* Countercl., Dkt. 316 ¶ 35.  Scepter has alleged no plausible facts that Counter-Defendants conspired to engage in anticompetitive conduct that harmed competition. *See* Counter-Defs.' Mem., Dkt. 375 at 19–20.

### D. Scepter's Opposition Fails to Cure Its Lack of Standing To Bring a Section 7 Claim and the Insufficiency of its Conclusory Allegations

Scepter continues to repackage the same group of allegations as a claim under Section 7 of the Clayton Act, which is designed to prevent mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly." *Brunswick Corp.*, 429 U.S. at 485 (quoting 15 U.S.C. § 18); Opp. at 27–30.  However, Scepter still fails to cure two fatal flaws: first, that as a competitor complainer, it lacks standing to bring a claim under Section 7; and second, that in support of its claims it puts forth only conclusory statements without any underlying factual allegations.

As highlighted in Counter-Defendants' opening brief, antitrust injury is a necessary element for any Section 7 claim.  Counter-Defs.' Mem., Dkt. 375 at 21 (citing *Brunswick*, 429 U.S. at 489; *Cargill v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986)).  In particular, courts hold that competitor complainers, like Scepter, cannot bring Section 7 claims based on alleged increased prices for consumers or reduced consumer choice.  This is because competitors actually benefit from increased prices and reduced choice, and therefore do not suffer antitrust injury. *Id.* at 21–22.  Nevertheless, Scepter's opposition brief doubles

down on its Section 7 allegations that the acquisitions of No Spill and Midwest Can will "ultimately raise PFC prices."  Opp. at 29.

Scepter does cite to a case in which increased price post-merger injured a competitor, but the holding in *Cmty. Publishers, Inc. v. Donrey Corp.*, Opp. at 28, only applies in the "unique circumstances of the newspaper industry."  *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1166 (W.D. Ark. 1995).  In *Donrey*, the competitor complainer proved that the merging parties would have such a dominant market share that any post-merger increase in the newly combined newspaper's advertising rates would soak up all the available advertising revenue in the local geographic market.  *Id.*  The court called this a "must buy" phenomenon, under which a price increase can actually injure competitors, and expressly observed that this "is something which does not exist in most industries."  *Id.*  The court went on to explain that "in the typical situation, a price increase by the dominant market firm does not cause an antitrust injury."  *Id.* (citing *Matsushita*, 475 U.S. at 585, n.8).  In contrast to *Donrey*, Scepter's allegations paint a picture of the typical case:  the transactions combined PFC competitors and raised the prices of PFCs, which would benefit Scepter.  Opp. at 28–29.  Scepter thus alleges zero facts establishing standing as a competitor to bring a Section 7 claim.

Even if it could remedy its lack of antitrust injury, Scepter's continuing reliance on the acquisitions somehow increasing "Scepter's costs to participate in the PFC (with FMD) market" ignores its own allegations.  Opp. at 29.  Scepter does not and cannot allege that Midwest Can competes with No Spill for the provision of FMD intellectual property.  Thus, the combination of Midwest with No Spill could not possibly affect competition in the FMD technology market.  Counter-Defs.' Mem., Dkt. 375 at 22–23.  Moreover, even if the transactions could raise the prices for FMD technology, Scepter's allegations that Midwest Can continued to compete effectively by passing on royalty costs to consumers demonstrates that Scepter could have too.  Countercl., Dkt. 316 ¶ 52.  Scepter remains the market leader, unaffected, *id.* ¶ 35, and there are no allegations that others were prevented from entering the alleged market for PFCs with FMDs as a result of the acquisitions.  Taking Scepter's own allegations as true, there is no basis for

concluding that the transactions involving Midwest Can and No Spill could or did lead to harm to competition.[17]

## III.    CONCLUSION

Scepter's Counterclaims' defects remain unaddressed by its Opposition.  Despite rebranding its theory as an "overarching scheme," Scepter still hasn't alleged or explained how it could have been injured by any of the challenged conduct, which is a threshold jurisdictional requirement.  In addition, the infringement litigation—the central component of Scepter's "overarching scheme"—is protected by *Noerr-Pennington* immunity.  The other aspects of the "scheme" either are demonstrably harmless as alleged, or reflect the exercise of lawful rights inherent in a patent.  Scepter's narrative, therefore, that it faces a dilemma between licensing a product or defending an infringement suit, betrays a competitor complainer who refuses either to innovate or compete on the merits.

