## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NO SPILL, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>SCEPTER CORPORATION, and<br>SCEPTER MANUFACTURING LLC,<br><br>                    Defendants. | Case No. 2:18-cv-2681-HLT-KGG |
| SCEPTER CANADA, INC. and SCEPTER<br>MANUFACTURING, LLC,<br><br>                    Counterclaim-Plaintiffs,<br><br>v.<br><br>NO SPILL, LLC, TC CONSULTING INC.,<br>MIDWEST CAN COMPANY, LLC,<br>GENNX360 CAPITAL PARTNERS,<br>GENNX/MWC ACQUISITION, INC., and<br>ARGAND PARTNERS, LP<br><br>                    Counterclaim-Defendants | |

## GENNX360 CAPITAL PARTNERS, LP'S REPLY IN SUPPORT
## OF ITS MOTION TO DISMISS SCEPTER CANADA INC.
## AND SCEPTER MANUFACTURING, LLC'S COUNTERCLAIMS

In its motion to dismiss, GenNx360 showed that Scepter's Counterclaims are woefully inadequate to state an antitrust claim against GenNx360. The Counterclaims do not allege that GenNx360 was a party to the license agreement between Midwest Can and No Spill or their later alleged merger—two agreements at the core of the alleged antitrust conspiracy. Indeed, the Counterclaims allege that GenNx360 sold its stake in Midwest Can well before the merger.[1] And there are no allegations that GenNx360 had any involvement in enforcing No Spill's patents—the third element of Scepter's alleged antitrust conspiracy.

Indeed, the only allegations against GenNx360 in the Counterclaim are that it "acquired Midwest Can" around January 2017 and "installed Frank Anglin as CEO of Midwest Can at that time" (Countercls. ¶¶ 38, 61); that "[a]t the time of Mr. Anglin's hire, Jerry Burris was a member of the Midwest Can Board of Directors and an advisor for GenNx360" (*id*.); that when "Mr. Anglin was fired from his post as CEO and President of Midwest Can," "GenNx360 replaced him with Mr. Burris" (*id*. ¶ 59); and that "[i]n March 2020, GenNx360 sold Midwest Can to Argand Partners" (*id*. ¶ 60). But as Scepter concedes in its opposition, it is not enough to allege (erroneously) that Midwest Can was a wholly-owned subsidiary of GenNx360. Scepter must allege that GenNx360 controlled, dictated, or encouraged Midwest Can to engage in alleged anticompetitive behavior.

Realizing the insufficiency of its allegations, Scepter tries to resuscitate its claims by asserting a trove of new allegations in its opposition. Claiming that GenNx360 "took an active role in the complained-of events," Scepter now alleges that "GenNx360 developed a plan to raise

---

[1] As GenNx360 noted in its motion to dismiss, contrary to the allegations in the Counterclaims, GenNx360 Capital Partners, LP *never* actually owned Midwest Can or GenNx/MWC Acquisition LLC. Dkt. No. 367 at 2, n.1. But GenNx360 will address the allegations as pled in this motion to dismiss.

the perceived value of" Midwest Can, and that GenNx360 appointed two officers to Midwest Can's leadership team who became involved "in all aspects of Midwest Can's day-to-day operations" and "took a key role in the negotiations" of the license agreement with No Spill. *Id*. at 15-16. Scepter now alleges that the license agreement "aligned Midwest Can's actions with the goals of GenNx360: to create immediate, short-term perceived value." *Id*. at 16.

This court should reject Scepter's thinly veiled attempt to amend its Counterclaims through its opposition. But even if this court were to consider Scepter's new allegations, they do not rise to the level of control, direction, or encouragement courts require to make GenNx360 independently liable under the Sherman Act. Likewise, Scepter all but cedes its Section 7 claim, admitting that it cannot establish damages against GenNx360. But it claims that GenNx360 should remain in this litigation to provide some undefined "complete equitable relief." Because GenNx360 was not even the *seller* of Midwest Can, however, it can provide no such relief.

