## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **NO SPILL LLC, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 2:18-cv-02681-HLT-KGG** |
| **SCEPTER CANADA, INC., et al.,** | |
| **Defendants.** | |
| **SCEPTER CANADA, INC., et al.,** | |
| **Counterclaim-Plaintiffs,** | |
| **v.** | |
| **NO SPILL LLC, et al.,** | |
| **Counterclaim-Defendants.** | |

## MEMORANDUM AND ORDER

This case stems from a soured business relationship concerning flame mitigation devices in portable fuel containers. Plaintiffs No Spill, LLC and TC Consulting, Inc. (collectively "No Spill")[1] bring patent infringement, contract, and trade dress claims against Defendants/Antitrust Plaintiffs Scepter Canada, Inc. and Scepter Manufacturing, LLC (collectively "Scepter"). Doc. 41. No Spill principally alleges that the flame mitigation device in Scepter's fuel containers infringe No Spill's two patents.

---

[1] The Court also defines No Spill to include No Spill Inc. and NSIP Holdings, LLC where appropriate. *See* Doc. 317 at 51. These entities no longer exist and the distinction between those entities and No Spill, LLC is not relevant to the current motion.

Last year the magistrate judge granted Scepter leave to bring antitrust counterclaims against No Spill, Midwest Can Company, LLC, GenNx/MWC Acquisition, Inc., GenNx360 Capital Partners, and Argand Partners, LP (collectively "Antitrust Defendants"). Doc. 280. Scepter principally alleges that a series of mergers over several years and a supracompetitive royalty rate in No Spill's 2017 license to Midwest Can coupled with other purportedly unique licensing provisions create an overall anticompetitive scheme of which the patent litigation is a part.

Antitrust Defendants move to dismiss the counterclaims. Docs. 359, 364. Because Scepter fails to allege fraud in patent procurement, expressly disclaims that the instant lawsuit is sham litigation, and otherwise fails to plausibly allege anticompetitive conduct, the Court grants Antitrust Defendants' motions to dismiss.[2]

## I.    BACKGROUND[3]

No Spill holds two flame mitigation device patents directed to preventing portable fuel containers from exploding. Doc. 280 at 1. The parent patent issued in November 2015 and is U.S. Patent No. 9,174,075. Doc. 317 at 54. The continuation patent issued in July 2018 as U.S. Patent No. 10,029,132. *Id*. at 55.

Starting in about 2013, No Spill and Scepter had a business relationship where Scepter manufactured No Spill's fuel container products. Doc. 41 at 17-18. The business relationship broke down, and No Spill filed suit against Scepter in December 2018. Doc. 1. Ultimately, No Spill alleged patent infringement, contract, and trade dress claims in its Second Amended Complaint. Doc. 41. This Court issued a *Markman* order last June that rejected Scepter's indefiniteness

---

[2]    After closely reviewing the record, the Court determined that oral argument would not materially assist deciding the issues in this case.

[3]    The Court relies on alleged facts and grants all reasonable inferences in Scepter's favor. Additional facts are included throughout the order.

arguments and largely adopted No Spill's constructions. Doc. 257. Five days later, Scepter moved to amend its answer to assert Sherman and Clayton Act antitrust counterclaims against No Spill and to add as parties Midwest Can Company, LLC, GenNx/MWC Acquisition, Inc., GenNx360 Capital Partners, and Argand Partners, LP. Doc. 258. The magistrate judge granted the motion. Doc. 280.

The antitrust allegations take place against the following backdrop. In 2016, No Spill had approximately ten percent of the market share for portable fuel containers, and Midwest Can had around twenty-five percent. Doc. 317 at 56. Scepter, meanwhile, was the market leader with around forty to fifty percent of the market share. *Id.* In 2017, No Spill licensed its flame mitigation device technology to Midwest Can, which was owned by GenNx360. *Id.* at 49, 57. The license was purportedly an arm's-length non-exclusive license. *Id.* at 49. Jerry Burris was a member of the Midwest Can Board of Directors and an advisor for GenNx360 at that time. *Id.* at 57. Scepter alleges that the agreement between No Spill and Midwest Can set an unreasonably high royalty rate. *Id.* at 62. The agreement also contained (1) a most-favored-nation clause that guaranteed that No Spill would give Midwest Can the lowest royalty rate it gives to any other licensee of its intellectual property and (2) a promise that No Spill would enforce its intellectual property against any third party, "or else Midwest Can could do so." *Id.* at 56; *see also* Doc. 274-1.[4] Scepter alleges that this licensing agreement was designed to raise prices on all portable fuel containers with flame mitigation devices and increase competitors' costs. Doc. 317 at 62. In May 2018, Burris became

---

[4]    "A district court may consider documents (1) referenced in a complaint that are (2) central to a plaintiff's claims, and (3) indisputably authentic when resolving a motion to dismiss without converting the motion to one for summary judgment." *Thomas v. Kaven*, 765 F.3d 1183, 1197 (10th Cir. 2014) (citation omitted). "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *GFF Corp. v. Ass'n Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997). The 2017 licensing agreement is central to Scepter's claims, and Scepter has not disputed the authenticity of the licensing agreement in the record. Therefore, the Court can refer to the licensing agreement even at the motion to dismiss stage.

