# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NO SPILL, LLC and TC CONSULTING, INC.,

               Plaintiffs,

    v.

SCEPTER CANADA INC., and
SCEPTER MANUFACTURING, LLC,

               Defendants.

Case No. 2:18-cv-02681-HLT-KGG

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## ITS MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.     INTRODUCTION.......................................................................................... 1

II.    STATEMENT OF MATERIAL FACTS ..................................................... 1

    A.     The Asserted Patents .......................................................................... 2

    B.     The Asserted '075 Claims .................................................................. 2

    C.     The Asserted '132 Claims .................................................................. 3

    D.     The Accused Products ......................................................................... 4

    E.     The Prior Art Protectoseal Flame Arrester ........................................ 5

    F.     The "Too-Rich-To-Combust" Element ............................................... 6

III.   LEGAL STANDARDS ............................................................................... 10

    A.     Summary Judgment ........................................................................... 10

    B.     Infringement ...................................................................................... 11

    C.     Patentable Subject Matter under § 101 ............................................. 11

    D.     Invalidity under §§ 102 and 103 ...................................................... 12

IV.    THE '075 PATENT IS INVALID FOR CLAIMING A LAW OF NATURE........... 13

    A.     The asserted claims of the '075 patent, which claim every structure with a "too rich to combust" environment, are an abstract idea and fail Alice step 1............. 14

        1.     The independent claims of the '075 patent merely claim the abstract result of a structure that is "too rich to combust." ................................................. 14

        2.     The dependent claims of the '075 patent merely add additional desirable results rather than ideas for achieving them, and additional routine and generic concepts in fuel cans. ................................................................. 18

        3.     The claims of the '075 patent preempt all methods for causing the internal environment to exceed the UFL, which further indicates their disclosure of an abstract concept.................................................................. 21

    B.     The asserted claims of the '075 patent also fail *Alice* step 2 because they do not recite an inventive concept......................................................... 23

    C.     No genuine issue of material fact exists, and the Court should grant summary judgment that the asserted claims of the '075 patent are invalid as directed to un-patentable subject matter.................................................... 26

V.     THE '132 PATENT IS EITHER NOT INFRINGED OR IT IS INVALID ............. 27

    A.     Plaintiffs show infringement through a "dipped test" and a "shake test."............ 28

    B.     Replicating Dr. Roby's tests, Dr. Stevick determined that the accused products and the prior art Protectoseal products perform the same...................... 29

    C.     Dr. Roby's 9/18/2022 Report fails to substantively rebut Dr. Stevick, or otherwise raise a genuine issue of material fact. ................................................. 30

1.      No Spill is estopped from criticizing testing based spark energy. ............ 30

2.      The unrebutted evidence shows that Dr. Stevick used the correct spark energy for his testing. ................................................................................. 31

3.      Ultimately, for a "comparative test," spark energy does not matter under Plaintiffs' own theories. ........................................................................... 32

4.      Dr. Roby's sole criticism only establishes non-infringement of all asserted '132 claims ............................................................................................... 33

D.      There are no genuine issues of material fact that the Protectoseal products disclose the remaining claim limitations. .......................................................... 34

**VI.  CONCLUSION** ........................................................................................................ **36**

## TABLE OF AUTHORITIES

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ................................................................................................ 13

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
  838 F.3d 1266 (Fed. Cir. 2016) ................................................................................................ 15

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016) ................................................................................................ 16

*Alvarado v. J.C. Penney Co.*,
  768 F. Supp. 769 (D. Kan. 1991) ............................................................................................. 11

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
  967 F.3d 1285 (Fed. Cir. 2020) ........................................................................................ passim

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................................. 10

*ArcelorMittal France v. AK Steel Corp.*,
  700 F.3d 13142 (Fed. Cir. 2012) .............................................................................................. 13

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015) ................................................................................................ 22

*BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ................................................................................................ 25

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ................................................................................................................. 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................................. 10

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) ................................................................................... 21, 22, 26

*Cone v. Longmont United Hosp. Ass'n*,
  14 F.3d 526 (10th Cir.1994) .................................................................................................... 11

*Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005) ................................................................................................ 11

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ................................................................................................ 12

*Glacier Const. Co. v. Travelers Prop. Cas. Co. of Am.*,
   569 F. App'x 582 (10th Cir. 2014) .................................................................. 26, 35

*Internet Patents Corp. v. Active Network, Inc.*,
   790 F.3d 1343 (Fed. Cir. 2015) ........................................................................... 14

*Interval Licensing LLC v. AOL, Inc.*,
   896 F.3d 1335 (Fed. Cir. 2018) .......................................................... 15, 19, 22, 23

*Kitto v. Farmers Ins. Co.*,
   39 F.3d 1192 (10th Cir. 1994) ........................................................................ 26, 35

*KSR Int'l Co. v. Teleflex, Inc.*,
   550 U.S. 398 (2007) ........................................................................................ 13, 35

*Lab'y Skin Care, Inc. v. Ltd. Brands, Inc.*,
   661 F. Supp. 2d 473 (D. Del. 2009) ...................................................................... 31

*Lockwood v. Am. Airlines, Inc.*,
   107 F.3d 1565 (Fed.Cir.1997) ........................................................................ 26, 36

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ................................................................................ 11

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012) ................................................................................... 12, 17, 21

*O'Neal v. Thompson*,
   54 F. App'x 301 (10th Cir. 2002) ........................................................................ 10

*OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*,
   701 F.3d 698 (Fed. Cir. 2012) .............................................................................. 13

*Paschal v. Bd. of Cnty. Comm'rs*, No. 07-1017-DWB,
   2008 WL 4171836 (D. Kan. Sept. 5, 2008) .......................................................... 11

*Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM-GEB,
   2016 WL 4039641 (D. Kan. July 28, 2016) .............................................. 26, 34, 35

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ...................................................................... 12, 16

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008) ........................................................................ 32, 34

*SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*,
   859 F.2d 878 (Fed. Cir. 1988) .............................................................................. 11

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017)................................................................... 25

*Wahpeton Canvas Co. v. Frontier, Inc.*,
   870 F.2d 1546 (Fed. Cir. 1989)................................................................... 11

*Yu v. Apple Inc.*,
   1 F.4th 1040 (Fed. Cir. 2021) .................................................................... 24

**Statutes**

35 U.S.C. § 102(a) .......................................................................................... 12

35 U.S.C. § 103(a) .......................................................................................... 13

35 U.S.C. § 271(a) .......................................................................................... 11

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................... 10

# TABLE OF EXHIBITS

U.S. Patent No. 9.174,075 ............................................................................   **A**

U.S. Patent No. 10,029,132 .........................................................................   **B**

Mr. Cray's 6/18/2015 Declaration ...............................................................   **C**

Plaintiffs' Response to Interrog. No. 15 .......................................................   **D**

Plaintiffs' Amended Infringement Contentions ...........................................   **E**

Dr. Roby's 6/21/2022 Expert Report (excerpted) .......................................   **F**

Dr. Roby's 11/23/2020 Deposition Tr. (excerpted) .....................................   **G**

Dr. Stevick's 1/8/2021 Declaration (excerpted) ..........................................   **H**

Dr. Stevick's 6/21/2022 Expert Report (SEALED) (excerpted) ...................   **I**

Dr. Roby's 7/22/2022 Expert Report (excerpted) .......................................   **J**

Dr. Stevick's 8/10/2022 Expert Report (SEALED) (excerpted) ...................   **K**

Dr. Roby's 8/19/2022 Expert Report .........................................................   **L**

No Spill's 2d Supp. Resp. to Interrog. No. 26 ............................................   **M**

Scepter's 2d Election of Asserted Prior Art ...............................................   **N**

1/25/2022 Scepter Email .............................................................................   **O**

5/15/2012 Generation 4 Proposal to Blitz (SEALED) ................................   **P**

Blitz Provisional Application .......................................................................   **Q**

Dr. Stevick's 2010 Email to ASTM ...........................................................   **R**

Physical Testing Report (*Showers v. Walmart*) ...............................................   **S**

Pursuant to Local Rule 56.1, defendants Scepter Canada, Inc. and Scepter Manufacturing LLC (collectively, "Scepter") seek summary judgment that plaintiffs' No Spill LLC and TC Consulting, Inc. (collectively, "No Spill") asserted claims for U.S. Patent No. 9,174,075 ("the '075 patent") are invalid as directed to un-patentable subject matter under 35 U.S.C. § 101.  Scepter also seeks summary judgment of noninfringement or invalidity for U.S. Patent No. 10,029,132 ("the '132 patent").

