**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

NO SPILL, LLC and TC CONSULTING, INC.,

                        Plaintiffs,

      v.

SCEPTER CANADA INC., and
SCEPTER MANUFACTURING, LLC,

                 Defendants.

**REDACTED PUBLIC VERSION**

Case No. 2:18-cv-02681-HLT-KGG

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................. 1

II.  RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS ("PSOF") ...................... 1

III.  DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS ............ 10

IV.  SUMMARY JUDGMENT STANDARD ....................................................... 16

V.  THE ACCUSED PRODUCTS ARE NOT "COVERED" BY THE ASSERTED
CLAIMS (PLS' ISSUE 1) ............................................................................ 17

A.  Relevant Legal Principles ................................................................. 18

B.  A Reasonable Jury Could Find in Favor in Favor of Scepter on Non-
Infringement. ................................................................................... 18

1.  Scepter's validated expert testing confirms that the asserted
claims do not cover the asserted claims, and establish a
material issue of fact. ............................................................ 18

2.  Scepter replicated Dr. Roby's testing, conclusively showing
non-infringement, or at least raising contested issues of material fact. .... 20

3.  Dr. Roby's testing and opinions ignore the language of the
claims and thus do not show infringement by the accused products. ...... 21

4.  Plaintiffs mischaracterize the testimony and opinions
of Scepter's experts. ............................................................ 22

VI.  ESTOPPEL DOES NOT APPLY TO ALL OF DEFENDANTS' INVALIDITY
THEORIES FOR THE '132 PATENT (PLS' ISSUE 2) ................................. 23

A.  Scepter did not raise, and reasonably could not have raised, the Eagle,
Justrite, and Protectoseal flame arrester products
during IPR proceedings ................................................................. 24

B.  The Eagle, Justrite, and Protectoseal flame arrester products
are not "cumulative" of the patents and printed publications
raised during the IPR proceedings. ................................................. 26

VII.  THE PTAB'S '075 RULING DOES NOT INVOKE
ESTOPPEL (PLS' ISSUE 4) ....................................................................... 30

VIII. THE BLITZ FLAME ARRESTER QUALIFIES AS
PRIOR ART (PLS' ISSUE 3) ...................................................................... 33

A.  The Blitz Flame Arrester Prior Art Should Not Be Limited to Image 1. ...... 33

B.  What No Spill Refers to as the "Purported Blitz Flame Arrester(s)"
Were Included in Scepter's Invalidity Contentions. ............................. 34

C.  The Daniels Provisional Application Is Available as Prior Art. .................. 36

D.  The Blitz Flame Arrester Qualifies as Prior Art under pre-AIA
35 U.S.C. § 102(g)(2). ..................................................................... 37

1.    Scepter Timely Raised Its Blitz Flame Arrester § 102(g)(2) Defense...... 37

2.    Scepter Can Prove Conception and that Mr. Johnston Was a "Prior Inventor." ................................................................................................... 39

E.    **The Blitz Flame Arrester Qualifies as Prior Art under pre-AIA 35 U.S.C. §§102(a) and 102(b) and AIA 35 U.S.C. § 102(a)(1) as a Public Use or Sale.** ....................................................................... 42

1.    Scepter Has Established that the Blitz Flame Arrester was the Subject of a Public Use. ....................................................... 42

2.    Scepter Has Established that the Blitz Flame Arrester was Ready for Patenting...................................................................... 44

IX.    **THE ASSERTED '132 CLAIMS ARE INVALID (PLS' ISSUE 5)** ........................... 45

X.    **THE '075 CLAIMS ARE NOT DIRECTED TO PATENTABLE SUBJECT MATTER (PLS' ISSUE 6)** ........................................................................ 46

XI.    **THE ASSERTED CLAIMS ARE INDEFINITE (PLS' ISSUE 7)** ........................... 48

XII.    **CONCLUSION** ........................................................................................ 49

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Acceleron, LLC v. Dell, Inc.*, No. 1:12-cv-4123-TCB,
   2020 WL 10353767 (N.D. Ga. Mar. 30, 2020) .................................................. 24, 26, 27, 28

*Advocate Health Care Network v. Stapleton*,
   137 S. Ct. 1652, 198 L.Ed.2d 96 (2017) ........................................................................ 30, 32

*AFG Indus., Inc. v. Cardinal IG Co.*,
   375 F.3d 1367 (Fed. Cir. 2004) ............................................................................................ 18

*Alice Corp. Pty v. CLS Bank Int'l*,
   573 U.S. 208 (2014) .............................................................................................................. 47

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
   939 F.3d 1355 (Fed. Cir. 2019) ............................................................................................ 48

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................................ 16, 17

*Bayer AG v. Elan Pharm. Res. Corp.*,
   212 F.3d 1241 (Fed. Cir. 2000) ............................................................................................ 18

*Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994) .............................................................................................. 39

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .............................................................................................................. 17

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, No. CV 17-1612 (MN),
   2022 WL 2643517 (D. Del. July 8, 2022) ............................................................................ 29

*CliniComp Int'l, Inc. v. Athenahealth, Inc.*, No. A-18-CV-00425-LY,
   2020 WL 7011768 (W.D. Tex. Oct. 28, 2020) ..................................................................... 24

*Cooper v. Goldfarb*,
   154 F.3d 1321 (Fed.Cir.1998) .............................................................................................. 39

*Diamond v. Diehr*, 450 U.S. 175 (1981) ..................................................................................... 48

*Dow Chem. Co. v. Astro-Valcour, Inc.*,
   267 F.3d 1334 (Fed. Cir. 2001) ....................................................................................... 39, 42

*Eastman Chem. Co. v. Acktiengesellschaft*,
   47 Fed. App'x 566 (Fed. Cir. 2002) ..................................................................................... 22

*Finjan, Inc. v. Blue Coat Sys., LLC*,
   283 F. Supp. 3d 839 (N.D. Cal. 2017) ................................................................................. 30

*Geiserman v. MacDonald*,
   893 F.2d 787 (5th Cir. 1990) ............................................................................................... 17

*Gen. Access Sols., Ltd. v. Sprint Spectrum LLC*, No. 2:20-cv-00007-RWS,
   2021 WL 5154085 (E.D. Tex. July 21, 2021) ...................................................................... 24

*Goldman v. Standard Ins. Co.*,
    341 F.3d 1023 (9th Cir. 2003) ................................................................. 19

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*,
    855 F.3d 1356 (Fed. Cir. 2017) .............................................................. 44

*HP Inc. v. MPHJ Tech. Inv., LLC*,
    817 F.3d 1339 (Fed. Cir. 2016) .............................................................. 31

*In re Hall*,
    781 F.2d 897 (Fed. Cir. 1986) ................................................................ 37

*Intell. Ventures I LLC v. Toshiba Corp.*, No. CV 13-453-SLR,
    2017 WL 107980 (D. Del. Jan. 11, 2017) .............................................. 31

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018) .............................................................. 47

*Intuitive Surgical, Inc. v. Ethicon LLC*,
    25 F.4th 1035 (Fed. Cir. 2022) .............................................................. 30

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
    545 F.3d 1340 (2008) ............................................................................. 37

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) .............................................................. 36

*Matsushita Elec. Indus. v. Zenith Radio*,
    471 U.S. 574 (1986) ............................................................................... 17

*Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17-cv-7216,
    2020 WL 5512132 (N.D. Ill. Sept. 14, 2020) .................................. passim

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
    271 F. Supp. 3d 990 (E.D. Wis. 2017) ................................................... 24

*Overhead Door Corp v. Chamberlain Grp., Inc.*,
    194 F.3d 1261 (Fed. Cir. 1999) .............................................................. 18

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998) ................................................................................. 44

*Polaris Indus., Inc. v. Arctic Cat Inc.*, No. CV 15-4475 (JRT/TNL),
    2019 WL 3824255 (D. Minn. Aug. 15, 2019) ....................................... 24

*Precision Fabrics Group, Inc. v. TieTex Int'l*, Nos. 1:13-cv-645/650,
    2016 WL 6839394 (M.D.N.C. Nov. 21, 2016) ...................................... 31

*Process Control Corp. v. HydReclaim Corp.*,
    190 F.3d 1350 (Fed. Cir. 1999) .............................................................. 22

*Ragas v. Tenn. Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1998) ................................................................. 17

*Rockwell Int'l Corp. v. United States*,
    147 F.3d 1358 (Fed.Cir.1998) ................................................................ 19

*SAS Inst., Inc. v. Iancu*,
   200 L. Ed. 2d 695, 138 S. Ct. 1348 (2018) ............................................................................. 24

*Slip Track Sys., Inc. v. Metal-Lite, Inc.*,
   304 F.3d 1256 (Fed. Cir. 2002) .............................................................................................. 44

*Transonic Sys., Inc. v. Non–Invasive Med. Techs. Corp.*,
   143 Fed.Appx. 320 (Fed.Cir. July 25, 2005) ........................................................................ 19

*ViaTech Techs., Inc. v. Microsoft Corp.*, No. CV 17-570-RGA,
   2021 WL 663057 (D. Del. Feb. 19, 2021) ............................................................................ 39

*Warner–Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003) .............................................................................................. 21

*Wasica Finance GmbH v. Schrader International, Inc.*, No. 13-353-LPS,
   2020 WL 1150135 (D. Del. Jan. 14, 2020) ................................................................. 27, 28, 29

**Statutes**

35 U.S.C. § 101 ................................................................................................................................. 46

35 U.S.C. § 102(b) ........................................................................................................................... 37

35 U.S.C. § 103 ............................................................................................................ 11, 12, 24, 26

35 U.S.C. § 112 ..................................................................................................................... 18, 46

35 U.S.C. § 315(e)(2) ............................................................................................................ passim

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................................... 16

# TABLE OF EXHIBITS

U.S. Patent No. 9.174,075 ........................................................................................... **A**

U.S. Patent No. 10,029,132 ......................................................................................... **B**

No Spill's 2d Supp. Resp. to Interrog. No. 26 .................................................... **C**

Dr. Roby's 9/30/2020 Declaration (excerpted) .................................................... **D**

Tom Cray's 5/5/2022 Deposition Tr. (excerpted) ................................................ **E**

Dr. Stevick's 6/21/2022 Expert Report (excerpted) ........................................... **F**

Dr. Roby's 6/21/2022 Expert Report (excerpted) ............................................... **G**

Dr. Stevick's 7/22/2022 Expert Report (excerpted) ........................................... **H**

Status Update on ASTM F 5.10 Testing, 12/3/2013 (DEFS-0000001619) ....... **I**

Dr. Stevick's 8/10/2022 Expert Report (excerpted) ........................................... **J**

Dr. Roby's 8/19/2022 Expert Report ..................................................................... **K**

Petition for IPR (the '132 patent) .......................................................................... **L**

PTAB 7/7/2020 Order Denying Institution (the '075 patent) ........................... **M**

Stevick I ..................................................................................................................... **N**

Stevick II .................................................................................................................... **O**

Frost ............................................................................................................................ **P**

Scepter's 7/28/2022 Invalidity Contentions ....................................................... **Q**

Claim Charts Exs. A-2 and B-3 ............................................................................... **R**

Scepter's 2/24/2021 first supplemental responses to Plaintiff's Interrogatories ................ **S**

Damon Johnston Deposition Transcript (excerpted) ......................................... **T**

Dr. Stevick 8/17/2022 Expert Report .................................................................... **U**

I.    **INTRODUCTION**

No Spill moves for summary judgment on seven grounds, but none offer a credible basis for summary adjudication on the merits. (ECF No. 539.)  For the reasons discussed below, Scepter respectfully submits that all of No Spill's motions for summary judgment should be denied.

II.    **RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS ("PSOF")**

1.    PSOF 1 is admitted.

2.    PSOF 2 is admitted.

3.    PSOF 3 is admitted.

4.    PSOF 4 is admitted.

5.    PSOF 5 is admitted.

6.    PSOF 6 is admitted to the extent Exemplary Accused Products were produced by Scepter as SML-PHSICAL-0000001-SML-PHYSICAL-0000012.   Otherwise, denied; No Spill alleges that the products identified at ¶ 17 of the parties' Pretrial Order ("PTO") (ECF No. 525) are covered by the Asserted Claims.

7.    PSOF 7 is admitted to the extent "Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 7 is denied.

8.    PSOF 8 is admitted.

9.    PSOF 9 is admitted to the extent that portable fuel cans ("PFCs") since the 1920s (including Scepter's identified prior art) are a fuel container having a hollow tank body defining a fuel receiving chamber, and to the extent "Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 9 is denied.  (ECF No. 540-3 at 188:24-189:6.)

