**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| NO SPILL, LLC | ) | |
| and | ) | |
| TC CONSULTING, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 18-cv-2681-HLT-KGG |
| v. | ) | |
| | ) | |
| SCEPTER CANADA, INC., | ) | |
| and | ) | |
| SCEPTER MANUFACTURING LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NO SPILL'S MEMORANDUM IN TO OPPOSITION TO**
**<u>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS.................. 2

III.   NO SPILL'S RULE 56.1(b)(2) STATEMENT OF ADDITIONAL MATERIAL FACTS ........................................................................................................ 16

IV.   ARGUMENT AND AUTHORITIES............................................................... 22

    A.   THE CLAIMS OF THE '075 PATENT ARE DIRECTED TO PATENTABLE SUBJECT MATTER ............................................... 22

        1.   Legal Standards-- Patent Eligibility Under Section 101 ........................... 23

        2.   *Alice* Step 1 is Satisfied; The Claims of the '075 Patent Are Not Directed to an Abstract Idea or a Law of Nature ...................................... 24

        3.   *Alice* Step 2 | The Asserted Claims Include an "Inventive Concept" ....... 28

        4.   The Cases Cited by Scepter Are Inapt ...................................................... 33

    B.   THE SCEPTER ACCUSED PRODUCTS INFRINGE, AND NONE OF THE CLAIMS OF THE '132 PATENT ARE INVALID IN LIGHT OF THE PURPORTED PROTECTOSEAL FLAME ARRESTER (PRODUCT) ................................................................................... 36

        1.   Dr. Stevick's Opinions About His Purported and Undisclosed "Tests" of the Scepter FMD Are Irrelevant and Insufficient to Manufacture a Non-Infringement Defense ................................................ 38

        2.   The Experts Agree That the Protectoseal Flame Arrester Does Not Retain Sufficient Fuel to Provide a Fuel Vapor Air Mixture That is Too Rich to Combust ................................................................................ 39

        3.   Dr. Stevick's Purported Testing Methodology is Fundamentally Flawed, Irrelevant, and Unreliable............................................................. 40

        4.   Scepter's "Estoppel" Argument is Groundless ......................................... 42

        5.   Scepter Misrepresents Dr. Roby's Testimony Regarding a "Comparative Test" ................................................................................... 46

        6.   As the PTAB Previously Found, and the Federal Circuit Has Now Affirmed, a POSITA Would Not Have Been Motivated to Make a Metal Flame Arrester Out of Plastic ......................................................... 47

V.      CONCLUSION ................................................................................................... 49

## TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
 882 F.3d 1121 (Fed. Cir. 2018) .................................................................................. 29

*Alice Corp. Pty. v. CLS Bank Int'l*,
 573 U.S. 208 (2014) ............................................................................................. 23, 24

*American Axle & Manufacturing, Inc.*,
 967 F.3d .............................................................................................................. 33, 34

*Berkheimer v. HP Inc.*,
 881 F.3d 1360 (Fed. Cir. 2018) ........................................................................... 24, 29

*CardioNet, LLC v. Infobionic, Inc.*,
 955 F.3d 1358 (Fed. Cir. 2019) .................................................................... 24, 27, 29

*Cellspin Soft, Inc.v. Fitbit, Inc.*,
 No. 4:17-cv-5928, 2022 WL 2784467 (N.D. Cal. June 15, 2022) ........................... 38

*ChargePoint, Inc. v. SemaConnect, Inc.*,
 920 F.3d 759 (Fed. Cir. 2019) .................................................................................. 25

*Diamond v. Diehr*,
 450 U.S. 175 (1981) .................................................................................................. 23

*Elec. Power Grp., LLC v. Alstom S.A.*,
 830 F.3d 1350 (Fed. Cir. 2016) ................................................................................ 24

*Enfish, LLC v. Microsoft Corp.*,
 822 F.3d 1327 (Fed. Cir. 2016) ................................................................................ 28

*Funk Bros. Seed Co. v. Kalo Inoculant Co*.,
 68 S. Ct. 440 (1948) .................................................................................................. 23

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ......................................... 38

*In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-5810,
 2017 WL 6729295 (S.D.N.Y. Dec. 28, 2017) ......................................................... 42

*Interval Licensing LLC v. AOL, Inc.*,
  896 F.3d 1335 (Fed. Cir. 2018) ................................................................. 35

*JP Morgan Tr. Co. Nat. Ass'n v. Mid-Am. Pipeline Co.*,
  413 F. Supp. 2d 1244 (D. Kan. 2006) ................................................... 42, 43

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) ................................................................. 25

*Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders*,
  No. 16-1094-JTM, 2018 WL 5962876 (D. Kan. Nov. 14, 2018) ............................ 33

*Nw. Univ. v. KUKA AG*,
  No. 21 C 599, 2021 WL 4711538 (N.D. Ill. Oct. 8, 2021) ..................... 24, 25, 28

*Parker v. Flook*,
  437 U.S. 584 (1978) ................................................................................... 23

*Research Corp. Techs. v. Microsoft Corp.*,
  627 F.3d 859 (Fed. Cir. 2010) ................................................................... 23

*Spaulding v. United Transp. Union*,
  279 F.3d 901 (10th Cir. 2002) ................................................................... 42

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ................................................................. 26

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017) ................................................................. 35

## Statutes

35 U.S.C. § 101 ....................................................................... 1, 23, 24, 26

35 U.S.C. § 282(a) ........................................................................... 29

# I.  INTRODUCTION

Scepter's Motion for Summary Judgment advances two meritless attacks on the Patents-In-Suit. First, Scepter contends that the apparatus claims of the '075 patent are directed to ineligible subject matter under 35 U.S.C. § 101. But Scepter's attack is premised on the falsehood that the claims are directed to nothing more than the natural law or abstract idea of "too rich to combust." To the contrary, Tom Cray's idea to configure a device with specific physical characteristics within PFCs which *retains* gasoline, in order to create an internal environment which is too rich to combust, is an ingenious, counter-intuitive invention which has saved countless lives. Scepter's thesis that the resulting claims are "merely a law of nature" is specious; such logic would invalidate nearly all mechanical patents since they by necessity must operate within the laws of nature or they would not work at all.

Scepter next asks the Court to enter summary judgment of non-infringement and invalidity of the '132 Patent premised on the Protectoseal Flame Arrester. But in its Memorandum, Scepter unequivocally admits that: (1) the Accused Products infringe the Asserted Claims of the '132 Patent (Scepter SoMF 40); and (2) the Protectoseal Flame Arrester—a double-walled metal flame arrester—does NOT retain sufficient fuel to inhibit combustion, which is a requirement of every Asserted Claim of the '132 Patent (Memorandum at 26-27). Dr. Roby's testing of the Scepter Accused Products and the Protectoseal Flame Arrester further confirm Scepter's admissions. Scepter's attempt to walk away from these admissions by presenting a purported "battle of the experts" under which No Spill is somehow "estopped" from challenging Dr. Stevick's plainly unreliable "testing" is without merit.

There is thus no basis to find that the Accused Products do not infringe or that any of the claims of the Patents-In-Suit are invalid. Scepter's Motion should be denied in its entirety.

## II.    RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

No Spill provides the following responses to Scepter's alleged Statements of Material Facts ("SoMF"):

1.      Admitted.

2.      Admitted.

3.      No Spill admits that it alleges Scepter Canada has directly infringed and induced infringement of the Asserted Claims of the '132 Patent.

4.      Admitted.

5.      No Spill admits that the quoted language "wherein the retained quantity of the liquid fuel is held in the perforations by intermolecular forces, wherein the intermolecular forces are sufficient to retain the quantity of liquid fuel in the perforation regardless of the orientation of the portable fuel container" appears in claim 12 of the '075 Patent. No Spill further responds by stating that the respective language, and thus corresponding scope, of Claim 12 of the '075 Patent and Claim 1 of the '075 Patent do have significant differences. For example, Claim 12 specifically requires that the liquid fuel be retained in the perforations of the fuel retention structure whereas Claim 1 does not. Claim 12 also requires that the "too rich to combust" fuel vapor-air mixture be inside the "fuel retention structure" whereas claim 1 requires the "too rich to combust" fuel vapor-air mixture be "proximate to the main container opening." Exh. 1 ('075 Patent) at Claim 1, Claim 12. Claim 1 also lacks any "intermolecular forces" limitation.

6.      Admitted.

7.      Admitted

8.      Admitted.

9.      No Spill admits that it alleges Scepter Canada has directly infringed and induced infringement of the Asserted Claims of the '132 Patent. *See* Exh. 2.

10.     Admitted.

11.     Denied. The Asserted Claims of the Patents-In-Suit cover the fuel containers as a whole, not merely the flash suppressor or fuel retention structure. No Spill thus alleges the manufacture, use, sale, offer for sale, and/or importation of the Accused Products by Scepter Canada and/or Scepter Manufacturing are acts of direct infringement of the Asserted Claims of the '132 Patent.  *See* ECF No. 525 at pp. 18-19. No Spill admits that Dr. Roby identified the Accused Products in his June 21, 2022 Expert Report.

12.     No Spill admits that each Accused Product includes a Scepter FMD as identified in No Spill's Statement of Uncontroverted Fact No. 12 in support of its Motion for Summary Judgment (ECF No. 549). That Scepter FMD is shown in the following image:



 Exh. 3 (Roby Opening Report) at 15-16; Exh. 4 at (Responses to RFAs) at RFA 3-4.

13.     Admitted.

14.     Admitted.

15.     Admitted.

16.     No Spill admits that Scepter has asserted invalidity theories premised on the Protectoseal Flame Arrester. No Spill denies that any claim of the '132 Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See* Exh. 5 (Roby Rebuttal Report) ¶¶ 19, 554-611.

17.     No Spill admits that the Protectoseal Flame Arrester identified in Scepter's February 4, 2022 Selection of Six Prior Art References was a double-walled metal flame arrester

where each wall was formed of sheet metal perforated with round holes, and the end was imperforate. *See* Exh. 6 (Election of References). No Spill admits the Proectoseal Flame Arrester was publicly available before September 16, 2014.

18.     Denied. Scepter's Memorandum identifies an element 1(a) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(a) above" is cited. No Spill further denies that any claim of the '132 Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See* Exh. 5 (Roby Rebuttal Report) ¶¶ 19, 554-611. This contention is also barred by the IPR estoppel.

19.     Denied. Scepter's Memorandum identifies an element 1(b) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(b) above" is cited. No Spill further denies that any claim of the '132 Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See* Exh. 5 (Roby Rebuttal Report) ¶¶ 19, 554-611. This contention is also barred by the IPR estoppel.

20.     Denied. Scepter's Memorandum identifies an element 1(c) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(c) above" is cited. No Spill further denies that any claim of the '132 Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See* Exh. 5 (Roby Rebuttal Report) ¶¶ 19, 554-611. This contention is also barred by the IPR estoppel.

21.     Denied. Scepter's Memorandum identifies an element 1(d) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(d) above" is cited. Further, No Spill denies that the Protectoseal Flame Arrester is a "flash suppressor" as construed by the Court as the Protectoseal Flame Arrester does not retain sufficient liquid fuel to inhibit combustion. *See* Exh. 5 (Roby Rebuttal) at ¶¶ 566-576. No Spill denies that any claim of the '132

Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See* Exh. 5 (Roby Rebuttal Report) ¶¶ 19, 554-611. This contention is also barred by the IPR estoppel.

22.     Denied. Scepter's Memorandum identifies an element 1(e) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(e) above" is cited. Further, No Spill denies that the Protectoseal Flame Arrester is a "flash suppressor" as construed by the Court as the Protectoseal Flame Arrester does not retain sufficient liquid fuel to inhibit combustion.  *See* Exh. 5 (Roby Rebuttal) at ¶¶ 566-576. No Spill denies that any claim of the '132 Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See* Exh. 5 (Roby Rebuttal Report) ¶¶ 19, 554-611. This contention is also barred by the IPR estoppel.