Respectfully submitted,

**AXINN, VELTROP & HARKRIDER LLP**

By:   *s/ Nicholas E.O. Gaglio*

Nicholas Emrys Owen Gaglio
Varnitha Siva
Axinn, Veltrop & Harkrider LLP
114 West 47th Street, 22nd Floor
New York, NY 10036
Tel: 212-728-2220
ngaglio@axinn.com
vsiva@axinn.com
*Pro hac admitted*

**BARBER EMERSON, LC**

By:   *s/ Terrence J. Campbell*

Terrence J. Campbell, KS #18377

---

[17] Scepter admits in the opposition that the market shares provided are not market shares in the relevant product market.  Opp. at 23 (admitting that market shares provided are "market share percentage for sales of PFC[s]" while the needed market shares are "PFCs with FMDs"); *see also* Counter-Defs.' Mem., Dkt. 375 at 23 n.21.  Without providing market shares in the relevant product market, Scepter's Section 7 claim should be dismissed.  *See* Counter-Defs.' Mem., Dkt. 375 at n.21.

Catherine C. Theisen, KS # 22360
1211 Massachusetts Street
PO Box 667
Lawrence, KS 66044
Tel: 785-843-6600
tcampbell@barberemerson.com
ctheisen@barberemerson.com

***Attorneys for Argand Partners, LP, Midwest Can
Company, LLC, GenNx/MWC Acquisition, Inc.***

**STINSON LLP**

Douglas R. Dalgleish, KS #22328
Bradley J. Yeretsky, KS #21092
Zachary H. Hemenway, KS #23602
Bryce E. Langford, KS #27548
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Tel: (816) 842-8600
Fax: (816) 691-3495
doug.dalgleish@stinson.com
brad.yeretsky@stinson.com
zachary.hemenway.com
bryce.langford@stinson.com

Andrew J. Scavotto
7700 Forsyth Blvd., Suite 1100
St. Louis, MO  63105-1821
Tel:  (314) 719-3048
Fax:  (314) 259-3959
andrew.scavotto@stinson.com
*Pro hac admitted*

Peter J. Schwingler
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 335-1564
Fax: 612) 335-1657
peter.schwingler@stinson.com
*Pro hac admitted*

**LEWIS RICE LLC**

Robert M. Evans, Jr.
Michael J. Hartley

600 Washington Ave., Ste. 2500
St. Louis, MO 63101
Tel:  314-444-7600
revans@lewisrice.com
mhartley@lewisrice.com
*Pro hac admitted*

***Attorneys for No Spill, Inc. and TC Consulting, Inc.***

**WINSTON & STRAWN LLP**

Luke A. Connelly
200 Park Avenue
New York, NY  10166
Tel: 212-294-6882
lconnell@winston.com
*Pro hac admitted*

**GRAVES GARRETT LLC**

Andrew P. Alexander, KS #27743
Edward D. Greim, KS #21077
1100 Main Street
Suite 2700
Kansas City, MO 64105
Tel: 816-256-3181
aalexander@gravesgarrett.com
edgreim@gravesgarrett.com

***Attorneys for GenNx360 Capital Partners, LP***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby states that on this 14th day of January, 2022, a true and correct copy of the foregoing was filed with the Court using the CM/ECF system, which sent notice of electronic filing to all counsel of record.

<u>*s/ Terrence J. Campbell*</u>
Attorney for *Argand Partners, LP, Midwest Can Company, LLC, GenNx/MWC Acquisition, Inc.*