## I.  Scepter's Counterclaims Fail to State a Claim Against GenNx360 Under the Sherman Act

Scepter alleges that Counterclaim Defendants engaged in an antitrust conspiracy through a 2017 patent license agreement between No Spill and Midwest, No Spill's enforcement of the licensed patents against competitors, and the 2020 merger between No Spill and Midwest Can. *See* Countercls. ¶ 98. In its opposition, Scepter does not dispute that GenNx360, an alleged corporate affiliate of Midwest Can, was not a party to the license agreement between Midwest and No Spill, played no role in No Spill's patent enforcement efforts, and had no stake in Midwest Can before the alleged merger. Nor does Scepter dispute that the mere allegation that GenNx360 was once a corporate affiliate of Midwest Can is not enough to implicate GenNx360 in the alleged conspiracy.

Scepter argues, however, that GenNx360 controlled and directed Midwest Can's alleged anticompetitive activities, and that "[w]hen the parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act." *Nobody in Particular Presents, Inc. v. Clear Channel Comms., Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004). Scepter's argument fails for at least two reasons.

**First,** the allegations Scepter relies upon in its opposition can be found nowhere in its Counterclaims. Betraying the insufficiency of the Counterclaim's allegations against GenNx360, Scepter now baldly alleges—for the very first time—that "GenNx360 developed a plan to raise the perceived value of the company in just three short years," that "GenNx360 was directly involved in the negotiation of the sham License Agreement," and that "its advisors and board members were directly involved in the direction and control of Midwest Can's business." Opp'n at 16-17. Courts routinely hold that brand new "allegations in a response cannot cure deficiencies in a complaint." *Osage Producers Ass'n v. Jewell*, 191 F. Supp. 3d 1243, 1251 n.4 (N.D. Okla. 2016); *see also Hancock v. N. Sanpete Sch. Dist.*, 2012 WL 3060118, at *1 (D. Utah July 25, 2012) ("new allegations asserted by Plaintiffs in their [opposition] are not before the Court"). This is true even if the plaintiff claims, as Scepter does here, that the court may take judicial notice of the new information. *See Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 n.93 (C.D. Cal. 2015) (finding it "improper" to use opposition to "supplement [the] allegations included in the complaint," even with otherwise judicially-noticeable materials such as a website).

**Second,** even if Scepter had included its new allegations in the Counterclaims, the new allegations fail to show that GenNx360 controlled, directed or encouraged Midwest Can to engage in the allegedly anticompetitive conduct. The Counterclaims do not identify a single officer,

director or employee of GenNx360 who allegedly participated in the antitrust conspiracy. The only individuals mentioned in connection with GenNx360 are Frank Anglin and Jerry Burris, who Scepter claims played a role in negotiating the license agreement with No Spill. But both men were officers or directors of Midwest Can at the time of those activities, and the Counterclaims do not allege that Anglin and Burris were employees or agents of GenNx360 at that time.[2] Scepter's allegations boil down to the claim that GenNx360 appointed the officers of Midwest Can, who engaged in anticompetitive activities in their capacities as officers and directors of Midwest Can.

But GenNx360's alleged appointment of Midwest Can's leadership is insufficient to hold GenNx360 liable for Midwest Can's alleged actions. Nor is the claim that GenNx360 wanted Midwest Can to be more profitable. Both are inherent features of every parent-subsidiary relationship. As Scepter's own cases make clear, "when a plaintiff alleges, as the only basis for liability against a parent, that the parent owns the subsidiary that engaged in wrongful conduct, such allegation is insufficient to hold a parent directly liable for the wrongful conduct." *Nobody in Particular Presents*, 311 F. Supp. 2d at 1069. This principle would be empty if a plaintiff could circumvent it simply by alleging conduct by the parent that is inherent in any parent-subsidiary relationship.

Indeed, Scepter's allegations are a far cry from what courts have required to show that a parent sufficiently controlled, directed or encouraged its subsidiary. For example, in *Climax Molybdenum v. Molychem, L.L.C.*, which Scepter cites, the parent directly participated in the antitrust conspiracy by refusing to sell its own raw material inputs (or selling only at high prices) to help its subsidiary monopolize the market for products using those inputs. *See* 414 F. Supp. 2d

---

[2] Scepter's insistence that Anglin was an "adviser" to GenNx360 in no way suggests that he was an officer or employee of GenNx360 or that he acted or possessed the power to act on GenNx360's behalf.