CEO and President of Midwest Can. *Id.* at 64. In March 2020, GenNx360 sold Midwest Can to Argand Partners. *Id.* at 65. In December 2020, GenNx/MWC purchased No Spill. *Id.* at 66. GenNx/MWC is ultimately owned by Argand Partners. *Id.* at 52. Thus, Argand Partners became the ultimate parent company of No Spill and Midwest Can. *Id.* Burris is now CEO and President of both Midwest Can and No Spill. *Id.* at 67.

Meanwhile, Congress enacted the Portable Fuel Container Safety Act of 2020, which directed the U.S. Consumer Product Safety Commission to promulgate a final rule to require flame mitigation devices in portable fuel containers within thirty months of enactment, except to the extent that there is a voluntary standard developed by ASTM International or a similar standard development organization within eighteen months after enactment. *Id.* at 54. Scepter argues that No Spill believes that a portable fuel container manufacturer cannot have a nonmetallic flame mitigation device and comply with federal law without licensing No Spill's patents. *Id.* at 69. Thus, Scepter has been forced to choose between paying supracompetitive royalty rates for a flame mitigation device license or defending itself from patent infringement litigation brought by No Spill. *Id.* at 71. Scepter argues that, but for the unlawful agreement between Antitrust Defendants, Scepter would have benefited from competition in the market for flame-mitigation-device intellectual property and consumers would have benefited from lower prices. *Id.* at 72.

Based on these events, Scepter brings the following claims against Antitrust Defendants: (1) conspiracy to restrain trade under the Sherman Act § 1 for "entering into an unlawful agreement to fix and artificially raise the price" at which portable fuel container manufacturers could license flame mitigation device intellectual property; (2) conspiracy under the Sherman Act § 2 for planning to maintain a monopoly in the market for portable fuel containers with flame mitigation devices; and (3) a transaction that substantially lessens competition under the Clayton Act § 7 for

Argand Partners becoming the ultimate parent company of both Midwest Can and No Spill. Doc. 317 at 70, 75-76. Scepter also brings claims against No Spill for monopolization and attempted monopolization under the Sherman Act § 2 for holding and seeking to hold a monopoly on flame mitigation devices that comply with federal law. *Id.* at 72-75. Antitrust Defendants move to dismiss all claims. Docs. 359, 364.

## II.    ANALYSIS

Antitrust Defendants move to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. Docs. 359, 364. The Court begins with subject-matter jurisdiction.

### A.    Subject-Matter Jurisdiction

Antitrust Defendants move for dismissal due to lack of subject-matter jurisdiction. They contend Scepter lacks constitutional standing because it has not suffered an injury. Antitrust Defendants specifically argue that defense of a patent infringement suit is not a cognizable injury under *Noerr-Pennington*. Doc. 388 at 6. Scepter argues that it was injured because it was forced to choose between (1) paying a supracompetitive royalty rate for a flame mitigation device license, (2) ceasing sale of portable fuel containers, or (3) defending itself in a patent-infringement suit. Doc. 378 at 16.

Subject-matter jurisdiction requires constitutional standing. Constitutional standing requires (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable court decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992). Being forced to litigate an anticompetitive suit is a cognizable injury such that this Court has subject-matter jurisdiction. *See, e.g.*, *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1310 (Fed. Cir. 2016) (holding that the attorneys' fees in that case were both injury-in-fact and antitrust injury). The Court is thus satisfied that it has

5

subject-matter jurisdiction and turns to the remaining arguments.

### B.    Failure to State a Claim

Antitrust Defendants next move for dismissal for failure to state a claim. A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Scepter must plead antitrust standing to allege plausible claims.[5] To establish antitrust standing, a party must allege antitrust injury. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986) ("A showing of antitrust injury is necessary, but not always sufficient, to establish [antitrust] standing."). An antitrust injury is an injury that "the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The Tenth Circuit governs this Court's application of antitrust law. *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000) However, Federal Circuit law governs whether conduct in enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws. *Id.*

The intersection of antitrust injury and patent litigation is impacted by *Noerr-Pennington*. Under *Noerr-Pennington*, a party fails to state an antitrust claim when the claim is premised on the other party petitioning the legislature or the executive branch. *Cal. Motor Transp Co. v. Trucking Unlimited*, 404 U.S. 508, 509-10 (1972). The Supreme Court extended *Noerr-Pennington* protection to activity before courts and agencies in *California Motor*. *Id.* at 510-11. It

---

[5]    Antitrust standing is a pleading requirement that does not remove subject-matter jurisdiction when it is not met and is best addressed under the Rule 12(b)(6) framework. *See Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 270 (3d Cir. 2016) ("[S]tatutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place." (citation omitted)).

held that "it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the . . . courts to advocate their causes." *Id.* Therefore, the Supreme Court extended *Noerr-Pennington* to court activity, and filing a lawsuit is generally protected from antitrust liability.