## I.   INTRODUCTION

Plaintiff No Spill asserts two patents in this case, but each suffers from fundamental problems.  For the '075 Patent, No Spill seeks to patent any device that adheres to a natural law taught in high school chemistry courses—if a certain space has too much gas vapor and not enough air in it, then it is "too-rich-to-combust." The Federal Circuit holds that attempts to patent devices that adhere to natural laws are invalid as un-patentable abstract ideas under *Alice*.  For the '132 Patent, No Spill's own infringement test—dipping a device in gasoline and testing (shaken and unshaken) whether it ignites—shows the exact same results when applied to a prior art product that has been on sale for almost a hundred years.  It is black-letter law that, "[t]hat which infringes if later, anticipates if earlier."  Because No Spill's own test for infringement gives the same results for the accused product and the undisputed prior art, the '132 Patent must be either invalid or not infringed.

## II.   STATEMENT OF MATERIAL FACTS[1]

There is no genuine dispute as to the any of the below material facts.

---

[1] Hereinafter, "SoMF."

### A.    The Asserted Patents

1.      On November 3, 2015, the U.S. Patent and Trademark Office issued U.S. Patent No. 9,174,075 ("the '075 patent"), titled "Explosion Inhibiting Portable Fuel Container and Method of Inhibiting Explosions" listing Thomas M. Cray as the inventor.  (Ex. A, '075 pat.)

2.      On July 14, 2018, the U.S. Patent and Trademark Office issued U.S. Patent No. 10,029,132 ("the '132 patent"), titled "Explosion Inhibiting Portable Fuel Container and Method of Inhibiting Explosions" listing Thomas M. Cray as inventor.  The '132 patent is a continuation of the '075 patent.  (Ex. B, '132 pat.)

### B.    The Asserted '075 Claims

3.      No Spill asserts that Scepter infringes claims 1, 4, 8, 13, and 17 of the '075 patent (collectively, the "asserted claims"). (Ex. A, '075 pat.)

4.      Independent claim 1 of the '075 Patent, from which claims 4 and 8 depend, recites as follows:

**[1(a)]**   A fuel container comprising:

**[1(b)]**   a hollow tank body defining a fuel-receiving chamber and a main container opening for permitting flow of a liquid fuel into and out of the fuel-receiving chamber;

**[1(c)]**   a fuel dispensing assembly coupled to the tank body proximate the main container opening and configured to dispense the liquid fuel from the container; and

**[1(d)]**   a fuel retention structure located proximate the main container opening and extending generally downwardly into the fuel-receiving chamber,

**[1(e)]**   wherein the fuel retention structure comprises a plurality of perforations through which the liquid fuel must flow in order to dispense the liquid fuel from the container,

**[1(f)]**   wherein the fuel retention structure is configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom,

**[1(g)]**  wherein the retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion.

5.    Independent claim 12 of the '075 Patent, from which claims 13 and 17 depend, is substantially similar to claim 1, adding a limitation that "wherein the retained quantity of the liquid fuel is held in the perforations by *intermolecular forces*, wherein the intermolecular forces are sufficient to retain the quantity of liquid fuel in the perforations regardless of the orientation of the portable fuel container." (emphasis added.)

6.    This Court has construed limitation 1(g) of the '075 Patent to require that the "retained quantity of the liquid fuel is sufficient to provide a fuel vapor-air mixture proximate to the main container opening that is *above the upper flammability limit*." (ECF No. 257 at 1 (emphasis added).)

7.    Plaintiffs' expert, Dr. Richard Roby, has explained that the "concept of 'too rich to combust' is a fundamental one in the combustion and fire safety industry, as well as in the fields of chemical, mechanical, and fire protection engineering," that the "upper flammability limit (UFL)" is the state of having "too much fuel and not enough air to sustain flame propagation," and that "[a]nyone considered to be a POSITA in the art at issue in this case must have knowledge and understanding of this fundamental concept in combustion and fire safety." (ECF No. 257 at 7.)

8.    The Court has held that a "POSITA would have known …that the flammability range for gasoline was 1.4% to 7.6% gasoline in the air." (ECF No. 257 at 10.)

**C.    The Asserted '132 Claims**

9.    No Spill asserts that Scepter infringes claims 1, 9, 14, 17, and 18 of the '132 patent (collectively, "the asserted '132 claims").  (Ex. B, '132 pat.)

10.     Independent claim 1 of the '132 patent, from which claims 9, 14, 17, and 18 depend, recites as follows—

**[1(a)]**   A fuel container comprising:

**[1(b)]**   a hollow tank body defining a fuel-receiving chamber and a main container opening for permitting flow of a liquid fuel into and out of the fuel-receiving chamber;

**[1(c)]**   a fuel dispensing assembly coupled to the tank body proximate the main container opening and configured to dispense the liquid fuel from the container; and

**[1(d)]**   a flash suppressor located proximate the main container opening and extending at least 2 inches downwardly into the fuel-receiving chamber,

**[1(e)]**   wherein the flash suppressor comprises a plurality of perforations through which the liquid fuel is required to flow in order to dispense the liquid fuel from the container,

**[1(f)]**   wherein the flash suppressor is formed of a synthetic resin material,

**[1(g)]**   wherein the flash suppressor has an internal volume of at least 2 cubic inches,

**[1(h)]**   wherein the flash suppressor is at least 10 percent open,

**[1(i)]**   wherein the average open area of the perforations is at least 0.001 and not more than 0.05 square inches and wherein the flash suppressor is not more than 80 percent open; and wherein the total number of perforations is at least 100 and not more than 10,000 and wherein the average length of the perforations is at least 0.02 inches.

(Ex. B, '132 pat. at cl. 1.)

**D.    The Accused Products**

11.     No Spill alleges that Scepter's flame mitigation device (FMD) sold as a feature in its portable fuel cans (PFCs) infringes the asserted '132 claims ("the accused products").   An identification of the accused products appears in Dr. Roby's 6/21/2022 Expert Report.   (Ex. F at ¶¶ 32-35, 6/21/2022 Roby Report.)

12.     Each of the accused products includes a Flame Mitigation Device ("FMD").

E.      The Prior Art Protectoseal Flame Arrester

13.      Dr. Glen Stevick, retained by Scepter Canada Inc., provided an expert report containing opinions related to the invalidity of the asserted patents on June 21, 2022.  (Ex. I, 6/21/2022 Stevick Report.)

14.      Dr. Richard J. Roby retained by Plaintiffs No Spill, LLC and T.C. Consulting, Inc., provided a rebuttal expert report on July 22, 2022 related to the expert report submitted by Dr. Stevick on June 21, 2022. (Ex. J, 7/22/2022 Roby Report.)

15.      Dr. Stevick provided a Reply Invalidity Expert Report on August 10, 2022, in response to the rebuttal expert report submitted by Dr. Roby on July 22, 2022.  (Ex. K, 8/10/2022 Stevick Report.)

16.      Scepter alleges that the asserted '132 claims are invalid as obvious over the Protectoseal Flame Arrester, in combination with the knowledge of a person of ordinary skill in the art.  (Ex. I, 6/21/2022 Stevick Report at 175-196.)

17.      The Protectoseal Flame Arrester is a perforated FMD that was used and available for sale to the public since the 1920s, before September 16, 2014, the priority date of the '132 patent.  (Ex. I, 6/21/2022 Stevick Report at 175-196; Ex. F at ¶ 14, 6/21/2022 Roby Report.)

18.      The Protectoseal Flame Arrester discloses element 1(a), above.  (Ex. I, 6/21/2022 Stevick Report at 177-180.)

19.      The Protectoseal Flame Arrester discloses element 1(b), above.  (Ex. I, 6/21/2022 Stevick Report at 181.)

20.      The Protectoseal Flame Arrester discloses element 1(c), above.  (Ex. I, 6/21/2022 Stevick Report at 181-183.)

21.      The Protectoseal Flame Arrester discloses element 1(d), above.  (Ex. I, 6/21/2022 Stevick Report at 184-186.)

22.     The Protectoseal Flame Arrester discloses element 1(e), above.  (Ex. I, 6/21/2022 Stevick Report at 186-187.)

23.     It would have been obvious to form the Protectoseal Flame Arrester from a synthetic resin.  (*See* element 1(f), above; Ex. I, 6/21/2022 Stevick Report at 187-189, 196.)

24.     The Protectoseal Flame Arrester discloses element 1(g), above.  (Ex. I, 6/21/2022 Stevick Report at 189.)

25.     The Protectoseal Flame Arrester discloses element 1(h), above.  (Ex. I, 6/21/2022 Stevick Report at 189-192.)

26.     The Protectoseal Flame Arrester discloses element 1(i), above.  (Ex. I, 6/21/2022 Stevick Report at 192-193.)

27.     The Protectoseal Flame Arrester discloses claim 9.  (Ex. I, 6/21/2022 Stevick Report at 193-194.)

28.     The Protectoseal Flame Arrester discloses claim 14.  (Ex. I, 6/21/2022 Stevick Report at 194.)

29.     The Protectoseal Flame Arrester discloses claim 17.  (Ex. I, 6/21/2022 Stevick Report at 194-195.)

30.     The Protectoseal Flame Arrester discloses claim 18.  (Ex. I, 6/21/2022 Stevick Report at 195-196.)

**F.     The "Too-Rich-To-Combust" Element**

31.     The Court construed the term, "flash suppressor," of claim 1 of the '132 patent (appearing first in element **1(c)**, above), to mean "a structure configured to retain sufficient liquid fuel to inhibit combustion."  (ECF No. 257 at 2.)