10.    PSOF 10 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) have had a main container opening for permitting liquid fuel to flow into and out of the fuel receiving chamber, and to the extent "Scepter Accused Product" means the products

identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 10 is denied.  (ECF No. 540-3 at 188:24-189:6.)

11.　　PSOF 11 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) have had a fuel dispensing assembly adapted to be coupled to the tank body and configured to dispense liquid fuel from the tank body, and to the extent "Scepter Accused Product" means the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 11 is denied. (ECF No. 540-3 at 189:7-15.)

12.　　PSOF 12 is admitted to the extent "Scepter Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525), and that the photo is of an FMD found in those products; otherwise PSOF 12 is denied.

13.　　PSOF 13 is admitted to the extent "Scepter Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525), and that "Scepter FMD" refers to the FMD found in those products; otherwise PSFO 13 is denied.

14.　　Scepter admits that the Scepter FMD installed inside the main container opening in each Accused Product extends more than 2 inches into the fuel container, similar to the prior art PFCs (including Scepter's identified prior art), and to the extent "Scepter Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525), and that "Scepter FMD" refers to the FMD found in those products; otherwise PSOF 14 is denied.  (ECF No. 540-3 at 200:8-16; ECF No. 541-3 at RFA 16.)

15.　　PSOF 15 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) include FMDs, each having more than 100 and less than 10,000 perforations, and to the extent "Scepter FMD" refers to the FMD found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 15 is denied.

16.   PSOF 16 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) provide that liquid fuel must flow through perforations in each of the prior art FMDs in order to disperse liquid fuel, and to the extent that "Scepter Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525), and "Scepter FMD" refers to the FMD found in those products; otherwise PSOF 16 is denied.  (ECF 540-3 at 190:14-23.)

17.   PSOF 17 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) provide that the sum of the open areas of each of the perforations in the prior art FMDs is a sum that is greater than 10 percent and less than 80 percent of the external surface area of the FMD, and to the extent "Scepter FMDs" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 17 is denied.  (ECF 540-3 at 199:23-200:7.)

18.   PSOF 18 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) provide that the sum of the open areas of each of the perforations is a sum that is at least 25 percent of the external surface area of the prior art FMDs, and to the extent "Scepter FMDs" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 18 is denied.  (ECF 540-3 at 193:23-195:6.)

19.   PSOF 19 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) provide that the bottom wall of each of the prior art FMDs is at least 25 percent open, and to the extent "Scepter FMD" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 19 is denied.  (ECF 540-3 at 195:7-17.)

20.   PSOF 20 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) provide that the sidewalls of each of the prior art FMDs is at least 25 percent

open, and to the extent "Scepter FMD" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 20 is denied.  (ECF No. 540-3 at 193:233-195:6.)

21.    PSOF 21 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) provide that the internal volume of each of the prior art FMDs is more than 4 cubic inches and not more than 15 cubic inches, and to the extent "Scepter FMD" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 21 is denied.  (ECF No. 540-3 at 200:8-16.)

22.    PSOF 22 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) provide that the average area of the perforations in each of the prior art FMDs is at least 0.001 square inches and not more than 0.05 square inches, and to the extent "Scepter FMDs" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 22 is denied.  (ECF 540-3 at 199:23-200:7.)

23.    PSOF 23 is admitted to the extent that PFCs since the 1920s (including Scepter's identified prior art) provide that the "average length" of the square holes in each of the prior art FMDs is at least 0.02 inches, and to the extent that "Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525), and "Scepter FMDs" refers to the FMD found in those products; otherwise PSOF 23 is denied.

24.    PSOF 24 is admitted to the extent that prior art PFCs (including Scepter's identified prior art) included FMDs made of a synthetic plastic resin, and to the extent "Scepter FMD" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 24 is denied.  (ECF No. 540-3 at 195:18-23.)

25.    PSOF 25 is admitted to the extent that prior art PFCs (including Scepter's identified prior art) included FMDs configured to receive a conventional gasoline pump nozzle, and to the

extent "Scepter FMD" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 25 is denied.  (ECF No. 540-3 at 197:1-25.)

26.     PSOF 26 is admitted to the extent that prior art PFCs (including Scepter's identified prior art) included FMDs adapted to be filled with gasoline under common gas filling conditions at a rate greater than 5 gallons of gasoline per minute, and to the extent that "Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525), and "Scepter FMD" refers to the FMD found in those products; otherwise PSOF 26 is denied.  (ECF 540-3 at 197:1-25.)

27.     PSOF 27 is admitted to the extent that "Scepter FMD" refers to the FMDs found in the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 27 is denied.

28.     PSOF 28 is denied.  (Ex. H, 7/22/2022 Stevick Rpt. at 32-48; Ex. U, 8/17/2022 Stevick Rpt. at 2-6; Ex. J, 8/10/2022 Stevick Rpt. at 9-17.)

29.     PSOF 29 is admitted to the extent intermolecular forces are a law of nature; otherwise PSOF 29 is denied.

30.     PSOF 30 is admitted.

31.     PSOF 31 is admitted.

32.     PSOF 32 is admitted.

33.     PSOF 33 is admitted.

34.     PSOF 34 is admitted to the extent that the excerpted statements appear in the PTAB's July 7, 2020 decision regarding the '075 patent; otherwise PSOF 34 is denied.

35.     PSOF 35 is admitted.

36.     PSOF 36 is admitted to the extent that the excerpted statement appear in Scepter's Petition for IPR of the '132 patent; otherwise PSOF 36 is denied.

37.     PSOF 37 is admitted to the extent that the statement accurately paraphrases a statement that appears in Scepter's Petition for IPR of the '132 patent; otherwise PSOF 37 is denied.

38.     PSOF 38 is admitted to the extent it reflects measurements summarized in Table 1 of Stevick I and Table 1 of Stevick II; otherwise PSFO 38 is denied.

39.     PSOF 39 is admitted to the extent that the excerpted statements appear in the PTAB's July 2, 2021 decision regarding the '132 patent; otherwise PSOF 39 is denied.

40.     Exhibit A-13 of Scepter's invalidity contentions for the '075 patent is based on Eagle Type I Safety Can, alone or in view of Stevick II, in view of Elias, and in view of Frost GB 674; otherwise PSOF 40 is denied.

41.     Exhibit B-2 of Scepter's invalidity contentions for the '132 patent is based on Eagle product and/or Justrite product, alone or in view of Stevick I, in view of Stevick II, in view of Justrite Brochure, and in view of Flider, and in view of Frost US 083; otherwise PSOF 41 is denied.

42.     PSOF 42 is admitted to the extent Exhibit B-2 of Scepter's invalidity contentions for the '132 patent includes the cited statement; otherwise PSOF 42 is denied.

43.     PSOF 43 is admitted to the extent that Exhibit B-2 of Scepter's invalidity contentions for the '132 patent includes the cited statement; otherwise PSOF 43 is denied.

44.     PSOF 44 is admitted to the extent that Stevick I includes the excerpted Table 1; otherwise PSOF 44 is denied.

45.     PSOF 45 is denied as not supported by the cited evidence; for example, Table 1 at ECF 541-7 at 11 does not show that the Eagle Type 1 Flame Arrester and the Justrite Flame Arrester have the same "mesh hole size."

46.     PSOF 46 is admitted.

47.     PSOF 47 is denied as not supported by the cited evidence.

48.     Exhibit A-12 of Scepter's invalidity contentions for the '075 patent are based on Justrite® flame arrester, alone or in combination with the Justrite® Brochure, in view of Stevick II, in view of Elias, and in view of Frost GB 674; otherwise PSFO 48 is denied.

49.     Exhibit B-2 of Scepter's invalidity contentions for the '132 patent is based on Eagle product and/or Justrite product, alone or in view of Stevick I, in view of Stevick II, in view of Justrite Brochure, and in view of U.S. Patent No. 6,390,153 ("Flider"), and in view of U.S. Patent No. 2,850,083 ("Frost US 083"); otherwise PSOF 49 is denied.

50.     PSOF 50 is admitted to the extent that Exhibit B-2 of Scepter's invalidity contentions for the '132 patent includes the cited statement; otherwise PSOF 50 is denied.

51.     PSOF 51 is admitted.

52.     PSOF 52 is admitted.

53.     PSOF 53 is admitted.

54.     PSOF 54 is admitted to the extent that Flider includes the excerpted Figure 5; otherwise PSOF 55 is denied.  Flider is directed to a valve body for safety cans.  (ECF No. 541-15 at 1:1.)

55.     PSOF 55 is admitted.

56.     PSOF 56 is admitted to the extent that Mack relates to a safety container for storing and dispensing flammable liquids, and that the cited statement describes one embodiment; otherwise PSOF 56 is denied.

57.     PSOF 57 is admitted.

58.     PSOF 58 is denied as not supported by the cited evidence.

59.     PSOF 59 is denied as not supported by the cited evidence.

60.     PSOF 60 is denied as not supported by the cited evidence.

61.     PSOF 61 is denied as not supported by the cited evidence.

62.     PSOF 62 is admitted.

63.     PSOF 63 is admitted.

64.     PSOF 64 is admitted.

65.     PSOF 65 is admitted.

66.     PSOF 66 is admitted.

67.     PSOF 67 is denied as not supported by the cited evidence.

68.     Exhibit A-2 of Scepter's invalidity contentions for the '075 patent is based on Blitz Flame Arrester, alone or in view of Stevick II, in view of Elias, and in view of Frost GB 674; otherwise PSOF 68 is denied.

69.     Exhibit B-3 of Scepter's invalidity contentions for the '132 patent is based on Blitz U.S.A., Inc. Flame Arrester ("Blitz Flame Arrester"), alone or in view of Stevick I, in view of Stevick II, in view of Flider, and in view of Frost US 083; otherwise PSOF 69 is denied.

70.     PSOF 70 is denied.  *See*, *e.g.*, ECF No. 517 at 3-5.

71.     PSOF 71 is admitted.

72.     PSOF 72 is admitted.

73.     PSOF 73 is admitted.

74.     PSOF 74 is admitted.

75.     PSOF 75 is denied as not supported by the evidence.

76.     PSOF 76 is admitted.

77.     PSOF 77 is admitted to the extent that Mr. Johnston's design proposed on May 15, 2012 had narrow elongated slots; otherwise PSOF 77 is denied.

78.     PSOF 78 is admitted.

79.     PSOF 79 is denied as not supported by the evidence.

80.     PSOF 80 is denied as not supported by the evidence.

81.     PSOF 81 is admitted to the extent Mr. Johnston stated that it was "probably not a good thing" because "those are made out of prototype material"; otherwise PSOF 81 is denied. (ECF No. 540-11 at 207:24-208:5.)

82.     PSOF 82 is admitted.

83.     PSOF 83 is admitted.

84.     PSOF 84 is admitted.

85.     PSOF 85 is admitted.

86.     PSOF 86 is admitted.

87.     PSOF 87 is admitted.

88.     PSOF 88 is admitted.

89.     PSOF 89 is admitted.

90.     PSOF 90 is admitted.

91.     PSOF 91 is denied.

92.     PSOF 92 is admitted to the extent that prior art PFCs (including Scepter's identified prior art) included fuel retention structures configured to retain a quantity of the liquid fuel in the chamber when the container is tipped or inverted to dispense the liquid fuel therefrom, and to the extent that "Accused Products" means the products identified at ¶ 17 of the PTO (ECF No. 525); otherwise PSOF 26 is denied.

93.     PSOF 93 is admitted to the extent that prior art PFCs (including Scepter's identified prior art) included perforations configured such that the liquid fuel is required to flow through the

perforations in order to fill the container with the liquid fuel, and to the extent that "Accused Products" means the protects identified at ¶ 17 of the PTO (ECF No. 525); PSOF 93 is otherwise denied.

## III.   DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS[1]

94.   In 2010, Stevick co-authored a report about portable gas can container explosions and their preventions ("Stevick I").[2] Stevick I compared the geometry and dimensions of flame arresters in three commercially available gasoline containers: JUSTRITE, EAGLE, and Blitz.  (*See* Ex. N, Stevick I.)

95.   In 2011, Stevick co-authored a journal article about portable gas can containers explosions and their preventions ("Stevick II").[3] Stevick II compared the geometry of three additional flame arresters, including a plastic flame arrester.  (*See* Ex. O, Stevick II.)

96.   Frost discussed the physics principles behind the retention of fuel in a perforated cell and honeycomb structure that lined a fuel tank.  (*See* Ex. P, Frost.)

97.   Scepter's IPR Petition argued that a person of skill in the art ("POSA") would have been motivated to combine the teachings of Stevick I and Stevick II to implement a plastic version of the Eagle flame arrester for Claims 1-15 of the '132 patent. (*See* Ex. L, Petition for IPR (the '132 patent) at pp. 23-34).