23.     Denied. Scepter's Memorandum identifies an element 1(f) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(f) above" is cited. Further, No Spill denies that the Protectoseal Flame Arrester is a "flash suppressor" as construed by the Court as the Protectoseal Flame Arrester does not retain sufficient liquid fuel to inhibit combustion. *See* Exh. 5 (Roby Rebuttal) at ¶¶ 566-576. No Spill further denies this SoMF because a POSITA would not be motivated to make a metal flame arrester out of plastic, particularly a double-walled metal flame arrester having very thin concentric walls. Indeed, the United States Patent Trial and Appeal Board ("PTAB") found, under a lower "preponderance of the evidence" standard than the "clear and convincing" standard applicable here, that a person of ordinary skill in the art would **not** have been motivated to make a metal flame arrester out of plastic. ECF No. 268-1, at 20. That finding by the PTAB was affirmed by the Court of Appeals of the Federal Circuit on October 5, 2022. ECF No. 561-1. Dr. Roby has also explained why a POSITA would not be

motivated to make a metal flame arrester, such as the double-walled metal Protectoseal Flame Arrester, out of plastic. Exh. 5 (Roby Rebuttal) at ¶¶ 585-592; *see also id.* at ¶¶ 326-340. This contention is also barred by the IPR estoppel.

24. Denied. Scepter's Memorandum identifies an element 1(g) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(g) above" is cited. Further, No Spill denies that the Protectoseal Flame Arrester is a "flash suppressor" as construed by the Court as the Protectoseal Flame Arrester does not retain sufficient liquid fuel to inhibit combustion. *See* Exh. 5 (Roby Rebuttal) at ¶¶ 566-576. No Spill denies that any claim of the '132 Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See id.* ¶¶ 18-21, 515-684. This contention is also barred by the IPR estoppel.

25. Denied. Scepter's Memorandum identifies an element 1(h) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(h) above" is cited. Further, No Spill denies that the Protectoseal Flame Arrester is a "flash suppressor" as construed by the Court as the Protectoseal Flame Arrester does not retain sufficient liquid fuel to inhibit combustion. *See* Exh. 5 (Roby Rebuttal) at ¶¶ 566-576. No Spill denies that any claim of the '132 Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See* Exh. 5 (Roby Rebuttal Report) ¶¶ 19, 554-611. This contention is also barred by the IPR estoppel.

26. Denied. Scepter's Memorandum identifies an element 1(i) from both the '075 Patent and the '132 Patent and this SoMF does not identify which element "1(i) above" is cited. Further, No Spill denies that the Protectoseal Flame Arrester is a "flash suppressor" as construed by the Court as the Protectoseal Flame Arrester does not retain sufficient liquid fuel to inhibit

combustion. *See* Exh. 5 (Roby Rebuttal) at ¶¶ 566-576. No Spill denies that any claim of the '132 Patent is invalid over the Protectoseal Flame Arrester, either alone or in combination with any other reference relied upon by Scepter. *See id.* ¶¶ 19, 554-611. This contention is also barred by the IPR estoppel.

27.     Denied. The Protectoseal Flame Arrester does not disclose every element of claim 1 of the '132 Patent. *See* Roby Rebuttal Report at 161-174.  Accordingly, the Protectoseal Flame Arrester does not, as a matter of law, disclose all of the elements of claim 9 of the '132 Patent, which depends from Claim 1. *See id.* ¶¶ 541-543. This contention is also barred by the IPR estoppel.

28.     Denied. The Protectoseal Flame Arrester does not disclose every element of claim 1 of the '132 Patent. *See* Exh. 5 (Roby Rebuttal) at ¶¶ 529-531. Accordingly, the Protectoseal Flame Arrester does not, as a matter of law, disclose all of the elements of claim 14 of the '132 Patent, which depends from Claim 1. *See id.* ¶ 544-546. This contention is also barred by the IPR estoppel.

29.     Denied. The Protectoseal Flame Arrester does not disclose every element of claim 1 of the '132 Patent. *See* Exh. 5 (Roby Rebuttal) at ¶¶ 529-531. Accordingly, the Protectoseal Flame Arrester does not, as a matter of law, disclose all of the elements of claim 17 of the '132 Patent, which depends from Claim 1. *See id.* ¶¶ 547-549. This contention is also barred by the IPR estoppel.

30.     Denied. The Protectoseal Flame Arrester does not disclose every element of claim 1 of the '132 Patent. *See* Exh. 5 (Roby Rebuttal) at ¶¶ 529-531. Accordingly, the Protectoseal Flame Arrester does not, as a matter of law, disclose all of the elements of claim 18 of the '132

Patent, which depends from Claim 1. *See id.* ¶¶ 550-553. This contention is also barred by the IPR estoppel.

31.     Admitted.

32.     Admitted.

33.     No Spill Admits that Mr. Cray submitted a demonstration of the fuel retention attributes (or lack thereof) and performance of certain metal flame arresters and a No Spill flash suppressor when responding to the Examiner's statements. Exh. 7 ('075 File History) at NSP0000243-268. More specifically, Mr. Cray demonstrated that the JUSTRITE™ and EAGLE™ wire mesh flame arresters retained only 0.39 g and 0.35 g of fuel, respectively, as compared to the 5.11 g of fuel retained by the claimed NO-SPILL® flash suppressor after each was submerged in gasoline. *Id.* After the devices were submerged in liquid gasoline, a spark generator was inserted within the open end of each of the devices. *Id.* A generated spark caused a combustion flame to occur in the JUSTRITE™ and EAGLE™ wire mesh flame arresters. *Id.* The spark generator did not cause a combustion flame in the NO-SPILL® flash suppressor as claimed because the fuel-air mixture in it was too rich. *Id.*

34.     No Spill Admits that Mr. Cray did not identify the exact spark energy used in the ignition tests described in his Declaration submitted during prosecution of the application that issued as the '075 Patent. *See* Exh. 8 (Cray '075 declaration). No Spill further states that the spark ignitor used by Mr. Cray in the testing reported in the Cray Declaration was a CAMCO GM-12X Multisparker and that this spark ignitor provided sufficient spark energy to ignite a gasoline fuel vapor-air mixture that was within the flammable region (*i.e.* above the lower flammability limit and below the upper flammability limit). *See* Exh. 9 (Roby Reply Report) at ¶ 66. No Spill Denies

that this is a material fact pertinent to the validity and/or infringement of the Asserted Claims of

the Patents-In-Suit.

35.    No Spill Admits that the following statement appears in its response to Scepter's

Interrogatory No. 15:

> The perforations in the flash suppressor of the Accused Instrumentalities also retain a
> quantity of the liquid fuel when the container is tipped or inverted to dispense the liquid
> fuel therefrom. Such a quantity of liquid fuel is sufficient to provide a fuel-air mixture
> proximate to the main opening in each of the Accused Instrumentalities that is too rich
> to support combustion. A spark test, as detailed in the affidavit submitted by inventor
> Tom Cray during prosecution of the application that issued as the '075 patent and in
> which the flash suppressor of the Accused Instrumentalities was submerged in liquid
> gasoline and then subjected to a spark (*e.g.* ignition source), was conducted. The flash
> suppressor of the Accused Instrumentalities was submerged in liquid gasoline and
> retained approximately 5 grams of liquid gasoline after being removed from the liquid
> gasoline. After submersion and removal, the flash suppressor was subjected to a spark
> (*e.g.* ignition source). No flame or other combustion occurred, confirming that the fuel-
> air mixture proximate the flash suppressor was too rich to support combustion.

ECF No. 534-5 at 4-5. No Spill Admits that the specific spark energy is not stated in No Spill's

response to Interrogatory No. 15 regarding No Spill's pre-filing investigation. No Spill further

states that a POSITA would know that any spark ignitor that produces 4 mJ or more of spark

energy is sufficient as the necessary ignition energy for the hydrocarbons in liquid gasoline vapors

near the lean and rich flammability limits rises only to 2 mJ to 4 mJ. Exh. 9 (Roby Reply) at ¶¶ 56-

66. The piezo-electric gas appliance lighter used by Mr. Cray in the testing reported in the Cray

Declaration was designed to produce a spark of sufficient energy to ignite a hydrocarbon fuel/air

mixture. *Id*. ¶ 66.

36.    No Spill Admits that its Supplemental Infringement Contentions includes the

following statement:

> CSE performed a "spark test" on the exemplar Scepter FMD. A video of that "spark test"
> was produced as ROBY0000006. The exemplar Scepter FMD was submerged in gasoline
> and placed on top of a metal screen. The gasoline used in this test was purchased at a
> local commercial gasoline station. The gasoline was pumped into a Scepter Smart
> Control gasoline can and the nozzle was promptly replaced when filling was finished. A

standard automotive spark plug used as a "sparker" was then placed inside the interior space of the exemplar Scepter FMD. Upon activation of the "sparker," no combustion occurred in the interior space of the exemplar Scepter FMD. No combustion occurred because the exemplar Scepter FMD retained sufficient fuel in its perforations to create an environment inside the exemplar Scepter FMD that was "too rich to combust."

In addition, CSE performed a second "spark test" on the Scepter FMD. A video of this second "spark test" was produced as ROBY0000007. The Scepter FMD was submerged in gasoline. Upon removal from the gasoline, the Scepter FMD was impacted against the side of the container containing the liquid gasoline and shaken, dislodging much of the retained liquid gasoline from the perforations in the Scepter FMD. The "sparker" was then inserted into the interior space of the Scepter FMD and activated. As seen in the video, combustion occurred almost immediately with the activation of the "sparker." Combustion occurred at this point because after the retained gasoline in the Scepter FMD was shaken out of the device the fuel vapor-air mixture dropped below the UFL and was thus in the combustive mixture range. That is, after the liquid was shaken out of the Scepter FMD, it could no longer maintain an environment inside the Scepter FMD that was "too rich to combust."

ECF No. 534-5 (Chart A1) at 6-7; *see also* Exh. 10 (Infringement Contention Video Excerpts). (VIDEOS ROBY000006 and ROBY000007). No Spill further states that the spark energy of the CSE spark ignitor was disclosed to Scepter repeatedly beginning nearly two-years ago. *See* ECF No. 167-1 (Dr. Roby's Nov. 2020 Decl'n) (ECF No. 167-1) ¶¶ 16-21; ECF No. 187-07 (Dec. 2020 Decl'n) ¶¶ 13-14); Exh. 9 (Roby Reply) ¶¶ 57-66.

     37.    Admitted.

     38.    Admitted.

     39.    Admitted.

     40.    Admitted.

     41.    Denied. As Dr. Roby explained, and as demonstrated in the videos served with Dr. Roby's reports and prior declarations, CSE used the same spark source for the tests performed in conjunction with Dr. Roby's Opening Report as was used in CSE's prior testing. Exh. 9 (Roby Reply) ¶ 64. *See also* Exhibit 10 (videos submitted with infringement contentions); videos filed with Exhibit 3 to No Spill Motion for Summary Judgment. Dr. Roby also provided detailed

calculations of the spark energy for the CSE test apparatus. Exh. 12 (ROBY0000051-53); *see ECF No.* 167-1 (Nov. 11, 2020 Decl'n) ¶ 20. The spark energy for the CSE test apparatus used in all CSE tests (other than those performed with the CAMCO sparker) is approximately 10 mJ. ECF No. 167-1 (Nov. 11, 2020 Decl'n) ¶¶ 19-20.

42.     Denied. Dr. Roby did not testify that spark energy "does not matter" as asserted within this SoMF. Dr. Roby testified that the testing reported in the Cray declaration was "demonstrating" the "principle of too rich to burn" and a POSITA would understand the test was "a comparative circumstance, not an absolute circumstance." Exh. 11 (Roby Tr.) at 177:9-179:4. Dr. Roby testified:

> And the point of what Mr. Cray did was, and what I got from it, and what I believe a person of ordinary skill in the art would get from it is, with the same ignition source, when you wrap the metal flame arresters and took them out and use that ignition source, you were able to get ignition, which meant inside there, it was within **the flammability limits that would correspond to the spark energy of the device he was using**.
>
> And when you did that with the No Spill FMD, it did not ignite, which tells me that you were outside the flammable region **as defined by the spark energy for the same spark device** he was using for the two of them.
>
> This is a **side-by-side comparison demonstration**, and I think it's very effective.