1007, 1011-12 (D. Colo. 2005). There, the parent was a producer of molybdenum as a by-product of its copper mining operations, while its subsidiary produced molybdenum through its own direct mining operations and also manufactured and sold products made from molybdenum. The plaintiff alleged that the defendants collectively had monopoly power in the molybdenum market and had conspired to monopolize the downstream market for certain molybdenum-based products by (a) engaging in a "price squeeze" by charging high prices for molybdenum, (b) refusing to sell molybdenum to consumers unless they also purchased the subsidiary's molybdenum-based products, and (c) enforcing fraudulently obtained patents on those products.

The court denied in part and granted in part the defendants' motion dismiss the parent. The court noted the allegations that both parent and subsidiary produced molybdenum and participated in the "price squeeze" and refusal to deal, and that those activities and the two defendants' combined strength in molybdenum market had allowed the subsidiary to monopolize that market. *Id*. at 1012-13. The court noted that under these circumstances, "[t]he fact that the alleged combination involves related corporations does not allow one of them to escape liability." *Id*. at 1013. The court, however, dismissed the patent-based claims against the parent, noting that the subsidiary owned the patents and there were no allegations that the parent had any right to enforce the patents or had controlled, dictated or encouraged their enforcement.

Unlike the parent in *Climax Molybdenum*, GenNx360 is alleged to be merely a holding company and there is no allegation that it designed, manufactured, or sold portable fuel cans or the flame mitigation device technology used in those products. As such, even as alleged, GenNx360 was in no position to advance the alleged antitrust conspiracy, in stark contrast to the parent in *Climax Molybdenum* whose participation in restricting or conditioning sales of molybdenum was essential to the success of that conspiracy.

The conduct of the parent in *Clear Channel*, another case Scepter cites, is equally distinguishable from this case. *See* 311 F. Supp. 2d at 1070. That case involved allegations that Clear Channel Communications, which held a dominant position in radio advertising, colluded with its subsidiary to force musical artists and record labels to sign with its subsidiary concert promoters. The plaintiffs pointed to evidence that officers and employees of the parent directly threatened consumers that Clear Channel would give fewer radio advertisements and "spins" (on-air plays of the artists' songs) if they signed with competing concert promoters and identified intra-company correspondence laying out the strategy whereby the parent would refuse to deal with artists and record labels who did not sign with its subsidiary. *Id.* at 1061-64.

The court denied the defendants' motion for summary judgment as to the parent, finding that the parent company "directs and controls the policies and behavior of its subsidiaries." *Id.* at 1071. In doing so, the court documented at length the evidence of Clear Channel's day-to-day involvement in and control of the most basic activities of its subsidiaries. For example, the court noted that Clear Channel "participates in the budgeting process for all subsidiaries," writes "most of the checks that the subsidiaries require so the divisions cannot spend money on capital acquisitions without consulting Clear Channel Communications for funding," "handles payroll for all of its subsidiaries," "coordinates meetings between managers from the different subsidiaries 'to try and encourage networking within the company," and "'routinely reviews staffing levels and operating costs [and] advises local managers on broad policy matters and is responsible for long-range planning, allocating resources, and financial reporting and controls.'" *Id.* at 1071-72. The court also noted that Clear Channel's own senior officers testified that the company "operates its subsidiaries as divisions of the company, with each division . . . reporting up to Mark Mays [the Chief Operating Officer] at Clear Channel Communications." *Id.* at 1071. The court concluded

that "a reasonable jury could conclude, based on the evidence in the record, that Clear Channel Communications operates as an operating company, controlling and managing the conduct of its subsidiaries, rather than as a holding company." *Id*. at 1072.[3]

Scepter's allegations here pale in comparison to the direct threats and actions of the parent company in *Clear Channel* or the extent of its day-to-day strategic and financial management and control of its subsidiaries. Indeed, Scepter fails to identify any act by an officer or employee of GenNx360—let alone one that controlled, directed or encouraged the alleged conspiracy. *Twombly*, 550 U.S. at 555 (Courts need not accept a "legal conclusion couched as a factual allegation"). Instead, Scepter relies entirely on the allegation that GenNx360 appointed officers and directors of Midwest Can who then took certain actions in their official Midwest Can capacities. Were this sufficient, it would implicate every parent in the conduct of every subsidiary, no matter how little their involvement. Because that is not the law, Scepter's Sherman Act claims should be dismissed.