### 1.   Traditional Exceptions to *Noerr-Pennington*

In general, a patentee is protected by the *Noerr-Pennington* doctrine and is therefore not liable under antitrust laws for suing to protect its invention unless one of two conditions is met. *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304 (Fed. Cir. 2004). First, a patentee can be liable if the "asserted patent was obtained through knowing and willful fraud." *Q-Pharma*, 360 F.3d at 1304 (citations omitted). Second, a patentee can be liable if the lawsuit was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id.* (citation omitted). A lawsuit is not a sham unless (1) the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) the baseless lawsuit conceals an "attempt to interfere <u>directly</u> with the business relationships of a competitor." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (emphasis denoted as italics in original). "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation" under the second prong of the sham test. *Id.* at 60.

Here, Scepter has not pleaded that Antitrust Defendants obtained the asserted patents via knowing and willful fraud. Nor has Scepter pleaded that the current patent infringement litigation is a sham. In fact, Scepter <u>expressly states</u> that it is not making sham litigation allegations. Doc. 378 at 18 n.10 ("Scepter does not make sham litigation allegations."). Thus, Scepter does not fall into either of the two well-known *Noerr-Pennington* exceptions.

Undeterred, Scepter argues that it nevertheless has established an antitrust injury because "[l]itigation conduct can be part of an overall anticompetitive scheme, and the costs of defending against such litigation can constitute antitrust injury, regardless of whether the litigation was a sham." *Id.* To support this contention, Scepter relies on old caselaw that predates the extension of *Noerr-Pennington* protections to court advocacy.

### 2.    Scepter's Pre-*Noerr-Pennington* Caselaw

First, Scepter relies heavily on the Seventh Circuit's sixty-year-old decision in *Dairy Foods Inc. v. Dairy Maid Products Co-op.*, 297 F.2d 805 (7th Cir. 1961). There, the Seventh Circuit reversed the district court's dismissal of an antitrust counterclaim. *Id.* at 807-08, 810. It held that the counterclaim plaintiffs had adequately alleged that Dairy Foods and two other corporations had engaged in antitrust violations by pooling patents and patent applications pertaining to instant milk and instant milk products. *Id.* at 807-08. Dairy Foods sued the antitrust plaintiffs for patent infringement, and the antitrust plaintiffs filed a counterclaim for antitrust damages and injunctive relief because they were "faced with choosing between the three alternatives of ceasing production of instant milk, defending expensive patent litigation if they refuse to accept plaintiff's proffered license, or accepting a discriminatory and restrictive license under patents in plaintiff's pool that deprives them of an equal opportunity to compete." *Id.* at 808. The Seventh Circuit held that having to choose between those alternatives was an antitrust injury. *Id.* at 808-09. Thus, "[w]here an infringement suit is brought as part of and in furtherance of a combination and conspiracy which violates the antitrust laws and results in injury such as is here alleged the person injured may recover threefold the damages he sustains." *Id.* at 809 (citations omitted).

Second, Scepter relies on the Tenth Circuit's even older opinion in *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952). There, Kobe sued Dempsey for patent infringement,

and Dempsey alleged antitrust counterclaims. *Id.* at 418. Kobe and its predecessor had a patent pool. *Id.* at 419-20. The express purpose of the patent pool "was to acquire patents relating to hydraulic pumps" and to "build up and maintain [a] patent monopoly." *Id.* at 420. Between 1933 and 1945, Kobe's predecessor acquired more than seventy patents. *Id.* In 1948, however, Dempsey introduced its own hydraulic pump to the oil industry at the International Petroleum Exposition at Tulsa. *Id.* The Dempsey pump attracted great attention at the exposition, and Kobe was concerned that it would lose customers because the Dempsey pump was less expensive and outperformed the Kobe product. *See id.* at 421. In August 1948, Kobe served notice of infringement on Dempsey without even looking at drawings of the Dempsey pump. *Id.* In September 1948, Kobe filed suit. *Id.* at 422. Two weeks later, it sent notices to forty major pumping equipment purchasers notifying them of the lawsuit. *Id.* Due to the lawsuit and notices, Dempsey's business dried up. *Id.* The district court held that Kobe was guilty of unlawful monopolization under the Sherman Act even though one of Kobe's patents was valid and infringed. *Id.* at 418.

The Tenth Circuit affirmed. *Id.* at 430. The Tenth Circuit held that

> although Kobe believed some of its patents were infringed, the real purpose of the infringement action and the incidental activities of Kobe's representatives was to further the existing monopoly and to eliminate Dempsey as a competitor. The infringement action and the related activities, of course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused, but when considered with the entire monopolistic scheme which preceded them we think, as the trial court did, that they may be considered as having been done to give effect to the unlawful scheme.