6

***—Mr. Cray's Testing—***

32.     During prosecution of the '075 patent, inventor Thomas M. Cray submitted a declaration in support of his application for a patent.  (Ex. C, Cray 6/18/2015 Decl.)

33.     Responding to the Examiner's arguments, Mr. Cray performed a "submerged" (or "dipped" test) on the cited prior art and a No Spill product.  (Ex. C, Cray 6/18/2015 Decl. at ¶¶ 6-10.)

34.     In his 6/18/2015 declaration, Mr. Cray did not identify the spark energy he used for his "submerged" (or "dipped") tests.  (Ex. C, Cray 6/18/2015 Decl. at ¶¶ 6-10.)

***—Plaintiffs' Testing—***

35.     In their response to Scepter Canada's Interrogatory No. 15, asking the basis for plaintiffs filing suit, plaintiffs stated that they relied on the same testing as disclosed by Mr. Cray in his 6/18/2015 declaration.  Plaintiffs did not identify the spark energy.  (Ex. D, Pls' Resp. to Interrog. No. 15, p. 4.)

36.     Plaintiffs' amended initial infringement contentions disclosed a "spark test" and "second spark test" (more recently referred to as the "dipped" and "shake" tests, respectively) ultimately relied on by Dr. Roby.  Plaintiffs did not identify the spark energy (Ex. E, Pls' Am. Infringement Contentions at Supp. Ex. A1, pp. 6-7.)

37.     In his opening expert report on infringement, for element 1(c) ("flash suppressor"), for every accused product, No Spill's expert Dr. Roby performed what he termed "the dipped test" and "the shake test."  (Ex. F, 6/21/2022 Roby Report at ¶¶ 199 and 200.)

38.     Describing the results of "the dipped tests" for every accused product, Dr. Roby explained that, "[t]he results of the dipped tests showed that when the FMD was dipped in gasoline,

removed and subjected to a spark ignition while still retaining the gasoline in the fuel retention structure, no [*sic*] ignitions were observed."  (Ex. F, 6/21/2022 Roby Report at ¶ 200.)

39.    Describing the results of "the shake tests" for every accused product, Dr. Roby explained that, "in the shake tests, when the gasoline was shaken out of the fuel retention structure and the FMD was subsequently subjected to spark ignition, the vapors ignited."  (Ex. F, 6/21/2022 Roby Report at ¶ 200.)

40.    The results of Dr. Roby's "dipped" and "shake" tests "demonstrated that the fuel retention characteristics of the [accused] FMD provide a mixture in the interior of the [accused] FMD that was too rich to burn when the fuel was retained in the structure, but allowed ignition to occur when the fuel was shaken from the FMD."  (Ex. F, 6/21/2022 Roby Report at ¶ 200.)

41.    Dr. Roby did not disclose the spark energy associated with the automotive spark plug that he used for the testing described in his 6/21/2022 report.  (Ex. F, 6/21/2022 Roby Report.)

42.    Dr. Roby testified that, when performing a "comparative test" for a given FMD, the spark energy does not matter, so long as the same spark energy is used for both tests, and so long as it is shown that an FMD can ignite at the spark energy used.  (Ex. G, 11/23/2020 Roby Tr. at 177:9-179:4, 184:12-185:14, 191:12-192:11.)

*—Scepter's Testing—*

43.    Scepter's expert Dr. Stevick established that the spark energy associated with the automotive spark plug used by Dr. Roby was less than 1 mJ.  (Ex. H, Stevick 1/8/2021 Decl. at ¶¶ 22-34.) Specifically, Dr. Stevick examined the raw data from Dr. Roby's oscilloscope measurements of the spark igniter voltage over time, and explained that Dr. Roby erroneously assumed that the igniter maintained its "peak voltage" of 2842.6 V "during the entire course of the spark," when in fact the energy "quickly decreases to 200 V." (*Id.*, at ¶ 25.)

44.      In his 8/10/2022 reply expert report, for element **1(c)** ("flash suppressor"), for the Scepter FMD and the Protectoseal Flame Arrester, Dr. Stevick replicated "the dipped test" and "the shake test" described by Dr. Roby in his 6/21/2022 Expert Report.  (Ex. K, 8/10/2022 Stevick Report at 9-17.)

45.      The results of Dr. Stevick's dipped tests showed that when the Scepter FMD was dipped in gasoline, removed and subjected to a spark energy of 0.4 mJ while still retaining the gasoline in the FMD, the vapors ignited.  (Ex. K, 8/10/2022 Stevick Report at 13-17.)

46.      The results of Dr. Stevick's shake tests showed that when the gasoline was shaken out of the Scepter FMD and the FMD was subsequently subjected to a spark energy of 0.4 mJ, the vapors ignited.  (Ex. K, 8/10/2022 Stevick Report at 13-17.)

47.      The results of Dr. Stevick's dipped tests showed that when the Protectoseal Flame Arrester was dipped in gasoline, removed and subjected to a spark energy of 0.7 mJ while still retaining the gasoline in the FMD, the vapors ignited.  (Ex. K, 8/10/2022 Stevick Report at 13-17.)

48.      The results of Dr. Stevick's shake tests showed that when the gasoline was shaken out of the Protectoseal Flame Arrester and the Protectoseal Flame Arrester was subsequently subjected to a spark energy of 0.7 mJ, the vapors ignited.  (Ex. K, 8/10/2022 Stevick Report at 13-17.)

49.      The results of Dr. Stevick's dipped tests showed that when the Protectoseal Flame Arrester was dipped in gasoline, removed and subjected to a spark energy of 0.5 mJ while still retaining the gasoline in the FMD, no ignitions were observed.  (Ex. K, 8/10/2022 Stevick Report at 13-17.)

50.      The results of Dr. Stevick's shake tests showed that when the gasoline was shaken out of the Protectoseal Flame Arrester and the Protectoseal Flame Arrester was subsequently

subjected to a spark energy of 0.7 mJ, the vapors ignited.  (Ex. K, 8/10/2022 Stevick Report at 13-17.)

### III.   LEGAL STANDARDS

#### A.   Summary Judgment

A court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. *Id.* at 324.  If the nonmoving party fails to identify evidence to support an essential element of the non-moving party's case, Rule 56 mandates the entry of summary judgment because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *O'Neal v. Thompson*, 54 F. App'x 301, 304 (10th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *O'Neal*, 54 F. App'x at 304. Thus, "[f]actual disputes about immaterial matters are irrelevant to a summary judgment determination."  Indeed, "the mere existence of a scintilla of evidence will not avoid summary judgment; there must be sufficient evidence on which a jury could reasonably find for the nonmoving party." *Alvarado v. J.C. Penney*

*Co.*, 768 F. Supp. 769, 772 (D. Kan. 1991), *aff'd*, 997 F.2d 803 (10th Cir. 1993) (citing *Anderson*, 477 U.S. at 251). "If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted." *Paschal v. Bd. of Cnty. Comm'rs*, No. 07-1017-DWB, 2008 WL 4171836, at *3 (D. Kan. Sept. 5, 2008) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir.1994)).

### B.    Infringement

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent . . . ." 35 U.S.C. § 271(a). In deciding infringement, the Court must first construe the asserted claims to determine their meaning and scope. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Next, the trier of fact must compare the construed claims with the accused infringing product. *See id.*

"To infringe an apparatus claim, the device must meet all of the structural limitations." *Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311–12 (Fed. Cir. 2005). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989).

The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

### C.    Patentable Subject Matter under § 101

Whether patent claims are drawn to patent-eligible subject matter under 35 U.S.C. § 101 is an issue of law for the court to decide. *See Bilski v. Kappos*, 561 U.S. 593, 621 (2010). "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty v. CLS Bank*

*Int'l*, 573 U.S. 208, 216 (2014). These exceptions are "reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (internal citations omitted).

The Supreme Court has established a two-step analytical framework for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 573 U.S. at 217. First, the court must determine "whether the claims at issue are directed to one of those patent-ineligible concepts," such as an abstract idea. *Id*. at 217. Second, if the claims are directed to an abstract idea, the court must "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id*. at 221. An "inventive concept" includes an element or combination of elements that "is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id*. at 217 (citation omitted).

The first step of the *Alice* inquiry examines "the focus of the claims, their character as a whole." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). The second step requires the court to "look[] more precisely at what the claim elements add—specifically, whether, in the Supreme Court's terms, they identify an 'inventive concept' in the application of the ineligible matter to which (by assumption at step two) the claim is directed." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations omitted).