98.   Scepter's IPR Petition also argued that a POSA would have been motivated to combine the teachings of Stevick I and Stevick II with the physics principles taught in Frost, to know that the perforations in the cell are able to retain fuel when the fuel tank is inverted and

---

[1] Hereinafter, "DSoF."
[2] Glen Stevick, David Rondinone, Allan Sagle, and Joseph Zicherman, "Portable Plastic Gasoline Container Explosions and Their Prevention," Society of Forensic Engineers and Scientists (2010).
[3] Glen Stevick, Joseph Zicherman, David Rondinone, and Allan Sagle, "Failure Analysis and Prevention of Fires and Explosions with Plastic Gasoline Containers" Journal of Failure Analysis and Prevention, Volume 11, Issue 5, pp. 455-465 (October 2011) ("Stevick II").

maintain an air-fuel mixture too rich to combust. (*See* Ex. L, Petition for IPR (the '132 patent) at pp. 51-56).

99.     During discovery, No Spill identified "three tests that could be performed to 'test a device to determine whether it retained sufficient fuel to provide a fuel-air mixture above the UFL," including an "'oxygen sensor-based system' test."  (Ex.C, Pls' 2d Supp. Resp. to Interrog. No. 26 at 2.)

100.     During discovery, No Spill further explained that,

Any test performed to determine whether a device retains sufficient fuel to provide a fuel vapor-air mixture that is too rich to support combustion (i.e. above the upper flammability limit) should be conducted under normal, ambient laboratory conditions using fresh gasoline. The test FMD should be completely submerged in the fresh gasoline. The test FMD should then be removed from the fresh gasoline and the tester should then promptly: (1) obtain a representative sample of the vapor space inside the FMD for further chemical analysis; or (2) insert an appropriate spark source into the vapor space inside the FMD and then activate the spark source.  (Ex.C, Pls' 2d Supp. Resp. to Interrog. No. 26 at 4.)

101.     The upper flammability limit ("UFL") for gasoline is a 7.6% fuel-to-air mixture.

(*Id*. at 33; Ex. G, 6/21/2022 Roby Rpt. at 21.)

102.     In his 6/21/2022 opening expert report, Dr. Stevick opines that the Justrite flame arrester alone or in combination with Frost renders the asserted claims invalid under 35 U.S.C. § 103.  To support his opinion, Dr. Stevick relies on the Eagle flame arrester; '075 patent; Stevick I; Stevick II; Frost; Cray Declaration submitted to the Patent Office 9/16/14; Elias Thesis; Blitz plastic flame arrester; Health & Safety Executive, Health & Safety Series Booklet HS(G)11: Flame Arresters and Explosion Reliefs (1980), Ali S. Rangwala & Robert G. Zalosh, Analysis of Mitigation Strategies Associated with Flame Propagation Within the Pour Spout of a Portable Gasoline Container, Worcester Polytechnic Institute proposal to ASTM (2011); Laurence G. Britton, Avoiding Static Ignition Hazards in Chemical Operations, Center for Chemical Process Safety of the American Institute of Chemical Engineers (1999); *Markman* Order; SCI-

0000002804; May 18, 2022 Deposition of Sergio Garza and Exhibits; June 6, 2012 WPI presentation of WPI to ASTM F 15.10; September 18, 2012 WPI Presentation to ASTM F 15.10, No Spill's Second Supplemental Response to Interrogatory No. 26; and testing pursuant to No Spill's infringement tests.

103.     In his 6/21/2022 opening expert report, Dr. Stevick opines that the Eagle flame arrester alone or in combination with Stevick II, the Elias Thesis, and/or Frost renders the asserted claims invalid under 35 U.S.C. § 103.  To support his opinion, Dr. Stevick relies on the Justrite flame arrester; '075 patent; Stevick I; Stevick II; DEFS-0000010359; JUSTRITE-0000002; JUSTRITE-0000003; DEFS-0000010361; Justrite® Flame Arrester Brochure; JUSTRITE-0000002; *Markman* Order; No Spill's Second Supplemental Response to Interrogatory No. 26; Cray Declaration submitted to the Patent Office 9/16/14; Elias Thesis; SCI-0000002804; Health & Safety Executive, Health & Safety Series Booklet HS(G)11: Flame Arresters and Explosion Reliefs (1980); Ali S. Rangwala & Robert G. Zalosh, Analysis of Mitigation Strategies Associated with Flame Propagation Within the Pour Spout of a Portable Gasoline Container, Worcester Polytechnic Institute proposal to ASTM (2011); Laurence G. Britton, Avoiding Static Ignition Hazards in Chemical Operations, Center for Chemical Process Safety of the American Institute of Chemical Engineers (1999); Frost; Blitz plastic flame arrester; May 18, 2022 Deposition of Sergio Garza and Exhibits; June 6, 2012 WPI presentation of WPI to ASTM F 15.10; September 18, 2012 WPI Presentation to ASTM F 15.10; and testing pursuant to No Spill's infringement tests.

104.     In his 6/21/2022 opening expert report, Dr. Stevick opines that the Protectoseal flame arrester alone or in combination with Frost and/or the Anschiks '656 patent renders the asserted claims invalid under 35 U.S.C. § 103.  To support his opinion, Dr. Stevick relies on the Justrite flame arrester; Stevick I; Stevick II; Elias Thesis; Frost; Protectoseal-000000002; May 11,

2022 Deposition of Edward O'Shea and Exhibits; Anschicks '180, '656, '785; Protectoseal-000000052; Protectoseal-000000006; Protectoseal-000000005; Protectoseal-0000000001-54; Protectoseal-0000000053; DEFS-0000001517; DEFS-0000001572; SCI-0000002804; Physical Testing Report for the Efficacy of Plastic Screens vs. Metal Screens As Flame Arresters, RULE 26 REPORT Regarding Joshua Showers, et al. vs. Wal-Mart Stores, Inc. United States District Court, District of South Carolina Case No.: 001-3533-19, by Robert J. Mellon, Ph.D., P.E., Pinnacle Engineering, LLC, 2003; *Markman* Order; No Spill's Second Supplemental Response to Interrogatory No. 26; Cray Declaration submitted to the Patent Office 9/16/14; Elias Thesis; SCI-0000002804; Health & Safety Executive, Health & Safety Series Booklet HS(G)11: Flame Arresters and Explosion Reliefs (1980); Ali S. Rangwala & Robert G. Zalosh, Analysis of Mitigation Strategies Associated with Flame Propagation Within the Pour Spout of a Portable Gasoline Container, Worcester Polytechnic Institute proposal to ASTM (2011); Laurence G. Britton, Avoiding Static Ignition Hazards in Chemical Operations, Center for Chemical Process Safety of the American Institute of Chemical Engineers (1999); Frost; Blitz plastic flame arrester; May 18, 2022 Deposition of Sergio Garza and Exhibits; June 6, 2012 WPI presentation of WPI to ASTM F 15.10; September 18, 2012 WPI Presentation to ASTM F 15.10; and testing pursuant to No Spill's infringement tests.

105.    In his 7/22/2022 rebuttal expert report, Dr. Stevick tested the air levels in the neck of the accused products, with the spout on and with no FMD installed in the neck of the can, consistent with the testing parameters provided by No Spill in this case (and filling in any gaps in those parameters with those that a person of ordinary skill in the art would understand to be appropriate for such testing) ("Opinion 1").  (Ex. H, 7/22/2022 Stevick Rpt. at 33-35.)

106.    The results of the testing described above (¶ 102), show that, "both sizes of accused Scepter cans, tested with spout on and no FMD under the parameters disclosed by No Spill, already had fuel-to-air ratios well above the 7.6% UFL near the neck of the can where an FMD would be." (Ex. H, 7/22/2022 Stevick Rpt. at 36.)

107.    In his 8/10/2022 reply expert report, for the Scepter FMD, Dr. Stevick replicated "the dipped test" and "the shake test" described by Dr. Roby in his 6/21/2022 Expert Report.  (Ex. J, 8/10/2022 Stevick Report at 9-17.)

108.    The results of Dr. Stevick's dipped tests showed that when the Scepter FMD was dipped in gasoline, removed and subjected to a spark energy of 0.4 mJ while still retaining the gasoline in the FMD, the vapors ignited.  (Ex. J, 8/10/2022 Stevick Report at 13-17.)

109.    The results of Dr. Stevick's shake tests showed that when the gasoline was shaken out of the Scepter FMD and the FMD was subsequently subjected to a spark energy of 0.4 mJ, the vapors ignited.  (Ex. J, 8/10/2022 Stevick Report at 13-17.)

110.    The results of Dr. Stevick's dipped tests showed that when the Protectoseal Flame Arrester was dipped in gasoline, removed and subjected to a spark energy of 0.7 mJ while still retaining the gasoline in the FMD, the vapors ignited.  (Ex. J, 8/10/2022 Stevick Report at 13-17.)

111.    The results of Dr. Stevick's shake tests showed that when the gasoline was shaken out of the Protectoseal Flame Arrester and the Protectoseal Flame Arrester was subsequently subjected to a spark energy of 0.7 mJ, the vapors ignited.  (Ex. J, 8/10/2022 Stevick Report at 13-17.)

112.    The results of Dr. Stevick's dipped tests showed that when the Protectoseal Flame Arrester was dipped in gasoline, removed and subjected to a spark energy of 0.5 mJ while still

14

retaining the gasoline in the FMD, no ignitions were observed.  (Ex. J, 8/10/2022 Stevick Report at 13-17.)

113.    The results of Dr. Stevick's shake tests showed that when the gasoline was shaken out of the Protectoseal Flame Arrester and the Protectoseal Flame Arrester was subsequently subjected to a spark energy of 0.5 mJ, the vapors ignited.  (Ex. J, 8/10/2022 Stevick Report at 13-17.)

114.    On April 27, 2020, No Spill served its Interrogatory No. 4 on Scepter Canada, which requested: "Describe the facts and circumstances of the design and development of each Accused Product, including where and when the events occurred, the identity of the persons involved, and the nature of each person's involvement." (Ex. S, Scepter's 2/24/2021 first supplemental responses to Plaintiff's Interrogatories at 7.)

115.    Scepter's initial response to No Spill's Interrogatory No. 4, served May 27, 2020, identified Arash Nik-Seresht of Scepter Canada, the third-party vendor Brighton Cromwell, Damon Johnston from Brighton Cromwell, and Sergio Garza from Scepter Manufacturing. (*Id.*, pp. 7-9), and stated Scepter would identify additional responsive documents subject to Rule 33(d).

116.    Scepter's First Supplemental Response to No Spill's Interrogatory No. 4, served February 24, 2021, explained in relevant part (*Id.,* pp. 9-11):





## IV.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence could lead a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The applicable substantive law identifies which facts are material. *Id.*

In determining whether a genuine issue for trial exists, a court views all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio*, 471 U.S. 574, 587 (1986). The moving party bears "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *Ragas v. Tenn. Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998).

Once a party has made that showing, the nonmoving party bears the burden of establishing otherwise by supporting its contentions with some evidence. *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990) (citing *Celote*x*,* 477 U.S. at 324). Summary judgment is not appropriate where the nonmoving party presents evidence demonstrating the existence of a genuine issue of material fact. *See Anderson*, 477 U.S. at 247.

## V.   THE ACCUSED PRODUCTS ARE NOT "COVERED" BY THE ASSERTED CLAIMS (PLS' ISSUE 1)

No Spill's motion for summary judgment ignores the opinions of Scepter's expert, and suggests that certain key facts are uncontested in its favor.  A review of the record, including the opinions provided by Scepter's expert Dr. Glen Stevick, tells a different story.  A reasonable jury could find that the asserted claims do not "cover" any accused Scepter FMD.  In fact, Scepter's motion for summary judgment justifiably argues that there are ***no disputed facts that Scepter does not infringe***.  (ECF No. 533.)  At the very least, Scepter's showing in that regard provides enough evidence that a reasonable jury could find that Scepter's accused products lack at least one limitation of the asserted '132 and '075 patent claims.