Exh. 11 (Roby Tr.) at 190:6-21 (emphasis added). This "side-by-side" demonstration was comparing the fuel retention performance of the No Spill FMD against prior-art metal flame arresters. *See id*. Dr. Roby did not testify that the "shake test" was a necessary component to determine infringement of the Asserted Claims. Rather, Dr. Roby testified that the "shake" test was also "a demonstration of principle;" stated otherwise, the "shake" test was not a "quantitative test" but rather a "demonstration." Exh. 11 (Roby Tr.) at 169:3-173:1. No Spill further states that the spark ignitor used by Mr. Cray in the testing reported in the Cray Declaration was a CAMCO GM-12X Multisparker and that this spark ignitor provided sufficient spark energy to ignite a gasoline fuel vapor-air mixture that was within the flammable region (*i.e.* above the lower

flammability limit and below the upper flammability limit). *See* Exh. 9 (Roby Reply Report) at ¶ 66. No Spill Denies that this is a material fact pertinent to the validity and/or infringement of the Asserted Claims of the Patents-In-Suit.

43.     Denied. No Spill Denies that any "testing" performed by Scepter's retained expert Stevick is valid, accurate or legitimate. *See generally* ECF No. 553 (Memorandum in Support of No Spill Motion to Exclude). Dr. Roby provided the calculations for the spark energy of the CSE test apparatus. Exh. 12 (ROBY0000051-53) (calculating the energy to be 10.6 mJ); *see also* ECF No. 167-1 (Nov. 11, 2020 Decl'n) ¶ 20. No Spill further denies Scepter's assertion that the "energy" of the CSE test apparatus "quickly decreases to 200V" from 2842.6 volts because "volts" is not a unit of energy, *inter alia*. *See* ECF No. 167-1 (Roby Decl'n) ¶¶ 19-21.

44.     Denied. No Spill Denies that any "testing" performed by Scepter's retained expert Stevick is valid, accurate or legitimate. *See generally* ECF No. 553 (Memorandum in Support of No Spill Motion to Exclude). Dr. Stevick did not "replicate" the "dipped test" and the "shake test" described by Dr. Roby in his June 21, 2022 Expert Report. *Id*. at pp. 15-19 (detailing reasons that Dr. Stevick's spark test apparatus and methodology are unreliable and should be excluded). Rather, and as Dr. Stevick admitted, he improperly sought to achieve a particular result [*i.e.* replication of the visual result of Dr. Roby's "dipped" and "shake" tests performed on the Scepter FMD, without regard for the necessary spark energy to ignite a gasoline vapor-air mixture near the upper flammability limit] and altered his test methodology until he to achieved the result he wanted. Exh. 13 (Stevick Reply Invalidity Report) at 13 ("For this testing we began by replicating Dr. Roby's spark tests for both the accused products and the Protectoseal Flame Arrester at higher spark energies and larger spark gaps, and ***then decreased the spark energies and spark gaps until we saw something approximating Dr. Roby's results***.") (emphasis added).

45.     Denied. No Spill Denies that any "testing" performed by Scepter's retained expert Stevick is valid or legitimate or that any reported spark energy levels provided by Dr. Stevick's unconventional, unreliable circuit are accurate.  *See generally* ECF No. 553 (Memorandum in Support of No Spill Motion to Exclude). Neither Scepter nor Dr. Stevick reported any purported spark-testing performed on a Scepter FMD prior to Scepter's service of Dr. Stevick's August 10, 2022 Reply Report. In that Reply Report, Dr. Stevick made the following conclusory statement:

> . . .with a spark gap of under 1/32" and an input VAC of 40 (approximately .4 mJ for the accused products and approximately .7 mJ for the Protectoseal Flame Arrester, based on slight differences in spark gap), both the accused product and the Protectoseal Flame Arrester ignited under both the "dipped" and "shaken" conditions from Dr. Roby's infringement testing.

Exh. 13 at 13. Neither Dr. Stevick nor Scepter produced any videos or other substantiation for Dr. Stevick's above quoted statement, despite the fact that Dr. Stevick had previously testified that it is BEAR's practice to "videotape every test we do." Exh. 14 (Nov. 13, 2020 Stevick Depo.) at 17:18-18:1. Consequently, No Spill denies that there are any legitimate "results" of any "dipped tests" allegedly performed by Dr. Stevick on the Scepter FMD.

46.     Denied. No Spill Denies that any "testing" performed by Scepter's retained expert Stevick is valid or legitimate or that any reported spark energy levels provided by Dr. Stevick's unconventional, unreliable circuit are accurate. *See generally* ECF No. 553 (Memorandum in Support of No Spill Motion to Exclude). Moreover, as explained above in response to SOmF 45, neither Scepter nor Dr. Stevick provided any evidentiary support for Dr. Stevick's assertions in his Reply Expert Report regarding alleged tests performed using the Scepter FMD. Consequently, No Spill Denies that there are any legitimate "results" of any "dipped tests" allegedly performed by Dr. Stevick on the Scepter FMD. No Spill further states that the CSE tests performed at Dr. Roby's direction established that the Scepter FMD ignited in the "shake" tests because liquid fuel had been dislodged from the perforations in the Scepeter FMD and thus there was insufficient retained fuel

to provide a fuel vapor-air mixture above the UFL. Exh. 3 (Roby Opening Report) at ¶¶ 112-113 and videos submitted therewith; *see also* Exh. 10 (infringement contention videos). This was in direct contrast to the results of CSE's "dipped" tests wherein the Scepter FMD did not ignite using a much higher energy spark because it retained sufficient liquid gasoline to provide a fuel vapor-air mixture inside the Scepter FMD that was too rich to combust. Exh. 3 (Roby Opening Report) at ¶¶ 111, 113 and videos submitted therewith; *see also* Exh. 10 (infringement contention videos).

47.    No Spill Denies that any "testing" performed by Scepter's retained expert Stevick is valid or legitimate or that any reported spark energy levels provided by Dr. Stevick's unconventional, unreliable circuit are accurate. *See generally* ECF No. 553 (Memorandum in Support of No Spill Motion to Exclude). No Spill admits that Dr. Stevick asserts the Protectoseal Flame Arrester ignited in Dr. Stevick's "dipped test" using Dr. Stevick's spark source—a spark source he admits was constructed specifically for this litigation. No Spill denies that Dr. Stevick correctly calculated the spark energy in his testing for the reasons stated in No Spill's *Daubert* Motion (*id.* at 15-19), which is incorporated herein by reference. For purposes of responding to the present Motion, however, the specific spark energy applied to the Protectoseal Flame Arrester in Dr. Stevick's reported testing is not a material fact because Dr. Stevick's test showed that the Protectoseal Flame Arrester, at the time it was tested, did not retain sufficient fuel to provide a fuel vapor-air mixture that was above the UFL, and thus it fails to disclose the "too rich to combust" limitations of the Asserted Claims of the '132 Patent. *See* Memorandum at 27 (Chart A and Chart B).

48.    No Spill Denies that any "testing" performed by Scepter's retained expert Stevick is valid or legitimate or that any reported spark energy levels provided by Dr. Stevick's unconventional, unreliable circuit are accurate. *See generally* ECF No. 553 (Memorandum in

Support of No Spill Motion to Exclude). No Spill admits that Dr. Stevick asserts the Protectoseal

Flame Arrester ignited in Dr. Stevick's "dipped test" using Dr. Stevick's spark source—a spark

source that he admittedly created specifically for this litigation. No Spill denies that Dr. Stevick

properly calculated the spark energy in his testing, however, for the reasons stated in No Spill's

*Daubert* Motion (*Id.* at 15-19). For purposes of responding to the present Motion, however, the

specific spark energy applied to the Protectoseal Flame Arrester in Dr. Stevick's reported testing

is not a material fact as Dr. Stevick's test showed that the Protectoseal Flame Arrester, at the time

it was tested, did not retain sufficient fuel to provide a fuel vapor-air mixture that was above the

UFL and thus fails to disclose the "too rich to combust" limitations of the Asserted Claims of the

'132 Patent. *See* Memorandum at 27 (Chart A and Chart B); *see also* Response to SoMF 47

regarding Dr. Stevick's testing methodology.

49.    No Spill Denies that any "testing" performed by Scepter's retained expert Stevick

is valid or legitimate or that any reported spark energy levels provided by Dr. Stevick's

unconventional, unreliable circuit are accurate. *See generally* ECF No. 553 (Memorandum in

Support of No Spill Motion to Exclude). No Spill admits that Dr. Stevick makes this assertion. No

Spill denies the stated facts, and denies that Dr. Stevick properly calculated the spark energy in his

testing for the reasons stated in No Spill's *Daubert* Motion. (*Id.* at 15-19.) For purposes of

responding to the present Motion, however, the specific spark energy applied to the Protectoseal

Flame Arrester in Dr. Stevick's reported testing is not a material fact as Dr. Stevick's test showed

that the Protectoseal Flame Arrester, at the time it was tested, did not retain sufficient fuel to

provide a fuel vapor-air mixture that was above the UFL and thus fails to disclose the "too rich to

combust" limitations of the Asserted Claims of the '132 Patent. *See* Memorandum at 27 (Chart A

and Chart B); *see also* Response to SoMF 47 regarding Dr. Stevick's testing methodology.

50.     No Spill Denies that any "testing" performed by Scepter's retained expert Stevick is valid or legitimate or that any reported spark energy levels provided by Dr. Stevisk's unconventional, unreliable circuit are accurate. *See generally* ECF No. 553 (Memorandum in Support of No Spill Motion to Exclude). No Spill Admits that Dr. Stevick asserts the Protectoseal Flame Arrester ignited in Dr. Stevick's "shake tests" using Dr. Stevick's spark source—a spark source that he admittedly created specifically for this litigation. No Spill denies that Dr. Stevick properly calculated the spark energy in his testing, however, for the reasons stated in No Spill's *Daubert* Motion. (*Id.* at 15-19.) For purposes of responding to the present Motion, however, the specific spark energy applied to the Protectoseal Flame Arrester in Dr. Stevick's reported testing is not a material fact as Dr. Stevick's test showed that the Protectoseal Flame Arrester, at the time it was tested, did not retain sufficient fuel to provide a fuel vapor-air mixture that was above the UFL and thus fails to disclose the "too rich to combust" limitations of the Asserted Claims of the '132 Patent. *See* Memorandum at 27 (Chart A and Chart B); *see also* Response to SoMF 47 regarding Dr. Stevick's testing methodology.

## III.    NO SPILL'S RULE 56.1(b)(2) STATEMENT OF ADDITIONAL MATERIAL FACTS

1.     The claims of the '075 patent recite specific structural requirements, including, among other things, a hollow tank body, a main container opening, a fuel dispensing assembly, and a fuel retention structure located proximate the main container opening and having a plurality of perforations through which the liquid fuel must flow in order to be dispensed. '075 Patent at Claim 1, Claim 12; *see also* Roby Rebuttal at ¶¶ 716-719.

2.     During prosecution of the application that issued as the '075 Patent, Mr. Cray, the sole inventor of the Patents-In-Suit, submitted a Declaration ("the Cray Declaration"). Exh. 8.

3.     The Cray Declaration states: 1) the "wire guard cylinders" of Rasmussen, a reference relied upon by the Examiner in a non-final office action, were wire mesh flame arresters; 2) a wire mesh flame arrester functions on the principle that the highly thermally conductive metal wires absorb and dissipate heat so that an insufficient amount of heat exists for auto-ignition of fuel; 3) dissipating heat to a level below an auto-ignite temperature is an entirely different principle of operation than retaining fuel in an amount sufficient to provide a fuel-air mixture too rich to support combustion as required by the claims; and 4) the wire guard cylinders of Rasmussen are incapable of performing as a fuel retention structure as claimed. *Id.* at ¶¶ 3-4.