## II.    Scepter's Section 7 Claims Against GenNx360 Must Be Dismissed

Scepter does not dispute that GenNx360 cannot be liable for monetary damages under § 7 because it was not the acquirer. *See* Opp'n at 29. But Scepter contends that GenNx360 should still be kept in the case because it seeks equitable relief, contending that a seller may be kept in a § 7 claim where necessary to "fashion complete relief."

This is at most the exception, not the rule. *U.S. v. Coca-Cola of Los Angeles*, 575 F.2d 222, 230 (9th Cir. 1978) ("Normally relief should be molded, if possible, which does not adversely

---

[3] Scepter also cites *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1052 (D. Kan 2020), in claiming that "GenNx360 need not be a signatory to the License Agreement; it is enough that GenNx360 was directly involved…." Opp'n at 16-17. But *Budicak* alleged an agreement to manipulate the commodities markets through conversations between the defendant and its alleged co-conspirators that conduct was "all part of the plan," and that would "give the scheme the gas" to increase the conspirator's profits. No such direct communications are alleged here.

affect the interests of [§ 7 sellers]").  In any event, Scepter does not explain why GenNx360 is needed for equitable relief or what kind of equitable relief GenNx360 could offer.  Scepter asserts that GenNx360 sold any stake in Midwest Can well before the allegedly anticompetitive merger. Thus, even were the court to order an equitable remedy such as rescission, GenNx360 could not possibly facilitate that relief.

Scepter's own cases demonstrate this point.  In *U.S. v. Coca-Cola of Los Angeles*, 575 F.2d 222 (9th Cir. 1978), the Department of Justice sued both buyer and seller defendants, where the seller defendant was liquidating (and the other a limited partnership created post-transaction to manage the liquidation).  The Ninth Circuit cautiously allowed a § 7 claim to proceed against the direct sellers, reasoning that although "sellers in [section] 7 cases are not technical violators of the law itself is a strong equity consideration against rescission," the direct seller's impending liquidation was grounds for an exception.  *Id.* at 230.  Here, GenNx360 was not party to the "anticompetitive" combination, so even if rescission of the acquisition were proper (and rescission is a drastic and disfavored remedy for § 7 violations, *id.*), GenNx360 would not be implicated.

Scepter's other case, *Tim W. Koerner & Assocs. v. Aspen Labs*, 492 F. Supp. 294 (S.D. Tex. 1980), does not say what Scepter claims.[4]  In *Aspen Labs*, the court considered a claim that Bristol-Myers' sale of Aspen Labs to Zimmer U.S.A., Inc. (all of whom were codefendants) caused the anticompetitive lessening of competition.  Although the plaintiffs had sought both monetary damages *and* divestiture, the district court held that "[b]y its express terms section 7 of the Clayton Act is directed only against the acquiring corporation.  Consequently, Plaintiffs cannot state a claim against Aspen or Bristol-Myers."  *Id.* at 300.

---

[4] In fact, the quotation referenced on page 30 of the Opposition, "in order to fashion complete relief," is absent from the decision.

## CONCLUSION

For the foregoing reasons, GenNx360 respectfully requests that this Court grant its motion.

Dated:  January 14, 2022

Respectfully submitted,


By:  s/ Edward D. Greim
Edward D. Greim, #21077
Andrew P. Alexander, #27743
Graves Garrett LLC
1100 Main Street
Kansas City, MO 64105
(816) 256-4144
EDGreim@gravesgarrett.com
AAlexander@gravesgarrett.com

Luke A. Connelly (admitted *pro hac vice*)
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
LConnell@winston.com

Matt Campbell
Winston & Strawn LLP
1901 L Street NW
Washington, D.C. 20036
(202) 282-5000
MACampbe@winston.com

*Attorneys for Defendant*
*GenNx360 Capital Partners LP*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Defendant's Reply In Support of Its Motion to Dismiss Scepter Canada Inc. and Scepter Manufacturing, LLC's Counterclaims was served by electronically filing upon all counsel of record.

s/ Edward D. Greim
Edward D. Greim
edgreim@gravesgarrett.com

Dated: January 14, 2022