*Id.* at 425.

But *Dairy Foods* and *Kobe* differ drastically from this case. Both *Dairy Foods* and *Kobe* involved patent pooling to prevent smaller competitors from competing in the relevant market. *Dairy Foods* involved three corporations pooling their patents related to instant milk and instant

milk products, and *Kobe* involved accumulating more than seventy patents relating to hydraulic pumps. Here, Scepter is the self-described market-share leader in the portable fuel containers market and No Spill has two patents (one of which is a continuation patent). Scepter tries to fashion an anticompetitive scheme from this non-analogous situation by alleging that Antitrust Defendants believe that practicing the '075 and '132 patents will be the only way to make portable fuel containers that meet a forthcoming standard under the Portable Fuel Container Safety Act of 2020. But Scepter has not pleaded that Antitrust Defendants had anything to do with the Act's passage or the implementation of any forthcoming standard. And even if Scepter had pleaded as much, Scepter could still face *Noerr-Pennington*'s protections for advocacy in a legislative or agency setting to the extent it seeks to hold Antitrust Defendants liable for lobbying a government body. Scepter has failed to plead any facts to show that the current litigation is part of an overall scheme to prevent it from being able to compete in the market. Thus, Scepter has failed to plead any antitrust injury from an overall anticompetitive scheme even considering *Dairy Foods* and *Kobe*. Its only injury is defending a patent infringement lawsuit, and that is insufficient to overcome *Noerr-Pennington* even at the motion to dismiss stage.

### 3.    Lower Court Applications of *Dairy Foods* and *Kobe*

Furthermore, even if Scepter had alleged facts sufficient to show an overall anticompetitive scheme causing antitrust injury under the theory in *Dairy Foods* and *Kobe*, courts have struggled with how much persuasive weight to give these cases in the wake of *Noerr-Pennington*'s extension to court proceedings. On the one hand, holding a party liable for enforcing a presumptively valid patent as part of an overall scheme cuts against the Supreme Court's statement that "efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition" because "[s]uch conduct is not illegal, either standing alone or as part of a broader

scheme itself violative of the Sherman Act." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) (emphasis added); *see also Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 429-30 (D. Del. 2006) (noting the same language in *Pennington*). On the other, in *Professional Real Estate Investors*, the Supreme Court expressly reserved whether a party "could have made a valid claim of immunity [from antitrust liability] for anticompetitive conduct independent of petitioning activity." 508 U.S. at 54 n.2 (emphasis added). General statements and dicta from the Federal Circuit have also been inconclusive. *Compare Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576–77 (Fed. Cir. 1990) (stating in dicta that patent owners may incur antitrust liability when there is an overall scheme to use the patent to violate antitrust laws), *and TransWeb, LLC*, 812 F.3d at 1311-12 (citing to *Dairy Foods* and *Kobe* to support the proposition that attorneys' fees can form the basis for antitrust damages), *with In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d at 1326 (stating that *Walker Process* fraud and sham litigation are the two ways a patent-holder can be liable under antitrust laws), *and Q-Pharma*, 360 F.3d at 1304 (same).

In the absence of clear guidance from either the Supreme Court or the Federal Circuit, some courts have held that cases such as *Kobe* lack weight post-*Noerr-Pennington*. *See, e.g.*, *Abbott*, 432 F. Supp. 2d at 429-30. *Abbott* reasoned in part that *Kobe*'s focus on the "real purpose" of litigation was contrary to the Supreme Court's holding in *Professional Real Estate Investors* that courts should not examine the subjective intent behind litigation unless it is objectively meritless (i.e., a sham). *See id.* at 429. If *Dairy Foods* and *Kobe* lack weight, then Scepter certainly fails to state a claim because Scepter expressly concedes that it is not making sham litigation allegations. Doc. 378 at 18 n.10.

But other courts have been more generous to *Dairy Foods* and *Kobe* and have held that "scheme" antitrust allegations can include constitutionally protected litigation when the litigation is causally connected to other actions that create anticompetitive harms. *See, e.g.*, *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1096-97 (N.D. Cal. 2007). Under this approach:

> the court must first find that the other aspects of the scheme independently produce anticompetitive harms. Once this step has been established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms. If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme.

*Id.* at 1097.

Applying *Hynix*'s approach to this case, the Court examines whether the alleged anticompetitive scheme produces anticompetitive harms that are independent of the patent litigation. After examining Scepter's additional allegations, the Court does not find that the other aspects of the alleged scheme independently produced anticompetitive harms.