### D.    Invalidity under §§ 102 and 103

35 U.S.C. § 102(a) provides that "[a] person shall be entitled to a patent unless . . . the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent . . . ." To prove that a claim is invalid due to anticipation, the accused infringer must show that "each

and every limitation is found either expressly or inherently in a single prior art reference." *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1322 (Fed. Cir. 2012) (citation omitted).

"Patents are presumed to be valid and invalidity must be proven by clear and convincing evidence." *OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 704 (Fed. Cir. 2012). "Anticipation is a question of fact" and "[w]hat a prior art reference discloses" is also a factual question. *ArcelorMittal France*, 700 F.3d at 1322, 1324.

A claimed invention is invalid if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art. 35 U.S.C. § 103(a). To invalidate a patent claim based on obviousness, a challenger must demonstrate "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (citation omitted); *see also OSRAM Sylvania, Inc.*, 701 F.3d at 706-07. Courts must adopt a flexible approach that asks whether the claimed invention is more than the predictable use of prior art elements according to their established functions. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415-17 (2007). The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. *Id*. at 416.

## IV. THE '075 PATENT IS INVALID FOR CLAIMING A LAW OF NATURE

The "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  Despite this black letter law, the asserted '075 claims rely on "intermolecular forces" existing in nature to claim the result of the "accepted

scientific fact" that "if the fuel-air mixture has too much fuel (becoming too rich), combustion cannot occur."  (Ex. A, '075 Pat. at 2:36-48, 8:42-50.)

Beyond claiming the results of these natural phenomena, the asserted '075 claims add nothing of further value to the art—rather, the claims consist of generic and conventional steps. Federal Circuit case law is clear—"Claiming a result that involves application of a natural law without limiting the claim to particular methods of achieving the result" is patent ineligible.  *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1295 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 2902 (2022).

### A. The asserted claims of the '075 patent, which claim every structure with a "too rich to combust" environment, are an abstract idea and fail Alice step 1.

At *Alice* step 1, the court must "first determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 573 U.S. at 217. In this step, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).

The asserted '075 claims fail *Alice* step one by claiming every possible structure in the neck of a gas can that employs the well-known natural law of a "too-rich-to-combust" environment (that is, a space where there is too much gas vapor and not enough air for fire to spread). This is classic results-oriented claiming that cannot survive scrutiny under 35 U.S.C. § 101.

### 1. The independent claims of the '075 patent merely claim the abstract result of a structure that is "too rich to combust."

The allegations in this case focus on perforated FMDs in the neck of portable gas cans, which have existed for almost a century. (SoMF ¶ 17.)  As explained by the patent, once gasoline flows through these perforations, natural phenomena cause the structure to retain fuel through "intermolecular forces" or surface tension—

> In certain embodiments, the perforations are configured in a manner such that after the liquid fuel has been dispensed from the container and the fuel retention structure is no longer submerged in the liquid fuel, *a quantity of the liquid fuel is retained in the perforations due to intermolecular forces. The intermolecular forces include forces between molecules within the liquid fuel and forces between molecules of the liquid fuel and molecules of the fuel retention structure.* (Ex. A, '075 Pat. at 8:42-50 (emphasis added).)

The asserted '075 claims rely on these natural "intermolecular forces" to claim the results of the "*accepted scientific fact* that . . . if the fuel-air mixture has too much fuel (becoming too rich), combustion cannot occur[.]." (Ex. A, '075 Pat. at 2:36-48.)

Rather than limiting the claims to a particular method of achieving this result, the asserted '075 claims seek the results themselves. The below limitations are illustrative—

> wherein the fuel retention structure is *configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom*,

> wherein the retained quantity of the liquid fuel is *sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion*.

As emphasized above, claim 1 provides no concrete solutions for achieving the claimed result of a structure with a too-rich-to-combust environment in the gas can. Any structure with perforations that happens to abide by this natural law somehow infringes. Thus, there is nothing to "convert, the abstract idea" of creating a too-rich-to-combust environment inside a gas can "into a particular conception of how to carry out that concept." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1346 (Fed. Cir. 2018); *see also Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 939 F.3d 1355, 1365 (Fed Cir. 2019) ("[A] claim to a[n abstract idea] without specifying the means of how to implement the concept is ineligible under Section 101.").[2]

---

[2] *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) ("purely functional nature of the claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea."); *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d

Indeed, it is undisputed that "intermolecular forces" and the results of a too-rich-to-combust environment are well-known and "fundamental" natural laws. *See* ECF No. 257 at 7; *Alice*, 573 U.S. at 216. The Federal Circuit has consistently found "[c]laiming a result that involves application of a natural law without limiting the claim to particular methods of achieving the result" is patent ineligible. *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1295 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 2902 (2022). For instance, in *Am. Axle*, the asserted patent was directed to "tuning a liner" of driveline propeller shafts to achieve certain types of vibration attenuation. *Id*. at 1293. The Federal Circuit found this "requires use of a natural law of relating frequency to mass and stiffness—i.e., Hooke's law." *Id*. at 1294. The Federal Circuit reasoned the asserted claim "merely describes a desired result" because "the claim on its face does not identify the 'particular [tuned] liners' or the 'improved method' of tuning the liners to achieve the claimed result." *Id*. "Claiming a result that involves application of a natural law without limiting the claim to particular methods of achieving the result" is patent ineligible. *Id*. at 1295.

Here, like in *Am. Axle*, the asserted claims go to an abstract idea and apply natural laws, i.e., a too-rich-to-combust environment and the intermolecular forces that create it. For instance, even during prosecution of the '075 patent, Mr. Cray distinguished his application's claims from

---

1285, 1295 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 2902 (2022) ("The Supreme Court has long held that claims that state a goal without a solution are patent ineligible."); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (A claim must have "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it."); *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1265 (Fed. Cir. 2016) ("[C]laims that are 'so result-focused, so functional, as to effectively cover any solution to an identified problem' are frequently held ineligible under section 101");

the prior art asserted by the Examiner by emphasizing that his alleged invention requires the use of natural laws, specifically the results of a fuel-air mixture.[3]

The closest claim 1 of the '075 patent comes to specifying structure that could help achieve the result of a "too rich to combust" environment is its requirement of perforations.  But perforated structures are conventional, and have been used in the neck of gas cans for decades to stop the spread of flames (*see* Ex. I, Dr. Stevick's 6/21/2022 at 24).  For example, claim 1 does not identify any improvement over the prior art Protectoseal products that have been on sale since the 1920s—



*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 82 (2012) ("[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable.").  Further, the **only** reason a perforated structure achieves the claimed result—of creating a too-rich-

---

[3] *See* Ex. C, Cray 6/18/2015 Declaration at 2-3 (asserting the prior art is "different from the structure and functionality of the fuel retention structure of the present invention…which requires that fuel be retained in the retention structure in an amount sufficient to provide *a fuel-air mixture loo rich to support combustion*.").

to-combust environment—is because it relies on the natural "intermolecular forces" at play between the molecular structures of the hydrocarbons and/or the FMD structure itself.

Independent Claim 12 is substantially similar to Claim 1, but expressly requires that "wherein the retained quantity of the liquid fuel is held in the perforations by ***intermolecular forces***." Claims 12 is un-patentable for all the same reasons discussed above.

> **2.     The dependent claims of the '075 patent merely add additional desirable results rather than ideas for achieving them, and additional routine and generic concepts in fuel cans.**

The dependent claims fare no better.  They fail to remedy the above deficiencies, and merely recite more results-oriented steps and routine and conventional characteristics already present in the prior art. For example, asserted claim 4 of the '075 patent adds results-oriented abstract ideas for desirable characteristics for an FMD to have, without disclosing any concrete means for achieving those desirable characteristics.  Specifically, claim 4 only adds that the FMD must be "configured to receive a conventional gasoline pump nozzle" and where "the perforations are configured to permit at least 5 gallons per minute of gasoline to flow through."  These desirable outcomes "are obvious goals that everyone in [an industry] working group [on FMDs] understood needed to be accomplished with any FMD." (Ex. I, Dr. Stevick's 6/21/2022 at 217.)  Indeed, the record is replete with discussions from individuals in the portable gas can industry recognizing that portable gas cans need to be compatible with fuel pumps, and should accommodate a reasonable flow of gasoline through any structure in the opening of those gas cans.  (*See*, *e.g.*, Ex. P, 5/15/2012 Generation 4 Proposal to Blitz, DJ000013, at -14 ("Filter must allow for the 14 gpm flow without kicking off the gas nozzle during filling.").)  Rather than disclose any concrete ideas for achieving these obvious and desirable goals for anyone selling a portable fuel can, the patentee merely claims the desirable results, thereby improperly preempting all such ideas in the FMD industry.  Nothing in claim 4 provides for a unique or novel method for achieving the results

attendant to receiving a nozzle or flow rate—instead, the claims simply recite that the structure be "configured to…[achieve a result.]"  Otherwise, claim 4 simply takes advantage of the natural consequences of a too-rich-to-combust environment caused by intermolecular forces.  Like claim 1, these claimed concepts in claim 4 are directed to an abstract idea and do not convert the abstract idea "into a particular conception of how to carry out that concept." *Interval Licensing*, 896 F.3d at 1346; *see also Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 939 F.3d 1355, 1365 (Fed Cir. 2019) ("[A] claim to a[n abstract idea] without specifying the means of how to implement the concept is ineligible under Section 101.").