### A.      Relevant Legal Principles

A finding of literal infringement as to a patent claim requires a finding that each element of that claim is literally present in the accused device. *See*, *e.g.*, *Overhead Door Corp v. Chamberlain Grp., Inc.*, 194 F.3d 1261, 1269 (Fed. Cir. 1999). Where a claim depends from another claim (for example, claim 4 of the '075 patent depends from claim 1), then the dependent claim incorporates and adds limitations to the independent claim. 35 U.S.C. § 112, ¶ 4.  If an independent claim is not infringed, then its dependent claims are not infringed either.  Literal infringement is a fact question, and the patentee bears the burden of proving infringement by a preponderance of the evidence. *See*, *e.g.*, *Bayer AG v. Elan Pharm. Res. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). In the context of summary judgment, "a trial court cannot reach a conclusive finding of noninfringement if the record shows some evidence supporting a finding of noninfringement and some evidence to the contrary."  *AFG Indus., Inc. v. Cardinal IG Co.*, 375 F.3d 1367, 1371 (Fed. Cir. 2004).

### B.      A Reasonable Jury Could Find in Favor in Favor of Scepter on Non-Infringement.

The crux of No Spill's infringement case is simple—*if* an isolated Scepter FMD, dipped in gasoline, does not ignite, *and* an isolated Scepter FMD, dipped in gasoline and shaken, does ignite, then the Scepter FMD infringes.  Factual issues preclude a finding of summary judgment of "claim coverage" pursuant to No Spill's testing and opinions, for at least the below reasons.

#### 1.      Scepter's validated expert testing confirms that the asserted claims do not cover the asserted claims, and establish a material issue of fact.

Scepter's expert independently tested the accused products and concluded that the accused products are not covered by the asserted claims.  Specifically, Dr. Stevick performed the "oxygen sensor-based system" test that plaintiffs identified as one that could be performed to determine whether an accused product includes the too-rich-to-burn elements.

As of the time of the invention of the Patents-In-Suit, a POSITA would have known of at least three tests that could be performed to "test a device to determine whether it retained sufficient fuel to provide a fuel-air mixture above the UFL," including but not limited to: . . . . (3) ***an "oxygen sensor-based system" test such as that described in the article titled "Failure Analysis and Prevention of Fires and Explosions with Plastic Gasoline Containers" by Dr. Stevick et al. ("Stevick II") and used by Dr. Stevick to "confirm published explosive limits for commercial gasoline blends***"

(Ex. C, Pls' 2d Supp. Resp. to Interrog. No. 26 (describing an "oxygen sensor-based system" test).)

Using this test, Dr. Stevick measured the fuel-to-air ratios inside the necks of the accused products, with no FMD.  (Ex. H, 7/22/2022 Stevick Rpt. at 32-36, 48-59.)  The parties do not dispute that the UFL for gasoline is a 7.6% fuel-to-air mixture.  (*Id*. at 33; Ex. G, 6/21/2022 Roby Rpt. at 21.)  Dr. Stevick found that the fuel-to-air mixture for all products tested measured above the UFL, or greater than 7.6%.  (Ex. H, 7/22/2022 Stevick Rpt. at 35-36.)  He thus opined that, "no person of skill in the art would conclude that adding a flame mitigation device . . . is 'sufficient' to bring the fuel-to-air mixture proximate to the main can opening or within the device itself above the UFL to prevent combustion."  (*Id*. at 36.)  Ultimately, Dr. Stevick concluded that his tests "demonstrate that No Spill cannot show infringement by the accused products of any asserted claim, and in fact establish that no infringement has occurred."  (*Id*.)

The "claim coverage" issue offered by No Spill presents a classic "battle of the experts" that are not amenable to resolution prior to trial.  *See generally Transonic Sys., Inc. v. Non–Invasive Med. Techs. Corp.*, 143 Fed.Appx. 320, 330 (Fed.Cir. July 25, 2005) (noting "expert testimony sufficient to raise a genuine issue of material fact"); *Goldman v. Standard Ins. Co.*, 341 F.3d 1023, 1036 (9th Cir. 2003) (denying summary judgment because determination of "[w]ho is correct in this battle of experts is not for [the Court] to decide"); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1364 (Fed.Cir.1998) (affirming denial of summary judgment based on "summary judgment papers ... not [being] sufficient to resolve the differences in expert opinion").

19

For at least this reason, the Court should deny No Spill's motion for summary judgment.

> **2.      Scepter replicated Dr. Roby's testing, conclusively showing non-infringement, or at least raising contested issues of material fact.**

As discussed in Scepter's motion for summary judgment, Dr. Stevick also duplicated Dr. Roby's testing methodology, and performed his own "dipped" and "shaken" tests on the accused products.   Repeating the parameters disclosed by Dr. Roby, and filling in all undisclosed parameters with what a skilled artisan would have deemed appropriate,[4] Dr. Stevick found that at relatively low spark energies (less than 1 mJ), the accused products ignited in both the "dipped" and "shaken" tests, as illustrated in the below chart—

| Device | Input VAC | Spark Gap | Saturated (not shaken) | Ignition | Energy (mJ) |
|--------|-----------|-----------|------------------------|----------|-------------|
| Scepter | 42 | < 1/32" | No | Yes | 0.4 |
| Scepter | 42 | < 1/32" | Yes | Yes | 0.4 |
| Protectoseal | 42 | < 1/32" | Yes | Yes | 0.7 |
| Protectoseal | 42 | < 1/32" | No | Yes | 0.7 |

(Ex. J, 8/10/2022 Stevick Rpt. at 14.)   As explained in Scepter's motion for summary judgment (ECF No. 533 at 30-34), Dr. Roby did not meaningfully rebut Dr. Stevick's testing procedure, except to assert that Dr. Stevick should have increased spark energy by 4 mJ or more. (Ex. K, 8/19/2022 Roby Rpt. at 19.) Dr. Stevick's testing showed that the accused products ignited under both the "dipped" and "shaken" tests, and there is nothing in the record to suggest that increasing spark energy by 4 mJ or more would cause the accused products to suddenly fail to ignite.   In fact, it is just the opposite; increasing spark energy ignites a wider range of fuel/air mixtures within the explosive range than lower spark energies.   For instance, the characteristic

---

[4] Dr. Stevick conducted this testing for his reply report on invalidity because at the time he served his opening report on invalidity, he could not be sure which infringement test Dr. Roby would rely on, given the broad disclosures by plaintiffs regarding Scepter's interrogatory no. 26.  (Ex. C, Pls' 2d Supp. Resp. to Interrog. No. 26.)

ignitibility curve introduced to by Roby,[5] and annotated by Dr. Stevick below clearly shows that the range of ignitable fuel/air mixtures within the explosive range increases with increasing spark energy.[6]  The pink-colored bands in the graphic show the fuel/air ranges that cannot be ignited by a 1 mJ spark even though they are within the flammability limits.  At the very least, Dr. Stevick's independent "dipped" and "shaken" testing—which remains unrebutted by Dr. Roby—presents a factual issue for trial and precludes summary judgment.

### 3.    Dr. Roby's testing and opinions ignore the language of the claims and thus do not show infringement by the accused products.

Finally, No Spill's testing methodology ignores that every asserted independent claim requires a too-rich-to-combust environment inside of a "fuel receiving chamber."  Claims 1 and 12 of the '075 patent, e.g., require that, **(A)** "the fuel retention structure . . . retain *a* quantity of the liquid fuel *in the [fuel-receiving] chamber*," and that **(B)** "*the* retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture proximate to the main container opening that is too rich to support combustion."  (Ex. A, '075 pat. at cls. 1 & 12; *see also* Ex. B, '132 pat. at cl. 1 (requiring a "flash suppressor . . . extending at least 2 inches downwardly into the fuel-receiving chamber".)  The recitation of the "quantity of the liquid fuel" in **(B)**, above, refers back to the "quantity of the liquid fuel" in **(A)**, which is "*in the [fuel-receiving] chamber*."

This conforms to the antecedent basis rule, which provides that when the word "the" (or other definite article) is used in a claim limitation (i.e., "the retained quantity of liquid fuel"), it refers back to the exact same term previously defined in the same claim (i.e., "retain a quantity of liquid fuel" in **(A)**) and should be given the same meaning.  *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("The words 'the use' require antecedent basis; thus, 'the

---

[5] Ex. D, 9/30/2020 Roby Decl. at ¶33 citing Zabetakis, "Flammability Characteristics of Combustible Gases and Vapors.")

[6] Ex. H, 7/22/2022 Stevick Rpt. at pps. 39-42.

use' refers to a specific 'use' rather than a previously undefined 'use.'"); *cf. Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) (noting "the identical language associated with the term 'discharge rate' in both clauses [b] and [d]," and concluding that "the presence of that identical language clearly indicates that 'a discharge rate' in clause [b] is the same as 'the discharge rate' in clause [d]."); *Eastman Chem. Co. v. Acktiengesellschaft*, 47 Fed. App'x 566, 573-74 (Fed. Cir. 2002) (noting "the salt" had antecedent basis in and referred to "a salt").

Accordingly, whether a "fuel retention structure" retains liquid in a sufficient amount to create a too-rich-to-combust environment *outside* of the fuel-receiving chamber is irrelevant as to whether a "fuel retention structure" retains liquid in a sufficient amount to create a too-rich-to-combust environment *in* the fuel-receiving chamber, per the clear and unambiguous requirements of the asserted claims.  (*See also* Ex. H, 7/22/2022 Stevick Rpt. at 37.)  Despite this clear import, Dr. Roby tested the accused Scepter FMDs in isolation, outside of the accused containers. Moreover, Dr. Roby's testing flouts the fundamental driving purpose of the asserted patents—"to provide a fuel-air mixture *within the container* that is too rich to support combustion."  (Ex. A, '075 pat. at 1:19-25 (emphasis added); *see also* ECF No. 257 at 5-6 (reinforcing the same).)  Thus, whether a Scepter FMD removed from the "fuel container" either ignites or does not ignite is immaterial as to whether the asserted claims cover the accused products.  In the absence of claim-relevant testing by No Spill, summary judgment of "claim coverage" fails.

### 4.   Plaintiffs mischaracterize the testimony and opinions of Scepter's experts.

Cobbling together an allegedly undisputed "claim coverage" issue, No Spill glosses over the fulsome opinions of Dr. Stevick (discussed *supra*), and cherry picks general statements from Scepter's retained experts in this case and before the PTAB.  The first, from Dr. Stevick's declaration supporting Scepter's claim construction positions, supports Dr. Stevick's opinion that

Dr. Roby's testing is "not a reliable test that a POSA would follow." (ECF 194-21 at ¶ 25.) In other words, the environment within the FMD begins above the UFL immediately after being removed from the PFC, which is consistent with Dr. Stevick's Opinion No. 1. (Ex. H, 7/22/2022 Stevick Rpt. at 32-36, 48-59.) Dr. Safaei's statements, from both his January 28, 2021 deposition and associated declaration during IPR, similarly discuss the problems with Dr. Roby's testing methodologies. (ECF No. 226-6 at 70:25-74:4; ECF No. 226-5 at ¶¶ 13-32.) Importantly, though—contrary to No Spill's claims—none of these statements address the ultimate fact issue of whether the retained quantity of liquid fuel is "*sufficient to provide* a fuel-air mixture proximate to the main container opening that is too rich to support combustion"—that is, these statements do not address whether the FMD, itself, played any role in creating a "too rich to support combustion environment."[7]  In the absence of undisputed facts supporting No Spill's arguments that the accused products are "covered by the asserted claims," summary judgment is not warranted.

## VI.   ESTOPPEL DOES NOT APPLY TO ALL OF DEFENDANTS' INVALIDITY THEORIES FOR THE '132 PATENT (PLS' ISSUE 2)

Estoppel does not apply to all of Scepter's invalidity theories for the '132 patent because, during the IPR proceedings, Scepter did not *and reasonably could not* have raised—(1) non-patent/non-printed publications to support its arguments, such as physical prior art products/systems; and (2) Dr. Stevick's testing of the physical prior art products/systems based on No Spill's tests for infringement.  Both are significant aspects of Scepter's invalidity case at trial and were unavailable at the time of IPR proceedings.

It is black letter law that IPR estoppel is limited to invalidity grounds that "could be raised under section 102 or 103 and *only* on the basis of prior art consisting of patents or printed

---

[7] The quoted passage from Dr. Stevick's reports are equally inapposite, and reference background, state-of-the art information, including the "Parameters Relevant to Flammability." (Ex. F, 6/21/2022 Stevick Rpt. at 26-30; Ex. H, 7/22/2022 Stevick Rpt. at 19-23.)

publications." 35 U.S.C. § 315(e)(2) (emphasis added); *see SAS Inst., Inc. v. Iancu*, 200 L. Ed. 2d 695, 138 S. Ct. 1348, 1353 (2018). As a corollary, physical products and systems cannot be raised during IPR proceedings.[8] Despite the plain text of the statute, plaintiffs attempt to read in ambiguity where it does not exist in an effort to stifle Scepter's ability to raise prior art products and other non-patent/non-printed publications that could not have been raised during the IPR proceedings. Because the Federal Circuit has yet to definitively weigh in on the scope of IPR estoppel, a minority of district courts have followed plaintiffs' approach. This Court should follow the line of courts that apply the plain text of the statute.