4.     A person of ordinary skill in the art at the time of the invention ("POSITA") would know that the ignition energy for the hydrocarbons in gasoline vapors near the lean and rich flammability limits rises only to 2 mJ to 4 mJ. ECF No. 167-1 (Roby Decl'n) at ¶¶ 16-21.

5.     A POSITA would know that an ignition source having an energy of approximately 4 mJ or more will ignite any gasoline vapor/air mixture within the flammability limits. *Id.*

6.     Dr. Roby explained in his November 2020 declaration that an ignition source having an energy of approximately 4 mJ or more will ignite any gasoline vapor/air mixture within the flammability limits. ECF No. 167-1 at ¶¶ 16-21.

7.     Dr. Roby calculated the spark energy of the CSE spark ignition source used in the CSE tests to be approximately 10.6 mJ. Exh. 12 (ROBY0000051-53) (calculating the energy to be 10.6 mJ); *see also* ECF No. 167-1 (11/11/2020 Decl'n) ¶ 20; Ex. 9 (Roby Reply) ¶ 61.

8.     Dr. Stevick reported that the fuel vapor-air mixture provided by the Protectoseal Flame Arrester after the Protectoseal Flame Arrester was submerged in liquid gasoline and removed from that liquid gasoline was not above the UFL because the fuel vapor-air mixture

ignited when subjected to a 0.7 mJ (as reported by Dr. Stevick) ignition source. Exh. 13 (Stevick Reply Report) at 13-14.

9.      The Protectoseal Flame Arrester does not retain sufficient liquid fuel to provide a fuel vapor-air mixture that is above the UFL inside the Protectoseal Flame Arrester. Exh. 15 (Roby Sur-Reply Report) at ¶¶ 14-17 and videos submitted therewith.

10.     The Protectoseal Flame Arrester, according to both Dr. Stevick's and Dr. Roby's stated test results, does not retain sufficient liquid fuel to provide a fuel vapor-air mixture proximate the main container opening that is above the UFL. *Id.*

11.     U.S. Pat. No. 1,814,656 ("Anschicks I") and United States Patent No. 1,725,386 ("Anschicks II") fully characterize to a POSITA all of the attributes of the Protectoseal Flame Arrester. Exh. 16 (Dep. of Glen Stevick, Sept. 7, 2022) at 161:1-162:11; *see also* Exh. 3 (Roby Opening Report) at ¶¶ 190-197.

12.     Attached to Scepter's Memorandum in Support of its Motion for Summary Judgment is an unauthenticated "Rule 26 Report" apparently from an unrelated 2003 lawsuit: "RULE 26 REPORT Regarding *Joshua Showers, et al., v. Wal- Mart Stores, Inc.,* U.S. District Court, District of South Carolina, Case No. 001-3533-19, by Robert J. Mellon, PhD, P.E., Pinnacle Engineering, LLC, 2003. ECF No. 543-17 (the "Mellon Report").

13.     Scepter cites to the Mellon Report to support Scepter's factual assertion that plastic flame arresters were "routine" and were "already used in the industry" before the invention of the Patents-In-Suit. ECF No. 534, 19 n.4, 20 n.5.

14.     In addition to purporting to contain expert opinion evidence, the Mellon Report cites to unidentified, unexplained, unauthenticated "research conducted at Hazen Research in Golden, CO." ECF No. 543-71.

15.     The Mellon Report was neither identified nor referenced in Scepter's Invalidity Contentions. ECF No. 294-1; **Decl'n of Courtney Harrison in Opposition to Summary Judgment** at ¶ 2.

16.     Scepter did not disclose Dr. Mellon as an expert witness. **Decl'n of Courtney Harrison in Opposition to Summary Judgment** at ¶ 6.

17.     Fact discovery on patent infringement and validity in this case closed on May 27, 2022. (ECF No. 393.)

18.     Scepter did not identify, produce or disclose the Mellon Report prior to the discovery deadline in this case. **Decl'n of Courtney Harrison in Opposition to Summary Judgment** at ¶ 2.

19.     The Mellon Report is not identified in Scepter's February 4, 2022 selection of six prior art references per patent. Exh. 6 (Feb. 4, 2022 prior art disclosure).

20.     The Mellon Report was referenced for the first time, in a footnote, in the June 17, 2022 Opening Invalidity Report of Scepter's expert witness Dr. Glen Stevick—well after all applicable discovery and disclosure deadlines. ECF No. 553-1 (Stevick Opening Invalidity Report), at 25 n.12.

21.     The Mellon Report was not attached to or served with Dr. Stevick's Opening Invalidity Report. **Decl'n of Courtney Harrison in Opposition to Summary Judgment** at ¶ 2.

22.     The Mellon Report was never publicly filed in the 2003 *Showers* litigation and cannot be found by searching the court docket. *Id.* at ¶ 3.

23.     The Mellon Report is not currently publicly available. *Id.* at ¶ 4.

24.     The Mellow Report was not publicly available before the priority dates of any of the Asserted Claims. *Id.* at ¶ 5.

25.     The embodiments of a "fuel retention structure" disclosed in the '075 Patent include dams, inverted pockets, flash suppressors having an imperforate dam, and fully perforated flash suppressors. *E.g.*, Exh. 1 ('075 Patent) at 2:63-3:49 and Figs. 7, 16; *see* Exh. 17 (Stevick Opening Report) at 31.

26.     The '075 Patent states as follows:

The present invention seeks to accomplish these goals by employing a method and apparatus which run contrary to conventional thinking, in that rather than cutting off a source of liquid fuel or ignition Sources, an overly rich fuel-to-air ratio is provided within the portable fuel container, thus preventing the possibility of combustion.

Exh. 1 ('075 Patent) at 2:30-35.

27.     The Stevick II article states that "testing and analysis also demonstrate that an inexpensive screen flame arrester can prevent these types of event [*sic*] from occurring," and that "such devices have been on the market without incident for decades . . . ." Exh. 18 (Stevick II) at 10.

28.     In his Opening Report, Dr. Stevick asserts that "as little as 50 mL of liquid volume of fuel will make the vapor concentration inside of a PGC too fuel rich to support combustion." Exh. 17 (Stevick Opening Report) at 56.

29.     A five-gallon fuel container has an internal volume of at least 1190 cubic inches.

30.     When submerged in fresh liquid gasoline and then removed from the fresh liquid gasoline, the Scepter FMD retains approximately 5.7 mL (0.35 cubic inches) of liquid gasoline in its perforations. Exh. 3 (Roby Opening Report) at ¶ 88.

31.     The amount of liquid gasoline retained by the Scepter FMD after being submerged in and then removed from fresh liquid gasoline is sufficient to provide a fuel vapor-air mixture inside the Scepter FMD that is too rich to combust, *i.e.*, above the upper flammability limit. Exh.

3 (Roby Opening Report) at ¶¶ 107-115, 165-171, 194-206, 265-274; ECF No. 194-21; ECF No.

226-6 at 72:20-74:4 ECF No. 226-5 at ¶¶ 23-24.

32.     On July 7, 2020, the PTAB issued its Decision denying institution of Inter Partes

Review of the '075 patent, ruling that:

> (i) the information presented in the Petition does not establish a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim.
>
> (ii) we do not find any evidence or argument that persuades us that these [flame arrester] structures in Stevick II retain sufficient fuel to prevent combustion. … Likewise, we do not find any evidence or argument that persuades us that it would have been obvious to modify these structures to retain sufficient fuel to prevent combustion;
>
> (iii) with respect to the fuel retention limitation, Petitioner focuses [on] the teachings of Elias to 'retain at least 50mL of gasoline in the portable gasoline container to maintain a concentration . . . that is too rich to combust.' … But this is a teaching regarding how much fuel is in the container, not how much fuel is retained in a fuel retention structure. Claim 1 requires that the fuel retention structure itself retains sufficient fuel to prevent combustion, not that the container as a whole retains sufficient fuel to prevent combustion. Thus, we do not find this passage sufficiently demonstrates that it would have been obvious to have a fuel retention structure as claimed.

Exh. 19 at, 2, 9 (emphasis in original).

33.     On July 2, 2021, the PTAB issued its Judgment, Final Written Decision ("'132

FWD") holding that:

> (i) Scepter had failed to establish by a preponderance of the evidence that any of the claims of the '132 patent were unpatentable.
>
> (ii) We also are not persuaded that one of ordinary skill in the art would have reasonably expected success in developing a plastic flame arrestor by taking the dimensions of the metal EAGLE flame arrestor, changing the material to plastic, and then increasing the wire thickness to match the thickness of the plastic flame arrestor of Stevick II.
>
> (iii) Considering all of the evidence and arguments put forth by both parties, we are persuaded that an ordinarily skilled artisan seeking to design a flame arrestor would not have reasonably expected that taking the design of a metal flame

arrestor, and substituting plastic in place of the metal, and then increasing the wire thickness, would yield a successful design.

Exh. 20, at 2, 20-23.

## IV.     ARGUMENT AND AUTHORITIES

### A.     THE CLAIMS OF THE '075 PATENT ARE DIRECTED TO PATENTABLE SUBJECT MATTER

Having lost its indefiniteness arguments as well as its IPR challenges at the PTAB, Scepter now asserts that the apparatus claims of the '075 patent are invalid because they allegedly encompass nothing more than a law of nature or an abstract idea. To support this theory, Scepter mischaracterizes and oversimplifies the claims to allege, incorrectly, that they cover "every possible structure in the neck of a gas can that employs the well-known natural law of a 'too rich to combust' environment." Memorandum at 14. But when the actual language of the claims are properly reviewed as a whole, as required, it is clear they do not simply encompass a "law of nature" or "abstract idea." The '075 patent claims are thus directed to patent ineligible subject matter under *Alice* Step 1.

There is nothing well-known, conventional, or routine about a "fuel retention structure" configured to retain sufficient fuel in a fuel container (or within the structure itself) to inhibit combustion, as reflected in the '075 patent. Indeed, Scepter fails to identify a single such structure that existed in the prior art. Instead, Scepter asks the Court to find that there is no dispute that a POSITA would have been motivated to transform a prior art metal flame arrester into a plastic "fuel retention structure." Scepter makes this argument while ignoring the realities that the PTAB reached (and the Federal Circuit just affirmed) the exact opposite conclusion in the '132 Patent IPR. Ultimately, Scepter's position is devoid of factual support and contradicted by the history of the entire portable fuel container industry.

Scepter's attacks are meritless and, respectfully, Scepter's Motion should be denied.

### 1.  Legal Standards-- Patent Eligibility Under Section 101

Section 101 states, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. This provision contains an implicit exception wherein "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216(2014).

The Supreme Court has explained that courts applying these exceptions must "tread carefully," because "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217. As explained by the Federal Circuit in *Research Corp. Techs. v. Microsoft Corp*:

> this court also will not presume to define 'abstract' beyond the recognition that this disqualifying characteristic should exhibit itself **so manifestly as to override the broad statutory categories of eligible subject matter** and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act.

627 F.3d 859, 868 (Fed. Cir. 2010) (emphasis added). Such an approach is proper because the Supreme Court has long distinguished between principles themselves (which are not patent eligible) and the integration of those principles into practical applications (which are patent eligible). The '075 patent employs principles in practical applications, indeed, applications which are life saving and which have revolutionized the portable fuel container industry.

The Supreme Court has further made clear that an invention "is not [rendered] unpatentable simply because it contains a law of nature or a mathematical algorithm." *Parker v. Flook*, 437 U.S. 584, 590 (1978) (emphasis added). Instead, the analysis turns on whether the invention is limited to "an application of [an unpatentable principle] to a known structure or process." *Diamond v. Diehr*, 450 U.S. 175 (1981) (emphasis in original); *see also Funk Bros. Seed Co. v. Kalo Inoculant*

*Co.*, 68 S. Ct. 440 (1948) ("If there is to be invention from [a discovery of a law of nature], it must come from the application of the law of nature to a new and useful end.").