**<u>First</u>**, Scepter has alleged that No Spill and Midwest Can entered a non-exclusive, "sham licensing agreement." Doc. 317 at 56. There is no allegation that No Spill is refusing to license its intellectual property to Scepter or anyone else in the industry at the exact pricing offered to Midwest Can. There is no allegation that this is even a partially exclusive license, such as a license limiting Midwest Can to certain geographic markets or fields-of-use. Therefore, the purportedly non-exclusive license here does not give rise to anticompetitive harm. *See, e.g.,* U.S. Dep't of Just. & FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* § 4.1.2 (2017) ("A non-exclusive license of intellectual property that does not contain any restraints on the competitive conduct of the licensor or the licensee generally does not present antitrust concerns. That principle holds true even if the parties to the license are in a horizontal relationship, because the non-

exclusive license normally does not diminish competition that would occur in its absence."). While No Spill may wish for Scepter's pricing to be lower, that allegation does not create an antitrust injury.

**Second**, Scepter has alleged that the licensing rates in the licensing agreement are inflated. Doc. 317 at 56. Although the allegations of supracompetitive or artificially inflated royalty pricing are thin, at the pleading stage, the Court will assume that the pricing is supracompetitive as alleged. But Scepter fails to allege a cognizable anticompetitive harm from a patent holder licensing its intellectual property at high prices. *See, e.g.*, *Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964) ("A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly.").

**Third**, Scepter has alleged the existence of a most-favored-nation clause in which No Spill has agreed not to license its intellectual property at lower rates to others. Most-favored-nation clauses "are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995). A most-favored-nation clause does not harm competition absent additional factual allegations. *See id.*

**Fourth**, Scepter alleges that the licensing agreement expressly states that No Spill will enforce its patents against any third party. Scepter fails to provide any authority that a company merely stating that it will continue to protect its validly procured patents somehow gives rise to an antitrust concern. Scepter does allege that No Spill agreed to obtain Midwest Can's consent prior to entering any settlement of any lawsuit that could impact No Spill's patents. Doc. 317 at 63. Scepter additionally alleges that the license expressly acknowledges that the royalty rate per unit

would only drop by a set amount if the patents were invalidated, and Midwest Can may terminate the licensing agreement if the patents are invalidated. No Spill, however, does not allege that these non-exclusive licensing terms are not available to others in the market, including Scepter.

**Fifth**, Scepter alleges that Argand became the ultimate parent company of both companies by December 2020. As discussed in the next section, that allegation also fails to allege an antitrust harm. *See infra* Section II.C.1

**Sixth**, Scepter also alleges that Antitrust Defendants believe that practicing the patents will be required under a forthcoming safety standard. Scepter fails to allege how Antitrust Defendants' <u>belief</u> gives rise to an antitrust harm apart from *Noerr-Pennington*-protected litigation, particularly when Scepter alleges that it continues to compete effectively in the market. *See* Doc. 317 at 48, 56, 69-70 (alleging that Scepter has been the low-cost leader in the sale of portable fuel containers with flame mitigation devices and contesting No Spill's alleged position that its patents are necessary to participate in the marketplace).

Ultimately, Scepter's allegations are insufficient to establish independent anticompetitive harm. This case is not like *Hynix*, where the antitrust defendant allegedly participated in a standards-setting organization, withheld information about its patent applications, waited until the industry was committed to a standard, and then began a litigation campaign to extract royalties. *Id.* at 1098. The antitrust defendant's behavior before the standards-setting organization created independent anticompetitive harm that was not shielded by *Noerr-Pennington*, and that harm was causally connected to the litigation campaign. *See id.* Here, Scepter has not sufficiently alleged anticompetitive harm independent of this litigation.[6]

---

[6]  Scepter's other arguments are also unavailing. Scepter's lead argument for antitrust injury is that the magistrate judge found it when he granted leave to add counterclaims. Doc. 378 at 14-15. But this argument ignores that not all parties had the opportunity to participate in that briefing and ignores that the magistrate judge explicitly

In sum, Scepter has not alleged the patents were procured by fraud, that this patent litigation is sham litigation, or that Scepter engaged in any inappropriate conduct related to the industry standard setting. Thus, the case falls outside recognized *Noerr-Pennington* exceptions. Scepter then turns to *Dairy Foods* and *Kobe*, but those cases are distinguishable and of questionable vitality. Even if they remain good law and were not distinguishable, Scepter does not allege a plausible overall anticompetitive scheme because it has not alleged that the patent litigation is causally connected to other anticompetitive harms. Therefore, Scepter fails to state a claim for all its antitrust counterclaims because it fails to plead an antitrust injury regardless of the approach the Court takes. Scepter is asking the Court to find an overarching antitrust violation when <u>none</u> of the underlying conduct constitutes independent antitrust harm. The Court declines to so find. *See Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012) ("Because these alleged instances of misconduct are not independently anti-competitive, we conclude that they are not cumulatively anti-competitive either."); *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 680 (D. Mass. 2020) ("[W]here a plaintiff has failed to demonstrate that any action was anticompetitive, there can be no overarching anticompetitive scheme."). The Court dismisses these claims.