Asserted claim 8 of the '075 patent, which depends from claim 7 and thus also claim 6 and claim 1, likewise adds routine and conventional characteristics already used in the industry.[4] Claim 8 requires that the "sidewall" and "bottom wall" both be "at least 25 percent open," and also requires that the structure be "formed of a synthetic resin material." As to the "at least 25 percent open" terms, FMD structures in the neck of gas cans have for decades been "at least 25 percent open" in order to accommodate the same reasonable flow of fuel discussed as to the prior limitation. (*See* Ex. I, Dr. Stevick's 6/21/2022 at 132.)

---

[4] *See* Ex. I, Dr. Stevick's 6/21/2022 Report at 217 (citing Ex. R, Stevick 2010 Email to ASTM members, SCI-0000002804 (addressing "plastic flame arrestors as working just as well as metal for a propagating flame," which is "consistent with our research and testing")); Ex. S, Physical Testing Report for the Efficacy of Plastic Screens vs. Metal Screens As Flame Arresters, RULE 26 REPORT Regarding Joshua Showers, et al. vs. Wal-Mart Stores, Inc. United States District Court, District of South Carolina Case No.: 001-3533-19, by Robert J. Mellon, Ph.D., P.E., Pinnacle Engineering, LLC, 2003 at 4 ("The plastic screen functions as efficiently as a metal screen in preventing a flashback beyond the screen. These findings are supported by the research conducted at Hazen Research in Golden, CO."); Ex. Q, Blitz provisional application, at DEFS-0000000012 (noting the benefits of "the utilization of a polymer and/or nylon material, rather than stainless steel or other metallic material").



As shown below, the Stevick II reference includes an image of a flame arrester with a sidewall at least 25 percent open defining at least a portion of the perforations and with a bottom wall at least 25 percent open coupled to the sidewall that defines a portion of the perforations.

Fig. 10 Photos of a screen-based flame arrestor used in a currently available commercial can (Manufacturer B). The screen arrestor is cylindrical, roughly 45 mm deep and 35 mm in diameter. Flame arrestor assembly fits into the gas can at the spout base.

*See, e.g.,* Stevick II at 463, Fig. 10.

As to the "synthetic resin material" term, Dr. Stevick explains that this too is a "routine, conventional characteristic[] of flame arrestors," citing abundant evidence. (Ex. I, Stevick 6/21/2022 Report at 217 (citing, *e.g.*, Ex. R, Stevick 2010 Email to ASTM (addressing "plastic flame arrestors as working just as well as metal for a propagating flame," which is "consistent with our research and testing")).)[5]

Dr. Roby's rebuttal opinion cites no opposing evidence, but merely states the conclusory assertion that "claims 4, 8, 13 and 17 recite specific structural; requirements to provide a fuel to air mixture that is too rich to combust." (Ex. J, Roby 7/22/2022 Report at ¶ 719.)  The undisputed facts tell a different story—requiring a "25 percent open[ing]" and that the structure be "formed of synthetic resin material" are routine and conventional standards in the industry.  Again like claim 1, claim 8 (and claims 6 and 7 from which it depends) "simply append[s] [these] conventional steps, specified at a high level of generality, to laws of nature, natural phenomena,

---

[5] *See also* Ex. S, Physical Testing Report for the Efficacy of Plastic Screens vs. Metal Screens As Flame Arresters, RULE 26 REPORT Regarding *Joshua Showers, et al. vs. Wal-Mart Stores, Inc.* United States District Court, District of South Carolina Case No.: 001-3533-19, by Robert J. Mellon, Ph.D., P.E., Pinnacle Engineering, LLC, 2003 at 4 ("The plastic screen functions as efficiently as a metal screen in preventing a flashback beyond the screen. These findings are supported by the research conducted at Hazen Research in Golden, CO."); Ex. Q, Blitz provisional application, at DEFS-0000000012 (noting the benefits of "the utilization of a polymer and/or nylon material, rather than stainless steel or other metallic material").

and abstract ideas, [and] ***cannot make those laws, phenomena, and ideas patentable***." *Mayo* at 82 (emphasis added).

Asserted claim 13 of the '075 patent adds the same results-oriented step of claim 4, stating the structure is "configured to permit at least 5 gallons per minute of gasoline to flow[,]" without limiting the claim to any concrete steps for accomplishing this outcome. Likewise, claim 13 is patent ineligible for the same reasons addressed above.

Finally, asserted claim 17 of the '075 patent adds that the "sidewall" has "a height of at least 3 inches and not more than 10 inches."  Like claim 8, these are routine, conventional characteristics, and were already present in a wide variety of existing FMDs, including the Protectoseal and Justrite flame arresters. (Ex. I, Stevick 6/21/2022 Report at 217.) For the same reasons as claim 8, claim 17 is patent ineligible. *See Mayo* at 82.

All of the asserted claims are directed to an abstract idea and cannot be saved by any other portion of the patent. *See Am. Axle*, 967 F.3d at 1293 (holding that relevant Supreme Court case law "focus[es] on the claims, not the specification, to determine section 101 eligibility"); *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) ("[T]he specification cannot be used to import details from the specification if those details are not claimed.").

### 3. The claims of the '075 patent preempt all methods for causing the internal environment to exceed the UFL, which further indicates their disclosure of an abstract concept.

As discussed above, it is undisputed that perforated structures have been used in the neck of gas cans for decades.  (*See* Ex. I, Stevick 6/21/2022 Report at 24.)  Further, the asserted claims of the '075 patent do no not identify any specific way for achieving a too-rich-to-combust environment in a gas can—instead, ***the claims recite only that such environment is created through the use of perforated structures***.  As a result, the asserted '075 claims are improperly broad and effectively preempt all future methods of exploiting a natural law.  "The breadth with

which [the asserted claims] are written further indicates that the claim[s] [are] directed to the abstract idea" of putting a structure in the neck of a gas can that makes the environment too rich to combust. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019); s*ee also Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) ("[P]reemption may signal patent ineligible subject matter[.]").

The Federal Circuit has consistently found invalid claims that "encompass[] all solutions for achieving a desired result." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018). Here, the asserted claims were "drafted in such a result-oriented way that they amount[] to encompassing the 'principle in the abstract' no matter how implemented." *Id*. Rather than try to patent a particular concrete means for achieving an FMD that causes the environment inside a gas can to be too-rich-to-combust, Mr. Cray's asserted claims (and claim 1 of the '075 patent in particular) seek to lock up this entire idea from innovation by the industry.  As Dr. Stevick concludes, citing abundant evidence with only a conclusory response from Dr. Roby, a person of ordinary skill in the art "would understand this basic law of nature and would read this patent claim and understand that Mr. Cray had attempted to patent the entire idea of an FMD that makes a gas can too rich to combust," thus "cutting off the opportunity for an actual innovation on concrete ideas for achieving this idea (assuming they would even be feasible and effective in practice)." (Ex. I, Stevick 6/21/2022 Report at 217.)

No Spill's expert, Dr. Richard J. Roby, argues that the '075 Patent "certainly does not block that metal flame arrestor technology from being used today." (Ex. J, Roby 7/22/2022 Report at ¶ 717.)  However, this argument is unavailing.  Nothing in the impermissibly broad asserted '075 claims (as further broadened by No Spill's theories in this case) prevents Mr. Cray from suing the manufacturer of a traditional prior art flame arrester, so long as it happens to retain enough fresh

gasoline to be too-rich-to-combust, which—as a practical matter and by virtue of natural "intermolecular forces"—is any plastic device with holes placed inside a portable fuel can. (*See* Ex. K, Stevick 8/10/2022 Report at 64.)[6]

This point is further evidenced by the case at hand. The accused products improve safety by applying prior art concepts to pass the ASTM flame test developed by wide-ranging representatives in the industry, and this test does not involve liquid gasoline. *Id.* However, Mr. Cray has still accused this product of infringing the '075 patent, "even though the ASTM test shows it does not need to retain liquid fuel to pass the industry-accepted test for flame safety[.]" *Id.* As written, the claims of '075 patent "encompass[] all solutions for achieving a desired result" and thus are directed to an abstract idea. *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018).

As the asserted claims here are directed to an abstract idea, the claims fail *Alice* step one.