A. **Scepter did not raise, and reasonably could not have raised, the Eagle, Justrite, and Protectoseal flame arrester products during IPR proceedings.**

Despite plaintiffs' attempt to muddy the waters, Scepter did not and reasonably could not have raised the physical Eagle, Justrite, and Protectoseal flame arresters during the IPR proceedings. This is because an IPR "can only be instituted on narrow grounds—anticipation and obviousness on the basis of prior art consisting of patents or printed publications." *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1030 (E.D. Wis. 2017). Put simply, a "petitioner cannot use an IPR to challenge the validity of a patent claim under §§ 102 or 103 based on prior art products or systems." *Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17-cv-7216, 2020 WL 5512132, at *3 (N.D. Ill. Sept. 14, 2020). This alone is sufficient to defeat summary judgment.

Here, Scepter petitioned for *Inter Partes* Review of U.S. Patent No. 10,029,132 on the grounds that Claims 1-15 of the '132 patent were unpatentable under 35 U.S.C. § 103 over Stevick

---

[8] *See Gen. Access Sols., Ltd. v. Sprint Spectrum LLC*, No. 2:20-CV-00007-RWS, 2021 WL 5154085, at *2 (E.D. Tex. July 21, 2021); *CliniComp Int'l, Inc. v. Athenahealth, Inc.*, No. A-18-CV-00425-LY, 2020 WL 7011768, at *2 (W.D. Tex. Oct. 28, 2020*); Acceleron, LLC v. Dell, Inc.*, No. 1:12-CV-4123-TCB, 2020 WL 10353767, at *2 (N.D. Ga. Mar. 30, 2020); *Polaris Indus., Inc. v. Arctic Cat Inc.*, No. CV 15-4475 (JRT/TNL), 2019 WL 3824255, at *3 (D. Minn. Aug. 15, 2019).

I in view of Stevick II and Claims 16-18 of the '132 patent were unpatentable under 35 U.S.C. § 103 over Stevick I in view of Stevick II and Frost.[9] (Ex. L, Petition for IPR (the '132 patent) at 4.) Stevick I compared the geometry and dimensions of flame arresters in three commercially available gasoline containers: JUSTRITE, EAGLE, and Blitz. (DSoF ¶ 94; Ex. N, Stevick I.) Stevick II compared the geometry of three additional flame arresters, including a plastic flame arrester. (DSoF ¶ 95; Ex. O, Stevick II.)  Frost discussed the physics principles behind the retention of fuel in a perforated cell and honeycomb structure that lined a fuel tank. (DSoF ¶ 96; Ex. P, Frost.)

Based on the geometrical findings in both Stevick I & II, Scepter argued that a person of skill in the art ("POSA") would have been motivated to combine the teachings of Stevick I and Stevick II to implement a plastic version of the Eagle flame arrester for Claims 1-15 of the '132 patent. (DSoF ¶ 97; Ex. L, Petition for IPR (the '132 patent) at pp. 23-34.)  And when combining those geometrical findings with the physics principles taught in Frost, a POSA would know that the perforations in the cell are able to retain fuel when the fuel take is inverted and maintain an air-fuel mixture too rich to combust. (DSoF ¶ 98; Ex. L, Petition for IPR (the '132 patent) at pp. 51-56.)  Scepter did not raise physical prior art products/systems during the narrowly-tailored IPR proceedings because it was not permitted to under the plain text of the statute. *See* 35 U.S.C. § 315(e)(2). (*See generally* Ex. L, Petition for IPR (the '132 patent).)

Accordingly, consistent with the plain text of the statute, this Court should deny plaintiffs' request for summary judgment because Scepter did not and reasonably could not have raised the physical Eagle, Justrite, and Protectoseal Metal Flame Arresters during the IPR proceedings.

---

[9] U.S. Patent No. 2,850,083 ("Frost").

**B.    The Eagle, Justrite, and Protectoseal flame arrester products are not "cumulative" of the patents and printed publications raised during the IPR proceedings.**

Aside from the statutory prohibition preventing Scepter from raising the three prior art flame arresters during IPR proceedings, the Eagle, Justrite, and Protectoseal flame arrester products are not "cumulative." As explained above, Scepter limited its IPR arguments to geometrical measurements and observations of the three metal flame arresters discussed in Stevick I & II, and combined with the physics principles taught by Frost.  (DSoF ¶¶97-98; Ex. L, Petition for IPR (the '132 patent) at pp 23-34; 51-56.) On the contrary, Scepter's theories of invalidity in this case extend beyond mere geometrical measurements and observations. For example, Scepter also asserts that Stevick's testing of the functionalities of the physical prior art, alone, and in combination with their patents and printed publications, render the '132 patent invalid. (Ex. F, 6/21/2022 Stevick Rpt. at pp. 175, 197, 205.) Dr. Stevick opines that based on the testing pursuant to No Spill's infringement tests and geometrical dimensions, the physical Eagle, Justrite, and Protectoseal flame arresters, alone and in combination with the teachings of the non-patent/non-printed publications render the '132 patent invalid under 35 U.S.C. § 103. (*See* DSoF ¶¶ 102-104.) In other words, Stevick's testing of the Eagle, Justrite, and Protectoseal flame arresters, pursuant to the tests offered by Plaintiff to practice the '132 patent, are a significant part of Scepter's invalidity theories. *Id.  Acceleron* is instructive here.

In *Acceleron*, the district court permitted the defendant to assert physical prior art products/systems, despite allegedly knowing of documents that purportedly established the relevant product's functionalities. *Acceleron*, 2020 WL 10353767, at *1. At issue was a motion to strike invalidity contentions on grounds that, among other reasons, the defendant possessed documents sufficient to show the relevant product's functionality but did not raise these documents at the IPR proceeding and thus was estopped from relying on the physical products embodied in

those documents. *Id.* at *2. The defendant contended that it was not estopped from asserting the physical products because (1) it could not have raised physical products during the IPR proceedings, and (2) it was permitted to combine the patents and printed publications with their prior art systems. *Id.* Agreeing with the defendant, the court discounted the movant's attempt to rely on *Wasica Finance GmbH v. Schrader International, Inc.*, No. 13-353-LPS, 2020 WL 1150135 (D. Del. Jan. 14, 2020). Critically, while the movant argued that the defendant had not identified any difference between the prior art printed publications and the physical system (i.e., cumulative), the court found it sufficient that the defendant relied "on the physical system to establish certain functionalities (or a lack thereof) that are not present in the printed publications." *Acceleron*, 2020 WL 10353767, at *3.

Much like *Acceleron*, Scepter is asserting the physical Eagle, Justrite, and Protectoseal Metal Flame Arresters to establish certain functionalities, based on No Spill's infringement tests that were not present within Stevick I, II, and Frost. (DSoF ¶¶ 102-104.) Specifically, Stevick concludes the following:

> It is my conclusion from this testing that under No Spill's own tests, as properly conducted, the Justrite, Eagle, Protectoseal, No Spill, and Scepter products all perform roughly the same, and all result in an environment near the opening of a portable fuel can that is well above the UFL. (*See* Markman Order, Doc. #257, p. 10 (explaining that "the claims…require enough fuel to provide a fuel-to-air mixture above the UFL" and that "the flammability range for gasoline was 1.4% to 7.6% gasoline in air"). ***This shows that three separate prior art products, under No Spill's own tests, practice the purportedly inventive concept contained in the asserted claims, and as explained below these three prior art products also contain the other claim elements of the asserted claims, either directly, inherently, or as part of an obvious combination with other disclosed prior art. It is thus my opinion that the asserted patents are invalidated by each of the Justrite, Eagle, and Protectoseal flame arrester products.***

(Ex. F, 6/21/2022 Stevick Rpt. at p. 38 (emphasis added).) It was not until plaintiffs provided a definitive response to Scepter's Interrogatory No. 26 that Dr. Stevick could even begin testing the

physical prior art products/systems, including the Eagle, Justrite, and Protectoseal flame arresters. Therefore, as apparent from Dr. Stevick's report, and similar to *Acceleron*, Scepter and its expert rely on the testing of the physical Eagle, Justrite, and Protectoseal flame arresters, alone, and in combination Stevick I, Stevick II, Frost, and/or Anschiks to support Scepter's invalidity theories.

Similar to the movant in *Acceleron*, No Spill misplaces its reliance in *Wasica*. The *Wasica* court applied the estoppel statute and prevented the defendant from relying on a physical sensor that was "materially identical" to a patent the defendant could have raised during the IPR proceeding. *Id*. at 455. The *Wasica* defendant did not dispute that a singular printed publication disclosed all relevant features of a physical system or that the printed publication could have been raised during IPR. Here, Scepter's theories expand beyond the mere disclosure of printed publications. As stated above, in making his expert report concluding that the '132 patent invalid, Dr. Stevick not only relied on the geometrical measurements and observations of the Eagle, Justrite, and Protectoseal Metal Flame Arresters, but he also relied on the new No Spill infringement tests that were not previously available; Stevick I, II, and Frost do not include any of these No Spill infringement tests. Additionally, *Wasica* dealt with evidentiary swaps, where the party is merely swapping the patent or printed publication for the physical prior art product/system. That is not the case here. Again, Scepter is relying on both the testing of the physical Eagle, Justrite, and Protectoseal Metal Flame Arresters based on No Spill's infringement tests, alone (which was not disclosed in patents or printed publications during the IPR proceedings), and in combination with their printed publications and patents, much like the *Acceleron* defendant.

What's more is that the same District Court that decided *Wasica* refused to follow that same approach two years later. Three months ago, the District of Delaware disregarded the *Wasica*-court's holding, in which No Spill now roots its argument. *See Chemours Co. FC, LLC v. Daikin*

*Indus., Ltd.*, No. CV 17-1612 (MN), 2022 WL 2643517, at *2 (D. Del. July 8, 2022). In *Chemours*, the plaintiff moved for summary judgment on the defendant's obviousness and anticipation counterclaims and defenses under IPR estoppel, arguing that the physical prior art products are "cumulative" to the paper art asserted during IPR proceedings. *Id*. at *1. In rejecting this argument, the *Chemours*-court found "[a]s a matter of statutory interpretation, estoppel does not apply to the prior-art products that [the defendant] relies on – regardless of whether those products are "cumulative." *Id.* While the *Chemours*-court acknowledged that district court decisions (like *Wasica*) have reached differing conclusions, it held that "[i]n the absence of guidance from the Supreme Court or the Federal Circuit, this Court aligns with those courts that have adhered more closely to the statutory language." *Id.* at 2. And with logical reasoning, too:

> The statute at issue was the product of considered debate and careful thought. Congress could have broadened the categories of prior art on which IPR could be requested. Congress could have dictated that estoppel applies to products covered by the paper art underlying the IPR where the paper art discloses the same claim limitations as the product. But Congress did not do so. Adhering to well-accepted canons of construction, it is not for this Court to ignore Congress's omission and create additional bases for estoppel.

*Id.* at *2. Consequently, the District of Delaware denied summary judgment, disregarded *Wasica*, and allowed the defendant's anticipation and obviousness counterclaims and defenses based on the physical prior art products. *Id.*

No Spill is trying to accomplish precisely what Congress did *not* set out to do. Rather than applying the black letter law, No Spill reads in ambiguity where there is none. As a more recent decision from another district court explained, *Wasica* "stretches the meaning of the term 'ground' in the IPR estoppel provision too far"—

> If Congress had wanted to estop an IPR petitioner from pursuing invalidity grounds that relied upon a physical product in a particular situation, such as where a patent or printed publication discloses the same claim limitations as the product, it could have provided language to that effect. Congress did not do so, and this failure

29

> indicates that Congress did not intend for the IPR estoppel provision to be that
> broad. *See Smith v. United States*, 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d
> 138 (1993) ("Had Congress intended the narrow construction petitioner urges, it
> could have so indicated. It did not, and we decline to introduce that additional
> requirement on our own."); *see also Advocate Health Care Network v. Stapleton*,
> 581 U.S. ——, 137 S. Ct. 1652, 1659, 198 L.Ed.2d 96 (2017) (Congress' failure to
> adopt readily available language that would have supported a party's statutory
> interpretation indicated that Congress did not intend for that interpretation).