In its *Alice* decision, the Supreme Court set forth a two-step analysis for patent eligibility under Section 101. The first step asks whether the claim is directed to a law of nature, a natural phenomenon or an abstract idea. If not, the claim is patent eligible. Otherwise, the inquiry shifts to the second step which asks whether the elements of the claim, alone or in combination, show an "inventive concept" that renders the claim patent eligible. *Alice*, 573 U.S. at 217-218.

Patent eligibility is a question of law that may contain underlying issues of fact. *CardioNet, LLC v. Infobionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2019). Such fact-based questions that are "pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

### 2. *Alice* Step 1 is Satisfied; The Claims of the '075 Patent Are Not Directed to an Abstract Idea or a Law of Nature[1]

Step 1 of the *Alice* inquiry considers the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *CardioNet, LLC*, 955 F.3d at 1367; *See also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) ("We have described the first-stage inquiry as looking at the focus of the claims, their character as a whole."). The patent's written description is pertinent in this Step 1 inquiry as it informs the understanding of the claims. *CardioNet, LLC*, 955 F.3d at 1359. *See also Nw. Univ. v. KUKA AG*, No. 21 C 599, 2021 WL 4711538, at *4 (N.D. Ill. Oct. 8, 2021) ("To determine what claims are 'directed to,' court often look to the patent's specification 'to understand the problem facing the inventor' and,

---

[1] The specific basis of Scepter's Section 101 attack is unclear. Throughout its Memorandum, Scepter interchanges "law of nature" and "abstract idea." *See*, *e.g.*, Memorandum at 13 ("law of nature"), 14 ("abstract idea" and "abstract result"). The claims of the '075 Patent are patent-eligible under either theory.

ultimately, what the patent describes as the invention."), citing *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 776 (Fed. Cir. 2019).

The Federal Circuit has further made clear that courts "must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). If the claim is not directed to a patent-ineligible concept under Step 1, the patent is eligible and the inquiry ends. *See*, *e.g.*, *Kuka*, 2021 WL 4711538, *3.

Here, the Asserted Claims of the '075 Patent are directed to more than a natural law, and are not mere abstract ideas. The '075 patent explicitly describes and claims structures, with explicitly defined parameters, that are designed to trap and retain fuel. The claims are thus patent-eligible and the inquiry should end here.

### a) *Scepter Oversimplifies and Mischaracterizes the Claims of the '075 Patent*

To support its summary judgment theory, Scepter falsely posits that "[t]he asserted '075 claims fail *Alice* step one by ***claiming every possible structure*** in the neck of a gas can that employs the well-known natural law of a 'too rich to combust' environment." Memorandum at 14 (emphasis added). Not true at all. In fact, Scepter's own retained expert, Dr. Stevick, identified in his own Opening Report two different embodiments disclosed in the '075 patent that are <u>not</u> covered by the claims of the '075 patent, such as a "dam structure" near the neck of the container and an "inverted pocket" in the neck of the container. Stevick Opening Report at 31. *See also* Exh 1 ('075 Patent) at, *e.g.*, Col. 2:63-Col. 3:49 (describing embodiments including a "neck dam," an "inverted pocket," and a "flash suppressor"). Further, the '075 Patent discloses "fuel retention structures" that are not located in the neck of the can, such as an absorbent sponge-like material located in the main body of the container. *Id.*; Stevick Opening Report at 31.

Claims 1 and 12 (the only independent claims) specifically require a "perforated" fuel retention structure. A "perforated" dam plainly would not be an effective fuel retention structure. Nor does such a dam rely on "intermolecular forces" to retain liquid fuel in the fuel container.[2] This alone dooms Scepter's Motion. Scepter's related argument, that the claims of the '075 patent "effectively preempt all future methods of exploiting a natural law," is thus equally without merit. *See* Memorandum at 21-23.[3] So, too, is Scepter's attorney argument made without evidentiary support that the claims cover "any plastic device with holes placed inside a portable fuel can." *See* Memorandum at 22-23.

Scepter's attempted distortion of the actual claims of the '075 patent is the exact approach the Federal Circuit has consistently warned against. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) ("And we have reiterated the Supreme Court's caution against 'overgeneralizing claims' in the § 101 analysis, explaining that characterizing the claims at 'a high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.'") (internal citations omitted).

Accordingly, Scepter's patent eligibility challenge is groundless.[4]

---

[2] The '075 Patent also discloses a flash suppressor or fuel retention structure that has both a perforated section and an imperforate fuel retaining wall that creates a fuel-retaining pocket adjacent the opening of the container—*i.e.* a dam. *See, e.g.*, Exh 1 ('075 Patent) at Fig. 7, 10-15 col. 3:31-42. *See also* Fig. 3 (showing an annular dam structure located proximate to the neck that is not perforated), Col. 5:40-51.

[3] Scepter also asserts that nothing would hypothetically preclude "Mr. Cray from suing the manufacturer of a traditional prior art flame arrester so long as it happens to retain enough fresh gasoline to be too-rich-to-combust." *Id.* at 22-23. Yet Scepter, despite challenging the validity of the claims of the Patents-In-Suit for nearly four years, has not identified any such prior art product. Scepter's hypothetical accusations are specious.

[4] Scepter also conflates Step 1 and Step 2 of the *Alice* inquiry, alleging (incorrectly) that "perforated structures are conventional" and "have been used in the neck of gas cans for decades to stop the spread of flames." Memorandum at 17. Scepter then points to a traditional metal flame arrester, the type of structure that was specifically distinguished during prosecution of the '075 patent and

### b)  The Asserted Claims Are NOT Merely Directed to an Abstract Idea or Law of Nature

The Asserted Claims of the '075 Patent are not generically directed to a method of preventing explosions in a portable fuel container that requires nothing more than the step of retaining sufficient fuel in the fuel container to provide a fuel vapor-air mixture that is above the UFL. Instead, as even a cursory reading of the '075 patent reveals, the claims are directed to a portable fuel container having discrete physical elements, one of which is a perforated "fuel retention structure" that is specifically configured to retain sufficient liquid fuel to provide a "too rich to combust" fuel vapor-air mixture proximate to the container opening (claim 1) or within the "fuel retention structure" itself (claim 12). Those claims are anything but "abstract" or generic. Those claims, when properly considered as a whole, are directed to a fuel container with improved safety features which can (and have been) readily manufactured in the millions, not an abstract idea or law of nature.

The written description of the '075 patent confirms this reality. For example, there is nothing in the written description that prior art fuel containers were previously employing the techniques disclosed in the '075 patent for inhibiting combustion inside a portable fuel container. *See CardioNet*, 955 F.3d at 1370 (finding claims eligible under Step 1 where, *inter alia*, there was "no suggestion" in the written description that techniques of the patent were "previously employ[ed]" and written description "confirms that the asserted claims are directed to a specific technological improvement.").

---

relied upon heavily by Scepter in its failed IPR challenges of the Patents-In-Suit. Those points aside, whether a structure was "well-understood, routine, and conventional" is a fact specific inquiry that is part of the *Alice* Step 2 analysis. As established below in Section 3(a), a perforated "fuel retention structure" was not well-known, conventional, or routine at the time of the invention of the '075 patent.

To the contrary, the '075 Patent explains that while traditional prior art flame arresters were "intended to keep the flame or spark from entering a portable fuel container,… [such devices] may not prove sufficient to defeat combustion when a user removes the flame arrestor or pours fuel directly onto [a] fire." '075 Patent at 2:22-26. Moreover, as explained in the Cray Declaration, traditional prior art flame arrestors rely on a completely different principle of operation than the claimed inventions of the '075 patent. *See* Exh. 8 (Cray Decl'n) at ¶¶ 3-4.

This is because the '075 Patent seeks to prevent explosions "by employing a method and apparatus which ***run contrary to conventional thinking***, in that rather than cutting off a source of liquid fuel or ignition sources, an overly rich fuel-to-air ratio is provided within the portable fuel container, thus preventing the possibility of combustion." *Id*. at 2:30:35 (emphasis added). The '075 Patent discloses numerous embodiments to accomplish this goal, including dams, inverted pockets, absorbent pads and flash suppressors. The Asserted Claims are thus directed to new and useful improvements in fuel containers. Their life-saving safety attributes are achieved through specific, novel structures that retain sufficient fuel to provide a fuel vapor-air mixture that is too rich to combust; consequently, they are patent eligible. *See*, *e.g.*, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016).

Accordingly, entry of summary judgment ***against*** Scepter on its § 101 defense is therefore proper without consideration of *Alice* Step 2. *Kuka AG*, 2021 WL 4711538, *3. *See also* ECF No. 549 at pp. 49-50.

### 3.  *Alice* Step 2 | The Asserted Claims Include an "Inventive Concept"

Though the Court need not reach Step 2 of the *Alice* inquiry, the Asserted Claims plainly satisfy this part of the test and are patent-eligible for this reason, as well.  In this second step, the Court considers "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible

application." *CardioNet*, 955 F.3d at 1368. This second step is a "search for an inventive concept – *i.e.* an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* If, in considering the claim elements individually and as an ordered combination, they merely recite well-understood, routine, and conventional steps, they will not constitute an inventive concept for patent eligibility purposes. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

"Whether something is well-understood, routine, and conventional, to a skilled artisan at the time of the patent is a factual determination" that "goes beyond what was simply known in the prior art." *Berkheimer*, 881 F.3d at 1369. "Because the patent challenger bears the burden of demonstrating that the claims lack patent eligibility, 35 U.S.C. § 282(a), there must be evidence supporting a finding that the additional elements were well-understood, routine, and conventional." *See id*. at 1371.

There is no reliable evidence to support Scepter's "well-understood, routine, and conventional" assertions. The inventions within the '075 patent were and remain revolutionary. Consequently, entry of summary judgment in favor of No Spill on Scepter's proffered §101 defense is therefore proper for this reason, as well.

> a)  *The Inventions of the Asserted Claims of the '075 Patent Were Not Well-Known, Conventional or Routine*

The Asserted Claims of the '075 patent are directed to an "inventive concept" that is a "new and useful" application of the principle of "too rich to combust." Claims 1 and 12 of the '075 Patent, for example, include at least the following inventive concepts that were neither conventional, well-known, nor routine:

- a fuel retention structure sized to fit inside the neck of a fuel container proximate the main container opening;

- wherein the fuel container also includes a fuel dispensing structure;

- wherein the fuel retention structure includes perforations to permit the fuel to flow out of the container; and

- wherein the fuel retention structure either: (1) has an imperforate fuel retaining wall that seals up against the main container opening to provide a dam such that the container cannot be completely emptied and a fuel vapor-air mixture above the UFL is maintained proximate the main container opening as a result of the liquid fuel retained by the dam; or (2) the perforations retain a sufficient amount of liquid fuel to provide a fuel vapor-air mixture above the UFL proximate to the main container opening.

Examples of such structures can be found in Figures 3 and 7-19 of the '075 Patent.

The dependent claims include limitations which become progressively more detailed about the structure of the "fuel retention structure" of claims 1 and 12. Claim 4, for example, requires that: (1) the "fuel retention structure" be further configured to receive a conventional gasoline pump nozzle; (2) the perforations of the "fuel retention structure" be configured such that liquid fuel is required to flow through them in order to fill the container with fuel; and (3) the perforations be further configured to allow at least 5 gallons of fuel per minute to flow through the "fuel retention structure." Claim 9 specifies that the "fuel retention structure" must: (1) have a sidewall and a bottom wall that are both at least 25% open; (2) be formed of a synthetic resin (unlike the prior art metal flame arresters in safety cans); and (3) have perforations with an open area of "not more than 0.05 square inches." Claim 17 imposes, among other things, length limitations for the "fuel retention structure." These detailed structural requirements of a novel "fuel retention structure" can hardly be considered well-known, conventional, or routine.