---

explained that his decision did not prejudice presenting these issues to this Court under Rule 12(b)(6). Doc. 280 at 17. Scepter also makes repeated passing references to consumers paying higher prices for portable fuel containers because of Antitrust Defendants' activities. *See, e.g.*, Doc. 317 at 70-77. Scepter cannot establish antitrust standing by referencing potential injury to consumers. *See, e.g.*, *Novation Ventures, LLC v. J.G. Wentworth Co.*, 156 F. Supp. 3d 1094, 1101 (C.D. Cal. 2015). Finally, in its opposition to dismissal, Scepter also argues that not only has it suffered antitrust injury, but it is at risk for future injury—being driven from the marketplace due to the pending patent enforcement litigation—and is thus still entitled to injunctive relief. Doc. 378 at 19. This argument merely reiterates Scepter's arguments that it has already been injured and moves them to a different timeframe. Even if the Court were to consider this new argument, this Court has held that the current patent-enforcement litigation is not an antitrust injury under *Noerr-Pennington*. Thus, future injury stemming from the litigation is not a risk of irreparable harm that the antitrust laws were designed to prevent.

### C.     Alternative Holdings

Even aside from a general lack of antitrust injury, the Court perceives numerous other deficiencies with Scepter's claims.

#### 1.     Clayton Act Claims

First, Scepter fails to state a claim for a transaction that substantially lessens competition under the Clayton Act § 7 against Antitrust Defendants. To state a claim under the Clayton Act § 7, a party must plausibly plead an antitrust injury and that a merger "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Under the Clayton Act, "courts have been reluctant to order divestiture at the behest of a private plaintiff after consummation of the allegedly anticompetitive merger." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 729 (4th Cir. 2021) (Rushing, J., concurring).

Scepter falls woefully short of pleading an antitrust injury due to an anticompetitive merger. Regardless of who the ultimate parent company of No Spill is, Scepter would have still faced patent infringement litigation. No Spill initiated this litigation in 2018, two years before Argand became its ultimate parent company. Thus, even if the patent litigation were an antitrust injury due to its relationship to an overall anticompetitive scheme, Scepter has not shown how any merger caused that injury. Therefore, Scepter does not have statutory standing to contest any acquisitions.[7]

---

[7]  Scepter's allegations are especially lacking with regards to GenNx360. Scepter has failed to articulate why GenNx360 is a necessary party for it to obtain equitable relief. Courts have been very reluctant to order post-merger divestiture at the behest of a private plaintiff. And even if the Court were to find that relief necessary, Scepter has pleaded no facts to show why the necessary divestiture would be Midwest Can from Argand rather than No Spill from GenNx/MWC and Argand. Scepter's own plea for relief suggests divesting No Spill from Antitrust Defendants rather than divesting Midwest Can. Doc. 317 at 77. Therefore, the Court holds in the alternative that Scepter fails to state a Clayton Act claim against GenNx360 for this additional reason.

This case is like *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547 (Fed. Cir. 1997), *overruled in part on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc). There, Eastman had acquired the exclusive right to enforce a patent in April 1990, and in September of that year it sued for patent infringement. *Id.* at 1551-52. Goodyear countersued with federal antitrust and state unfair competition claims. *Id.* at 1552. As relevant here, the district court granted summary judgment for Eastman on Goodyear's antitrust counterclaims. *Id*. at 1556. The Federal Circuit affirmed summary judgment for Eastman because Goodyear's injuries "were not that Eastman enforced the [relevant] patent, but that the patent was enforced at all. These injuries, therefore, did not occur 'by reason of' that which made the acquisition allegedly anticompetitive." *Id.* at 1558 (citation omitted). Therefore, the Court holds in the alternative that Scepter fails to state a claim under the Clayton Act for this additional reason.

### 2.    Sherman Act Claims Against GenNx360

Second, Scepter fails to state any claim against GenNx360. Scepter alleges two additional claims against GenNx360: (1) conspiracy to restrain trade under the Sherman Act § 1, and (2) conspiracy to monopolize under the Sherman Act § 2. Doc. 317 at 70-72, 75-76. A corporation is not liable under the Sherman Act when there is no evidence that the corporation was involved in the anticompetitive enterprise of its affiliates. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017).

Scepter has alleged the following facts against GenNx360 to support its claims. GenNx360 was a private equity firm that acquired Midwest Can in January 2017. Doc. 317 at 57. GenNx360 installed Frank Anglin as CEO of Midwest Can until May 2018. *Id.* Jerry Burris was a Midwest Can Board of Directors Member and an advisor for GenNx360. *Id.* Anglin negotiated and executed the licensing agreement with No Spill for its intellectual property, and Burris was an integral part

in the decision-making process. *Id.* at 59. In May 2018, six months after signing the licensing agreement, Anglin was fired from his job as CEO. *Id.* at 64. GenNx360 replaced Anglin with Burris. *Id.* In March 2020, GenNx360 sold Midwest Can to Argand Partners. *Id.* at 65.