**B.     The asserted claims of the '075 patent also fail *Alice* step 2 because they do not recite an inventive concept.**

The claims also fail *Alice* step two by simply claiming desirable results—like a fast pouring speed for a gas can (without claiming concrete ideas for achieving those results), and otherwise adding well-known, generic components. In other words, the asserted '075 claims fail *Alice* step 2 because they do not recite any inventive concept to transform the claimed abstract idea into patent-eligible subject matter. *See Alice*, 573 U.S. at 217. Instead, the asserted claims are "recited at a high level of generality and merely invoke[] well-understood, routine, conventional

---

[6] Of the asserted claims of the '075 patent, only claim 8 specifies a material to use, limiting the material of the fuel retention structure to any "synthetic resin material." If it benefitted No Spill to do so, it would likely cite the same abundant evidence cited by Dr. Stevick, showing that the choice between plastic and metal for FMDs was a known design choice prior to 2012, to argue that these metal prior art flame arresters infringe under the doctrine of equivalents.

components to apply the abstract idea identified above." *Yu v. Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021).

Claim 1, for instance, recites only generic, well-known, and off-the-shelf gas canister components. It discloses a "fuel container[,]" "hollow tank body[,]" "fuel dispensing assembly… to dispense the liquid fuel from the container[,]" and "fuel retention structure" (an FMD).  Claim 1 does not describe any special properties of these generic components.  Indeed, the claim recites a "fuel retention structure" with a "plurality of perforations through which the liquid fuel must flow[,]" but perforated FMDs already existed in the prior art for decades. (Ex. I, Stevick 6/21/2022 Report at 24.)  Additionally, the claimed result of a too-rich-to-combust environment created by intermolecular forces cannot qualify as an inventive concept, as this was well known in the prior art. (*Id.* at 26.)  No Spill's own expert, Dr. Roby, even admits that it is a "quite unremarkable proposition, that if sufficient gasoline is stored in a fuel container, the fuel vapor-air mixture in the headspace of the container will be above the UFL." (Ex. J, Roby 7/22/2022 Report at ¶ 313.)

The asserted dependent claims fare no better, as they only add more conventional and industry-used components.  Asserted claims 4 and 13 solely add "a *conventional* gasoline pump nozzle" (emphasis added) to the generic components of claim 1. Asserted claims 8 and 17, including the claims on which they depend, require the "the fuel retention structure" to have a generic "sidewall" and "bottom wall[.]"  Finally, asserted claim 8 also states "the fuel retention structure is formed of a synthetic resin material[,]" but this conventional characteristic of flame arrestors was already present in the prior art as shown by the unrebutted evidence cited above.

The alleged invention, then, could hardly be claimed more generically.  The asserted claims fail to recite any unconventional aspects of the claimed components.  Accordingly, the asserted claims fail *Alice* step 2 for this reason alone. *See Two-Way Media Ltd. v. Comcast Cable*

*Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (no inventive concept where claims use "generic functional language" to achieve purported solution).

No Spill's expert, Dr. Roby, states in conclusory fashion that the combination of the requirements of claims 1 and 12 is "not obvious, nor was it well-understood, routine or conventional at the time of the invention[,]" without pointing to any evidence or analysis for why this is so. (Ex. J, Roby 7/22/2022 Report at ¶ 718.) Contrary to Dr. Roby's unsubstantiated report, the ordered combination of the elements in the asserted claims fails to yield an inventive concept. As discussed above, none of the claim elements—e.g., "fuel dispensing assembly," "fuel retention structure," "perforations"—improve the prior art, or otherwise describe a specific and non-conventional way of achieving a too-rich-to-combust environment caused by intermolecular forces. In *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, the Federal Circuit held that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces," but no such non-conventional or non-generic arrangement is present here. *See* 827 F.3d 1341, 1350 (Fed. Cir. 2016).

That Dr. Roby's report only argues in conclusory fashion that the combination of the requirements of the claims is not "well-understood, routine or conventional" without stating what specifically makes the combination unconventional, betrays there is no inventive concept present in the claims. (Ex. J, Roby 7/22/2022 Report at ¶¶ 716-720.)  Dr. Roby's assertion that the combination of claim elements are not routine or conventional "amounts to no more than a restatement of the assertion that the desired results are an advance." *See Am. Axle,* 967 F.3d at 1299.  As explained above, these desired results present in the asserted claims are directed to ineligible subject matter, and "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept required to cross the line into eligibility." *Id.* (internal

quotations omitted); *ChargePoint*, 920 F.3d at 775 ("[T]he abstract idea itself ... cannot supply the inventive concept at step two.").  The asserted claims "disclose[] no other inventive concept. The real inventive work lies in figuring out how to design" and configure a particular FMD that creates an environment too-rich-to-combust "and no such inventive work is recited" in the asserted claims. *Am. Axle*, 967 F.3d at 1299.  Thus, the combination of elements in the asserted claims, which only describe desired results, cannot save the claims at *Alice* step 2.

Because the '075 patent claims are directed to an abstract idea implemented in a conventional manner by well-known components, the patent should be found invalid under 35 U.S.C. § 101.

**C.    No genuine issue of material fact exists, and the Court should grant summary judgment that the asserted claims of the '075 patent are invalid as directed to un-patentable subject matter.**

Under Tenth Circuit law, "[a] genuine issue of material fact cannot be shown from merely conclusory allegations. In order to be of any value to the judicial process at the summary judgment stage, an expert's opinion must, at a minimum, set forth a process of reasoning beginning from a firm foundation." *Roderick v. XTO Energy, Inc.*, No. 08-1330-EFM-GEB, 2016 WL 4039641, at *6 (D. Kan. July 28, 2016) (internal quotations omitted, *aff'd*, 955 F.2d 641 (10th Cir. 1992)).[7] As described above, here No Spill's invalidity expert provided only conclusory statements regarding the patentability of the '075 patent under 35 U.S.C. § 101. (Ex. J, Roby 7/22/2022 Report at ¶¶ 718-719.) Because "[a] genuine issue of material fact cannot be shown from merely conclusory

---

[7] *See also City of Chanute, Kan.*, 743 F. Supp. at 1445; *Kitto v. Farmers Ins. Co.*, 39 F.3d 1192 (10th Cir. 1994) ("[A] conclusory assertion…cannot create a genuine dispute about the underlying facts."); *Glacier Const. Co. v. Travelers Prop. Cas. Co. of Am.*, 569 F. App'x 582, 591 n.6 (10th Cir. 2014) (A "conclusory opinion does not establish a genuine issue of material fact."); *see also Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed.Cir.1997) (affirming summary judgment of invalidity because statements of patentee's expert were conclusory and thus failed to raise a genuine issue of material fact).

allegations," there are no fact issues regarding the invalidity of the asserted claims that have been preserved for trial. *Roderick*, 2016 WL 4039641, at *6. Thus, this Court should grant summary judgment that the asserted claims of the '075 patent are invalid under 35 U.S.C. § 101.

## V.   THE '132 PATENT IS EITHER NOT INFRINGED OR IT IS INVALID

No Spill's case rests on the performance of two simple tests—*if* (1) an FMD, dipped in gasoline, does not ignite ("the dipped test"), *and* (2) an FMD, dipped in gasoline and shaken, does ignite ("the shake test"), *then* the FMD infringes.  (SoMF ¶¶ 35-41).  Scepter's expert Dr. Glen Stevick duplicated these tests for both an accused device and a prior art device (Protectoseal) and demonstrated that they performed identically, summarized in the below charts—

*—Chart A—*

| Device | Input VAC | Spark Gap | Saturated (not shaken) | Ignition | Energy (mJ) |
|---|---|---|---|---|---|
| Scepter | 42 | < 1/32" | No | Yes | 0.4 |
| Scepter | 42 | < 1/32" | Yes | Yes | 0.4 |
| Protectoseal | 42 | < 1/32" | Yes | Yes | 0.7 |
| Protectoseal | 42 | < 1/32" | No | Yes | 0.7 |

*—Chart B—*

| Device | Input VAC | Spark Gap | Saturated (not shaken) | Ignition | Energy (mJ) |
|---|---|---|---|---|---|
| Protectoseal | 34 | 1/64" | Yes | No | 0.5 |
| Protectoseal | 34 | 1/64" | No | Yes | 0.5 |

Either the asserted '132 patent claims are invalid, as shown in Chart B, above, or the asserted '132 patent claims are not infringed, as shown in Chart A.[8]  Indeed, a Protectoseal device that has been on sale since the 1920s performs the same under those exact tests (SoMF ¶¶ 43-50). Scepter's technical expert Dr. Stevick represents these test results in the following images—

---

[8] As Dr. Stevick explains: "This does nothing to suggest that the accused products are not safe, as they were designed to work as part of a broader system with a portable fuel can and spout, and pass ASTM flame testing in that context, which as I have previously explained is the correct one. Rather, this shows that the accused products function like the prior art Protectoseal product, which Dr. Roby explains is 'a very effective design for removing heat from a flame.'" (Ex. K, p. 13, n.7).