*Medline Indus., Inc.*, 2020 WL 5512132, at *4 (N.D. Ill. Sept. 14, 2020). Similar to *Medline* and a host of other district courts including the District of Delaware on which Plaintiffs' rely, this Court should interpret IPR estoppel narrowly to cover only those specific legal theories of invalidity that could have been raised in the IPR—an interpretation that is consistent with the IPR estoppel statute and Congress' intent. In any event, even following plaintiffs' minority approach, the non-patent/non-printed publications are not "cumulative" because they are grounded in theories beyond what Scepter raised (or reasonably could have raised) during IPR proceedings. Accordingly, plaintiffs' request for summary judgment based on Issue 2 (IPR estoppel) should be denied.

## VII.    THE PTAB'S '075 RULING DOES NOT INVOKE ESTOPPEL (PLS' ISSUE 4)

PTAB's denial institution of the '075 patent—one that was not on the merits—does not invoke statutory IPR estoppel.  As the Federal Circuit has echoed, "[t]he plain language of § 315(e)(1) is clear that estoppel is triggered when an IPR proceeding results in a final written decision[.]" *Intuitive Surgical, Inc. v. Ethicon LLC*, 25 F.4th 1035, 1041 (Fed. Cir. 2022). Here, by plaintiffs own admission, PTAB denied institution of the '075 patent. (ECF No. 540-1, p. 45.) Thus, there was no final written decision to trigger estoppel as to Scepter's invalidity arguments regarding the '075 patent. *See e.g.*, *Finjan, Inc. v. Blue Coat Sys., LLC*, 283 F. Supp. 3d 839, 856 (N.D. Cal. 2017) (concluding, on a denial of summary judgment, that denial of institution does not establish IPR estoppel and explaining, "PTAB's decisions have little relevance to the validity issues before the Court."); *see also HP Inc. v. MPHJ Tech. Inv., LLC*, 817 F.3d 1339, 1347 (Fed.

Cir. 2016) ("noninstituted grounds do not become a part of the IPR" and "could not be raised in the IPR"; therefore "the estoppel provisions of § 315(e)(1) do not apply."); *Intell. Ventures I LLC v. Toshiba Corp.*, No. CV 13-453-SLR, 2017 WL 107980, at *1 (D. Del. Jan. 11, 2017) ("As I now understand the lay of the land, everyone agrees that estoppel applies to grounds for invalidity upon which the Board instituted review in the IPR proceeding, whether or not the Board addresses those grounds in its final decision ("instituted grounds"). I believe that there likewise can be no dispute that estoppel does not apply to invalidity grounds that were raised by a petitioner in an IPR, but rejected by the Board as instituted grounds (i.e., "noninstituted grounds").").

Aside from the misplaced notion that denial of institution triggers IPR estoppel, Scepter's IPR Petition for the '075 patent was not denied on the merits. Specifically, PTAB prefaces its denial by noting the Petition's procedural shortcoming—"Reviewing the Petition, we find that Petitioner has not addressed sufficiently the limitations directed to the fuel retention structure." (Ex. M, PTAB 7/7/2020 Order Denying Institution (the '132 patent), at p. 8.)  Put another way, the PTAB concluded that Scepter should have directed more analysis toward the fuel retention structure. Despite the PTAB prefacing its denial with this qualifier, plaintiffs cherry-pick language to seek estoppel based on *Precision Fabrics Group, Inc. v. TieTex Int'l*, Nos. 1:13-cv-645/650, 2016 WL 6839394 (M.D.N.C. Nov. 21, 2016).

In *Precision Fabrics*, the plaintiff moved for, among other things, summary judgment on the invalidity counterclaims. 2016 WL 6839394, at *9. One of *several* arguments for summary judgment advanced by the plaintiff was that the PTAB denied institution of defendant's IPR petition for all claims of a particular patent. *Id.* The court acknowledged that "[t]he estoppel provisions of 35 U.S.C. § 315(e)(2) do not apply to a denial of an inter partes review." *Id.* However, the court continued that denial of institution was indicative of the weakness of this particular

defendant's claim of invalidity. *Id*. The facts in *Precision Fabrics* are certainly distinguishable. Significantly, there is nothing in the PTAB's denial of institution that would even suggest its denial was a result of the weakness of Scepter's claim of invalidity for the '075 patent. Rather, it is the opposite. The PTAB's denial indicated that Scepter should have focused more on the claim limitations of the fuel retention structure instead of the container. While one could argue that the PTAB's decision in *Precision Fabrics* was "on the merits," that is certainly not the case here.

But whether PTAB's denial was "on the merits" or not confuses the issue. Plaintiffs' argument is riddled with the same flaws as their argument on Issue No. 4. Plaintiffs' interpretation of the statute is beyond the plain text of the statute. The IPR estoppel statute clearly states that estoppel is not triggered unless the IPR proceeding "results in a final written decision under section 318(a), . . . on any ground that the petitioner raised or reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(2). Rather than complying with the unequivocal text of the statute, Plaintiff again reads in ambiguity to stretch the scope of IPR estoppel further than Congress intended. As the Supreme Court of the United States and the *Medline* court explained, "Congress' failure to adopt readily available language that would have supported [No Spill's] statutory interpretation indicated that Congress did not intend for that interpretation." *Medline Indus., Inc.*, 2020 WL 5512132, at *4 (quoting *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659, 198 L.Ed.2d 96 (2017)). And because Congress did not adopt No Spill's interpretation, the Court must apply the unambiguous statute as written—IPR estoppel applies only to a "final written decision" based on grounds that were raised or reasonably could have been raised during IPR proceedings. This is because IPR proceedings are narrowly-tailored and restricted to novelty and obviousness arguments based on patents and printed publications. To prohibit Scepter from asserting its invalidity contentions on a patent that was never taken up (i.e.

denied institution) would effectively deny Scepter its day in court without actually litigating the issue.

In sum, because PTAB denied institution of the '075 patent (which alone is sufficient to defeat summary judgment) and that denial was based on procedural shortcomings, this Court should deny plaintiffs' request for summary judgment for Issue 4 (Validity of '075 Patent).

## VIII.   THE BLITZ FLAME ARRESTER QUALIFIES AS PRIOR ART (PLS' ISSUE 3)

Plaintiffs' motion merely repeats their already rejected argument that Scepter's invalidity theory based on the Blitz Flame Arrester should be excluded. (ECF No. 524). Scepter included the Blitz Flame Arrester as one of its six invalidity references and explained it was properly disclosed in various references. No Spill attempts to improperly narrow Scepter's disclosure of the Blitz Flame Arrester, a product subject to a vast amount of discovery in this case, to one singular image. Inconsistent with Scepter's disclosed invalidity theories, No Spill focuses on this singular image, arguing that the Blitz Flame Arrester does not qualify as prior art. As further explained below, Scepter properly asserted the Blitz Flame Arrester as prior art disclosed in various references, timely raised its invalidity defenses, and provided sufficient evidentiary support for the Blitz Flame Arrester to qualify as prior art.

### A.   The Blitz Flame Arrester Prior Art Should Not Be Limited to Image 1.

Scepter properly disclosed the Blitz Flame Arrester as prior art. No Spill agrees the Blitz Flame Arrester was cited as one of Scepter's six invalidity references, but tries to improperly limit Scepter's disclosure of the Blitz Flame Arrester in its 2020 invalidity contentions and lengthy claim charts to a single image. (Doc. 540-1, p. 34.) Scepter disclosed in its 2020 invalidity contentions that "[v]arious references disclose the design and functionality of the Blitz Flame Arrester, including presentations from WPI to ASTM and Daniels," and "Daniels discloses the design and functionality of the Blitz Flame Arrester." (Ex. Q, Scepter's 7/28/2022 Invalidity

Contentions at 28-29, 55, 57.) No Spill cannot blatantly ignore these direct statements from Scepter's invalidity contentions. Moreover, Scepter's claim charts identify "where specifically in each alleged item of prior art each limitation of each asserted claim is found" pursuant to Local Patent Rule 3.3(c) and do much more than solely allege "Image 1" from a WPI Report as No Spill contends. For instance, the claim charts repeatedly cite ASTM testing describing the Blitz product along with many other references describing the functionality of the Blitz Flame Arrester. (*See* Ex. R, Claim Charts Exs. A-2 and B-3.)  It was well understood by No Spill early in discovery that the Blitz Flame Arrester was disclosed as prior art through various references specifically identified by Scepter, and not solely Image 1 as No Spill alleges.

Further, No Spill's assertion that Scepter has never produced a physical "Blitz Flame Arrester (product)" is incorrect, though there is no requirement to produce a physical product for asserted prior art under the Court's Local Patent Rules. Even so, Scepter provided No Spill with a box of Blitz prototypes that No Spill inspected and questioned multiple witnesses on. (ECF No. 517, p. 7.)  Additionally, No Spill inspected another Blitz prototype produced by Damon Johnston in response to a subpoena by Scepter. *Id*. at 8. No Spill also subpoenaed "Brighton Cromwell, LLC, c/o registered agent Damon Johnston" in December 2020, leading to production of relevant design documents back to May 2012, and did not request a physical product. *Id*.  No Spill's argument that none of the Blitz prototypes were the exact product shown as Image 1 in the Scepter's July 2020 claim charts is unavailing. No Spill had the ability to request a physical product in its December 2020 subpoena, and did not. For these reasons, the Blitz Flame Arrester asserted as prior art should not be limited to Image 1.

**B.    What No Spill Refers to as the "Purported Blitz Flame Arrester(s)" Were Included in Scepter's Invalidity Contentions.**

Since July 2020, No Spill has had Scepter's invalidity contentions that plainly state:

The Blitz Flame Arrester was publicly used and described at least as early as April 2012 when Worcester Polytechnic Institute published test results to the Flame Mitigation Device ("FMD") Task Group F15:10 of American Society for Testing and Materials to identify effective designs for FMDs to mitigate flames. Various references disclose the design and functionality of the Blitz Flame Arrester, including presentations from WPI to ASTM and Daniels.

(Ex. Q, Scepter's 7/28/2022 Invalidity Contentions at 28-29, 55, 57.) No Spill argues the prototypes made from Concepts 2 and 4 provided during Arash Nik-Seresht's deposition on May 3, 2022 were not included in Scepter's invalidity contentions. However, as Dr. Stevick states in his opening invalidity expert report, "as of July 2012 the Concept 2 and Concept 4 designs developed by Mr. Johnston had already passed Blitz's flame mitigation testing, and those designs are disclosed in the July 2012 [Daniels] provisional patent application." (Ex. F, 6/21/2022  Stevick Rpt. at 45.)  (citing Johnston Depo. Tr., p. 221-222, 225; *see also* Garza Depo. Tr., pp. 49-50, 83, 88.) As the invalidity contentions disclose the Daniels provisional, and Concepts 2 and 4 are disclosed in the provisional, these concepts were undoubtedly included in Scepter's invalidity contentions.

Further, No Spill argues Concepts 5-6 and 8-9 were not disclosed in Sceptor's invalidity contentions. Dr. Stevick notes in his opening invalidity report "that the [Daniels] Blitz provisional specifically includes a design drawing for Concept 8 at DEFS-0000000045, and that for example design drawings for Concept 5 (DJOHNSTON000033), Concept 6 (DJOHNSTON000034), and Concept 9 (DJOHNSTON000034) also predate the Blitz provisional and in my opinion are encompassed by the disclosures of the [Daniels] Blitz provisional." (Ex. F, 6/21/2022 Stevick Rpt. at 45.) Moreover, Dr. Stevick explains that "the Blitz prototype tested by WPI in April 2012 (see SCI-0000009462), appears to be the same prototype from the Concept 5 drawing from Damon Johnston produced in this case." *Id.* Because Concepts 5-6 and 8-9 are encompassed by the disclosures of the Daniels provisional, and Concept 5 also appears to have been tested by WPI,

these Concepts were included Scepter's invalidity contentions, which specifically asserts the Blitz Flame Arrester is disclosed in the Daniels provisional and WPI published testing.

Accordingly, the Court should allow these Concepts to be asserted as part of the Blitz Flame Arrester prior art.

### C.    The Daniels Provisional Application Is Available as Prior Art.

Scepter's July 2020 invalidity contentions state that "[v]arious references disclose the design and functionality of the Blitz Flame Arrester, including presentations from WPI to ASTM and Daniels," and "Daniels discloses the design and functionality of the Blitz Flame Arrester." (Ex. Q, Scepter's 7/28/2022 Invalidity Contentions at 28-29, 55, 57.) Seeking to use the Blitz Flame Arrester disclosed in the Daniels provisional as prior art in no way is "in clear violation of this Court's Rules and Orders" as No Spill alleges. (ECF No. 540-1, p. 36.) Moreover, Scepter's early interrogatory responses confirmed that the Blitz Flame Arrester submitted for flame testing as part of ASTM work, and the Blitz Flame Arrester in the Daniels provisional patent to Blitz, are the same project, and were later prepared for manufacturing by Scepter as the flame mitigation device in the accused products. DSoF, ¶ 116. Thus, as No Spill has long understood, the Blitz Flame Arrester is disclosed in the Daniels provisional application.