Notably, many of these structural requirements are also present in the claims of the '132 Patent, <u>claims that Scepter has not alleged are invalid under § 101</u>.[5] That is because these structural requirements, considered as a whole as they must be, are not conventional, well-known, or routine.

Scepter's Memorandum is devoid of any evidence that fuel retention in a portable fuel container was well-known, conventional, or routine. Indeed, there is no evidence in the record that *any type of device* had been used to retain sufficient fuel in a portable fuel container to provide a fuel vapor-air mixture that was too rich to combust, much less a "fuel retention structure" specifically configured to do so as required by the Asserted Claims, let alone that such devices were well-known, routine and conventional. Scepter never explains why, if the inventions within the '075 patent were so well known, it went on a crash course to duplicate No Spill's FMD within Scepter's U.S.-sold portable fuel containers four years <u>after</u> the priority date of the '075 Patent.

Indeed, the PTAB has held just the opposite. *See, e.g.*, Exh. 19 ('075 IPR Institution Decision) ("we do not find any evidence or argument that persuades us that these structures in Stevick II retain sufficient fuel to prevent combustion"). Scepter's own paid expert (Dr. Stevick), who claims substantial expertise in this field, never suggested retaining liquid gasoline in a fuel container as a solution to the problem of gas can explosions. Rather, he explicitly stated in 2012 that a thin disc flame arrester was the solution to the problem. *See* Exh. 18 (Stevick II) at 10 ("an inexpensive screen flame arrester can prevent these types of [explosive] event [*sic*] from occurring."). *See also* Exh. 11 (Roby Tr.) at 40, 50 ("when I saw what [Mr. Cray] had done and I still remember saying to my partner, Mr. Carpenter, darn, I wish I'd have thought of that… Hence the genius of Mr. Cray's device").

---

[5] Scepter's retained expert Dr. Stevick did not opine that any claim of the '132 Patent is patent-ineligible. Exh. 17 (Stevick Opening Report) at 216-217.

### b) Scepter's "Evidence" Under Alice Step 2 is Deficient

Scepter failed to present any evidence that fuel retention to provide a "too rich to combust" mixture was conventional or well-known, so instead, Scepter generically asserts that "perforated FMDs already existed in the prior art for decades." Memorandum at 24, citing Stevick Opening Invalidity Report at p. 24 . That is meaningless because, as already established as a matter of law, such "perforated FMDs" were traditional flame arresters that were specifically distinguished during prosecution of the '075 Patent and that were found lacking by the PTAB. Exh. 19 (Institution Decision) at 7; Exh. 20 ('132 IPR FWD) at 9. Indeed, the '075 Patent specifically distinguishes these typical flame arrestors, explaining that the solution of retention of fuel accomplished by the claimed inventions "*run[s] contrary to conventional thinking*, in that rather than cutting off a source of liquid fuel or ignition sources, an overly rich fuel-to-air ratio is provided within the portable fuel container." Exh. 1 ('075 Patent) at 2:30-35.

Scepter next asserts that "the claimed result of a too-rich-to-combust environment created by intermolecular forces cannot qualify as an inventive concept, as this was well known in the prior art." Memo at 24, citing page 26 of Dr. Stevick's 6/21/2022 Report for support. Not so.

No Spill disputes the validity of Dr. Stevick's flawed testing in this case. *See* ECF No. 553. Regardless, Dr. Stevick's report (solely cited and relied upon by Scepter for the above proposition) contains no such discussion or opinion. *See* Exh. 17 at 26. Rather, Dr. Stevick states only the fact that the "flammability range for gasoline is 1.4% to 7.6%" and that this "law of nature and its applicability was well known in the art as of 2012."[6] *Id*.

---

[6] Dr. Stevick supported Scepter's denial of the flammability limits prior to the *Markman* hearing and the Court's Order rejecting Scepter's indefiniteness allegations. *See, e.g.*, ECF 194-2.

Scepter's argument that a "synthetic resin" "fuel retention structure" was also well-known, conventional, or routine also misses the mark. Again, the PTAB (and the Federal Circuit) have already rejected Scepter's assertion that a POSITA would have made metal flame arresters out of plastic.

In an effort to evade the import of this dispositive authority, Scepter has now cited and attempted to rely upon the unauthenticated, inadmissible, hearsay Mellon Report. (*see* SAFs X-X, *supra*) The Mellon Report does not establish any *admissible* material facts.[7]  Even if the Mellon Report was admissible, which it is not, it does not change the result. Nothing in the Mellon report makes any mention of fuel retention. It is of no import, and the fact that Scepter would attempt to resort to it at the eleventh hour is revealing

There is no evidence of record of any prior art device or fuel container structure that retained sufficient liquid fuel to provide a fuel vapor-air mixture that is above the UFL. This, too, was another argument Scepter attempted before the PTAB which was explicitly rejected. '075 Patent Institution Decision at 9.

### 4.  The Cases Cited by Scepter Are Inapt

Scepter's attempt to align the system claims of the '075 Patent with the method claims at issue in the Federal Circuit's decision in *American Axle* misses the mark. In *American Axle*, a sharply divided court held that one of the claims at issue there was "directed to a natural law because it clearly invokes a natural law, ***and nothing more***, to accomplish a desired result." *American Axle & Manufacturing, Inc.*, 967 F.3d at 1297 (emphasis added). More specifically, the

---

[7] *See e.g. Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders*, No. 16-1094-JTM, 2018 WL 5962876, at *14 (D. Kan. Nov. 14, 2018), *as amended* 2019 WL 1014727 (D. Kan. Mar. 4, 2019) (granting motion to strike expert opinion not disclosed pursuant to Rule 26 expert disclosure deadlines).

majority explained that the claim called for "controlling the mass and stiffness" of a liner to match relevant frequencies to dampen vibrations, which "requires use of a natural law relating frequency to mass and stiffness—i.e., Hooke's law," which describes the relationship between an object's mass, its stiffness, and the frequency at which the object vibrates. *Id*. at 1293-1294. Ultimately, the majority concluded that the challenged claim "simply requires the application of Hooke's law to tune a propshaft liner." *Id*. at 1292.   The majority thus concluded that the claim merely "define[d] a goal" of "tuning a line" to achieve "vibration attenuation," but failed to identify any specific steps or structures to achieve it. *Id*. at 1293. Because the claim at issue lacked "any physical structure or steps for achieving the claimed result," the majority found the claim patent ineligible. *Id*. at 1295.

As explained in Section I(B) above, the '075 claims are plainly different because they require specific defined structures—*i.e.* something more than just a natural law—to reduce the risk of gas can explosions. The '075 claims here are more akin to claim 1 at issue in *American Axel*, consideration of which the Federal Circuit remanded to the district court because "the mere fact that any embodiment practicing claim 1 necessarily involves usage of one or more natural laws is by itself insufficient to conclude the claim is directed to such natural law." *Id*. at 1300.[8]

Scepter's reliance on *Interval Licensing* (Memorandum at 15, 19, 22-23) is equally misplaced. There, the Federal Circuit considered claims to "[a] computer readable medium ... encoded with one or more computer programs for enabling acquisition of a set of content data and display of an image or images generated from the set of content data on a display device during

---

[8] The Federal Circuit remanded for full consideration of whether the broader concept of "tuning" was an abstract idea. *Id*. No Spill respectfully submits, for the reasons stated throughout this Opposition and in No Spill's Motion for Summary Judgment, that the claims of the '075 patent are not directed to an abstract idea.

operation of an attention manager." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1339–40 (Fed. Cir. 2018). After commenting about the difficulty of assessing computer software-related inventions under § 101, the Federal Circuit held that the challenged claims were ineligible as they "failed to recite a practical way of applying an underlying idea." *Id*. at 1343. *See also id*. at 1343 ("[r]ecitation, as in this case, of the collection, organization, and display of two sets of information on a generic display device is abstract absent a 'specific improvement to the ways computers [or other technologies] operate.'"). The '075 patent has nothing to do with computer software-related concepts.

*Two-Way Media* is also readily distinguished. The claims at issue there "generally relate[d] to a system for streaming audio/visual data over a communications system like the internet". *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1333 (Fed. Cir. 2017). In affirming a rejection of the claims under Section 101, the Federal Circuit explained that "[n]othing in the claims or their constructions, including the use of "intermediate computers," requires anything other than conventional computer and network components operating according to their ordinary functions." *Id*. at 1339. Unremarkably, the Federal Circuit concluded that "merely reciting an abstract idea performed on a set of generic computer components, as claim 1 does here, would 'not contain an inventive concept.'" *Id*. The inventions of the '075 patent are not generic computer components and the analysis and holding of *Two-Way* is thus irrelevant.

In summary, the claims of the '075 Patent pass both steps of the *Alice* analysis. The claims are neither directed to "nothing more" than a law of nature, nor an abstract idea. The claims also include inventive concepts that were not well-known, conventional, or routine. Scepter's motion for summary judgment should be denied. Instead, summary judgment should be entered holding that the '075 claims are patent eligible under §101.

**B.**     **THE SCEPTER ACCUSED PRODUCTS INFRINGE, AND NONE OF THE CLAIMS OF THE '132 PATENT ARE INVALID IN LIGHT OF THE PURPORTED PROTECTOSEAL FLAME ARRESTER (PRODUCT)**

Scepter has admitted that all but one element—the "too rich to combust" element—of the Asserted Claims of the '132 Patent, are found in the Scepter Accused Products. *See* ECF No. 549 at 22-24. Simple testing of Scepter's FMD easily establishes that it infringes the '132 patent because it creates an internal environment which is too rich to combust. In an effort to try to slip the noose of this reality, Scepter essentially posits that the opinions of its retained expert Dr. Stevick concerning too rich to combust should be believed over the contrary opinions of No Spill's expert, Dr. Roby.   But Scepter did not to file a *Daubert* motion challenging *any aspect* of Dr. Roby's testing or opinions; consequently, there is no basis at this juncture, as part of the instant motion, to discredit any of anything Dr. Roby's opinion.   Conversely, No Spill has challenged the veracity of Dr. Stevick's testing and conclusions with its pending *Daubert* challenge. ECF No. 553. Therefore, at most, a "battle of the experts" concerning "too rich to combust" exists here. This battle of the experts itself establishes, however, that Scepter's motion for summary judgment should be denied because there are genuine issues of material fact which are in dispute, and the facts asserted by Dr. Roby are not subject to a *Daubert* challenge.

In reality, as established in No Spill's Motion for Summary Judgment (ECF No. 549), Dr. Roby has tested the Accused Products and found that: (1) the Scepter FMD retains over 5 mL of liquid gasoline and has an internal volume of only 5.3 cubic inches[9] (which neither Scepter nor

---

[9] Notably, Dr. Stevick has asserted that as little as 50 mL of fresh gasoline in a five gallon container will provide a fuel-air mixture in the headspace of the container that is too rich to combust. Stevick Invalidity Report at 56. A five gallon container has an internal volume of approximately 1190 cubic inches. It is thus not surprising that the 5.69 mL retained by the Scepter FMD, which has an internal volume of only 5.3 cubic inches (Roby Opening at ¶ 215), is sufficient to provide a fuel vapor-air mixture inside the FMD that is too rich to combust.

Dr. Stevick have measured or contested) (Exh. 3 (Roby Opening Report) at 28-29); and (2) this amount of retained fuel is sufficient to inhibit combustion as required by the Court's *Markman* Order (Exh. 3 (Roby Opening Report) at 33-34; Exh. 9 (Roby Reply) at 19-23); *see also* Videos submitted with Exhibits 3 and 9 to No Spill's MSJ. Indeed, Scepter admits this (again) in its Statement of Undisputed Facts in this very Motion:

> 40.    The results of Dr. Roby's "dipped" and "shake" tests "demonstrated that the fuel retention characteristics of the [accused] FMD provide a mixture in the interior of the [accused] FMD that was too rich to burn when the fuel was retained in the structure, but allowed ignition to occur when the fuel was shaken from the FMD."  (Ex. F, 6/21/2022 Roby Report at ¶ 200.)