Therefore, Scepter has pleaded no facts to show that GenNx360 was involved in any anticompetitive enterprise. Scepter merely pleads that GenNx360 installed Midwest Can's CEOs in 2017 and 2018 and that a member of Midwest Can's Board of Directors was also a GenNx360 advisor. Thus, Scepter fails to state a claim against GenNx360 under §§ 1 and 2 of the Sherman Act.

### 3.    Sherman Act Claims Against GenNx/MWC and Argand Partners

Third, Scepter also fails to state claims against GenNx/MWC and Argand Partners. Once again, Scepter brings two additional claims beyond the Clayton Act: (1) conspiracy to restrain trade under the Sherman Act § 1, and (2) conspiracy to monopolize under the Sherman Act § 2. Doc. 317 at 70-72, 75-76.

"To state a claim for a violation of [§ 1] the [party] must allege facts which show: the defendant entered a contract, combination or conspiracy that unreasonably restrains trade in the relevant market." *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992). The elements of a § 2 conspiracy claim are (1) conspiracy, (2) specific intent to monopolize, and (3) overt acts done in furtherance of the conspiracy. *Lenox*, 847 F.3d at 1231 (citation omitted). Thus, both conspiracy under Sherman Act § 1 and conspiracy under Sherman Act § 2 require an illegal agreement.

Here, Scepter argues it is plausible that GenNx/MWC and Argand Partners joined an anticompetitive conspiracy with other Antitrust Defendants because the parties entered into a 2020 Litigation Management Agreement. Doc. 378 at 31. Further, Scepter argues it is plausible that

GenNx/MWC and Argand Partners joined the conspiracy with knowledge of No Spill's and Midwest Can's illegal prior conduct, and they are thus liable for prior acts of the conspiracy. *Id.* at 32. To support this, Scepter points to its allegations that Argand purchased Midwest Can because it was "attracted to Midwest Can's leading market position within the portable fuel container market" and nine months later GenNx360 purchased No Spill. *Id.* at 33.

These allegations are insufficient to state a claim for conspiracy under §§ 1 and 2 of the Sherman Act as a matter of law. There is no plausible allegation of an illegal agreement. First, the litigation agreement is the primary allegation Scepter relies on to show an illegal agreement. The litigation agreement, like the patent enforcement litigation, is shielded from antitrust liability under *Noerr-Pennington*. Entities may coordinate their litigation strategy without running afoul of antitrust laws. *See United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, 925 (7th Cir. 2005) (holding *Noerr-Pennington* protects creditors collaborating to formulate a position in court proceedings). To hold otherwise would gut *Noerr-Pennington*. Thus, aside from the alleged litigation agreement between Antitrust Defendants, Scepter asks the Court to find it plausible that GenNx/MWC and Argand Partners joined an illegal conspiracy because Argand Partners stated it was "attracted to Midwest Can's leading market position within the portable fuel container market" nine months before it became the ultimate parent company of both Midwest Can and No Spill. Scepter has failed to allege sufficient facts to push its claims from the possible to the plausible. *Iqbal*, 556 U.S. at 679 ("But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" (citing Fed. R. Civ. P. 8(a))); *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ("[I]f [the complaint] fails to allege particular facts against a particular defendant, then the

defendant must be dismissed."). Therefore, Scepter fails to state a claim against GenNx/MWC and Argand Partners under §§ 1 and 2 of the Sherman Act.

### 4. Sherman Act Claims Against No Spill and Midwest Can

Thus, assuming antitrust standing, the only Antitrust Defendants left in this case would be No Spill and Midwest Can. As with the previous alternative holdings, Scepter brings the following claims against both No Spill and Midwest Can (1) conspiracy to restrain trade under the Sherman Act § 1, and (2) conspiracy to monopolize under the Sherman Act § 2. Doc. 317 at 70-72, 75-76. Scepter also brings claims for monopolization and attempted monopolization under the Sherman Act § 2 against No Spill. *Id.* at 72-75.

The standards for conspiracy under the Sherman Act §§ 1 and 2 were set forth above. The elements of a Sherman Act § 2 monopolization claim are: "(1) monopoly power in the relevant market; (2) willful acquisition or maintenance of this power through exclusionary conduct; and (3) harm to competition." *Lenox*, 847 F.3d at 1231 (citation omitted). The elements of a Sherman Act § 2 attempted monopolization claim are: "(1) 'predatory or anticompetitive conduct,' (2) 'a specific intent to monopolize,' and (3) 'a dangerous probability of achieving monopoly power.'" *Id.* (citation omitted).

The Court first addresses Scepter's Sherman Act §§ 1 and 2 conspiracy claims. Scepter fails to allege an unreasonable restraint in trade in the relevant market (which is fatal to a § 1 conspiracy), or a specific intent to monopolize (which is fatal to a § 2 conspiracy). Scepter states the licensing agreement between No Spill and Midwest Can forms "the core basis" for its Sherman Act claims. Doc. 342 at 8. Scepter essentially alleges that the non-exclusive licensing agreement was a restraint of trade because the royalty rate was irrationally high, there was a most-favored-nation clause, and No Spill gave Midwest Can leverage to ensure the patents were enforced. Doc.