(Ex. K, 8/10/2022 Stevick Report at 17.)  No Spill served a sur-reply expert report solely on this Protectoseal testing, but No Spill's sole critique of that testing sidesteps competent evidence with conclusory and unsupported statements, and thus does not create a genuine fact issue under controlling law.  (Ex. L, 8/19/2022 Roby Report.)  There are no genuine fact disputes about these tests being the same, and summary judgment of invalidity is appropriate.  As such, either the '132 Patent is invalidated by Protectoseal, or No Spill has failed to prove infringement.

### A.   Plaintiffs show infringement through a "dipped test" and a "shake test."

Dr. Roby, No Spill's technical expert, served his opening report on infringement on June 21, 2022, opining that Scepter infringes the '132 patent by pointing to videos of a "dipped" and "shake" test on the FMD of the accused products.  (SoMF ¶ 35.)  In the "dipped" test, Dr. Roby (1) dips Scepter's FMD into gasoline, and (2) immediately subjects it to a "sparker," showing that in this condition the FMD *does not* light on fire.  (SoMF ¶ 38.)  In the "shaken" test, Dr. Roby (1) dips Scepter's FMD into gasoline, but then (2) shakes the gasoline out of the FMD, and then (3)

subjects it to a "sparker," showing that in this condition he FMD *does* light on fire.  (SoMF ¶ 39.)
Dr. Roby concludes this shows that in the "dipped" condition the fuel-to-air mixture within the
FMD was above the flammability range, and that in the "shake" condition the fuel-to-air mixture
was within the flammability range.  (SoMF ¶ 40.)  Dr. Roby concluded that this shows the accused
product retains sufficient fuel to bring the area inside the FMD over the upper flammability limit,
as required by each asserted claim of the '132 Patent.  Dr. Roby's expert disclosures did not specify
the "spark energy" of the sparker used for this test.  (SoMF ¶ 40.)

### B. Replicating Dr. Roby's tests, Dr. Stevick determined that the accused products and the prior art Protectoseal products perform the same.

Dr. Stevick's reply report on invalidity replicated that exact testing as to the prior art
Protectoseal product, which has been on sale since the 1920s, long before any asserted priority
date of the '132 patent.  (SoMF ¶¶ 17, 43.)  That is, Dr. Stevick replicated this testing on the
Protectoseal product, repeating every parameter disclosed by Dr. Roby, and filling in all
undisclosed parameters with what a skilled artisan would have deemed appropriate.[9]  Dr. Stevick
found that at relatively low spark energies (less than 1 mJ), both the accused product and the
Protectoseal product ignited in both the "shake" and "dipped" condition.  As Dr. Stevick lowered
the spark energy to 0.5 mJ, however, he found that the Protectoseal product behaved in the exact
way that Dr. Roby finds infringing—the Protectoseal product did not ignite in the "dipped"
condition, but did ignite in the "shaken" condition.  Dr. Stevick summarized these results in the
above image. (SoMF ¶ 45-50.)

---

[9] As explained by Dr. Stevick in his report, he conducted this testing for his reply report on
invalidity because at the time he served his opening report on invalidity he could not be sure which
infringement test Dr. Roby would rely on, given the broad disclosures of Plaintiff on potential tests
for infringement in response to Scepter Canada Interrogatory No. 26.  (SoMF ¶ 43; Ex. **M** No
Spill's 2d Supp. Resp. to Interrog. No. 26 at 2-4.)

**C.** **Dr. Roby's 9/18/2022 Report fails to substantively rebut Dr. Stevick, or otherwise raise a genuine issue of material fact.**

By agreement of the parties, on August 18, 2022 Dr. Roby served a supplemental reply report specifically addressed to Dr. Stevick's Protectoseal testing, but that supplement does not raise any genuine fact issue on whether the Protectoseal product invalidates the '132 patent. (Ex. L, 8/19/2022 Roby Report.) Dr. Roby does not address any aspect of Dr. Stevicks' Protectoseal testing, except for the spark energy, a parameter that Dr. Roby did not himself even disclose in his opening infringement report. First, Dr. Roby comments in a negative tone about Dr. Stevick's calculations of spark energy (Ex. L, 8/19/2022 Roby Report at ¶ 11.). But Dr. Roby does not opine that Dr. Stevick's data leads to a different spark energy than that calculated by Dr. Stevick, or point to any additional data Dr. Roby would need to make that determination. Second, Dr. Roby now claims that Dr. Roby's testing for his opening infringement report actually had a spark energy of 10 mJ, and criticizes Dr. Stevick's spark energy as being too low, claiming that "an adequate test needs to be run with at least 4 mJ of spark energy across the flammability limits of gasoline." (Ex. L, 8/19/2022 Roby Report at ¶ 19.) Dr. Roby's criticisms in his supplemental reply report do not create a genuine fact issue for the jury for several reasons.

**1.** **No Spill is estopped from criticizing testing based spark energy.**

First, Plaintiffs are estopped several times over from challenging an infringement test for using an incorrect spark energy. The inventor's declaration to the patent office during prosecution history discussed only the "submerged" (or "dipped") test on certain FMDs, and did not disclose the spark energy he used for this test. (SoMF ¶¶ 32-34.) Plaintiffs' interrogatory response on their basis for filing this lawsuit said they would rely on the same testing as that inventor declaration, and again did not specify a spark energy for testing. (SoMF ¶ 35.) Plaintiffs' amended infringement contentions disclosed both the "dipped" and "shake" tests now used by Dr. Roby,

but still did not disclose a spark energy for testing.  (SoMF ¶ 36.)  This information was only later revealed through direct requests from Defense counsel.  When Plaintiffs answered an interrogatory asking for all tests known to a POSA for testing whether something is over the upper flammability limit, Plaintiffs specified certain parameters (e.g., use fresh gasoline), but provided no parameters for spark energy.[10]  This, even though Defendants repeatedly stated that they would be relying on this response, and would move to strike any criticism based on parameters not disclosed in this response.[11]  Finally, Dr. Roby's opening infringement report in this case provided newly performed "dipped" and "shake" tests with accompanying videos, but once again did not provide any information about spark energy.  (SoMF ¶ 41.)  Having refused over and over to specify any particular spark energy for these tests, Plaintiffs should be estopped from now criticizing this fatal Protectoseal testing on this basis.

> ### 2.    The unrebutted evidence shows that Dr. Stevick used the correct spark energy for his testing.

Second, Dr. Roby's criticism that the Protectoseal testing should have used a spark energy above 4 mJ does not create a genuine fact issue, as the unrebutted evidence shows Dr. Roby's own infringement testing used less than 1 mJ, just like the Protectoseal testing.  (SoMF ¶ 43.)  Indeed,

---

[10] (Ex. M, No Spill's 2d Supp. Resp. to Interrog. No. 26 at 2-4.)  Plaintiffs will doubtlessly claim that they disclosed specifics as to spark energy by citing to Dr. Roby's deposition transcript in its entirety, but one comment buried in hundreds of pages of indiscriminately cited declarations and testimony is not properly disclosed under the circumstances. *See Lab'y Skin Care, Inc. v. Ltd. Brands, Inc.*, 661 F. Supp. 2d 473, 479 (D. Del. 2009). This is especially so where, as discussed below, the cited material also states that spark energy does not matter for a "comparative test." (SoMF ¶ 42.)

[11] *See* Ex. N, 2d Election of Asserted Prior Art at 2 ("[T]his election is made in reliance on the parameters identified by No Spill in response to Interrogatory No. 26"); *see also* Ex. O, 1/25/2022 Scepter Email ("With respect to SC Interrogatory No. 26, we explained that your response still fails to identify the parameters necessary to reliability re-create the results for any identified testing method. We explained that if [No Spill] did not supplement that we will move to strike any later argument about such parameters that was not properly identified with sufficient specificity in this response.").

when Dr. Roby *finally* disclosed his view that his testing for the amended infringement contentions in this case used a spark energy above 10 mJ, Defendants requested the data supporting that calculation.  Reviewing that data, Dr. Stevick explained in detail that Dr. Roby's calculations contained errors, and that this data actually showed a spark energy of 0.7 mJ.  (SoMF ¶ 43.) Despite several opportunities to do so, Dr. Roby never responded to Dr. Stevick's calculation, supported by Dr. Roby's own data, for why Dr. Roby's spark energy was 0.7 mJ. (SoMF ¶¶ 44-50.)  Instead, Dr. Roby continues to state in conclusory fashion that his testing used over 10 mJ.