In an effort to improperly halt Scepter from using the Daniels provisional application, No Spill argues that the Daniels provisional cannot be used for Scepter's § 102(g) invalidity theory as it is a U.S. patent application. This is incorrect.  Under § 102(g), Scepter asserts the Blitz Flame Arrester product, disclosed in the Daniels provisional. The Daniels provisional is and can be used as evidence of conception under § 102(g). *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1375 (Fed. Cir. 2009) (Under § 102(g), a "patent application is evidence of conception."). No Spill's arguments here are thus unavailing.

Additionally, the Daniels provisional qualifies as a printed publication under pre-AIA 35 U.S.C. § 102(b) or AIA 35 U.S.C. § 102(a)(1), and thus is available as prior art. "[P]ublic accessibility has been called the touchstone in determining whether a reference constitutes a printed publication." *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986) (quotation marks omitted). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (2008) (quotation marks omitted). As the Daniels application was made accessible to public bidders as part of Blitz's bankruptcy proceedings in fall of 2012, the application was sufficiently accessible to the public qualifying it as a printed publication under pre-AIA 35 U.S.C. § 102(b) or AIA 35 U.S.C. § 102(a)(1).[10] Accordingly, the Court should find the Daniels application is available as prior art.

**D.     The Blitz Flame Arrester Qualifies as Prior Art under pre-AIA 35 U.S.C. § 102(g)(2).**

**1.     Scepter Timely Raised Its Blitz Flame Arrester § 102(g)(2) Defense.**

In its Motion to Strike Portions of Defendants' Expert's Opening Invalidity Report, No Spill alleged that prior invention of the Blitz Flame Arrester under Pre-AIA § 102(g) was not timely disclosed in Scepter's July 2020 invalidity contentions or other discovery responses. (Doc. 508, p. 10.) No Spill lost on this motion and now re-alleges Scepter did not timely raise the Blitz Flame Arrester as a § 102(g)(2) defense. No Spill should not be given a second bite at the apple.

---

[10] *See In re Hall*, 781 F.2d 897, 900 (Fed. Cir. 1986); Sept. 2012 Bankruptcy Order DEFS-0000009111, at -5 (noting that "all potential bidders have been afforded a full, fair, and reasonable opportunity to submit bids for the Purchased Assets" and that the "Debtors and their professionals adequately marketed the Purchased Assets to all potential purchasers"); *id.* at -9224 (listing the July 20, 2012 Daniels provisional as a purchased asset).

In plaintiffs' Motion to Strike, they acknowledge, as they must, that Scepter disclosed in its original invalidity contentions in 2020 that Scepter was asserting invalidity under Section 102(g). (Doc. 508, p. 3; Doc. 517, p. 1.) That 2020 disclosure explains that the work of participants of the ASTM task force on flame mitigation devices pre-dated and contributed to the alleged inventions of the asserted patents or, alternatively, were previously "made" and thus invalidated under § 102(g). (Ex. Q, Scepter's 7/28/2022 Invalidity Contentions at 89-90.) Plaintiffs ignore that these 2020 contentions further explain that Blitz was one of these participants. *Id*. The 2020 invalidity contentions discuss in detail the Blitz prototype as part of that ASTM work and disclosed in the Daniels provisional, which names Damon Johnston as an inventor.

Further demonstrating the sufficiency of Scepter's 2020 disclosures, and the lack of any prejudice to plaintiffs, the underlying facts of Scepter's 102(g) theory have been a focus of heavy discovery throughout this case.   This includes: (1) early interrogatory responses on the development of the Blitz Flame Arrester and the accused products; (2) early requests for production on all designs leading up to the accused products and resulting production from Scepter; (3) early document subpoenas to Brighton Cromwell and Damon Johnston by plaintiffs, leading to production of relevant design documents back to May 2012 from Damon Johnston; (4) inspection of a box of Blitz prototypes by plaintiffs, who questioned multiple witnesses on it; (5) inspection by plaintiffs of another Blitz prototype produced by Damon Johnston in response to a subpoena by Scepter; and (6) questioning by plaintiffs of at least seven witnesses with personal knowledge of the development of the accused products, including Damon Johnston and two 30(b)(6) witnesses on this topic from Scepter. (Doc. 517, pp. 5-10.) With so much discovery focused on the work of Blitz, as opposed to the other ASTM members disclosed in connection

with Scepter's 102(g) theory, plaintiffs cannot credibly claim to be surprised that Dr. Stevick's 102(g) opinion focused on the work of Blitz that became the accused products.

Nevertheless, No Spill asserts Scepter is attempting to inject a new invalidity theory that is prejudicial to No Spill. Plaintiffs cite *ViaTech Techs., Inc. v. Microsoft Corp.*, No. CV 17-570-RGA, 2021 WL 663057, at *2 (D. Del. Feb. 19, 2021) for this assertion. However, Scepter's 2020 disclosures, and the resulting extensive discovery on the underlying facts of Scepter's 102(g) theory as to the Blitz Flame Arrester, easily distinguish this case from the one cited by plaintiffs. For instance, in *ViaTech*, the court excluded new infringement theories on the doctrine of equivalents ("DOE") first raised during expert reports, including because "Plaintiff had not previously asserted *any* DOE theories for claim 1 of the '567 patent in its infringement contentions or during fact discovery." (emphasis added.)  Here, Scepter did not wait until expert reports to raise its invalidity theory under § 102(g). Instead, it raised its 102(g) theory in its July 2020 invalidity contentions, and heavy discovery throughout this case focused on the underlying facts of this theory as outlined above.  As such, the differences from this case only highlight that exclusion here is not appropriate. Accordingly, the Court should not grant summary judgment.

### 2.  Scepter Can Prove Conception and that Mr. Johnston Was a "Prior Inventor."

Conception is a legal conclusion premised on various underlying facts. *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed.Cir.1998). "[T]he test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention." *Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994). "[T]he date of the conception of a prior inventor's invention is the date the inventor first appreciated the fact of what he made." *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 (Fed. Cir. 2001).

### a.  *Damon Johnston Was Sufficiently Identified for the Blitz Flame Arrester, and conception can be shown.*

First, No Spill argues that no inventor has been identified for the Blitz Flame Arrester so conception cannot be shown. This is plainly false. No Spill acknowledged in its motion to strike that "Scepter further alleged in the Invalidity Contentions that Mr. Cray did not 'disclose to the [USPTO] Examiner any of the work by ASTM or WPI … [n]or … the work of Glen Stevick, Brian Elias, **and other ASTM members [that] contributed to the conception** of the '075 and '132 Patents.'" Doc. No. 508 at 10.  As discussed at length in the 2020 Contentions, the work by ASTM members included the Blitz Flame Arrester.  While the 2020 contentions do not separately name Damon Johnston, they explain that the characteristics of the Blitz Flame Arrester are described in the Daniels provisional patent application produced with those contentions, which names Damon Johnston as an inventor and explains that the claimed inventions arose out of the work of ASTM. Scepter's early interrogatory responses confirmed that the Blitz Flame Arrester submitted for flame testing as part of ASTM work, and the Blitz Flame Arrester in the Daniels provisional patent to Blitz, are the same project, and were later prepared for manufacturing by Scepter as the flame mitigation device in the accused products. DSoF at ¶ 116.

For some reason, No Spill emphasizes that Mr. Johnston's confidentiality agreement with Blitz on May 9, 2012, came after Blitz made public the Blitz Flame Arrester in April 2012. (Doc. 540-1, p. 40.) As explained by Dr. Stevick, Blitz sent a flame mitigation device to WPI for testing in April 2012, and those test results were published. (Ex. F, 6/21/2022 Stevick Rpt. at 44.)  Blitz also asked its consultant Damon Johnston (as well as other vendors and consultants) to keep his designs confidential. *Id*. at 44-45. The date of Mr. Johnston's confidentiality has no weight regarding Scepter's ability to prove conception and that Mr. Johnston was a prior inventor.

Further, No Spill fixates on whether Mr. Johnston could identify if Image 1 in Scepter's claim charts was one of his prototypes, but Scepter's asserted prior art of the Blitz Flame Arrester

should not be limited to Image 1 as discussed above. *See* § VI.A.  Even so, No Spill  acknowledges that Mr. Johnston stated Image 1 "looks like one of [his] prototypes." (Doc. 540-1, p. 40) (citing Johnston Depo. Tr. at 60:14-61:2; 32:16-36:25.) No Spill's argument that "Johnston's own sworn testimony thus establishes that the various prototypes he supposedly developed are not the Blitz Flame Arrester of Image 1" is wrong and unsubstantiated. (ECF No. 540-1, p. 40.)

There are significant fact issues attendant to each of No Spill's arguments, such as the credibility and weight of Mr. Johnston's testimony. Accordingly, the Court should not grant summary judgment and find instead that Mr. Johnston was sufficiently identified.

### b.    Scepter Can Establish Conception Because Damon Johnston "Appreciated" his Invention under 35 U.S.C. § 102(g).

Damon Johnston did not make the Blitz Flame Arrester by accident. No Spill ignores all other claim limitations and focuses on the phrase "too rich to combust," arguing that Mr. Johnston could not have appreciated his invention without knowing this specific phrase. However, "the Blitz Flame Arrester, as depicted in WPI documents, in the Blitz provisional application, and in the physical Blitz prototypes embodied in that application and made public through various means, disclose the same characteristics that No Spill now claims contribute to retaining fuel" for creating a too-rich-to-combust environment. (Ex. F, 6/21/2022 Stevick Rpt. at 52.)

Further, Mr. Johnston did acknowledge that one of the problems he was trying to solve was to make the Blitz Flame Arrester pass flame mitigation testing. (Ex. T, Johnston Depo. Tr., p. 218). As explained by Mr. Johnston, solving the flame mitigation problem with the Blitz product was not "rocket science," as the basic problem had been solved with the Davy coal miner lamp in the 1800s. *Id.* at 39, 218-219. Thus, No Spill's argument that Mr. Johnston never tested any of his designs in gasoline is unavailing. As Dr. Stevick explained in his  invalidity expert report, the fact "[t]hat the accused products, and No Spill's product (eventually), and the Blitz FMD, all pass the

WPI flame test…which does not use liquid fuel shows that these FMDs actually prevent flame mitigation under the principle of the Davy coal miner lamp, and any fuel retention is obvious in that it is an inconsequential and accidental by-product of a long-established principle for flame mitigation that actually works." (Ex. F, 6/21/2022 Stevick Rpt. at 53.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ Thus, Mr. Johnston appreciated his invention of the Blitz Flame Arrester. *Dow Chem. Co.*, at 1341 (finding that an invention was "clearly recognized and appreciated" where the employees understood "its significance" and its potential to give an "advantage over the industry.")

Lastly, No Spill's arguments involve significant fact issues, such as the credibility and weight of Mr. Johnston's testimony. As such, the Court should not grant summary judgment and find instead that Scepter established conception because Mr. Johnston "appreciated" his invention.

     **E.**      **The Blitz Flame Arrester Qualifies as Prior Art under pre-AIA 35 U.S.C. §§102(a) and 102(b) and AIA 35 U.S.C. § 102(a)(1) as a Public Use or Sale.**

          **1.**      **Scepter Has Established that the Blitz Flame Arrester was the Subject of a Public Use.**

As Scepter's 2020 invalidity contentions state, "[t]he Blitz Flame Arrester was publicly used and described at least as early as April 2012 when Worcester Polytechnic Institute published test results to the Flame Mitigation Device ("FMD") Task Group F15:10 of American Society for Testing and Materials to identify effective designs for FMDs to mitigate flames." Notably, Tom Cray was a participating member of this Task Force at the time in question.  (*See* Ex. I, DEFS-0000001619; Ex. E, Cray Depo. Tr., pp. 59-65; Ex. F at 7; Ex. Q, Scepter's 7/28/2022 Invalidity

Contentions at 28-29, 55, 57.) Dr. Stevick further specifically pointed to public information in

2012, stating:

> The public information included references disclosing the design and functionality
> of the Blitz Flame Arrester, including presentations from WPI to ASTM. (*See* June
> 6, 2012 Status Update on ASTM F 15.10 presentation by WPI; Sept. 18, 2012
> Status Update on ASTM F 15.10 presentation by WPI; SCI-0000009462); *see also*
> Monckton Depo. Tr., pp. 64-66, 82-83, 170 (describing the public nature of
> ASTM's information and information presented at ASTM meetings); *id.* at 168
> (explaining that Scepter "submitted a lot of concepts to WPI for testing, aware that
> those test results would probably end up in the public domain.")).