ECF No. 534 at 8. Claim coverage is not reasonably in dispute.

Scepter argues that Dr. Stevick has tested the Scepter FMD and concluded that it does not retain sufficient fuel to inhibit combustion. Memorandum at 27, 33-34 In addition to the fact that No Spill has challenged Dr. Stevick's test methodology and opinions via *Daubert*, these purported tests performed by Dr. Stevick **were never actually produced**. Rather, Scepter simply asks the Court to accept Dr. Stevick's unsubstantiated *ipse dixit* and enter summary judgment of non-infringement in the face of No Spill's overwhelming evidence to the contrary.

Alternatively, Scepter asks the Court to invalidate the Asserted Claims of the '132 Patent—claims that the PTAB and Federal Circuit have already affirmed are valid over the prior art—based on additional testing added by Dr. Stevick in his Reply Expert Report. But Dr. Stevick and Scepter admit that Dr. Stevick's testing proves that the Protectoseal Flame Arrester did **NOT** retain sufficient liquid fuel to provide a "too rich to combust" fuel vapor-air mixture.

Scepter's non-infringement and invalidity theories are wholly without merit. No Spill moves the Court to deny Scepter's Motion for Summary Judgment, and sustain No Spill's Motion for Summary Judgment of Claim Coverage and Validity (ECF No. 539).

**1. Dr. Stevick's Opinions About His Purported and Undisclosed "Tests" of the Scepter FMD Are Irrelevant and Insufficient to Manufacture a Non-Infringement Defense**

Scepter attempts to walk away from its infringement admission regarding Dr. Roby's "too rich to combust" testing quoted above by positing that Dr. Stevick performed tests showing that the Scepter FMD "ignited under both the 'dipped' and 'shake' tests" at a mere 0.4 mJ and thus does not retain sufficient fuel to inhibit combustion. Memorandum at 27, 33.

But, tellingly, neither Dr. Stevick nor Scepter has produced any images, videos, or descriptions of those purported tests on the Scepter FMD, despite the fact that Dr. Stevick previously testified that it is BEAR's practice to "videotape every test we do." SAF 45, citing 11/13/2020 Stevick Depo. at 17:18-18:1). Neither Scepter nor Dr. Stevick provided any timely explanation of how Dr. Stevick was able to achieve such an undocumented result in the face of all of the other contrary testing in this case. There is thus a dearth of admissible or reliable evidence to support Dr. Stevick's assertion that there is no infringement. Such *ipse dixit* from an expert is insufficient to manufacture a genuine dispute of material fact. *See*, *e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (Court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). *See also Cellspin Soft, Inc.v. Fitbit, Inc.*, No. 4:17-cv-5928, 2022 WL 2784467, at *8-9 (N.D. Cal. June 15, 2022) (holding that as it pertains to summary judgment, it is insufficient to point to an expert's conclusory opinion when the expert fails to provide a sufficient explanation of the testing and analysis done to support that opinion).

For these reasons, and for those established in No Spill's co-pending Motion for Summary Judgment of Claim Coverage (ECF No. 549 at 24-27), No Spill respectfully submits that entry of summary judgment that the Scepter Accused Products are covered by the Asserted Claims of the '132 Patent is proper.

### 2. The Experts Agree That the Protectoseal Flame Arrester Does Not Retain Sufficient Fuel to Provide a Fuel Vapor Air Mixture That is Too Rich to Combust

Dr. Stevick's "testing" of the Protectoseal Flame Arrester itself confirms that the Protectoseal Flame Arrester does not retain sufficient liquid fuel to provide a fuel vapor-air mixture. *See* Memorandum at 27, Chart A (reporting that the Protectoseal Flame Arrester ignited in both the "dipped" and shake tests with only a 0.7 mJ ignition source). This fact alone is fatal to Scepter's invalidity defense premised on the Protectoseal Flame Arrester. This reality also confirms that the Protectoseal Flame Arrester product fails to disclose any relevant features beyond those disclosed in the Anschicks patents such that the Protectoseal Flame Arrester is cumulative of the Anschicks patents.[10] It follows that the Protectoseal Flame Arrester is not available to Scepter as prior art due to the IPR estoppel. *See* No Spill MSJ (ECF No. 549) at 30.

As with Dr. Stevick's, Dr. Roby's testing demonstrated that the Protectoseal Flame Arrester did not retain sufficient fuel to provide a fuel vapor-air mixture above the UFL. Exh. 15 (Roby Sur-Reply) at ¶¶ 14-15, *see also* video exhibits submitted with Exh. 32 to No Spill MSJ. There is thus no dispute of material fact that the Protectoseal Flame Arrester does not satisfy the "too rich to combust" claim elements and does not invalidate any of the Asserted Claims of the '132 Patent. *See* SAF 47-50.

---

[10] This is all the more evident from Scepter's Memorandum, which exclusively cites a figure from the Anschicks '386 Patent as representative of the Protectoseal Flame Arrester "that ha[s] been on sale since the 1920s." Memorandum at 17.

For these reasons, and those established in No Spill's Memorandum in Support of its Motion for Summary Judgment of Validity (ECF No. 549), the Court should enter an Order holding that the '132 Patent is valid over the Protectoseal Flame Arrester.

### 3.   Dr. Stevick's Purported Testing Methodology is Fundamentally Flawed, Irrelevant, and Unreliable

Faced with undisputed evidence of infringement, and with both sides' experts agreeing that the Protectoseal Flame Arrester ignites during the Cray test and thus does not satisfy the "too rich to combust" claim elements, Scepter asserts that Dr. Stevick was able to "replicate" Dr. Roby's "dipped" and "shake" test results using the Protectoseal Flame Arrester and that the Asserted Claims are thus somehow invalid. Memorandum at 29-30. These assertions are groundless and entry of summary judgment in favor of No Spill regarding validity of the Asserted Claims over the Protectoseal Flame Arrester, alone or in combination with the other references relied upon by Scepter, is appropriate.

Unlike Dr. Roby's testing and analysis, which determined whether the Accused Products are covered by the Asserted Claims, Dr. Stevick sought only to improperly "replicate" the ***results*** of Dr. Roby's testing but with the Protectoseal Flame Arrester. As Dr. Stevick confessed in his Reply Report:[11]

> For this testing we began by ***replicating Dr. Roby's spark tests*** … **and then decreased the spark energies and spark gaps** ***until we saw something approximating Dr. Roby's results.*** …

---

[11] Dr. Stevick did not do these purported "tests" with his Opening Invalidity Report. Rather, he waited until service of his Reply Report. Scepter's proffered justification for this fails as Dr. Roby's tests have remained the same throughout the case.

Exh. 13 (Stevick Reply) at 13-14 (emphasis added). More specifically, Dr. Stevick purportedly reduced the energy of his spark source using a variac[12] until he achieved a macro result where the "Protectoseal product performed exactly like the accused product did in Dr. Roby's test for infringement: failing to ignite in the 'dipped' test and igniting in the 'shaken' test.'" *Id*. at 14. From this, Scepter takes the leap of logic that the Protectoseal Flame Arrester must invalidate the Asserted Claims of the '132 Patent. *Id*. at 27 ("a Protectoseal device that has been on sale since the 1920's performs the same under those exact tests"), 29 ("As Dr. Stevick lowered the spark energy to 0.5 mJ, however, he found that the Protectoseal product behaved in the exact way that Dr. Roby finds infringing").

It is thus evident that Dr. Stevick's "testing" was not designed to determine whether a device—here, the Protectoseal Flame Arrester—retained sufficient fuel to provide a fuel vapor-air mixture that is above the UFL as required by the Court's claim construction Order. *See* ECF No. 257 at 9. In fact, nowhere does Dr. Stevick opine, nor does Scepter argue, that the Protectoseal Flame Arrester actually retains sufficient fuel to provide a fuel vapor-air mixture that is above the UFL. *See* Memorandum at 27-33, *generally*. Nor could they, for the reasons explained in Section B.1 above.

Instead, Scepter simply argues that because Dr. Stevick's contrived test—which admittedly used a spark from a litigation inspired spark source having an energy level known to be grossly insufficient to ignite the full combustible range of gasoline vapors—was able to replicate Dr. Roby's results, the claims must be invalid.

---

[12] As explained in No Spill's *Daubert* Motion, Dr. Stevick's "testing" is inherently unreliable and inadmissible. *See* ECF No. 553.

Dr. Stevick's result oriented testimony is inadmissible. *See* generally ECF No. 553. Even if admissible, Stevick's "testing" is meaningless, or at best, creates a dispute between experts. Accordingly, Dr. Stevick's opinions regarding the Protectoseal Flame Arrester do not warrant summary judgment in Scepter's favor. *See*, *e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-5810, 2017 WL 6729295, at *8 (S.D.N.Y. Dec. 28, 2017) (excluding opinions by Dr. Stevick that "reverse-engineer[ed] a theory to fit the desired outcome" and thus "does not reveal the scientific method at work").

At best, Dr. Stevick's purported testing, if considered, does nothing more than establish that the Protectoseal Flame Arrester is just that—a (double walled) metal flame arrester that does not retain sufficient fuel and thus relies on the same thermal quenching abilities as the metal flame arresters specifically distinguished during prosecution of the '075 Patent. Scepter's invalidity attacks are without merit.

### 4. Scepter's "Estoppel" Argument is Groundless

Scepter next argues that No Spill should be "estoped" from pointing out the fatal flaws in Dr. Stevick's testing methodology or his specially crafted spark source. *See* Memorandum at 29-31. Scepter's "estoppel" theory is devoid of a single legal citation because the equitable doctrine of estoppel is irrelevant

The doctrine of equitable estoppel "prevent[s] a party from taking a legal position inconsistent with an earlier statement or action that places his adversary at a disadvantage." *JP Morgan Tr. Co. Nat. Ass'n v. Mid-Am. Pipeline Co.*, 413 F. Supp. 2d 1244, 1275–76 (D. Kan. 2006) (citing *Spaulding v. United Transp. Union*, 279 F.3d 901, 909 (10th Cir. 2002)). The elements of such an estoppel are as follows: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting

the estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel must rely on the other party's conduct to his injury. *Id.* Furthermore, "mere reliance is not enough—such reliance on an adversary's misrepresentations must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* (quotation omitted). This is a standard that Scepter cannot meet.

None of the required elements for estoppel exist here. Scepter's allegation that No Spill somehow "refused over and over" to provide any particular spark energy is false. *See* Memo at 30-31. As Dr. Roby explained in a declaration submitted ***nearly two-years ago*** on November 11, 2020, a POSITA would know that a spark source must provide at least 4 mJ of energy to properly test the flammability limits of gasoline vapors. ECF No. 167-1 at ¶¶ 16-21. *See also* Exh. 9 (Roby Reply Report) at ¶ 59. To quote Dr. Roby's November 2020 declaration (which also included the following image taken from Lewis and Von Elbe for context):



Fig. 171. Minimum ignition energies of combustible–air mixtures in relation to the stoichiometric percentage in air.

18.     Furthermore, this graph shows that the ignition energy for these hydrocarbons near the lean and rich flammability limits (shown by where the curves approach a vertical asymptote) rises only to 2 mJ to 4 mJ.  Thus, any spark ignitor that produces 4 mJ or more of spark energy will be able to ignite a fuel/air mixture of any hydrocarbon or mixture of hydrocarbons that is within the flammability limits.  The figure also shows that the range of ignition energies for propane/air mixtures is not significantly different than those for other hydrocarbon/air mixtures including Benzene and Hexane, both of which are common components in gasoline.  Thus, an ignitor, such as the piezo-electric type used on many propane grills, is capable of igniting gasoline vapor/air mixtures just as readily as it can ignite propane/air mixtures over their respective flammability limits.  Similarly, a spark plug capable of igniting gasoline vapors can just as readily ignite propane.  Thus, the mechanism for providing a spark for testing the flammability of a fuel/air mixture is not dependent on the type of mechanism creating the spark.