317 at 61, 70-71. This is insufficient to allege an unreasonable restraint in trade. As previously noted, "[a] patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly" within the life of the patent. *Brulotte*, 379 U.S. at 33. "The law also recognizes that [a patentee] . . . may license others to practice his invention." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 135 (1969). Most-favored-nation clauses and assurances that the patentee will protect the patent generally foster competition rather than hinder it, so Scepter needed to allege something more to plausibly allege the license agreement was a restraint of trade.[8]

Scepter seems to argue that it can establish a plausible overarching Sherman § 1 claim from cobbling together a bunch of completely legal acts, but that is not the law. *See Eatoni*, 486 F. App'x at 191 (affirming dismissal of a § 2 claim because no instances of misconduct were anticompetitive). Furthermore, because Scepter fails to allege anticompetitive actions under § 1, it also fails to allege a specific intent to monopolize under § 2. *See Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982) ("[S]ince we have found that [the defendant] did not engage in anticompetitive conduct, we can infer no intent to monopolize from its actions."); *see also Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1206 (10th Cir. 2006) (holding that failure to establish harm to the competitive process under § 1 is also fatal to a § 2 conspiracy to monopolize claim). Therefore, Scepter also fails to state Sherman Act §§ 1 and 2 conspiracy claims against No Spill and Midwest Can.

Thus, the only remaining claims would be Scepter's Sherman § 2 monopolization and attempted monopolization claims against No Spill. Because Scepter has already failed to allege

---

[8]    Scepter tries to allege the licensing agreement "set the floor for royalty rates for other industry participants." Doc. 317 at 56. This statement is contradicted by the language of the agreement. Doc. 274-1 at 6. Therefore, Scepter has not properly alleged that the licensing agreement set a floor for the industry. *GFF Corp*, 130 F.3d at 1385 ("[F]actual allegations that contradict such a properly considered document are not well-pleaded facts that the court must accept as true.").

anticompetitive/exclusionary conduct or a specific intent to monopolize by any party, these claims must also fail. *See Richter*, 691 F.2d at 823-28. Therefore, all Scepter's claims would still fail even if it had established antitrust standing.[9]

## III.    CONCLUSION

The parties did a thorough job briefing the issues. The Court carefully reviewed the record and finds that Scepter did not plausibly allege any of its antitrust claims. The Antitrust Defendants are entitled to dismissal of those claims. The Court grants the motions.[10]

THE COURT THEREFORE ORDERS that Antitrust Defendants' motions to dismiss (Docs. 359, 364) are GRANTED. Midwest Can Company, LLC, GenNx/MWC Acquisition, Inc., GenNx360 Capital Partners, and Argand Partners, LP are dismissed from this case.

IT IS SO ORDERED.


Dated: April 6, 2022                          /s/ *Holly L. Teeter*
                                              HOLLY L. TEETER
                                              UNITED STATES DISTRICT JUDGE

---

[9]    The Court need not address Antitrust Defendants' other alternative arguments because it grants their motions.

[10]    Scepter tries to assert new facts in its opposition to dismissal, and it makes multiple requests in passing for leave to amend. *See, e.g.*, Doc. 378 at 25 n.16, 43. The Court denies these requests for two reasons. First, this is not the proper way to seek amendment under the local rules. Scepter declined to amend its counterclaims as a matter of right within 21 days of Antitrust Defendants moving to dismiss under Rule 12(b). *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 777 (10th Cir. 2021) ("[C]ounterclaims are distinct from other parts of an answer."); *see also* Fed. R. Civ. P. 15(a)(1). Instead, Scepter chose to stand on its counterclaims as filed. Furthermore, under District of Kansas Rule 15.1, a party seeking leave to amend must so move by (1) setting forth a concise statement of the amendment or leave sought; (2) attaching the proposed pleading or other document; and (3) complying with the other requirements of District of Kansas Rules 7.1 through 7.6. D. Kan. R. 15.1. Scepter has failed to do that. Scepter is a sophisticated party and does not have any excuse for failing to comply with the Court's rules. Rewarding this half-hearted method of amendment would promote a "wait-and-see" approach to dispositive motion practice and converts the motions to dismiss into a trial run. Second, even considering the plethora of new facts asserted throughout Scepter's opposition to dismissal, the Court has determined that adding such facts would not change its determination as to antitrust injury because the only facts relevant to antitrust injury are awareness of current and forthcoming safety standards and participation in a private standards-setting process. There is no allegation of misconduct. Thus, this case is still unlike *Hynix*. 527 F. Supp. 2d at 1098. Therefore, amendment would be futile even if Scepter had complied with the rules. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997) (citations omitted).