Such conclusory statements in the face of contrary detailed explanations with supporting data do not, under controlling law, create a genuine fact issue for trial. *See, e.g. Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment.").  Thus, there is no genuine dispute that Dr. Roby's infringement testing and Dr. Stevick's Protectoseal testing both use less than 1 mJ of spark energy.  Dr. Roby's sole criticism of the Protectoseal testing, that it should have used more than 4 mJ of spark energy, therefore does not create a genuine fact issue for trial on invalidity. Alternatively, this criticism, even if accepted as true, would show non-infringement of both asserted patents under the undisputed facts of this case, since every asserted patent claim requires an FMD that retains sufficient fuel to create an environment over the upper flammability limit, and there is no evidence from which a reasonable jury could conclude that Dr. Roby tested this issue at a spark energy above 4 mJ as he contends is required.

### 3. Ultimately, for a "comparative test," spark energy does not matter under Plaintiffs' own theories.

Third, under Dr. Roby's own testimony, the "dipped" and "shake" tests are a "comparative test" where the results speak for themselves without needing to know the spark energy.  This independently prevents any material fact issue from Dr. Roby's sole criticism of the Protectoseal

test, which is that it should have used a spark energy above 4 mJ.  Dr. Roby explained earlier in the case, in defending the usefulness of a similar test for which the spark energy was not known, it is not important to know the spark energy for a "comparative test" so long as the same spark energy is used for the two conditions being compared, and one of those conditions shows that the spark energy is sufficient to cause ignition where conditions allow it. (SoMF ¶ 21.)  Under Dr. Roby's reasoning, since the Protectoseal product ignited under the "shake" test then we know it was within the flammability limits in that condition, and since it did not ignite when subjected to the same spark energy in the "dipped" test then we know it was above the upper flammability limit due to retained fuel.  Here it is undisputed that Dr. Stevick used the same spark energy for each condition of this comparative test, so under Dr. Roby's own reasoning (which he has not recanted or distinguished) Dr. Roby's sole criticism of the Protectosel test is irrelevant.  The '132 Patent is not infringed, or alternatively invalid for this additional reason.

> **4.    Dr. Roby's sole criticism only establishes non-infringement of all asserted '132 claims**

Finally, there can be no doubt on this record that if Dr. Stevick repeated his testing at 4 mJ or more as Dr. Roby urges as his sole criticism, that this would merely show non-infringement under Dr. Roby's own tests.  Dr. Stevicks' testing showed that at 0.4 mJ for the accused products, and at 0.7 mJ for the prior art Protectoseal products, both products ignited under both the "dipped" and "shake" tests. (Ex. K, Stevick 8/10/2022 Report at 14.)  All of the evidence and opinions in this case support that raising those spark energies, as Dr. Roby suggests, would lead to the same results, with the accused product both acting the same as the prior art and not infringing under Dr. Roby's tests.[12]  There is certainly nothing in the record suggesting that increasing the spark energy

---

[12] As Dr. Stevick explains (and Dr. Roby has not tried to rebut): "Each asserted independent claim in this case, and therefore each asserted dependent claim that depends from

would cause either product to suddenly fail to ignite under either the "dipped" or "shake" tests. Dr. Roby's opinions call none of this into question. In fact, Dr. Roby's testing in his supplemental reply expert report only confirms these results. Dr. Roby uses his same testing rig, with an unrebutted spark energy of .7 mJ, to test a prior art Protectoseal product in the "dipped" condition, and found that it ignited in that condition (just as in Dr. Stevick's test). (Ex. K, Stevick 8/10/2022 Report at ¶ 14.) Dr. Roby tellingly never tests the Protectoseal product in the "shake" condition at any spark energy, once again leaving Dr. Stevicks' "comparative" testing on the Protectoseal product completely unrebutted, and establishing invalidity.

### D. There are no genuine issues of material fact that the Protectoseal products disclose the remaining claim limitations.

For each of the remaining claim limitations, Dr. Stevick similarly provided detailed opinions demonstrating that the prior art Protectoseal products disclosed the asserted '132 claims. (SoMF ¶¶ 17-30.) Under controlling law, "[c]onclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008)."); *see also Roderick v. XTO Energy, Inc.*, No. 08-1330, 2016 WL 4039641, at *6 (D. Kan. July 28, 2016) ("A genuine issue of material fact cannot be shown from merely conclusory allegations. In order to be of any value to the judicial process at the summary judgment stage, an expert's opinion must, at a minimum, set forth a process of reasoning beginning from a firm foundation.")

Here, No Spill's invalidity expert, Dr. Roby, only provided conclusory statements regarding whether or not the Protectoseal prior art flame arresters disclosed or rendered obvious

---

them, claims the following or something similar to it in relevant part: "A fuel container comprising … a fuel retention structure" that "is configured to retain a quantity of liquid fuel … wherein the retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion." (*See*, *e.g.*, '075 patent, claims 1, 4, 8) (emph. added)." (Ex. I at 32.)

the asserted '132 claims. For example, Dr. Roby ignores Dr. Stevick's detailed calculations for "open area" (SoMF ¶ 16), and instead states in conclusory fashion that Dr. Stevick "failed to come forward with a basis to find that any claim of the '132 patent is invalid over the Protectoseal Flame Arrester as he has failed to show that the Protectoseal Flame Arrester meets the 'open area' limitation of Claim 1." (Ex. J, Roby 7/22/2022 Report at ¶ 580.)

Dr. Roby further contends, again without any evidence, that "a POSITA would not have been motivated to make the Protectoseal Flame Arrester out of plastic at the time of the invention" because of the differences in the material characteristics of plastic compared to metal. (*Id.* at ¶¶ 585-592.) However, Dr. Roby ignores Dr. Stevick's evidence illustrating that flame arrestors using plastic are just as effective as those using metal, and flame arrestors using plastic were known in the art prior to 2012, and pointing to simultaneous or near-simultaneous invention of plastic flame arresters that passed the relevant flame tests recognized in the industry. (Ex. I, 6/21/2022 Stevick Report at 161-165); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, at 417, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.") Dr. Roby's unsubstantiated allegations do not respond to any of Dr. Stevick's evidence and thus fail to create a genuine issue of material fact. Because "[a] genuine issue of material fact cannot be shown from merely conclusory allegations" of Dr. Roby, there are no fact issues regarding the invalidity of the asserted '132 claims that have been preserved for trial. *Roderick*, 2016 WL 4039641, at *6. Thus, this Court should grant summary judgment that the asserted '132 claims are invalid.[13]

---

[13] *See id.*; *City of Chanute, Kan.*, 743 F. Supp. at 1445; *Kitto v. Farmers Ins. Co.*, 39 F.3d 1192 (10th Cir. 1994) ("[A] conclusory assertion…cannot create a genuine dispute about the underlying facts."); *Glacier Const. Co. v. Travelers Prop. Cas. Co. of Am.*, 569 F. App'x 582, 591 n.6 (10th Cir. 2014) (A "conclusory opinion does not establish a genuine issue of material fact.");

## VI.     CONCLUSION

For the reasons provided above, Scepter respectfully requests that the Court grant Scepter's Motion for Summary Judgment that the '132 patent is not infringed, or alternatively invalid, and Scepter's Motion for Summary Judgment that the '075 patent is invalid under 35 U.S.C. § 101.


Dated: September 19, 2022          Respectfully Submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Jordan T. Bergsten*
    Jordan T. Bergsten, KS #78639
    B. Trent Webb, KS #15965
    Joseph M. Rebein, KS #25912
    Laurie A. Novion, KS #19406
    Scott Sayler, KS #70402
    Ryan D. Dykal, *(pro hac vice)*
    Stefon David, *(pro hac vice)*
    2555 Grand Boulevard
    Kansas City, MO 64108
    T:816.474.6550/F:816.721.5547
    jbergsten@shb.com
    bwebb@shb.com
    jrebein@shb.com
    lnovion@shb.com
    ssayler@shb.com
    rdykal@shb.com
    sdavid@shb.com

David W. Morehan (*pro hac vice*)
600 Travis St., Suite 3400
Houston, TX 77002
T:713-546-5673/F:713-227-9508

---

*see also Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed.Cir.1997) (affirming summary judgment of invalidity because statements of patentee's expert were conclusory and thus failed to raise a genuine issue of material fact); *Davis v. Brouse McDowell, L.P.A.*, 596 F.3d 1355, 1364 (Fed. Cir. 2010) (applying Sixth Circuit law, finding that an "expert report contains no affirmative analysis supporting his opinion on patentability[,]" and holding that the district court properly granted Defendants' motion for summary judgment as "[a]n unsupported opinion such as this cannot and does not create a genuine issue of material fact as to the patentability of [the asserted] inventions").

dmorehan@shb.com

*Attorneys for Scepter Canada, Inc.*
*and Scepter Manufacturing, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 19, 2022, the above and foregoing pleading was filed with the Court using the CM/ECF system which will send notice of electronic filing to all counsel of record.

/s/ *Jordan T. Bergsten*
ATTORNEY FOR DEFENDATS