(Ex. F, 6/21/2022 Stevick Rpt. at 44.)

Again, No Spill tries to limit Scepter's asserted prior art of the Blitz Flame Arrester to

Image 1, but, as discussed above, this is improper. *See* § VI.A. "Various references disclose the

design and functionality of the Blitz Flame Arrester, including presentations from WPI to ASTM

and [the] Daniels [provisional application]." (Ex. Q, Scepter's 7/28/2022 Invalidity Contentions at

28-29, 55, 57.) Grasping at straws, No Spill argues that the Blitz Flame Arrester could not be

publicly disclosed because Mr. Johnston operated under a Confidentiality Agreement. However,

this argument directly contradicts No Spill acknowledgement in a separate section of its motion

that "Mr. Johnston's first agreement with Blitz was a May 9, 2012 confidentiality agreement, **after**

the April 2012 date Scepter asserts the alleged Blitz Flame Arrester was made public." (Doc. 540-

1, p. 40.)  Further, as discussed above, the Blitz Flamer Arrester was actually disclosed to Mr.

Cray, by virtue of his attendance of, and participation with, the ASTM task force at the time.  (*See*

Ex. I; Ex. E at 59-65; Ex. F at 7.)

As such, Scepter has come forth with sufficient evidence to establish the alleged public use

requirement that the Blitz Flame Arrester was the subject of public use. Accordingly, this Court

should not grant summary judgment and find instead that the Blitz Flame Arrester qualifies as

prior art under pre-AIA 35 U.S.C. §§102(a) or 102(b) or AIA 35 U.S.C. § 102(a)(1).

    2.      **Scepter Has Established that the Blitz Flame Arrester was Ready for Patenting**

"There are at least two ways in which an invention can be shown to be ready for patenting: 'by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.'" *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1371 (Fed. Cir. 2017), *aff'd,* 202 L. Ed. 2d 551, 139 S. Ct. 628 (2019) (citing *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 56 (1998)). The necessity and sufficiency of testing to demonstrate to one of skill in the art that the invention would work for its intended purpose is an issue of fact. *See Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1270 (Fed. Cir. 2002).

Again, No Spill focuses only on Image 1 and what it deems the "purported Blitz Flame Arresters" of Scepter's asserted prior art of the Blitz Flame Arrester, but, as discussed above, this is improper. *See* § VI.A. "Various references disclose the design and functionality of the Blitz Flame Arrester, including presentations from WPI to ASTM and [the] Daniels [provisional application]." (Ex. Q, Scepter's 7/28/2022 Invalidity Contentions at 28-29, 55, 57.)  No Spill argues that the April 20, 2012 WPI testing "used butane gas as the fuel, which is not a liquid that could be retained in the flame arrester to determine whether it was configured to function as a flash suppressor." However, as explained by Damon Johnston, solving the flame mitigation problem with the Blitz product was not "rocket science," as the basic problem had been solved with the Davy coal miner lamp in the 1800s. (Ex. T, Johnston Depo. Tr., pp. 39, 218-219.) Dr. Stevick explained in his invalidity expert report that passing a flame mitigation test that does not use liquid fuel is sufficient to show the flame mitigation devices "operate (as designed) under the long

established principle of the Davy miner lamp, such that any retention of fuel is an obvious and irrelevant side effect." (Ex. F, 6/21/2022 Stevick Rpt. at 61.)

Scepter has produced and identified documentation to support its argument as well as Mr. Johnston's oral testimony that the Blitz Flame Arrester was tested for the intended purpose. *See id.* at 44-48. As such, Scepter has established the Blitz Flame Arrester was ready for patenting, or at minimum, illustrated that there is an issue of fact regarding whether sufficient testing existed to demonstrate to one of skill in the art that the Blitz Flame Arrester would work for its intended purpose. Thus, the Court should deny summary judgment, and find instead that the Blitz Flame Arrester qualifies as prior art under pre-AIA 35 U.S.C. §§102(a) and 102(b) and AIA 35 U.S.C. § 102(a)(1) against the Asserted Patents.

## IX.  THE ASSERTED '132 CLAIMS ARE INVALID (PLS' ISSUE 5)

No Spill improperly seeks to obtain a global invalidity ruling on the '132 patent, based on unsupported conclusions in Issues 2 and 3. As discussed above, No Spill argues IPR estoppel precludes Scepter from asserting five of the six purported prior art references. However, as explained above in Section VI, Scepter did not and reasonably could not have raised the Eagle, Justrite, and Protectoseal flame arrester products during the IPR proceedings. *Medline Indus., Inc. v. C.R. Bard, Inc.*, No. 17 C 7216, 2020 WL 5512132, at *3 (N.D. Ill. Sept. 14, 2020) (A "petitioner cannot use an IPR to challenge the validity of a patent claim under §§ 102 or 103 based on prior art products or systems."). Further, as previously explained, the Eagle, Justrite, and Protectoseal flame arrester products are not "cumulative" of the patents and printed publications raised during the IPR proceedings, and thus can still be raised in this case.

No Spill then argues the remaining prior art reference, the Blitz Flame Arrester, cannot be asserted as prior art "because the WPI report was never published and the product cannot be found." This is plainly false. The WPI report was published as explained in Scepter's invalidity

contentions and Dr. Stevick's invalidity expert report. (Ex. Q, Scepter's 7/28/2022 Invalidity Contentions at 28-29, 55, 57); (Ex. F, 6/21/2022 Stevick Rpt. at 44.) Even if somehow the WPI was found to not be published, the Blitz Flame Arrester is disclosed in "[v]arious references... including presentations from WPI to ASTM and [the] Daniels [provisional.]" (Ex. Q, pp. 28-29, 55, 57.) Further, as explained above, No Spill was provided physical prototypes asserted by Scepter as part of the Blitz Flame Arrester prior art, and Mr. Cray attended and participated in the ASTM Flame Mitigation task force at the time.

In the alternative, No Spill contends the "Blitz Flame Arrester (product)" is a printed publication (the WPI report) that is estopped under the IPR estoppel rule. Again, this is inaccurate. It is well understood that the Blitz Flame Arrester is a product disclosed in various references including, but not limited to, the WPI report. As explained in Section VII, documents other than the WPI report, such as the Daniels provisional application, also qualify as prior art. Moreover, similar to the Eagle, Justrite, and Protectoseal flame arrester products, Scepter did not and reasonably could not have raised the "Blitz Flame Arrester (product)" during the IPR proceedings. *Medline*, at *3.

Lastly, No Spill argues Scepter has no other validity position, wholly ignoring Scepter's arguments under 35 U.S.C. § 112 disclosed in its invalidity contentions. This oversight alone is sufficient for the Court to deny summary judgment on this issue.  For all the reasons stated above, the Court should deny summary judgment of validity of the '132 patent.

## X.    THE '075 CLAIMS ARE NOT DIRECTED TO PATENTABLE SUBJECT MATTER (PLS' ISSUE 6)

Scepter has moved for summary judgment that the asserted '075 claims are invalid as directed to unpatentable subject matter under 35 U.S.C. § 101.  *See* ECF No. 534.  For the reasons

discussed therein, Scepter's motion should be granted, and summary judgment is warranted in favor of Scepter.

No Spill's motion seeking to affirm the opposite fails.  Plaintiffs concede that the asserted claims "utilize a law of nature," but fail to identify any actual "'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Alice Corp. Pty v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  The asserted '075 claims merely rely on "intermolecular forces" existing in nature ***to claim the result of*** the "accepted scientific fact" that "if the fuel-air mixture has too much fuel (becoming too rich), combustion cannot occur."  Indeed, rather than limiting the claims to a method of achieving this result, the asserted '075 claims seek the results themselves.

No Spill's recitation of conventional "structures" misses the point—the question here is not whether the asserted '075 claims disclose structure(s), but whether such structure(s) provides a concrete solution for achieving the claimed result, here a too-rich-to-combust environment.  They do not.  For example, the claims do not recite a particular way or structure for ***how*** the "fuel retention structure" retains fuel, other than benefitting from "intermolecular forces."  As another example, the claims fail to set forth a particular way or structure for ***how*** the claimed "retained quantity of liquid fuel in the container" is "sufficient to provide a fuel-air mixture . . . that is too rich to support combustion," other than benefitting from an "accepted scientific fact."  Indeed, all of the identified structures are conventional and found within the prior art—none convert the abstract idea of creating a too-rich-to-combust environment "into a particular conception of how to carry out that concept."  *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1346 (Fed. Cir. 2018); *see also Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 939 F.3d 1355, 1365 (Fed. Cir.

2019) ("[A] claim to a[n abstract idea] without specifying the means of how to implement the concept is ineligible under Section 101.").

No Spill's reliance on *Diehr* does not change this conclusion.  In *Diehr*, the patentee sought "patent protection for a process of curing synthetic rubber."  *Diamond v. Diehr*, 450 U.S. 175, 187 (1981).  While the patentee's process employed a well-known mathematical equation, the Supreme Court explained that they "do not seek to pre-empt the use of that equation," but only "to foreclose from others the use of that equation *in conjunction with all of the other steps in their claimed process* . . .  include[ing] installing rubber in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time."  *Id*. (emphasis added).  Unlike the claims in *Diehr*, the asserted '075 claims recite no particular structure or method for achieving the claimed results—the claims instead pre-empt any structure with perforations that happens to abide by the "accepted scientific fact" that "if the fuel-air mixture has too much fuel (becoming too rich), combustion cannot occur."

## XI.    THE ASSERTED CLAIMS ARE INDEFINITE (PLS' ISSUE 7)

Scepter previously argued during claim construction that the "too-rich-to-combust" elements of the asserted claims are indefinite.[11]  *See* ECF No. 194 (Dec. 11, 2020), *and* ECF No. 219 (Feb. 5, 2021).  Scepter argued that the "sole" test described during prosecution by the inventor, Mr. Cray, cannot measure whether the claimed "fuel-air mixture" is "too rich to combust," namely—Mr. Cray's test does not measure whether the "fuel retention structure" is the cause of "too rich to combust" environment; Mr. Cray's test focuses on a "fuel retention structure"

---

[11] The "too-rich-to-combust" terms include, "retained quantity of the liquid fuel is sufficient to provide a fuel-air mixture . . . that is too rich to support combustion," and "flash suppressor."  *See* Scepter's Revised Opening Claim Construction Br., ECF No. 219 (Feb. 5, 2021).

outside of the "fuel receiving chamber" and "main container opening"; and, finally, Mr. Cray's test fails to sufficiently describe the testing parameters. *Id.* The Court rejected Scepter's arguments, determining (among other things) that the asserted claims are not limited to Mr. Cray's testing, and that "a POSITA would have known how to test a device to determine whether it retained sufficient fuel to provide a fuel-air mixture above the UFL." ECF No. 257 at 9-10.

Scepter reaffirms its indefiniteness positions, for all the reasons discussed in prior briefings and related exhibits. *See*, *e.g.*, ECF Nos. 194 & 219, and their respective exhibits.

## XII.    CONCLUSION

For the reasons stated above, the Court should deny summary judgment.


Dated: October 7, 2022                    Respectfully Submitted,

                                          SHOOK, HARDY & BACON L.L.P.

                                          By:  */s/ Jordan Bergsten*
                                              Jordan T. Bergsten, KS #78639
                                              B. Trent Webb, KS #15965
                                              Joseph M. Rebein, KS #25912
                                              Laurie A. Novion, KS #19406
                                              Scott Sayler, KS #70402
                                              Ryan D. Dykal, *(pro hac vice)*
                                              Stefon David, *(pro hac vice)*
                                              2555 Grand Boulevard
                                              Kansas City, MO 64108
                                              T:816.474.6550/F:816.721.5547
                                              jbergsten@shb.com
                                              bwebb@shb.com
                                              jrebein@shb.com
                                              lnovion@shb.com
                                              ssayler@shb.com
                                              rdykal@shb.com
                                              sdavid@shb.com

                                              David W. Morehan (*pro hac vice*)
                                              600 Travis St., Suite 3400
                                              Houston, TX 77002
                                              T:713-546-5673/F:713-227-9508

dmorehan@shb.com

*Attorneys for Scepter Canada, Inc.*
*and Scepter Manufacturing, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2022, the above and foregoing pleading was filed with the Court using the CM/ECF system which will send notice of electronic filing to all counsel of record.

/s/ *Jordan Bergsten*
ATTORNEY FOR DEFENDANTS