19.     As long as the spark has an energy of approximately 4mJ or more, any spark will ignite any gasoline/air mixture within the flammability limits.  Thus, since both the ignitor used

…

ECF No. 167-1 at ¶¶ 17-18 (emphasis added).

Dr. Roby further provided detailed calculations of the spark energy of the CSE spark ignition source (approximately 10.6 mJ, more than double the necessary 4 mJ of energy required) which are reproduced below:

| discharge time (s) | | |
|---|---|---|
| end | start | Dt (s) |
| 0.0002662 | 0.0001283 | 0.0001379 |
| | | |
| current (A) | | |
| peak | baseline | dI (A) |
| 0.05450 | 0.0003 | 0.05416 |
| | | |
| peak voltage (V) | | |
| 2842.6 V | | |
| | | |
| Energy = W*s = ∫V*I *dt | | |
| | | |
| Energy | 0.0106 J | |
| | 10.6 mJ | |

Exh. 12. Dr. Roby explained that the same spark plug ignition source has been used by CSE for years for funded research and was used by CSE for all of the CSE tests in this matter (other than those that used the commercially available CAMCO ignitor at Scepter's insistence, which, incidentally, also confirmed all of Dr. Roby's other test results).[13] Exh. 9 (Roby Reply) at ¶ 63.

Scepter's allegations that Dr. Roby's detailed discussion of spark energy and his calculations of the spark energy generated by the CSE testing apparatus are merely "conclusory" are thus false. *See* Memorandum at 31-32. So, too, are Scepter's assertions that there is "unrebutted" evidence that "establishes" Dr. Roby's calculations are incorrect. *See* Memorandum at 8 (SoMF ¶43), 31-32. Scepter also ignores the fact that CSE and Dr. Roby tested the Scepter FMD using the same methodology but using a CAMCO Spark Ignitor and the Scepter FMD did not ignite in the "dipped" test, again showing that the Scepter FMD retained sufficient fuel to provide a fuel vapor-air mixture that is above the UFL.  Exh. 9 (Roby Reply) at ¶ 70. *See also* videos submitted with Exhibit 9 to No Spill MSJ.

In short, Dr. Stevick and Scepter know that the ignition energy of Dr. Stevick's purported "testing" of the Protectoseal Flame Arrester was far below that necessary to cover the flammable range of the fuel vapor-air mixture and thus fails to show that the Protectoseal Flame Arrester meets the "too rich to combust" claim elements. Scepter's attempt to circumvent this intentionally crafted and thus unreliable result by alleging that No Spill and Dr. Roby are somehow "estopped" from pointing out the shortcomings in Dr. Stevick's "testing" fails.

---

[13] This is in direct contrast to the multiple (unreliable) spark sources that Dr. Stevick has created and used specifically for the purposes of this litigation. *See* ECF No. 187-07 (Roby December 2020 Declaration) regarding Stevick's Allanson Ignitor; *see also* ECF No. 553.

### 5.   Scepter Misrepresents Dr. Roby's Testimony Regarding a "Comparative Test"

Scepter next attempts to justify Dr. Stevick's contrived Protectoseal Flame Arrester tests by alleging, without citation, that "under Dr. Roby's own testimony, the 'dipped' and 'shake' tests are a comparative test where the results speak for themselves without needing to know the spark energy." Memorandum at 32. This is not correct.

Dr. Roby did not testify that spark energy does not matter in establishing infringement. Rather, as explained above in Section B.2, Dr. Roby clearly explained that a POSITA would know a spark energy of at least 4 mJ is necessary to test whether a device retains sufficient fuel to provide a fuel vapor-air mixture that is above the UFL. SoMF 35; Exh. 9 (Roby Reply) at ¶¶ 56-66.

In the testimony cited by Scepter (Memorandum at 33)[14], Dr. Roby testified that the testing reported in the Cray declaration was "demonstrating" the "principle of too rich to burn" and a POSITA would understand the test was "a comparative circumstance, not an absolute circumstance." Exh. 11 (Roby Tr.) at 177:9-179:4. Dr. Roby further testified:

> And the point of what Mr. Cray did was, and what I got from it, and what I believe a person of ordinary skill in the art would get from it is, with the same ignition source, when you wrap the metal flame arresters and took them out and use that ignition source, you were able to get ignition, which meant inside there, it was within **the flammability limits that would correspond to the spark energy of the device he was using**.

> And when you did that with the No Spill FMD, it did not ignite, which tells me that you were outside the flammable region **as defined by the spark energy for the same spark device** he was using for the two of them.

> This is a **side-by-side comparison demonstration**, and I think it's very effective.

Exh. 11 (Roby Tr.) at 190:6-21. Further, this "side-by-side" demonstration in the Cray Declaration was comparing the fuel retention performance of the No Spill FMD against prior-art metal flame

---

[14] Scepter also cites to SoMF 21 (Memorandum at 33), but that SoMF is irrelevant to Scepter's argument. Presumably, Scepter intended to cite SoMF 42.

arresters to distinguish them during prosecution. *See id*. *See also* ECF No. 559 (*Markman* Tr.) at 44:11-45:6.

Furthermore, Dr. Roby did not testify that the "shake test" was a necessary component to determine claim coverage—*i.e.* whether a device retains sufficient fuel to provide a fuel vapor-air mixture above the UFL. Rather, Dr. Roby testified that the "shake" test was also "a demonstration of principle;" stated otherwise, the "shake" test was not a "quantitative test" but rather a "demonstration."  Exh. 11 (Roby Tr.) at 169:3-173:1. And what it demonstrated was that the subject FMD did not ignite in the "dipped" test because of the retained fuel, not because it was below the LFL as Scepter previously argued. *Id*.

There is thus nothing that Dr. Roby needed to "recant" or "distinguish" from his prior testimony, and Scepter's attempt to manipulate this testimony to justify Dr. Stevick's flawed testing methodology fails.

### 6. As the PTAB Previously Found, and the Federal Circuit Has Now Affirmed, a POSITA Would Not Have Been Motivated to Make a Metal Flame Arrester Out of Plastic

To try to create another dispute between experts, Scepter next argues that "Dr. Roby ignores Dr. Stevick's evidence" that a POSITA allegedly would have been motivated to make a double-walled Protectoseal flame arrester out of plastic. Memorandum at 35. Apart from the procedural irrelevance of this argument, As demonstrated below, this representation is factually false. Moreover, Scepter fails to mention that it made this same argument—*i.e.* that a POSITA would have been motivated to make a metal flame arrester out of plastic—in both the '075 Patent IPR and the '132 Patent IPRs *and lost both times* under the "preponderance of the evidence" standard applicable to IPR proceedings.

To quote the PTAB's Final Written Decision in the '132 IPR:

We also are **not persuaded that one of ordinary skill in the art would have reasonably expected success in developing a plastic flame arrestor by taking the dimensions of the metal EAGLE flame arrestor**, changing the material to plastic, and then increasing the wire thickness to match the thickness of the plastic flame arrestor of Stevick II. …

On this record, **we find that metals and plastics <u>differ significantly</u> in their abilities to conduct and absorb heat**. Considering all of the evidence and arguments put forth by both parties, we are persuaded that **an ordinarily skilled artisan seeking to design a flame arrestor <u>would not have reasonably expected that taking the design of a metal flame arrestor, and substituting plastic in place of the metal, and then increasing the wire thickness, would yield a successful design</u>**.

Exh. 19 at 20, 24 (emphasis added). *See also* Exh. 20 ('075 Institution Decision) at 45. This holding, omitted by Scepter, which was unanimously affirmed on October 5, 2022 in a Rule 36 *per curiam* decision by the Federal Circuit.  *See* ECF No. 561-1.

This omission by Scepter aside, Dr. Roby directly addressed Scepter's and Dr. Stevick's now finally rejected assertion that a POSITA would be motivated to simply make a metal flame arrester like the Protectoseal flame arrester out of plastic. As Dr. Roby explained, Dr. Stevick merely repackaged the arguments Scepter made at the PTAB during the IPR proceedings. Exh. 9 (Roby Reply) at 167-169, *citing* prior section VII(C)(4). *See also id.* at 99-105 (Section VII(C)(4)) (explaining reasons a POSITA would not make a plastic version of a metal flame arrester, particularly a double-walled metal flame arrester). In short, Dr. Roby explained why factors such as, *inter alia*, the vastly different thermal inertias, melting points, and thermal conductivities of metal and plastic would lead a POSITA away from making a metal flame arrester out of plastic. *Id.* Dr. Roby thus did not "ignore" Dr. Stevick's arguments as Scepter alleges; rather, Dr. Roby again proved them to be incorrect as the PTAB already found.

Similarly, Dr. Roby did not "ignore" Dr. Stevick's assertions regarding the purported open area of the Protectoseal Flame Arrester as Scepter asserts. *See* Memorandum at 35. Rather, Dr. Roby identified shortcomings in Dr. Stevick's calculations because Dr. Stevick's calculations

considered only the outer wall of the Protectoseal Flame Arrester—a double-walled device— and thus failed to account for the inner wall. Exh. 9 (Roby Reply) at ¶ 166.

## V.        CONCLUSION

Scepter's motions for summary judgment should be denied. The "075 patent is fare more than an abstract idea constituting a law of nature. It is an ingenious life-saving invention which specifies explicit structural parameters to manufacture a portable fuel container which creates an environment which is too rich to combust. The '132 patent is not invalid. Scepter's continuing efforts to ignore what the IPRs have held, and which the Federal Circuit has now affirmed, are meritless. Scepter cannot establish, as a matter of law and without dispute of material fact, that its Accused Products do not infringe No Spill's patents.

Respectfully submitted,

STINSON LLP

By:  *s/Douglas R. Dalgleish*
      Douglas R. Dalgleish, KS #22328
      Bradley J. Yeretsky, KS #21092
      Courtney J. Harrison, KS 27553
      Zachary H. Hemenway, #21092
      Stinson LLP
      1201 Walnut Street, Suite 2900
      Kansas City, MO 64106
      Tel: (816) 842-8600
      Fax: (816) 691-3495
      doug.dalgleish@stinson.com
      brad.yeretsky@stinson.com
      courtney.harrison@stinson.com
      zachary.hemenway@stinson.com

      Andrew J. Scavotto   (*admitted pro hac vice*)
      Stinson LLP
      7700 Forsyth Blvd., Suite 1100
      St. Louis, MO  63105-1821
      Tel:  (314) 719-3048
      Fax:  (314)259-3959
      andrew.scavotto@stinson.com

      LEWIS RICE
      Robert M. Evans, Jr.
      Michael J. Hartley
      600 Washington Ave., Ste. 2500
      St. Louis, MO 63101
      Tel: (314) 444-7600
      revans@lewisrice.com
      mhartley@lewisrice.com
      *Attorneys for Plaintiff No Spill Inc.*

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby states that on this 7th day of October, 2022, a true and correct copy of the foregoing was filed with the Court using the CM/ECF system, which sent notice of electronic filing to the following:

Joseph M. Rebein, KS #25912
Jordan T. Bergsten, KS #78639
B. Trent Webb, KS #15965
Laurie A. Novion, KS #19406
Scott Sayler, KS #70402
Ryan D. Dykal, (*pro hac vice*)
Lydia C. Raw, (*pro hac vice*)
Stefon David, (*pro hac vice*)
SHOOK, HARDY & BACON, L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
jrebein@shb.com
jbergsten@shb.com
bwebb@shb.com
lnovion@shb.com
ssayler@shb.com
rdykal@shb.com
lraw@shb.com
      sdavid@shb.com

      ***Attorneys for Defendants***

                            */s/Douglas R. Dalgleish*
                            Attorney for Plaintiff